UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division


PETER TRAUERNICHT, ET AL.        }
                                 }
v.                               }     Civil Action No.
                                 }     3:22 CV 532
GENWORTH FINANCIAL, INC.         }
ET AL.                           }

                                       March 15, 2023

COMPLETE TRANSCRIPT OF MOTION TO DISMISS
BEFORE THE HONORABLE ROBERT E. PAYNE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

Lauren Kuhlik, Esquire
TYCKO & ZAVAREEI
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC  20006

John C. Roberts, Esquire
Natalie Finkelman Bennett, Esquire
MILLER SHAH LLP (PA-NA)
1845 Walnut Street, Suite 806
Philadelphia, Pennsylvania  19103
     Counsel on behalf of Peter Trauernicht, et al.


Eugene Scalia, Esquire
Anna L. Casey, Esquire
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036

Brian E. Pumphrey, Esquire
McGUIRE WOODS LLP
2812 Emerywood Parkway, Suite 220
Richmond, Virginia  23294
     Counsel on behalf of Genworth Financial

KRISTA M. LISCIO, RMR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

2

(The proceeding commenced at 1:34 p.m.)

THE CLERK:  Case Number 3:22 CV 532.  *Peter Trauernicht, et al. v. Genworth Financial Inc. et al.*

The plaintiffs are represented by Lauren Kuhlik, John Roberts and Natalie Finkelman-Bennett.

The defendants are represented by Brian Pumphrey, Eugene Scalia and Anna Casey.

Are counsel ready to proceed?

MR. SCALIA:  Yes, we are.

MR. ROBERTS:  Yes.

THE COURT:  All right.

This is a motion to dismiss.  I'll hear you now on it.

Who's going to argue from the defendants?

MR. SCALIA:  Your Honor, I'm Eugene Scalia. I'll argue for the defendants.

THE COURT:  All right.

MR. ROBERTS:  And, Your Honor, John Roberts for plaintiffs.

THE COURT:  All right.

MR. SCALIA:  Good afternoon, Your Honor.  Eugene Scalia.

In addition to my co-counsel who were introduced, members of the Genworth Financial legal team are here as well:  Greg Karawan, Winston Brownlow, and

Nelson Wilkinson.

THE COURT:  All right.

MR. SCALIA:  Your Honor, from the very start this has been a very unusual case where the plaintiffs claim that it was a fiduciary breach to hold a series of so-called target date funds, or TDFs, which were among the most popular in the market holding virtually 10 percent of the market, which were ranked the highest rating by a respected financial advisor, Morningstar, and which actually were having an enormous amount of inflows of new investment, including in the year 2020, Your Honor, when there were more inflows to this particular series of TDFs than any other TDF series.

Nonetheless, against those kinds of facts, the plaintiffs are trying to claim it's a fiduciary breach. As I say, Your Honor, this was always a challenging case because no court has ever held that you can base a fiduciary breach claim on simply holding a fund that was not performing particularly well.  Never been held.

Now, as you know, Your Honor, we've got three different cases involving these particular funds in which the Courts have said it was not imprudent to hold these funds.  Well, under a basic *Twombly* standard, as you know, Your Honor, even supposing a course of conduct might be consistent with the breach – it's not – but even supposing

it were, their case still fails if that course is also consistent with a proper fiduciary course.

Here we already have three cases where the federal judges have said it was not imprudent to hold these funds.

THE COURT:  No, they know that the complaint wasn't sufficient.

MR. SCALIA:  I'm sorry, Your Honor?  The complaint plus what?

THE COURT:  You're talking about the cases in which they held the complaint wasn't sufficient.

MR. SCALIA:  That's correct, Your Honor.

And those complaints are virtually identical to the complaints here.  The core allegation --

THE COURT:  They say not so, according to what they filed in this motion this morning.  And what they say and what they filed does appear to be somewhat different than the *Hall* case and the *Tullgren* case out of the Alexandria division.

MR. SCALIA:  Different, Your Honor, in --

THE COURT:  They say that it is different in a way that is dispositive of your motion.  What do you think about what they say?

MR. SCALIA:  Your Honor, they're plainly wrong. Judge Nachmanoff, in his two decisions, made clear that he

was deciding those cases on two, and he said, independent grounds. The first was you can't bring a fiduciary base -- a fiduciary breach case based simply on a claim that an investment was not performing well. That is what they've brought here. At the end of the day, their complaint --

THE COURT: They didn't say it wasn't performing well. They say that -- that isn't the limit of what they say, as I read their complaint. Am I wrong about that?

MR. SCALIA: Respectfully, Your Honor, --

THE COURT: Where does it say that in the complaint? Maybe I just misread it.

MR. SCALIA: Your Honor, their complaint, from start to finish, is about the alleged underperformance of the BlackRock TDFs. And their claim is that because of the performance those TDF funds should have been let go.

No court has ever held that there's an obligation to drop a fund simply because it's not performing well. And remember, Your Honor, their complaint also alleges, or at least before the Court has proper judicially noticeable evidence of the fact, that this had the highest rating from Morningstar, which probably the most respected investment analyst. And it had an enormous amount of inflows. Those are the facts before the Court.

And the first of the two independent grounds of Judge Nachmanoff was that poor performance is not enough to file -- find a fiduciary breach.  Their case remains --

THE COURT:  I just -- I think that that's an overreading of what was held there because if you're a fiduciary and you choose to invest in a fund or a stock and it begins to go down, and go down, and go down, and go down, the first thing that happens is that you're supposed to watch it and see what happens.  And if it goes down, and you -- a little bit and you sue, then maybe what you're saying is correct.  But if it goes down a whole lot, say 40 percent, you can be sued for keeping it in a portfolio, can't you?

MR. SCALIA:  Your Honor, our position is that on performance --

THE COURT:  Nobody in their right mind would keep a stock that has tanked down 40 percent.

MR. SCALIA:  And that's the key, Your Honor.  Nobody in their right mind would hold it.  Or put differently, no prudent fiduciary would hold it.

Here, virtually 10 percent of the market held it.  Three Courts have held that these same plaintiffs' counsel have not adequately alleged that it was imprudent for others to hold it.  It can't, therefore, have been imprudent for Genworth to hold it.

And then in terms of --

THE COURT:  Why not?  Because if Genworth had its own standards that you had to measure it by, as it appears that they did, if those standards were not met then it would be imprudent for the fiduciary to continue to hold it, they say.  What's wrong with that theory?

MR. SCALIA:  Your Honor, what's wrong with that theory is, first, that it's a total mischaracterization of the investment policy statement or IPS of Genworth Financial.  When you actually read that document, what you see is it identifies a number of different criteria to consider in whether to retain a fund.  Past performance is only one of a number of those considerations.

What plaintiffs have done in the paragraphs of their complaint that they point out to you where they say, oh, this case is totally different, they have, first of all, ignored all the other criteria which that plan document says you ought to take a look at.

And then secondly, when it comes to that one criterion, they have both applied only half of it.  They have then misstated what that criterion is.  And then finally, they have misstated the fact.

So let me break that down:  First of all, again, there are a number of other factors that that document which they rely on says you ought to look at.  Those

include who the managers are, those include the investment strategy of the fund.  Nobody drops a fund just because of past performance.  They ignore those criteria.

THE COURT:  Well, that's a fact issue is the circumstances under which -- when people drop the fund, though, isn't it, –

MR. ROBERTS:  Respectfully --

THE COURT:  – when a trustee or a fiduciary drops an asset?

MR. SCALIA:  Respectfully, Your Honor, I have to say the Courts have uniformly held that past performance alone is not a reason because we know that past performance is not necessarily indicative of future performance.  It can be something to look at.

But then if I could talk about what this document says about past performance, Your Honor.  It identifies two benchmarks to consider.  The plaintiffs ignore one of two benchmarks in saying that Genworth did not proceed properly.  They ignore one of the two benchmarks that Genworth was to look at.

And then finally when it comes to the benchmark that the investment policy statement did say should also be considered, the plaintiffs really misdescribe and misrepresent what that investment policy statement says. It doesn't say you must drop the fund if it is not

performing as well as the S&P Index.  It does not say that at all.  It says it could --

THE COURT:  I don't think they say that either.

MR. SCALIA:  They do, Your Honor.

THE COURT:  They say they should have.

MR. SCALIA:  That lands in the same place, Your Honor.

THE COURT:  Well, there's a difference between the two words.  Whether you must or should, there's a difference.

MR. SCALIA:  Their case distills to the contention, Your Honor, that this document required that Genworth drop this fund, and that it was a breach not to do so.  That's not what the document says.  It says that a fund, quote, could, unquote be dropped if you looked at that performance.  It doesn't obligate the managers to drop the fund.  That's simply not what the document --

THE COURT:  I don't think they're saying that it should have been dropped simply because that that was what the document said.  They're saying that the benchmark was a set in the document, and that therefore the criticism that there's no benchmark is ill-placed.  And that's where the fighting ground is on this point, I think.

MR. SCALIA:  Your Honor, I agree with that.  And just to comment again on that, this question about the

benchmark, remember, that is the second of the two grounds on which Judge Nachmanoff decided his decision. And the case involving *Microsoft* in Washington state, that second ground wasn't even reached. There's this separate ground that complaining about performance alone does not constitute a fiduciary breach.

But if I could talk again about the benchmark, remember that S&P Index was only one of two benchmarks. Plaintiffs make no allegations about what this other benchmark showed, and so the fiduciaries could reasonably have looked at the second benchmark and said this is okay. This is fine.

With respect to the S&P Index, Your Honor, --

THE COURT: That's fine. But is that an issue that's addressed at this stage of the proceedings?

MR. SCALIA: It is, Your Honor, under *Twombly*.

THE COURT: But what you're -- no, but the problem I have with your argument, and with the decisions you have cited, is that it seems to me that you're taking *Twombly* and *Iqbal* to a place that the Fourth Circuit says it doesn't go. We can't decide the whole case on the basis of the pleadings.

As long as the pleadings are adequate until the day under those tests, and the cases decided in the Fourth Circuit applying *Twombly* and *Iqbal*, the plausibility test,

then the rest of it is reserved for the later aspect of litigation after discovery is had, it seems to me.

And it is an error, according to the Fourth Circuit, for district courts to apply *Twombly* and *Iqbal* so stringently as to make the entire case be made in the complaint. And so I -- the cases on which you rely raise the question in my mind whether or not what you're really asking is for an enhanced pleading standard under ERISA cases because of the fiduciary aspect.

And is there -- is there some rule that says that there is a special heightened pleading under 12(b)(6) to satisfy 12(b)(6) that a complaint has to meet a higher standard than otherwise?

MR. SCALIA: Your Honor, there is no special rule for ERISA under 12(b)(6).

However, if I can emphasize, first of all, the Supreme Court's decision in the *Hughes* case very recently where they were at pains to emphasize that when a district court reviews an ERISA fiduciary breach case under 12(b)(6), the Court ought to give, quote, due regard to the range of reasonable judgments, end quote, that a fiduciary could make based on their experience.

Here, it was well, well within the range of reasonable judgments for a fiduciary to say this is a well-regarded fund. It's got the highest rating. The

market is moving toward it.  There are no red flags, and we're going to hold on to this fund.  That was well within the range.

And the Supreme Court in that case, and in the *Dudenhoeffer* case, has expressed concern about ERISA fiduciary breach cases being forced into discovery in a manner that will make plan managers more hesitant to make the right decision, to hold onto funds during a period of lower performance.

The other point --

THE COURT:  Well, that, in essence, is an argument that there is sub rosa, an enhanced pleading standard, for ERISA cases because of a desire to protect the -- against too timid an approach in the management of the -- in the discharge of the fiduciary duty that ERISA performs.

And I'm not quite sure I understand those cases to mean that, that there is such an enhanced standard.

MR. SCALIA:  Your Honor, I think what I would say --

THE COURT:  Because otherwise to consider what you're talking about, you have to know an awful lot to know whether or not it was within the reasonable range. So, therefore, somewhere the reasonable range has to be established.  Where does it get established in your mind?

MR. SCALIA: It gets established in part, Your Honor, by examining how the market as a whole is behaving.

THE COURT: How do you do that and be faithful to the rule of 12(b)(6), which is that you consider the complaint?

MR. SCALIA: You consider the complaint, but there are also documents that were incorporated by reference in the complaint which we have attached to our motion which Courts --

THE COURT: Some of them.

MR. SCALIA: That's correct. And those --

THE COURT: What's the cite on *Hughes* again?

MR. SCALIA: I can provide that to you in a moment. It's a Supreme Court decision I believe from just last term, Your Honor. I'll have it to you in a moment.

And so what I would say is that *Hughes* --

THE COURT: Do you know, it's *Hughes* against whom?

MR. SCALIA: It's *Northwestern University*, Your Honor.

THE COURT: *Hughes against Northwestern*.

MR. SCALIA: And that decision was cited repeatedly by Judge Nachmanoff in explaining his decision. We've cited it repeatedly in our briefs. And the Judge in the *Beldock* case, which also concerned these same

allegations, he also relied on *Hughes* in making the point he did.

Your Honor, just a couple of other observations about 12(b)(6). Remember, the plaintiffs in this case have had the opportunity to get some discovery, and it just hasn't turned up what they would have wanted. What it shows is a fiduciary committee that's very engaged. It's meeting -- it's meeting with an investment advisor who's an independent fiduciary to them. It has its counsel joining in on those meetings. It's putting different funds on a watch list.

So they've actually gotten the benefit of discovery, which ERISA plaintiffs often don't get at the motion to dismiss stage, and yet still they've fallen short.

The other, I think, extremely important point, Your Honor, if we're going to focus on the complaint, and we should --

THE COURT: Well, that's what the focus of a 12(b)(6) motion is, is the complaint.

MR. SCALIA: And, Your Honor, --

THE COURT: I realize there's some problems with some of these documents being considered.

MR. SCALIA: Your Honor, you mentioned earlier an investment was going down 40 percent. Nobody was

holding it.  That's not the facts that plaintiffs have alleged here.

And if you look at Paragraphs 48 to 50 of the complaint, and we talked about this in our filing this afternoon, what the plaintiffs' own allegations show is that for the period of time where they allege their performance of the Genworth funds as against the benchmark, the BlackRock funds were gaining on those TDF indices.

THE COURT:  Does it say that in the complaint?

MR. SCALIA:  Yes.

THE COURT:  Where does it say that?  Help me, again.

MR. SCALIA:  Your Honor, if you look at pages, particularly 29 to 30 of the complaint, what you will see there is that the BlackRock TDFs are actually performing --

THE COURT:  Just a minute.  Let me get there.

MR. SCALIA:  Yes, sir.

THE COURT:  Page 29, which one of these charts? There are several charts here.  Which one do you want me to look at?

MR. SCALIA:  I would like to focus you on the chart at the top of Page 29 first, Your Honor.

THE COURT:  "3-Year Return as of 1Q19."

MR. SCALIA:  Exactly.

THE COURT:  All right.

MR. SCALIA:  And the second line is the line I would draw your attention to.  This is the S&P Index, which is the index mentioned in the Genworth IPS.

THE COURT:  "Outperformance vs S&P."

MR. SCALIA:  Right.  And what you will see, if you have it in color, is that the first three -- these are for people retiring in 2020, 2025, 2030.  The first three, the index is doing slightly better.  You know, .16 percent better.

But then if you look at the next five, Genworth -- I'm sorry, BlackRock is doing better.  And so in this particular chart on the three-year --

THE COURT:  When is the class period?

MR. SCALIA:  The class period, at the time they filed the complaint, started in 2016.  This is not even midway through --

THE COURT:  So what's that got -- what do these things have to do -- this chart have to do -- 2016 to when?

MR. SCALIA:  Until the time they filed in 2022.  It's a six-year period.  And here we are --

THE COURT:  What I have is 2020, and 2025, and 2030, and 2035.

MR. SCALIA:  Those are the years in which the participants in the plan would retire.  The way a TDF works is you target the retirement date.

THE COURT:  The three-year period would be first quarter of '16 to the first quarter of '19?

MR. SCALIA:  That's correct.  This is a three-year look back.

And what you see, Your Honor, is that at this point in time, we're not even halfway into the class period.  The BlackRock funds are outperforming the index five out of the nine times.  This isn't your example, Your Honor, of a 40-percent drop.  This is actually the BlackRock funds --

THE COURT:  Well, I wasn't suggesting, and didn't mean to suggest, that it was a 40-percent drop and that they allege that.  I was testing the validity of the assertion which you made on a rather broad basis that it seemed to be there wasn't any limit to it.  And it seems to me there is a limit to the principle that you're arguing, and that is it can certainly be a situation where the -- if the complaint alleged X, then it would pass muster, and X was the extreme of a 40-percent drop.  That's all I was talking about here.

MR. SCALIA:  I understand, Your Honor.

But what you see is that actually the BlackRock

funds, according to plaintiffs' own allegations, were actually beating the index about half the time halfway into the class period on a three-year basis.

The next chart I would point you to, Your Honor, is the third from the bottom on that page. This is the second quarter of 2019, three-year returns. And what you see again is there are nine different so-called suites, nine different retirement targets in these columns.

THE COURT: We're talking about the Sharpe ratio as of second quarter in '19?

MR. SCALIA: No, Your Honor. This is the third chart from the bottom. It's right below the --

THE COURT: "3-Year Return as of 2Q19."

MR. SCALIA: Exactly. And what you see is, again, there are nine target dates. For four of the nine, BlackRock is again beating the S&P Index. If you flip over to the next page, you look at the three-year return of three -- of the third quarter of 2019. Again, three of the nine times, the BlackRock TDF are outperforming the index.

And the same thing is true if you go back to the Fourth Circuit of 2018, which is on Page 28. And so, Your Honor, when you look at plaintiffs' own allegations about the performance of these BlackRock funds against the index, what you see -- and this actually is reflected in

the very early years all the way back to 2017, and even the end of 2016.  The BlackRock funds are continually doing better, and better, and better when measured against that index.  And what happens, Your Honor, is that when we get to -- and now I'm on Page 30.  When we get to the third quarter of 2019, plaintiffs stop telling you what happened.  And we know why.  Because these funds kept doing better.

THE COURT:  Where do we see that?

MR. SCALIA:  Well, you see it in part in the complaint they first filed in this case which showed that even against the comparators, the other investments which they cherrypicked as benchmarks, even against those, their original complaint showed that in 2022 the BlackRock funds were actually frequently outperforming.  And so what they've done, Your Honor, in this complaint, they don't even give you performance allegations for three --

THE COURT:  Let's take on Page 29 they point to the charts that have been cited above on 20 -- on Page 29, and on -- and you start back.  And it says at the end of the charts midway on Page 29, it says, "As of the end of the Second Quarter of 2019, a fiduciary prudently monitoring BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and

risk-adjusted performance issues compared to both the comparator TDF and the S&P Indices."

So they have posited an explanation for what those charts show, right, in that -- in that statement?

MR. SCALIA:  Well, Your Honor, --

THE COURT:  Isn't that what that does?

MR. SCALIA:  Respectfully, no.  I mean, this is their opinion.  These are conclusory summary allegations.

THE COURT:  I said in that statement they have posited an interpretation of what the charts, the three preceding charts, above that text say.  Isn't that what they say?

MR. SCALIA:  They have posited a theory, Your Honor, but that's different than properly pleading facts under *Twombly*.  The facts they have pled are not --

THE COURT:  What I want to know is what's wrong with their statement there?  Have you got 29 in front of you?

MR. SCALIA:  Yes, I do.

THE COURT:  As of the end -- it's the middle of Page 29.  They -- "a fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above."

So the trend identified above I suppose is where they start with these charts that go back on Page -

MR. SCALIA:  They start at Page 21, Your Honor.

THE COURT:  - 21.

MR. SCALIA:  And I would be pleased to go back and look at that with you because it proves the opposite. Their own alleged facts are the opposite of their summary conclusion because what these charts show is the gap between the S&P Index and the BlackRock funds keeps getting smaller.  The BlackRock funds are gaining every quarter on this three-year rolling basis until, like, the third quarter of 2019 they've caught up.  And once they've caught up, plaintiffs just stop alleging any facts about the relative performance.

And that's really important, Your Honor, for two reasons.  First, again, we have to go with the facts that they allege, not the labels and conclusions they put on them.  The facts that they alleged were that in 2016 there was a 1.21 difference where BlackRock was behind, and that by 2020 BlackRock was at times ahead.

So the trend that's shown over these three years is the BlackRock funds were actually doing better against Genworth's chosen index.  No reasonable fiduciary would say, well, that is underperform that compels me to drop them even if the BlackRock IPS said what it did.

But the other thing I want to emphasize, Your Honor, is they only give you comparative performance

information for the first three years of the six-year class period that they look at.  And so from this quarter -- the fourth quarter of 2019 on, they stop.  And so for the last half of the class period, they're not even telling you there are not allegations.  That's because in their original complaint they were embarrassed by the fact that BlackRock kept gaining, kept doing better, which just demonstrated how mistaken it would have been to drop funds based on a relatively short-term period of lower performance.  And so plaintiffs just stop even making the allegation about what the performance was for the second half of that six-year class period.

        And so again, Your Honor, the 40 percent drop, I know you're not saying the plaintiffs alleged a 40-percent drop.

        THE COURT:  I think you can put that back.  I mentioned it, I said, for a limited purpose.

        MR. SCALIA:  But what the actual pled facts here are different in kind.  And that's not only factually important, ultimately it's legally important.  Because if you look, for example, as the Sixth Circuit's *CommonSpirit* decision by the chief judge of the Sixth Circuit last summer, very similar set of allegations.  And that decision talks about how we would be folly to adopt an approach toward ERISA fiduciary breach cases where

fiduciaries always felt obligated to switch into the highest performing fund at that moment.

THE COURT:  What case are you citing?

MR. SCALIA:  That is the *CommonSpirit* case, Your Honor.  I can provide a cite for you to that in just a moment.

I can provide you a cite right now to the *Hughes* case, by the way.

THE COURT:  All right.

MR. SCALIA:  *Hughes* is 142 S.Ct. 737.  142 S.Ct 737.

THE COURT:  Uh-huh.

MR. SCALIA:  The *CommonSpirit* case is actually *Smith v. CommonSpirit*, 37 F.4th 1160.  We cited it in our brief.  Judge Nachmanoff relied on it.  A Judge in the *Beldock* case relied on it as well.

The -- if I could make just another point, Your Honor, about these performance charts because you have shown this great interest in them.  We have been looking at the three-year rolling averages, but these charts also show the five year.  So if we go back to Page 29, for example, at the top is the three year and then the next is the five year.

And what you will see is that the differences on the five year tend to be a little bit bigger.  In other

24

words, if you looked back five years, the BlackRock TDFs hadn't done as well as they did over the last three years. That is more evidence, Your Honor, that the BlackRock TDFs were continuing to gain and eventually catching up and surpassing the S&P Index because the five years include, evidently, years four and five, which weren't as good for BlackRock.  But the more recent years keep getting better and better.  That's why the plaintiffs own allegations are further evidence that performance was actually good and steadily improving.

To take you again back to the investment policy statement, which plaintiffs want to rely on, what that referred to was significant underperformance.  This is not significant underperformance.  This is a fund that, like any investment, will have highs and lows over a 40- or 50-year period, and was rebounding.  And then again look at the broader context, a gold rated fund.  A fund that right around this time in 2020 more people in the market went this to particular TDF than any other TDF.  It would have been eminently reasonable for fiduciaries in that context to hold on to this particular investment, and that's why the plaintiffs' allegations fail, Your Honor.

THE COURT:  Well, where do we know that more people were going to these funds than anybody else -- any other fund, where is that?

MR. SCALIA:  That is in ECF 75-5.  So it's ECF 75, Page 5.  And this is an exhibit to our motion to dismiss.  It's citing a document that plaintiffs themselves had cited.  And so, again, it's ECF 75-5.

And I apologize.  It's Page 6.

And here's what it says:  "Vanguard Dethroned for the First Time Since 2008."  It says, "A new winner among target-date series emerged in the annual race for most inflows.  BlackRock LifePath Index collected almost $22 billion in its mutual funds and CITs in 2020."

So, Vanguard had been the most popular TDF from 2008 to 2019.  But, Your Honor, smack dab in the middle of the class period, the market is saying BlackRock TDFs are great.

And so, Your Honor, plaintiffs and Genworth agree on one really important part about ERISA, and that is that you consider the context.  And the context is not only what the IPS said, which is that severe underperformance could result in something being dropped.  The context is also the other benchmark, which plaintiffs don't make an allegation about.  And the context is also the approval that these funds are getting in the market, which Judge Nachmanoff made note of, which the *CommonSpirit* decision made note of.  They are relevant considerations for ERISA fiduciaries.

And then there's the fact that the committee minutes, which plaintiffs --

THE COURT:  How do I know they're relevant factors for the fiduciaries?

MR. SCALIA:  Well, --

THE COURT:  How can I conclude that?  Is that in the complaint?

MR. SCALIA:  Your Honor, I think, respectfully, I think --

THE COURT:  Common sense says it is.

MR. SCALIA:  Common sense, and numerous cases. The *CommonSpirit* case, Judge Nachmanoff.  So two other decisions, in other words, in this district.  I believe the *Beldock* case.

THE COURT:  You have to consider what's in the complaint, and that's it, unless there's some reason to consider documents outside the complaint such as the document is incorporated in the complaint.

MR. SCALIA:  And that's what we have here.

THE COURT:  But you have documents that -- what is the document you're relying on to show me, again, that the -- that everybody was flocking to BlackRock, what exhibit is that?

MR. SCALIA:  It's the -- it's Exhibit E to our motion to dismiss.  And the ECF number is 75-5.

There are other places in our motion to dismiss where we explain that --

THE COURT: The Morningstar report?

MR. SCALIA: Exactly. And the Morningstar reports were mentioned in the complaint, and so they are fairly used in the motion to dismiss. And the plaintiffs, Your Honor, they've never objected. They've never objected to our use of these documents.

THE COURT: It doesn't look like it. But the rule is not that they're mentioned in the complaint. It's that they're mentioned and integral -- mentioned in, and integral to, the complaint to consider the documents.

MR. SCALIA: And they make substantial investigations based in part on these particular Morningstar reports to characterize how BlackRock's funds -- these BlackRock funds operated. And we've put them with our motion with zero objection by the plaintiffs at any point. And remember, Your Honor, this case has been briefed not once but twice, and they've never said it's not right to bring these in.

And again, if you look at the *CommonSpirit* case, Judge Nachmanoff's decision, these are the kinds of evidence of the market out as a whole that courts commonly consider on 12(b)(6).

THE COURT: Well, they're not except in

technical cases.  Generally, you don't consider all this kind of material.  They didn't object to it.

MR. SCALIA:  That's correct, Your Honor.

THE COURT:  So I guess that's where we.

What this approach to analyze -- to the application of Rule 12(b)(6) really is beyond that which is contemplated by 12(b)(6), which doesn't involve the analysis of complicated documents.  That usually is done at the summary judgment stage where some experts or witnesses testify to what it means.

So if the Court doesn't have to serve as expert by substitution in adopting the view of what the complex report says by -- of one side or the other.  And the more you place into the analytical equation, these complex documents, the more you're asking the Court to make factual determinations, that's what later processes seem, to me, to be for.

I don't know that you're wrong at all in the assertions that you make.  I just -- you're entitled, I think, however, to make them and they're going to have to argue about them because they pled all these charts, and put all these charts in their complaint, which I guess they did because somebody had criticized it in another forum for being too skimpy.

MR. SCALIA:  They made that choice, Your Honor,

and they waived any objection.

Your Honor, you've been generous in the time you have permitted me.  I would like to reserve a little time for rebuttal.

If I could just wrap up with just three points.  The first, there was not underperformance of these funds.  These funds, for example, coming back again to Page 30, in the third quarter of 2019, they gained 6.25 percent, 7 percent, as much as 9 percent.  Plaintiffs' allegations is just that the index gained slightly more.  But again, as I've been explaining to you, when you actually look at the actual facts that they put in versus their conclusory assertions and arguments about the facts, what you see --

THE COURT:  Where are you on Page 30 attempting to show the gain?  What are you doing?  Which chart?

MR. SCALIA:  So the chart refers to the three-year returns as of 3Q19, and then you see BlackRock TDF.  You see 6.25, 7.05, 7.74.

THE COURT:  And what is that?

MR. SCALIA:  That is a percent gain over that three-year period.  These funds are gaining.

And again, --

THE COURT:  What's the red line below that?

MR. SCALIA:  That's how much less or more the gain is.

THE COURT:  Well, the red is at the 6.25 under 2020 target date is .47 percent below what other funds are doing, is that the way you read it?

MR. SCALIA:  It's half of a percent -- less than half a percent, Your Honor.

THE COURT:  I said .47 percent.

MR. SCALIA:  So less than half a percentage point.  For that particular one --

THE COURT:  But that 6.25 percent gain that you're talking about that BlackRock had is actually -- how do you put it?  Less than half a percent of what the indices -- the others were gaining in other indices, is that right?  I want to make sure I'm reading the chart right.

MR. SCALIA:  That's correct, Your Honor.  In other words, the S&P Index would have been at 6.72 instead of 6.25.

THE COURT:  So for all the period -- for each of the bench target dates that are listed, and that's one, two, three, four, five, six, seven, eight, nine, the BlackRock is underperforming the index.

MR. SCALIA:  It's not, Your Honor.

THE COURT:  Or six of the nine.

MR. SCALIA:  That's correct.  And then if you --

THE COURT:  And the nine, it is at -- for three

of the nine, it is outperforming the index, is that right?

MR. SCALIA:  That's correct for that particular three-year look back.  But if you turn the page --

THE COURT:  But since we're talking about that, that's what I want to know.

MR. SCALIA:  That's correct.

And in the prior page, it shows that in other recent quarters there were five of the nine with the BlackRock or four of the nine.  This just isn't the significant underperformance.  In fact, it's positive performance that entire time.

THE COURT:  Well, how can you say it's positive when it's below the indices for two thirds of the period -- two thirds of the target dates?  Excuse me.

MR. SCALIA:  Because if you look, for example, at the 2050 series, it gained 9.37 percent in value over a three-year period.  That's a very substantial improvement in the value of the fund.  Again, coming back to the scenario where the fund is losing a lot in value, that's not happening here.  And I just wanted to be clear that that's not even plaintiffs' own allegation that these funds were losing value.

THE COURT:  But the question you were raising is whether it's significant.  And isn't whether it's significant something that has to be determined on the

basis of a factual record rather than a 12(b)(6) motion?

MR. SCALIA:  Respectfully, no, for many reasons, Your Honor.  Remember, first of all --

THE COURT:  How about taking the fundamental principle that 12(b)(6) is the test of sufficiency of the complaint, and that -- and as long as it alleges something that's plausible, then it's to be allowed to go forward? And here, their allegation is taking what your argument is.  Your argument is that BlackRock did pretty well in each of the target years -- as to each of the target years - these are forecast because they're forward looking as of 2019 - in an absolute way, but that BlackRock underperformed the S&P TDF index six out of those nine years, nine target date years.

MR. SCALIA:  But, Your Honor, --

THE COURT:  And that it was below by some amount, whatever you want to say.  If it was significant, that's a different issue.

The best performing comparator TDF in every year of those nine, and that it was at -- it was even worse than the worst performing comparator TDF in those years, is that not the way to read those allegations?

MR. SCALIA:  Respectfully, it's not, Your Honor. I think the way you have to read these --

THE COURT:  Okay.  Well, look, I think I need an

education in how to read this thing, so let's take it. I'm going to take the one you're talking about, and we're going to deal with it.

MR. SCALIA:  Yes, sir.

THE COURT:  So on Page 30 -- the answer is yes or no.  Page 30, 3-year return as of 3rd quarter '19.  So that's 2019.  And we're looking at the target dates for the retirees of 2020, 2025, 2030, 2035, 2040, 2045, --

Am I going too fast?

COURT REPORTER:  Yes, sir.

THE COURT:  Excuse me.  It's easy for me.

2050, 2055, and 2060.

Now, as I read the first line, it's what did BlackRock -- what were its figures for those nine years. And they're depicted beginning on the first line with 6.25, and continuing all the way across to 9.35, right?

MR. SCALIA:  Those are the BlackRock gains during that three-year period.

THE COURT:  That BlackRock gained that much, right?

Next line down.  BlackRock's performance as shown in the preceding line measures -- is measured there against the S&P TDF index.  And in six of those nine years, BlackRock's performance was less than the S&P TDF index, right?

MR. SCALIA:  That's true, Your Honor.  Slightly less --

THE COURT:  Wait a minute.  Don't argue now.  Just yes or no.

The next is the best performing comparator TDF, it says.  So we compare then the first line, BlackRock TDF, and what it did, with the best performing comparator.

And in each of those lines for each of the years, 2020 in 10-year increments -- or 5-year increments to 2060, BlackRock's numbers are less than the best performing comparator, right?

MR. SCALIA:  That is correct.  There's a whole separate problem with those comparators, which I can address in a moment.

THE COURT:  Wait a minute.  I know, but we're not there.  You are so wrapped up in all this stuff that you know it.  I'm trying to get educated in it.

The next one down is the worst performing comparator TDF.  And you compare then what BlackRock's percent of gain was in the first line called BlackRock TDF with the number opposite the worst performing comparator TDF.  And if you make that comparison, in each of the nine years, BlackRock's performance was worse than the worst performing comparator, is that right?

MR. SCALIA:  At this particular point in time,

that's correct, Your Honor.

THE COURT:  Okay.

So how does that square -- how does the fact that it's not as good as the best, it's worst than the worst, and it out -- in its performance in respect of the index chosen in your plan, how does that defeat their theory that it wasn't doing very well compared to the rest of the market?

MR. SCALIA:  Your Honor, many responses, beginning with their allegation is not merely that it wasn't doing very well.  That it was significantly underperforming.

Now, they misread the Genworth document in saying that significant --

THE COURT:  Stop just a minute.

Well, there's the issue then of whether or not the underperformance that we're talking about that is shown in your chart -- I mean their chart, Paragraph 50, Page 30, 3-year return as of third quarter 19 -- 2019, that the test is whether or not what is shown there, the differences between the BlackRock percent of gain and the other figures shown there is or is not significant, is that what I'm looking for?

MR. SCALIA:  That is part of the question, Your Honor.

THE COURT: How can I determine that it is or is not significant? How do I determine that?

Say I want to find for you, I want to say I'm desperate to say it's not significant, where in the complaint do I find that in either the complaint or the unobjected to exhibits?

MR. SCALIA: I think when you see that against the S&P Index, which is really the only benchmark that's even worth the Court's consideration, is that over this period beginning in 2018, the BlackRock TDFs are outperforming the S&P Index nearly as often as the S&P Index is outperforming them.

THE COURT: It looks to me like that's not the case. It looks to me like that in six of the nine years shown in that chart, the -- BlackRock is below the index.

MR. SCALIA: But, Your Honor, if you flip to the prior page --

THE COURT: But I'm not. I don't want to flip to the prior page because I'm analyzing this one.

So how can I use -- I mean, how do I -- one way -- let me try it this way. One way to look at whether or not the lack of performance matching the S&P TDF index is for me to look at the figure in the red and say, well, that's not really very much. And based on my common knowledge of mathematics, I would say that's not very

much.

And that's the judge making that judgment on the basis of those figures with whatever knowledge the judge has of mathematics, which I confess is quite slight.

MR. SCALIA:  Your Honor, --

THE COURT:  Now, that's one way to do it.  Or there's something in here in the complaint or in the exhibits that I can consider that says, well, that's not significant.

MR. SCALIA:  That's right, Your Honor.  I think there are many things that will tell you that that's not significant.

THE COURT:  Okay.  Where are they in the complaint or the exhibits that says that these figures on those lines are not significant?

MR. SCALIA:  First, when you have got a particular fund that sometimes is outperforming and other times is underperforming the index, for some people in the plan it's doing better than the index.  This is a punitive class action.  If for a third of the class members in this particular quarter, this is better than the index, it's certainly reasonable for a fiduciary to say that's not significant underperformance.  Likewise, --

THE COURT:  If two-thirds of the people I owe a fiduciary duty to are suffering below the index, it's okay

for me to keep it here?

MR. SCALIA:  Your Honor, they're not --

THE COURT:  Or is it if two-thirds of the people I'm a fiduciary for are below the index, but it's not far, is it okay for me to keep us in this investment if I consider other things?  Is that the latter?

MR. SCALIA:  I think the latter is an important part here, Your Honor.  And let me mention some of those other things.

THE COURT:  Isn't that the test?  Unless there's some independent proof of what's significant, isn't that the only thing that a judge can look at?

MR. SCALIA:  Let me mention some of the things beyond this particular page that you should look at as you evaluate this.

THE COURT:  Sure.

MR. SCALIA:  One is this trend that I've been discussing.  Remember, that for only three of the six years in the class period do they give performance allegations.  A prudent fiduciary looking at these series of charts beginning on Page 21 would see that the BlackRock funds continue to do better and better.  The nearer years --

THE COURT:  Better and better, but not better in comparison to the indices or the comparators.

MR. SCALIA:  No, better and better compared to the comparators.  Because if you go back, for example, to Page 21, you see that group --

THE COURT:  Hold on.  Hold on, please, until I get there.

I'm on 21.  Which one do you want me to look at?

MR. SCALIA:  The one at the very top you will see --

THE COURT:  Three-year return as of second quarter '16, that's comparable to that particular one we were talking about for 2019?

MR. SCALIA:  That's correct.  And what you see is the differences there are greater.  And so from 2016 to 2019, which is the very period where plaintiffs are saying they should have dropped these funds, these funds were already profitable.  They were making money every year, but they were doing better, and better, and better against the indices.

No prudent fiduciary ever drops a fund based on retrospective performance all by itself.  But here, certainly no prudent fiduciary drops a fund when it's actually gaining in the competition every year.  And as I mentioned, Your Honor, two other important data --

THE COURT:  Well, wait just a minute.  Let's just take this 2021 chart.  As I read it, BlackRock in the

years beginning with 2022 spaced -- for the target years of 2020, spaced five years apart, is 5.52.  And that's percent of gain, right?  That's what it was in the last chart.  That's the percent of gain?

MR. SCALIA:  That's correct.

THE COURT:  That it had a gain of 5.52 up to 7.0.  And then but that was 1.21 to 1.13 worse than the S&P TDF, and it was absolutely worse against the best performing comparator TDF by fairly significant margins, and it was worse than the worst performing comparator TDF by lesser margins, isn't that what that chart shows?

MR. SCALIA:  It does.  Again, Your Honor, I would emphasize --

THE COURT:  Wait a minute.

So let's compare that chart with the chart you were taking me to to begin with on Page 30.  That situation has not changed except as to the fact that in three of the years BlackRock's percent of gain was better than the S&P.  And the margin of difference between the best comparator and BlackRock was lightly smaller, and the margin between BlackRock and the worst comparator TDF was slightly smaller than is shown in the chart on Page 21, isn't that right?

MR. SCALIA:  That's correct.  Which means when you combine it, Your Honor, that BlackRock was gaining

throughout the period until its performance sometimes was beating the S&P, sometimes it wasn't.  Again, I think it's --

THE COURT:  Wait just a minute.  You say it was beating throughout the period.  The only way I can do that is to go back at each of the interceding pages.  But as between the two, the third quarter return as of 2016 on Page 21, in the third quarter return as of -- the first quarter return as of 2019 -- or I guess it's the -- excuse me.  I'm on 30.

The third quarter return as of 2019 for three years shown for the target dates, if I compare those two I can conclude that BlackRock's progress is better?

MR. SCALIA:  That's correct.  It is gaining and performing better in the near in years --

THE COURT:  It's performing better relative to the numbers that we're comparing?

MR. SCALIA:  And it's performing better than the S&P.  Because, remember, this is a three-year look back.  If you compare the three years to the five years, what you see is the margin is always closer and BlackRock is doing better on the three-year comparison than the five year.  That's because years four and five were the bad -- the years that were not as profitable.  But by the time you're in years one, two, and three, it's getting better and

better.

Your Honor, if I can mention the other things that you should properly consider in assessing this. One is what the investment policy statement said. It identified many different things to consider in deciding whether or not to retain a fund. Performance was just one. And again, we've been focused this entire time on just one of the performance benchmarks. And as I've said, the test there is whether there's significant underperformance. I'll come back to that in a moment.

The other things that you properly can consider, given the record that you have, is, first of all, all those inflows that the market was voting with its feet toward the BlackRock funds. We've been looking at 2019. In 2020, more fiduciaries went with the BlackRock funds then any others. That matters --

THE COURT: And I find that in Exhibit E to your papers?

MR. SCALIA: That's correct. And I believe that Judge Nachmanoff made note of that. And part of the reason that matters is that legally, Your Honor, remember that ERISA is a comparative standard. You asked what other reasonable fiduciaries are doing. And what Genworth would have seen is other reasonable fiduciaries were very positive about these BlackRock TDFs.

43

Also, Morningstar, the respected analyst, was very positive.  Those things matter, too.

THE COURT:  What if all the others were going to the Silicon Valley Bank?  You would call them lemmings then, wouldn't you?

MR. SCALIA:  But, Your Honor, this was --

THE COURT:  You can only use what others are doing so much.  It's something to consider.

MR. SCALIA:  Well, it is --

THE COURT:  It's not the driver.

MR. SCALIA:  It's not all by itself determinative.  But remember, ERISA is, at its heart, a comparative standard.  What would a prudent fiduciary in a like circumstance have done?  The fact that such a large part of the market sees it as prudent is one indicator of prudence.

THE COURT:  My concern is not whether you're going to win this argument at the trial or at summary judgment, it's whether -- what happens on this complaint.

MR. SCALIA:  Yes.

THE COURT:  That's the problem.

MR. SCALIA:  And, Your Honor, I would emphasize that the other reason that you can look at this and say it's not enough for plaintiffs to proceed is that *Hughes* case where the Supreme Court recognized that before

44

getting all the way into discovery -- remember, they already got some. That a judge ought to give due regard for the reasonable judgments fiduciaries make. I'm not asking you to determine what is significant or not significant.

THE COURT: Tell me something: What did the Supreme Court do to tell me what to give due regard to? Because I don't know. I'm not a fiduciary. I don't manage these funds. And I don't know what I am to look for except whatever is in the record that tells me that.

So what is in the record that tells me that -- that allows me to do what *Hughes* says I should do? Give due to regard to what other fiduciaries do, what should I look at here?

MR. SCALIA: Your Honor, I think you should look at the fact that this was a gold rated fund. The highest rated fund. The highest rating you can have in the market.

THE COURT: What's that got to do with it what others do?

MR. SCALIA: Because the Supreme Court has said, and ERISA itself says, that you look at how other fiduciaries respond in that context. And you look at what market analysts say.

THE COURT: What does it mean to be a gold rated

45

fund?

MR. SCALIA:  It means that one of the leading market analyst, Morningstar, which plaintiffs rely upon, was telling the market we've examined these BlackRock funds.  We think they are very, very good funds.  That is something a fiduciary --

THE COURT:  So I look at Exhibit E, is that right?

MR. SCALIA:  Yes, I think --

THE COURT:  I have to find it in the record.

MR. SCALIA:  Yes.

THE COURT:  One time I was listening to an argument before the Supreme Court of the United States and the lawyer kept saying things.  And Justice Marshall got very frustrated, then said, "Can you tell me where I can find that in the record as opposed to your head because I can't cite your head?"

And that's the point I'm trying to get to is where in the record is there something I can determine is what other reasonable investors would be doing per the *Hughes* standard; where would I go to find that?

MR. SCALIA:  At Page 75-3.  That's Exhibit C to our motion at Page 9.  I'm sorry.  It's ECF 75-3, Page 9. That's where you see that gold rating.

THE COURT:  It's 75-3?

46

MR. SCALIA:  Page 9.

THE COURT:  In exhibit what?

MR. SCALIA:  Exhibit C.

THE COURT:  All right.  That's the gold?

MR. SCALIA:  That's right.

THE COURT:  And what else?  Anything else?

MR. SCALIA:  Judge Nachmanoff noted that in his decision.

THE COURT:  Well, I can't cite him either.  I have to cite what's in my record.  And unless what's in my record is also in his, and I get pointed to it, and I need to know what it is.

MR. SCALIA:  It's in his record.  It's in the record in the *CommonSpirit* case in the Sixth Circuit I mentioned.

THE COURT:  I can't cite those unless they're here because they may be different.

MR. SCALIA:  But their legal significance is reflected in those other decisions.

THE COURT:  I know.  But I'm only asking about the factual basis for it now.  All I'm saying is where is it?  So right now I know to look to Exhibit 75-3.  Is there anything else I look to to find what the reasonable people were doing as per *Hughes*?

MR. SCALIA:  The 9 percent of the market that

held these particular TDFs, that's reflected in plaintiffs' own complaint. That's one of their own allegations on the face of their complaint.

And of course we've already talked about the enormous amount of investments being made by others in the market.

THE COURT: Where is that found?

MR. SCALIA: That is the document I cited earlier, ECF 75-5.

THE COURT: Okay.

MR. SCALIA: Page 6. So those are some of the indicators of how the market was viewing this.

You also, Your Honor, have in the minutes that were produced to plaintiff in which they cite. You have the independent investment advisor to Genworth saying you have good investments. You have a good portfolio. Reliance on an expert investment advisor is another reasonable thing for a fiduciary to do. And I believe that's reflected in the minutes that are Exhibit F.

THE COURT: That is 75 what?

MR. SCALIA: That is 75-6.

THE COURT: Okay.

MR. SCALIA: And also in minutes at Exhibit G, which are 78-3. And again at 78-4, which is Exhibit H.

These are different places, and we cite them in

our briefs, Your Honor, where the investment advisor that Genworth had retained to help get additional expertise was saying you have a good lineup.  These are all things that are eminently reasonable that other courts look to.

And then, Your Honor, the broader context.  You know, plaintiffs in their opposition have emphasized ERISA is contextual.  We've been talking a lot about this one issue, but it really is bedrock law in this circuit. There's not a court that has disagreed with it that you can't state a prudence claim by alleging underperformance alone.  And so we have been talking a lot about performance, but that Genworth IPS says to look at a lot of different things.  And so these fiduciaries were reasonably considering many other things, and it's wholly consistent --

THE COURT:  Well, let's take this situation: I'm a fund manager.  I get sued.  The complaint says Judge Payne chose to invest in this fund that you can measure against this index, and it underperformed for five straight years, and the underperformance was significant. Are you telling me that that would not state a complaint on the basis of underperformance alone?

MR. SCALIA:  The Sixth Circuit said it would not, Your Honor, in the *CommonSpirit* case, is just one example.  The Fourth Circuit --

THE COURT:  Now, wait a minute.  They didn't have that in the *CommonSpirit*.  *Smith* is the *CommonSpirit* case?

MR. SCALIA:  That's correct, Your Honor.

THE COURT:  It wasn't underperformance for a long period of years.

MR. SCALIA:  I think it was at least three years of underperformance.

THE COURT:  I think maybe I will look at that again.

MR. SCALIA:  And remember, Your Honor --

THE COURT:  Because your recollection of it and mine are different, so I'll go back and study it again.

MR. SCALIA:  And really, Your Honor, that in this --

THE COURT:  But I'll tell you what, I have a gag reflex at the notion that a fiduciary can let something underperform for five years and be held not to be imprudent, or at least that doesn't -- that state a claim for imprudence.  If mine did that, I would fire him for imprudence.

MR. SCALIA:  But, Your Honor, if I can remind you that in this case, they have performance allegations for only three years -

THE COURT:  I know.

MR. SCALIA:  - of the six-year period.

THE COURT:  That's a different issue.

I'm testing the validity of the broad assertion that underperformance can never be the basis for a claim. And I think the answer to that is there isn't any case that holds that.

MR. SCALIA:  Your Honor, if I could --

THE COURT:  There are cases, including Judge Nachmanoff's, which talk about that and which may say it in a broader way than the law actually permits.  And that's the way I read all these cases, but I have to go back after listening to you and them and see.

MR. SCALIA:  And, Your Honor, --

THE COURT:  Anything else?

MR. SCALIA:  Just one key point on that.  If there is five years of significant underperformance, there are going to be other indicators.  You're not going to be having a huge amount of new investments in that.  You may not have a gold rating.  And so if the underperformance is really that large, I think there are going to be other things as well which you did not hear.

Your Honor, you have been more than generous with your time.  I'll just conclude by emphasizing again the *Twombly* standard as explained by the Court in *Hughes*, which is that it is not enough for plaintiffs here to

allege something that is supposedly consistent with a fiduciary breach.  They actually have to allege that it's plausible.  And once it's shown that there was another explanation for what happened that is consistent with fiduciary conduct, they lose.

THE COURT:  Where is that explanation in this record?

MR. SCALIA:  The explanation consistent with fiduciary conduct here, Your Honor, is that this particular Genworth plan was well advised.  It met frequently.

THE COURT:  Where is that in the record?

MR. SCALIA:  I've already talked about the --

THE COURT:  You see, I can't decide this on the basis of assertions that you are making that are not in the record.  So, yes, you do take a look at what else there is, absolutely.  But I need to know where in the record that other alternative is.  Now, where is it?

MR. SCALIA:  Your Honor, we're on 12(b)(6), and the question is whether there's another plausible explanation --

THE COURT:  Where is the plausible explanation in this record?

MR. SCALIA:  Your Honor, --

THE COURT:  I need to see a piece of paper that

says it.  It's either in the complaint, it's in an exhibit, or somewhere because, otherwise, I'm concocting one from the record based on what I think, or I'm accepting your version of what one is, or his version of what it is and then making the measurement.  So if you'll tell me where it is in the record, I'll go back and study it.  But I didn't see in the papers anything identified that I can go look at.

MR. SCALIA:  Three responses to that:  First, we've already talked about during this period, according to plaintiffs' own allegations, the fiduciaries would have seen BlackRock funds that were always gaining in value and which were gaining and eventually catching the benchmark during that period.  That's plausible alternative explanation number one.

Number two, remember --

THE COURT:  And that appears in the charts?

MR. SCALIA:  In the charts.

Plausible explanation number two is that plaintiffs are asking you, Your Honor, to take one part of a single component of the criteria the plan identified and to make that the whole game.  And that's wrong.  And so the other plausible explanations are the gold rating given to these managers.  How well-regarded these funds were on the market.  That's all properly in the record before you.

And then finally, of course, Your Honor, on 12(b)(6), those plausible explanations can be made by argument, too.  By definition, a complaint at times will omit a plausible alternative explanation.  That's what we had in *Twombly* itself where the allegation that might have been perfectly competitive conduct weren't in the complaint, but the lawyers were able to explain that.  And so we're explaining here that it's bedrock law under ERISA, Your Honor.  And in investing, that it's a bad idea to drop a fund just because of a period of underperformance.  It's a bad idea.

THE COURT:  So it's your view that I can find plausible alternate explanations based on the arguments of counsel?

MR. SCALIA:  Based on the evidence that I've identified to you --

THE COURT:  Based on the arguments of counsel?

MR. SCALIA:  Based on alternative explanations that are identified by counsel, that's correct, Your Honor.  Because by definition, alternative explanations are not going to be in the plaintiffs' own complaint.

THE COURT:  Well, they could be.  In fact, I've seen them in --

MR. SCALIA:  Well, and we've got some here.  But often they won't be.

THE COURT:  So I just take whatever counsel says, or does there have to be something in the record to support what counsel says?

MR. SCALIA:  Your Honor, I think I've identified a number of things in the record that do support it.

THE COURT:  What you said is that BlackRock funds were gaining constantly, and I look at the charts. That they have a gold rating, and I look at Exhibit 75-3. And they were well-regarded in the market, which I think is 75-5.

And so how do those things constitute a plausible other explanation, and what's the other explanation for?  I guess the other explanation is for the decision of the committee not to change the investment, right?

MR. SCALIA:  Yes, Your Honor.

THE COURT:  Is that what we're looking at?

MR. SCALIA:  Yes, Your Honor.  And that's what the Supreme Court is talking about in *Hughes*. Respectfully, they don't want to force you to determine what's significant underperformance or not, although here I think it's clear that if the BlackRock funds are actually outperforming the index sometimes there's not significant underperformance.  At the end of day, what the Supreme Court says is give due regard to the reasonable

reins of judgments of the fiduciaries.

It is, yes, deference to the fiduciaries who have to make these tough decisions.  And the Supreme Court recognized how corrosive it would be if fiduciaries got second-guessed whenever a fund had a relatively brief period of underperformance.  That's what is threatened by the litigation here.  That's part of the reason that the other division of this Court rejected two of these cases.  Part of the reason the district -- the Western District of Washington rejected them.  Part of the reason for the decision in the *CommonSpirit* case, and a number of others.

Your Honor, thank you.  And I would like to reserve some time for rebuttal.

THE COURT:  Did the *CommonSpirit* case involve a complaint like this one by these lawyers?

MR. SCALIA:  I think it -- I believe so.  They'll tell you if I'm wrong.

THE COURT:  Well, we're going to take a common break for 20 minutes.  The court reporter, and all the rest of us, will respite.  And pray that she comes back.

(Recess taken.)

THE COURT:  Mr. Scalia, I forgot to ask you a question I wanted to ask you:  How do I measure at this stage of the proceedings what's significant?  That term has been used extensively in the papers and in your

argument, and what do I use to determine if a variance --
if there is one, is significant?

MR. SCALIA:  Your Honor, I think there are
several things to be considered there.  One is obviously
the size of the gap.  And what you see is that by the time
plaintiffs decide to stop even letting you know what the
performance is, what you see is that in some quarters the
BlackRock funds -- or actually the majority of them are
doing better.  So I think it's the third quarter of 2018,
the majority of the funds are doing better.  That, by no
definition, is significant underperformance.

In all of the quarters around that, Your Honor,
at least three of the BlackRock funds are doing better
than the S&P funds.

THE COURT:  Okay.  Well, what about the size of
the gap?  How do I -- what case says I look at the size of
the gap, and how do I determine what size is and is
significant and is not significant?

MR. SCALIA:  I don't believe there's case law on
that specific question, Your Honor.  I think we come back
to what a plaintiffs' obligation is to exclude the
plausible alternative explanations, which are that you've
got fiduciaries looking at a fund that's performing
positively the whole time but for the entire period they
allege, Your Honor.

And I can't emphasize this enough.  For the entire period where they give performance allegations, what the fiduciaries would have seen is that the BlackRock funds were doing better, and better, and better against the index.  That is not significant underperformance.  That is steadily improving performance.  I guess what I would say, Your Honor, is that steadily improving performance is not significant underperformance.

And then the other fact in the record --

THE COURT:  Well, in the NFL if you are losing by smaller and smaller amounts, you get fired if you're the coach, aren't you?  You're not doing your job.

MR. SCALIA:  Actually, if you take on a team that's down by a lot and are steadily closing the margin -- but of course this isn't football either.  I appreciate the analogy.  This is an investment decision that's being made for 40 or 50 years.  And as so many courts have said, you don't drop investments after a few years of performance that's not measured to a particular benchmark.

The other thing that's important to remember about this S&P Index is that it's just one thing to look at.  It's a combination.  As plaintiffs allege --

THE COURT:  I understand that.  You're telling me that I look at the size of the gap?

MR. SCALIA:  Well, and here's what else you look at, Your Honor.  You look at their first complaint, ECF 1, Paragraph 41, which shows that by 2022, the gap had not really been closed, but the BlackRock funds were outperforming most of the comparators that plaintiffs identified in that first complaint.  That's Paragraph 41, ECF 1.

Now, Judge Nachmanoff did not accept those comparators in the first complaint as even appropriate comparators.  They're totally inappropriate comparators for reasons that he identified – for reasons that I'm happy to talk about – but what that first complaint showed is that that performance continued to improvement.  Again, that's why the plaintiffs stopped even making allegations about the relative performance.

It's actually quite striking, Your Honor. They're suing for a six-year period for supposed underperformance, but during that period what do we see? Performance gets better, and better, and better until, Your Honor, they don't want to say anything about it.  But we can look at the first complaint, and that tells us how this story ends which, Your Honor, is why it's bad investment strategy to dump an investment just because it's a little low, relative to other things, for a period of time.

And the other reason, Your Honor, there are different strategies.  BlackRock is a so-called two fund. It had more, particularly prior to 2014, in real estate, for example.  And during different market conditions, different strategies are going to perform differently. That's yet another reason why you don't automatically drop a fund.

In fact, you want to hold onto a fund when there are reasons to believe it will turn around.  And they knew that this one had already been making returns -- had been quite profitable, actually, but was now gaining.  Steadily gaining in the market to the point that plaintiffs are trying to hide the facts from you, but they are there in the record.

THE COURT:  There is no case you know of that defines significant?

MR. SCALIA:  No, Your Honor.  I think the case law recognizes that this is a contextual decision to be made by fiduciaries.  And remember, the investment policy statement didn't say that they must drop the funds if there were significant underperformance.  It said they could.  And this wasn't the only benchmark.

So the plaintiffs are trying to drive this whole case through a single consideration when in fact there were many, many considerations, all the others of which

point in the direction of retaining these funds, or at least plaintiffs have no allegations that they pointed against holding them.

THE COURT:  Okay.  Thank you.

MR. SCALIA:  Thank you, Your Honor.

THE COURT:  Mr. Roberts.

MR. ROBERTS:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. ROBERTS:  I think as we've kind of seen clearly here today, the biggest issue here is that defendants are advocating for a standard at the motion to dismiss stage that doesn't exist.

THE COURT:  There are a lot of cases that have been granted that they cite that have been dealt with on motion to dismiss.  It's a pretty extensive analysis, analysis of the kind that one ordinarily would see in a summary judgment context, and they've been upheld by courts of appeals.

MR. ROBERTS:  That's correct, Your Honor.

And respectfully, I think we would disagree with those reasoning -- the reasoning in those cases as they apply a standard that does not actually exist.  Even in the citation to the *Hughes* case, which opposing counsel mentions, that case, even acknowledging the range of reasonable judgment of fiduciaries actually remanded the

case back to the Seventh Circuit specifically to consider whether petitioners had plausibly alleged a violation of the duty of prudence as articulated in *Tibble*, applying the pleading standard discussed in *Iqbal* and *Twombly*.

So the *Hughes* case is not some magic wand that gives fiduciaries blanket immunity based on this nebulous concept of a range of reasonable fiduciary judgment. And indeed, the *Hughes* court at Page 742 further cited *Dudenhoeffer* and noted that because of the content of the duty of prudence turns on the circumstances prevailing at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific.

Let's break that down. First, let's talk context specific.

THE COURT: What did you just cite?

MR. ROBERTS: So that comes from the Fifth, Third --

THE COURT: I have the opinion, but I don't have the -- I had a slip opinion. So is the cite to *Dudenhoeffer* at the end of the case?

MR. ROBERTS: Your Honor, it's the cite to *Dudenhoeffer* at the end of the last full paragraph of the *Hughes* case on Page 742.

THE COURT: "Because the content of the duty of prudence turns on 'the circumstances...prevailing' at the

time the fiduciary acts," the statute, which I won't recite is cited there, "the appropriate inquiry will necessarily be context specific."

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  And the Court has to "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."

Well, what tells me what the reasonable -- range of reasonable judgments are?  Where does that come from?

MR. ROBERTS:  I think -- I think in this complaint specifically, that comes from Genworth's own investment policy statement.  That's a document created by fiduciaries to provide guidance to the committee, and how to administer the plan and apply investment monitoring and selection criteria.

And notably, this is something that makes this case not only distinct from the other BlackRock cases decided by Judge Nachmanoff and the *Microsoft* case, but in fact actually distinct from any of the cases that they cite rejecting these similar allegations, such as *CommonSpirit* because what we have here is limited discovery about Genworth's own fiduciary process.  These other cases that they cite, whether it be the *Hall* and the *Tullgren* cases, or whether it be *CommonSpirit*, at the motion to dismiss stage applied a standard which held that

specific comparators proposed by plaintiffs were not adequately alleged to be benchmarks for a number of reasons, which, as I stated, we would disagree with.

But critically, none of them incorporated allegations about a specific benchmark used by the defendants in any of those cases. Here, from Genworth's own documents, we have not just a plausible benchmark, but one of the actual benchmarks that the plan stated, and selected for itself in its investment policy statement.

And what we have is consistent underperformance throughout the class period on both three and five-year return against the stated benchmark.

THE COURT: It doesn't look like it's a very being underperformance against the S&P. But maybe it's significant, maybe it's not. How do you say I judge significant?

MR. ROBERTS: Your Honor, I would say that a determination of what is significant performance would be -- we can find that in a few places. One, ERISA doesn't have a materiality requirement. And so largely, we would turn partially to the IPS which also doesn't define significantly. We have -- we have this language in there that the BlackRock TDFs are to outperform their S&P target date index, which we can see that did not happen throughout the class period.

And we have a series of charts in the complaint. But notably on Page 32 of the complaint in Paragraph 53, we demonstrate the accumulative affect of this underperformance, which is, over the class period, approximately 9 percent, or around $100 million, in missed capital appreciation for the retirement plan participants.

Your Honor, I don't know if $100 million is significant in Richmond. I think it is in Philadelphia.

So I think that -- to quantify it, I think that provides some evidence that this is significant. And I think as well this is underperformance significant not only in the differences from year to year, but in the duration, too.

Defendants try to cabin this and say that it's just a few years, a short time period, of underperformance. But another important note is that this is underperformance measured using Genworth's IPS metrics of using three- and five-year returns. This means when the BlackRock TDFs were found to be underperforming their stated benchmark in 2016 on a three- and five-year basis, that was actually based on performance data going back to 2011.

So it's -- when we look at the time period alleged in the complaint, 2016 to 2019, as of 2019 going back to 2016, and taking the three- to five-year returns,

you actual have performance data spanning 2011 through 2019. Nearly a decade of underperformance.

And, Your Honor, I think it's an overbroad reading of our complaint to suggest that our issue here is that the fiduciaries did not reflexively jettison investments at the instant that they began to underperform. Our allegations in the complaint, the plaintiffs' allegation here, are that according to its own policies, which it created upon the BlackRock TDFs underperforming their stated benchmark, they should have engaged in the fiduciary process outlined in their plan documents. This would have involved potentially placing the BlackRock TDF specifically on a watch list and considering potential replacements which would have, by the criteria set forth in their IPS as we note in Paragraph 40 of the complaint, potential replacements for the BlackRock TDFs should have been candidate funds that had sufficient assets under management such that the plan's assets would not constitute a disproportionately large share.

THE COURT: But doesn't all that that you're talking about really fit into Count 2 rather than Count 1?

MR. ROBERTS: I think they're intertwined.

THE COURT: They may be intertwined, and I would think that generally those kinds of things may fit

together, but it looks to me like the real gravamen of your complaint is Count 2 where they didn't monitor it and didn't do what they said they were going to do, what they were supposed to do, what is prudently done.  And that's the complaint that's really where the rubber meets the road in this case.

Am I wrong about how I read this complaint?

MR. ROBERTS:  No, that's exactly right, Your Honor.  I think what we allege here, I think they're trying to characterize this as us alleging that this is a performance case.  What we have here is actually a process failure case, right?

THE COURT:  That's Count 2.

MR. ROBERTS:  Right.

As the Supreme Court noted in *Tibble*, fiduciaries have an ongoing duty to monitor.  An investment can be imprudent at the time of selection or it can become imprudent, but all throughout the class period here, what we allege is defendants had an ongoing duty to monitor, and that they did not perform that duty.  And they didn't perform it consistent with the policies --

THE COURT:  That's Count 2.

MR. ROBERTS:  That's correct, Your Honor.  But I think --

THE COURT:  What's Count 1?

MR. ROBERTS:  The duty of prudence is intertwined with the duty to monitor.

THE COURT:  Isn't it really that this whole case is a failure of -- failure to monitor what was going on, and that Count 1 and Count 2 really are the same thing?

MR. ROBERTS:  They are.

THE COURT:  They're not even kissing cousins.  I mean, they are really right in there together in the same boat, aren't they?

MR. ROBERTS:  You've articulated it I think much more eloquently, actually, than I could have there.  I think they are intertwined there in a way that a breach of the duty to monitor would be breaching a fiduciary's duty to act in the best participant of plan -- planned participants.

And continuing in the application of Genworth's policy, Your Honor, what we have alleged here is that applying their own standards for investment selection criteria, if they were to have prudently engaged in a process of monitoring and considering replacing the funds at issue here, this would have necessarily led them to the proposed comparators which we allege here.  Applying their selection criteria that candidate funds are not to -- are to have sufficient assets under management such that the plan's assets would not constitute a disproportionately

large share would have eliminated approximately 72 percent of the TDF market, resulting in roughly 15 remaining candidate funds, six of which comprise 70 percent -- over 70 percent of the TDF market.

Of those six, we've included those in our complaint as apt comparators because these were the most likely alternatives to be selected if Genworth had carried through its own fiduciary process and a least considered replacements.

THE COURT:  Do you allege that -- is there any evidence -- let me start again.

Is there any evidence that they did consider these six?

MR. ROBERTS:  Your Honor, we have not seen that in any of the discovery, limited discovery, we have received.  I think that's something that discovery in this case would be appropriate to determine whether -- not just whether they considered the alternatives, but they point to other investment criteria in the IPS which they say they could have considered.  We have not seen anything in the meeting minutes to suggest that that actually occurred.

As we note, the meeting minutes are devoid of that kind of detail aside from periodically hearing from their investment advisor that their funds met the criteria

in the IPS.  But as we can see here, these funds consistently underperform their benchmark in the IPS.  So we see one clear, on its face, failure against a metric in the IPS.  And we have defendants say so that there were other factors that they could have considered.  They don't even state that they did consider other factors in determining to retain the BlackRock TDFs.  Instead, they merely say that there are other factors available to the committee.  But we don't have anything in the --

THE COURT:  Do the committee minutes have in them anywhere a reference to these other factors that they considered the other factors?

MR. ROBERTS:  Not that I've seen.  Where these minutes --

THE COURT:  Have you read all the committee minutes?

MR. ROBERTS:  That have been produced, I have looked through.  And what I have seen is instances where the minutes note that the committee met with its investment advisor, and the advisor confirmed that the BlackRock TDFs were a sound investment for the plan.  And that's not even every quarter.

THE COURT:  Well, do they -- for example, do the minutes reflect that the committee studied the performance of BlackRock against any comparators at all, even the S&P

ones?

MR. ROBERTS:  Your Honor, I've not seen that in the meeting minutes.

THE COURT:  Have you read them all and are you familiar with them?

MR. ROBERTS:  I have reviewed the meeting minutes in this case, Your Honor.

THE COURT:  All right.  So there's not in there any reference to the comparisons, right, between S&P or any other?

MR. ROBERTS:  Right.

And, Your Honor, going -- going to another argument that they make that this was just one of two comparators in the complaint, they note that we don't address the custom benchmarks that they cite in the complaint, but this is something that we do in fact address in the pleading.

THE COURT:  They don't address the custom benchmark, what are you talking about?

MR. ROBERTS:  The custom benchmark.  And what the custom benchmark is -- as we've explained in the complaint, a custom benchmark is merely an index designed to track the fund that it is an index benchmark for.

So the performance would mirror almost exactly what the underlying fund is because it's a custom

benchmark.  It wouldn't actually provide any meaningful performance data.  And so in asking the Court to consider these other factors, defendants are actually asking the Court to draw inferences in its favor.  That is not proper at a motion to dismiss stage.

So what we --

THE COURT:  Let me ask you something.  On Page 30, and elsewhere in the chart that he referred to on Page 30, 3-year return as of the third quarter of 2019, you have "Best Performing Comparator TDF."  Who is that and where is that identified?

MR. ROBERTS:  Your Honor, it's not specifically listed in this chart.  But in Paragraph 53 we have accumulative underperformance over the class period, and so here we have the best performer over the entire class period were the American Funds.

Now, I'm not positive whether or not in specifically the third quarter of 2019 if that specific fund was the best performing comparator.

THE COURT:  Who was it -- you say you're comparing best performing comparator TDF in Paragraph 50 at the top of Page 30 was a 7.59 percent gain, is that right?

MR. ROBERTS:  That's correct.

THE COURT:  Well, what firm are you referring to

there?  That's a very specific firm.  And you said somebody's the best.  So who is it?  I'm trying to figure that out.

MR. ROBERTS:  Your Honor, this comes from our list of the comparators that we had.

THE COURT:  Where is it?

MR. ROBERTS:  So the list of the comparators that we have here are listed on Page 17 of the complaint. But specifically to answer your question, the best performer of 3Q19 is not specifically identified.  If Your Honor would like more information about the specific --

THE COURT:  How can you make an assertion in a complaint that something was the best performing comparator and not identify the comparator you're talking to -- talking about, or something was the worst performing comparator TDF and not identify what this is, how can you do that?

MR. ROBERTS:  Your Honor, the reason the charts appear the way that they are is because adding in each -- the performance data for each of the comparators in the complaint, there's already numerous pages of charts, it was an effort to streamline.

THE COURT:  Well, why didn't you say the best performing -- you don't have to -- you have got yourself in a lot of trouble by throwing in all they details, but

if you're going to do it you did it.  Why can't you contextually just say X company was the best performing comparator TDF in the 3rd quarter of '19, and the same thing for the worst?  And then they can look at it and I can look at it and understand what you're talking about.

But somebody actually picked the figures for these people.  Either that, or they're out a whole coffin and the whole thing goes out for Rule 11.  So you're bound to know who they are.

MR. ROBERTS:  Your Honor, we -- we -- that's something we did use this looking at the universe of the comparators and their performance over the relevant class period to get these numbers.  We didn't provide a full breakout of how the top -- which those were.

I believe that the top performing throughout the period was the American Funds, and that the worst performing comparator were the Vanguard Funds.  But if that's a concern that the Court has, we are happy to provide additional details addressing those --

THE COURT:  I don't know that you need additional detail except other than to say who they are.

MR. ROBERTS:  Right.  And we can provide that, Your Honor.

THE COURT:  Because failing to know who they are causes me to doubt that there's any merit to the statement

that you make in the complaint which is an important component of your argument.

MR. ROBERTS:  Your Honor, if that's a concern that the Court has, we are happy to identify those for the Court.

THE COURT:  So he makes the argument that as held in *Hall* and *Tullgren* and a number of other case, the one in Washington state which I can't recall the name of right now, all take the view that if your complaint is that this is just an underperforming stock and you didn't jettison it, that that is not sufficient, do you agree that that is a correct statement of the law?

MR. ROBERTS:  I think that misreads the law. And specifically, defendants cite a great deal in their brief to the *DiFelice* case which provides guidance for this exact standard in the Fourth Circuit.

And so they -- they note that the *DiFelice* court noted that underperformance alone is not sufficient to state a claim.

THE COURT:  You agree with that then?

MR. ROBERTS:  I --

THE COURT:  That underperformance alone is not sufficient to state a claim?

MR. ROBERTS:  Your Honor, I would say that as you noted --

THE COURT:  Hey, hey, hey.  Let's try getting our tongue around yes or no on this one.

MR. ROBERTS:  Your Honor, no, I wouldn't agree. I think for the reasons that were discussed earlier, a significant --

THE COURT:  Where is *DiFelice*?  Where does it say what you say?  What's the citation on *DiFelice*?  It's in the papers.  Do you have it here?

MR. ROBERTS:  Your Honor, it's 497 at 424.

THE COURT:  F what?

MR. ROBERTS:  F.3d.

THE COURT:  At what?

MR. ROBERTS:  At 424.

THE COURT:  Will you get that, please.

What is it -- does it provide the test you said?

MR. ROBERTS:  First, as defendants describe it, they state it to say that relative underperformance is not sufficient to demonstrate a violation of fiduciary ERISA duties.  But the full quote is that "an investment's diminution in value is neither necessary, nor sufficient, to demonstrate a violation of a fiduciary's ERISA duties."

And why that's important in this case is unlike the dismissed cases and the *CommonSpirit* case to which they cite, none of those contained actual additional allegations about the process because the inquiry under

ERISA is the process in which a plan engages.

And as Judge Nachmanoff actually noted in the hearing on the amended complaints in *Capital One* and *Booz Allen*, he noted that specifically about this case if Genworth was using a particular comparator and then didn't choose to take BlackRock off the table, maybe they'll be able to make an allegation that they had it in front of them in realtime, it wasn't hindsight, and they should have acted differently.  That's not the case here.

What we have here are these facts.  We have allegations of the specific process that the defendant was supposed to follow according to its own internal documents.  And it didn't follow those.  And we have linked that to the underperformance.

THE COURT:  That's Court 2, failure to monitor.

MR. ROBERTS:  Right.  Which is, as I've noted, completely intertwined with a breach of the duty of prudence which requires a fiduciary to act in the best interests of planned participants because --

THE COURT:  Well, acting in the best inference of planned participants under your theory, though, in this case as pleaded is really not doing monitoring, right?

MR. ROBERTS:  Not doing monitoring, and upon --

THE COURT:  You're not saying that -- you're not saying that the underperformance is the breach of duty.

You're saying that the failure to monitor is the breach of duty?

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  Well, then Count 1 and Count 2 are essentially the same?

MR. ROBERTS:  That's correct.

THE COURT:  Okay.

MR. ROBERTS:  And, Your Honor, I just want to go to some of these other factors.  As an initial matter, defendants essentially note, and try to argue, that we have not objected to the incorporation of certain citations to evidence outside of the complaint here.

THE COURT:  Yes.  What did you object to and where is it?

MR. ROBERTS:  Well, we didn't -- we didn't actually state objections because we didn't have an objection to them stating specific figures from the complaint about a gold rating or a market share.  The standard is incorporation by reference is to allegations central to the complaint.

So by our failure to object, it's not that we are accepting every single word of these additional exhibits that are outside of the complaint.

THE COURT:  But you do know that by failing to object, and say that you object to it, you make it quite

difficult for the Court to ascertain that to which you take exception and which I can consider and that which I can't consider?

MR. ROBERTS:  Your Honor, respectfully, I would say that outside of the information that's central to the allegations of this case, the Court not read in the entirety of the additional exhibits.

THE COURT:  Well, how do I know what's central to the allegations in the case, particularly where you don't object to it?  I just take what it is they cite.  I mean, you have to tell me what you think.

MR. ROBERTS:  Your Honor, I would say -- I would say that examining specifically what they cite, as that's what we chose not to object to, I think that that's a sufficiently easy way to determine what is and is not determined to be central to the claims at issue here.

And specifically, I think going beyond that --

THE COURT:  And what are we arguing about?  I heard you just say that if you didn't object to it, it's central to the complaint if they cited it, and I don't understand what we're talking about.

MR. ROBERTS:  No, Your Honor, it's essentially just that defendants are trying to have the Court focus and make its determination almost entirely on factors that are not incorporated in the complaint -- by reference even

into the complaint.  Like these additional factors in the IPS that the IPS is incorporated by reference to plaintiffs' complaint, certain sections are incorporated.  But they -- they go on to identify factors that aren't contained there, and there's no evidence that they were considered by the committee.

THE COURT:  They aren't contained where?

MR. ROBERTS:  In the complaint.  And essentially they're asking the Court to draw upon outside information that the committee may or may not have considered throughout the class period specifically with regard to, let's say, the capital inflows that the BlackRock TDFs experienced in 2020.

THE COURT:  I guess I'm having a little trouble following you.

MR. ROBERTS:  Sorry, Your Honor.

THE COURT:  How am I going to know what you think I can consider and what I think -- what you think I can't consider that they're relying on; how do I know that?

MR. ROBERTS:  I think the standard of central to the claims in the complaint is instructive here.  The fact that they are --

THE COURT:  I understand it's instructive and it's dispositive.  I want to know what you're talking

about specifically.

MR. ROBERTS:  Fair enough.

THE COURT:  Take a piece of paper and put a pink highlight on it and say you can consider this, and in yellow and can't consider this.  And that's what I -- I need to know what you're talking about.  And when you object to it, the inclusion of all or part of a document, and you -- I then know, but you didn't do that.

MR. ROBERTS:  Your Honor, specifically with regard to the Morningstar report, we cite certain aspects of the Morningstar report to provide certain context for allegations in our complaint.  Defendants take completely different portions of the Morningstar report to use to support the gold ratings for the BlackRock TDFs.  The rating system is distinct from the purpose that the Morningstar report is used in the complaint to provide certain context about the TDF industry and the market.

THE COURT:  Well, now what case says that if a document is referred to by the plaintiff, and cited by the plaintiff, and is integral to the complaint, those are the only parts of that document that can be considered by the Court in deciding a 12(b)(6) motion?

MR. ROBERTS:  Your Honor, I don't have a case in front of me that says that.

THE COURT:  Well, do you know of one that you

believe you can chase down for me?

MR. ROBERTS:  Not off the top of my head, Your Honor.

THE COURT:  I don't know of one either.  So here is the -- you have to identify for me somewhere somehow what it is that they are relying on that you say is not integral to the complaint.  And so far you have said the Morningstar report.  I don't know what exhibit that is.  I'll have to look at it.  What exhibit is it?

MR. ROBERTS:  Your Honor, that's Exhibit C.  And that's Docket Number 75-3.

THE COURT:  And that part that you're objecting to is the gold -- what is it?

MR. ROBERTS:  The gold rating.

THE COURT:  Rating?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Do you object to that?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And what is it that says you can hold that objection to the oral argument?

MR. ROBERTS:  Your Honor, I'm not aware.  I haven't seen that authority.

THE COURT:  Well, doesn't that mean that you've let it go?

MR. ROBERTS:  Your Honor, I would respectfully

say that failing to object to an entire exhibit based on a specific citation -- when we incorporated it into our complaint by reference, a specific portion of the document, that didn't mean that we were incorporating the entire thing. But I do take the point that we did not object until this point.

But I don't think for the purpose of this case that we even need to go to the point of what's in or not because based on the section that they cite, I think there's other grounds to show that it's not dispositive here because while they note that the BlackRock TDFs received a gold rating that time, that same report also shows that each of the comparator funds received either a silver or a gold rating.

And that doesn't -- when you have someone getting a gold rating, and everyone else is also getting a gold rating, that's a participation trophy. That's not a meaningful metric.

THE COURT: So I dive into the weeds now of whether there's merit in any of the underlying comments, such as what does a gold mean? Is it a participation trophy, or is it -- and how can I do that on a Rule 12(b)(6)?

MR. ROBERTS: Respectfully, Your Honor, I think that's an improper inquiry at this stage.

THE COURT:  I do, too.

MR. ROBERTS:  And, Your Honor, the Court need not even reach that point because, as I've stated through our review of the limited discovery that we have received to date, there's no actual indication that the committee actually ever considered any of this information.  We don't see that in the minutes.  So what defendants are asking --

THE COURT:  Let me ask you this:  You say it that way.  I want to ask you the other way.  Do the minutes contain any reference to a consideration by the committee of any aspect of the merits of whether to retain or not retain a stay in the BlackRock funds?

MR. ROBERTS:  Your Honor, the minutes reflect that they periodically received advice from an independent investment advisor who advised them to retain the BlackRock funds in the plan.

THE COURT:  And how many times -- are we talking about, what, a six-year period?  And how many times did the committee meet over six years?

MR. ROBERTS:  They met quarterly, Your Honor.

THE COURT:  And how many times during that six-year period, that would be 24 meetings, did the investment advisors say BlackRock is a good thing, you keep it?

84

MR. ROBERTS:  Your Honor, I don't have that exact number in front of me.  But I know for a fact that the performance of the BlackRock funds in general were sometimes not discussed for multiple quarters at a time. So we know that the committee --

THE COURT:  Well, don't you think that's important given the theory of failing to monitor that you assert in Count 2?

MR. ROBERTS:  Your Honor, not necessarily because merely meeting with an advisor in and of itself is not sufficient to satisfy a fiduciary's duties under --

THE COURT:  Sorry.  I didn't ask the question right.  I used an indefinite pronoun.

Don't you think it is important in asserting a claim for failure to monitor, which we now know is your only claim other than Count 3, that it's important to know exactly how many times BlackRock was ever mentioned at all, how many times there was a discussion of its performance, and an evaluation of it; don't you think that's important?

MR. ROBERTS:  Your Honor, I think that's --

THE COURT:  Now, if you can answer that, I'd appreciate it.

MR. ROBERTS:  Yes, Your Honor.  I do think -- I do think its important as context, but I don't think it's

determinative whether that number were even if BlackRock --

THE COURT:  I didn't say that I think it's important to know because we do consider context.  So in the context, it's your view, if I understand it correctly, that except as to what the investment advisors said, the committee never once -- according to the minutes, the committee never once examined, measured the performance of BlackRock against anything, is that correct?

MR. ROBERTS:  Based on the discovery we have received, that's correct, Your Honor.

THE COURT:  Well, have you received all the 24 minutes?

MR. ROBERTS:  We have received all the discovery produced by defendants in the initial production that they provided.  I'm not -- I'm now aware whether or not that encompasses every --

THE COURT:  Well, why don't you answer the question this way:  I don't know how many we received.

I want to know, as I understand it, they met quarterly, you got the minutes, did you get all of the minutes for the six years that you're talking about, the quarterly minutes?

MR. ROBERTS:  I believe so, Your Honor.

THE COURT:  Okay.  And have you reviewed the 24

minutes?

MR. ROBERTS:  I have, Your Honor.

THE COURT:  And in those minutes is there any reference to that committee considering BlackRock in any way at all other than whatever the investment advisor said about it?

MR. ROBERTS:  I have not seen that, Your Honor.

THE COURT:  Is there any reference comparing BlackRock to any comparator, either Standard & Poor's or what you call the best and the worst in your charts?

MR. ROBERTS:  Your Honor, I am not aware of any such comparison in the minutes.

THE COURT:  All right.

Go ahead.

MR. ROBERTS:  Thank you, Your Honor.

I think what is crucial here in understanding, and I think going back to a distinction between maybe Counts 1 and 2, is a fiduciary can perhaps carryout its duty to monitor and still separately breach its duty of prudence.  Even if Genworth had engaged in a prudent monitoring process, and that means monitoring investments and actually performing the process stated in their IPS of examining this comparison, if they had done that and still elected to retain the BlackRock TDFs in light of their significant underperformance, unless there's evidence in

the --

THE COURT:  Well, they didn't do it, according to you.

MR. ROBERTS:  Correct, Your Honor.

THE COURT:  So if that circumstance comes up, what do you do?  You can't allege -- you can't allege anything based on what you don't know.  So what happens in litigation if that circumstance presents itself, what do you do?

MR. ROBERTS:  Your Honor, I would say --

THE COURT:  You move to amend the complaint -

MR. ROBERTS:  Right.

THE COURT:  - if and when it comes up to conform with what you've found out in discovery.

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  All right.  So I'm not going to use a Ouija Board and try to figure out what might come up in discovery and then what might happen.  I am reading Count 1 and Count 2, and to me they are the same thing. And earlier you said they were, is that right?

MR. ROBERTS:  Your Honor, that's correct.  And I think --

THE COURT:  Okay.  So then the issue is you are -- their argument, and Judge Nachmanoff's opinions, and the opinions of the other courts dealing with relying only

upon underperformance, are not relevant in this case at all, are they?

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  That's your point, according to your brief?

MR. ROBERTS:  That is.

THE COURT:  Okay.

So now we -- when you bring a complaint about monitoring, do you go to an expert and ascertain what the scope of the duty is and what a monitor is supposed to do in a situation like this?

MR. ROBERTS:  Your Honor, are you asking in the context of ERISA litigation?

THE COURT:  Yes.  At some point in time when you prepare a case you recognize this is a topic about which I know nothing, and can't really do anything about which the law is clear in some respects, but maybe not in what I'm doing, and I need to know something.  And where do you go to get that something?  You go to the expert.

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  Did you do that in this case?

MR. ROBERTS:  Here we have discussed with experts the process here.  Until we obtain some additional discovery, such as -- because what we have here is we have the structure of Genworth's process, but we don't have how

it's been applied.

THE COURT:  How do you find out how it's been applied?

MR. ROBERTS:  That would -- that would be a question for discovery where it would be receiving either communications between the members of the committee and their advisor, between members of the committee themselves, or deposition -- deposition of committee members explaining how they applied the investment criteria over the class period, and whether or not, as defendants state, that there were other factors considered that ultimately led them to retain the funds.  Or as we allege, and as seems to be reflected by the limited discovery here, that defendants were asleep at the wheel.

And that information is then presented to a process expert who can specifically opine, based on their expertise there, whether or not the defendants' conduct met minimum fiduciary standards.

THE COURT:  All right.

MR. ROBERTS:  And, Your Honor, just lastly I want to go back to clarify just the point made about the performance of the investments raised by the defendants here.

Repeatedly, defendants have characterized here today the performance of the BlackRock TDFs is not

underperformance because it was improving performance over the period. You can have improving performance and still be underperforming. The charts that we see here show for pretty much the entirety of the charts that we have here.

THE COURT: Which cover 11 years.

MR. ROBERTS: Which essentially cover 11 years.

That the BlackRock TDFs consistently underperformed on a three-year basis with some limited exceptions in these vintages. But also on a five-year basis, uniformly underperformed their stated benchmark. You can say that that gap closed.

THE COURT: That's the Standard & Poor's?

MR. ROBERTS: Right. And that is on a five --

THE COURT: But you also say the same thing as to the best and the worst comparators?

MR. ROBERTS: That's correct.

THE COURT: But it's hard for them to even address what you're talking about unless they know what the best and the worst comparators are.

MR. ROBERTS: Your Honor, respectfully, at this stage, the Court doesn't even need to go there because plaintiffs --

THE COURT: Judge Nachmanoff said you have got to go there.

MR. ROBERTS: We would disagree with Judge

Nachmanoff's ruling, but here what's --

THE COURT:  You might, but that's what he said and I think it's a very thorough opinion and I need to sort through it.  I may not agree with it.  And these other cases say that the comparator is important, so it looks to me like you have to specify the comparator.

MR. ROBERTS:  Certainly, Your Honor.  And I think that's why the Court need not even go there here today because what was crucially missing in the cases before Judge Nachmanoff were any allegations about comparators or benchmarks actually used by the defendants in those cases.

The S&P target date index is a benchmark actually used by Genworth.

THE COURT:  Well, let me ask you something.  I don't understand why you -- you make allegations early on about -- this is the problem with using flags without notes is that sometimes you get flag happy and you can't find what you want.  But I'll go back at it this way and save you some time.

In Count 1, the breach of fiduciary duty, it says it violates their fiduciary duty under the statute as you cite in that, and there are certain ways they violated.  They "failed and continue to fail to discharge their duties with respect to the Plan solely in the

interest of the Plan's participants and beneficiaries."

That's the first part of it.

Well, I expected when I read that to find out something later on that they considered something else, such as the fees they were having to pay.  But you never then do that -- say that.

And then you say, "and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing," et cetera.

I have to say that it's hard there for me to find out what it is that they did to breach the duty. You violated its respective duties to monitor other fiduciaries is the best I can -- it says, "In addition, as set forth above, Defendant violated its respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties."

That would be Count 2, right?

MR. ROBERTS:  So, Your Honor, --

THE COURT:  The last paragraph -- the last sentence in Paragraph 80 refers to what you are alleging in Count 2.  They're the ones they failed to monitor, the other fiduciaries, right?

MR. ROBERTS:  That's correct, Your Honor.  But I would like to draw a distinction between a duty to monitor other fiduciaries, which is, I think, what the monitoring count goes to.  And failure to monitor investments can actually be encompassed in a duty of prudence claim, and is distinct in that way.

THE COURT:  So you were wrong in conceding that Count 1and 2 are the same, is that what you're telling me?

MR. ROBERTS:  That's correct, Your Honor.  I misstated.  So the breach of the duty of prudence does apply to failing to monitor co-fiduciaries.  And so that would be the instance where Genworth failing to monitor the fiduciaries appointed to manage the plan.

THE COURT:  That's Count 2.

MR. ROBERTS:  That would be Count 2.

THE COURT:  The first sentence on Paragraph 80 is the failure to monitor investments.

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  So why does Genworth have the duty to monitor the investments?

MR. ROBERTS:  Your Honor, it has -- it has a duty in that it's still a fiduciary and is appointed.  It has delegated its duties to the committee, but still has a duty to oversee the monitoring there.

THE COURT:  Well, what is your allegation then

"that Defendant failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries," what did they do that was a breach there?

MR. ROBERTS:  Your Honor, I actually believe that in this case that we've entered into a stipulation with defendants regarding collectively the liability -- or the naming of the defendants in this case so that there's actually technically only one defendant in the case.  It's Genworth.

THE COURT:  Well, it says "Defendant".

MR. ROBERTS:  Right.

THE COURT:  That's not what I'm asking you.  I'm asking you what did they do that was -- they had a duty to act solely in the interest of the plan's participants and beneficiaries.  What did they do to violate that duty?

MR. ROBERTS:  Your Honor, what they did was -- and this ties into the process of investment monitoring. Is they have their process in the plan, and upon the continued underperformance of the BlackRock TDFs to the stated benchmark, they should have engaged in the monitoring process as described in their investment policy statement, and at least considered replacing the BlackRock TDFs with any of the comparators that would have been -- and we named some of them.  But any of the comparators

listed that would have -- of those 15 available TDF series that would have resulted from the application of Genworth's investment selection criteria.

THE COURT:  Well, look at the rest of that sentence then.  And its says, and (a) and (b).

MR. ROBERTS:  Right.

THE COURT:  And (a) has Roman (i) and Roman (ii).

MR. ROBERTS:  Right.

THE COURT:  I don't understand what that means.  Put that in English for me.  Tell me what that means.

MR. ROBERTS:  And I would say that subpart "(a) for the exclusive purpose of," and then Roman (i), "providing benefits to participants and their beneficiaries."  That involves making sure that you are providing the maximum that you can.  You're making sure that the investments that you have are appropriate for your planned participants.  So that's part of what we have here is that not only ensuring that you're just providing benefits period, but that based on the choices that you're making on behalf of planned participants, that those are the best choices for those planned participants.

THE COURT:  All right.  What about (ii), "defraying reasonable expenses"?

MR. ROBERTS:  Right.  "(ii) defraying reasonable

expenses of administering the Plan."

And (ii) wouldn't necessarily be applicable here.  Plaintiffs haven't alleged allegations about the expenses of the plan.

THE COURT:  You don't have that at all.

MR. ROBERTS:  Right.

THE COURT:  And then with (b), and of course you see grammatically that's an incorrect structure?

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  Because you're using the (b) as a modifier to really what is (a), Roman (i).

MR. ROBERTS:  That's correct.

THE COURT:  So is there anything really with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing" -- you see, I don't understand any of that.

I think this complaint, verbose though it is, is confusing beyond belief.  It doesn't really -- and as I have ascertained in our arguments this afternoon, does not really tee up the issues that need to be teed up.

The real complaint here is that not that they didn't jettison BlackRock when it went down, but that they

failed to monitor what was going on with BlackRock.  And when it became obvious that it should have been jettisoned because of the sustained performance -- lack of performance over a 10-year period, they didn't do it.

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  Is that your complaint for Count 1?

MR. ROBERTS:  That is, Your Honor.

THE COURT:  And they therefore didn't engage in the duty to satisfy the duty prudently to get an appropriate investment, right?

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  And then Count 2 is the same thing as the last sentence in Paragraph 81 of Count 1, which is the failure to monitor the committee, the administrative committee, and the -- well, who's the committee and who's the administrative committee?

MR. ROBERTS:  Here we refer to the administrative committee.

THE COURT:  Yeah, but you refer to the committee and its members, and then the administrative committee. And what I don't know is what committee do you mean by committee, and what do you mean by administrative committee?  Now, where is that?  Show me where that is. Maybe I just didn't read it right.

MR. ROBERTS:  Your Honor, I think that might

just be a typo. Some inconsistency in referring to the committee.

THE COURT: My suggestion is that you read it because you have the administrative committee didn't monitor the administrative committee. And if that's what you meant, then that's one thing.

MR. ROBERTS: Your Honor, I think that based -- I think that based on my reading of this now I do believe that that is a typo. We have Genworth is responsible for overseeing the administrative committee. I believe that the administrative committee in this case also had responsibility for monitoring the plan.

THE COURT: Yes. So what you're talking about in 1 and 2 is that Genworth didn't monitor the administrative committee.

Now, what is Count 3? What's that about? They haven't said much about that in the argument. There was some material in the paper. That looks to me like that you wrote that in anticipation -- or mindful that you were going to lose before Judge Nachmanoff, and this is an alternative way of asserting something, but I can't be sure of that.

What does it mean? I don't understand. What's the liability for a knowing breach of trust, and how does that differ from the breach of fiduciary duty in 1, and

the failing to monitor the investments in the breach of the duty of monitoring in 2; how does that 3 relate to anything different?

MR. ROBERTS:  Your Honor, so Count 2 applies to failure to monitor -- a failure by a fiduciary to monitor co-fiduciaries.

THE COURT:  A failure by Genworth to monitor the administrative committee which is the fiduciary as well, right?

MR. ROBERTS:  Right.

THE COURT:  Now what's this other thing, Count 3?

MR. ROBERTS:  And so here this -- this suggests in an instance where a defendant would be found not to be a fiduciary or a co-fiduciary under ERISA, a defendant can be held separately liable for participating.

THE COURT:  Okay.  All right.  But that just isn't even in the cards here.  I mean, you've alleged, and nobody contests, that Genworth is a fiduciary under ERISA, and the administrative committee is, too.  So it looks to me like that particular count needs to be expunged from the case.

MR. ROBERTS:  Your Honor, I believe that we have alleged that Genworth is a fiduciary.  We have alleged --

THE COURT:  I agree you have, and they haven't

disputed it.

MR. ROBERTS:  Right.  Right, Your Honor.  So if I'm following you correctly, based on that, and that there being no dispute there, there isn't necessarily a need to reach Count 3.  It is somewhat redundant of Count 2.

THE COURT:  Or useless?

MR. ROBERTS:  Fair enough.

THE COURT:  It just doesn't apply under the facts that you have alleged.  Everybody agrees that Genworth and the administrative committee are fiduciaries within the meaning of ERISA, and therefore the alternative basis for applying liability to either of them, it doesn't exist, right?

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  Okay.  So Count 3 is gone.

MR. ROBERTS:  Your Honor, I think we have essentially run through the points that we have had here.

THE COURT:  Well, what are you going to give me as a reason to go opposite all of these other courts, Judge Nachmanoff's two very thorough opinions -- or really one because I think he probably did what I would have done, which was use the one as the basis of the other. And then I don't know how many others were cited that -- I guess my answer to all that would be that a lot of those cases have to do with the theory of underperformance alone

as the basis for the claim, and you're not alleging that anymore?

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  So Count 1 is a -- is really a failure to monitor the investments, and Count 2 is the failure to monitor the fiduciaries?

MR. ROBERTS:  That's correct, Your Honor.

THE COURT:  And why don't we have an amended complaint that conforms to that aspect of life and takes account of the criticisms levied by the defendant, and then we will get the case structured in a way that perhaps we can deal with it?  It may mean another motion to dismiss.

I don't know whether Mr. Pumphrey and Mr. Scalia need to pay off bills for a Mercedes or a Maserati or school tuitions, but I have a distinct feeling that they are not going to like what you do the next time.  But I'd at least like to get it structured in a way that makes sense to what you're really saying as the briefs have evolved here and the arguments have evolved.  So that's my inclination here.

And how long would it take you to do the amended complaint, do you think?

And you need to order this transcript and you need to study it because you have said things and he has

said things that are of import to how you would redo your complaint.

MR. ROBERTS:  Your Honor, I think we could probably do that if 20 days sounds reasonable?

THE COURT:  I'm asking you.  Since I don't have to do it, and it's my practice in life to ask those people who have to do the work, what's a reasonable time to do it in because there were so many instances in my life as an associate that never got done.

MR. ROBERTS:  I appreciate that, Your Honor.

I think if we had 30 days.  A month.  I think that would be sufficient.

THE COURT:  All right.

I'm going to deny the motion to dismiss as moot in view of the fact that the arguments and the papers have revealed that the true nature of the claims is not accurately reflected in the amended complaint, and give you leave to file a second amended complaint.

And how long do you want to file your answer and any motion, Mr. Scalia?

MR. SCALIA:  Your Honor, if we could have 21 days to move and 28 to answer?

THE COURT:  Well, you do them at the same time.

MR. SCALIA:  How about 28?

THE COURT:  Okay.  That's fine.  Twenty-eight is

fine.

And I notice that there was somebody to your left that smiled.

MR. SCALIA:  She's even more appreciative than I, I assure you, Your Honor.

THE COURT:  All right.

And then we'll have the motions, and then after that you will have the -- we'll set a schedule.  So let's get the dates and see what the dates are and see what we're doing here.

And I don't know how best to eliminate the flow of paper and the demise of trees, but try to only attach those things that really need to be attached, please, for consideration under the 12(b)(6) motions.

So 30 days is what?  This is the 15th.  So it would be April the 16th, is that right?

And that is a Sunday, so you will file your amended complaint on April 17th, right?

Twenty-eight days from that is May 15th, you file your answer and your motions.

You file your -- how long do you want to file your response?  To the 31st?  That's a holiday in there.

MR. ROBERTS:  It is.  Whatever 14 days would be.

THE COURT:  The 29th.  That's a holiday.  I think it is.  Let me see.

MR. ROBERTS:  Could we do after the holiday then, Your Honor?

THE COURT:  Yes.  The 31st.

MR. ROBERTS:  The 31st.

THE COURT:  And then your reply?

MR. SCALIA:  If we could have 10 days, Your Honor?

THE COURT:  June the 12th, is that okay?  Does that get it?

MR. SCALIA:  Yes, Your Honor.

THE COURT:  Okay.  That will be the schedule.

MR. ROBERTS:  Thank you, Your Honor.

THE COURT:  Well, thank you very much.

I don't see any need for rebuttal on your part at this point, Mr. Scalia.

MR. SCALIA:  You don't seem to have needed my help, Your Honor.

THE COURT:  I didn't see you hopping up either, did you?

Where do you stand on this 12(b)(1) standing thing now that it's been briefed?  It doesn't seem like there was much merit to it, to tell you the truth.  But you will bring that up.  I'm going to deny the 12(b)(1) motion, too, and let them -- you'll have to respond to that in the -- if you have a 12(b)(1), you file a separate

motion for 12(b)(1) not because you don't proceed under 12(b)(6).

MR. SCALIA:  Understood, Your Honor.  And maybe they'll decide not to include those claims.

THE COURT:  I think a little prudence might be appropriately exercised here.  I know that the world of the higher law dispensers are enamored with standing in a way today that I've never seen before.

But anyway, look and see.  And then if there is, I'll deal with it.  But we'll deny the 12(b)(1) for the same reasons.

MR. SCALIA:  Yes, Your Honor.  This claim was dismissed in the *Beldock* case, but I understand.  Yes.

THE COURT:  All right.

Anything else?

All right.  We'll be in adjournment.

MR. SCALIA:  Thank you, Your Honor.

(The proceeding concluded at 4:24 p.m.)

REPORTER'S CERTIFICATE

I, Krista M. Liscio, OCR, RMR, Notary Public in and for the Commonwealth of Virginia at large, and whose commission expires March 31, 2024, Notary Registration Number 149462, do hereby certify that the pages contained herein accurately reflect the notes taken by me, to the best of my ability, in the above-styled action.

Given under my hand this 18th day of March, 2023.

/s/

Krista M. Liscio, RMR
Official Court Reporter