IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

```
*************************
PETER TRAUERNICHT,      *
ZACHARY WRIGHT, et al.  *
                        *
        Plaintiffs,     *    CIVIL NO.: 3:22-CV-00532
                        *    DATE: February 12, 2024 10:21 A.M.
                        *    MOTION TO CERTIFY CLASS
                        *
    vs.                 *
                        *    Before:
GENWORTH FINANCIAL,     *    THE HONORABLE ROBERT E. PAYNE
INC.,                   *    UNITED STATES DISTRICT COURT JUDGE
                        *    EASTERN DISTRICT OF VIRGINIA
        Defendant.      *
                        *
                        *
*************************
```

APPEARANCES:

For the Plaintiffs:   ALEC BERIN, ESQUIRE
                      MILLER SHAH, LLP
                      1845 Walnut Street, Ste. 806
                      Philadelphia, Pennsylvania 19103

                      GLENN E. CHAPPELL, ESQUIRE
                      TYCKO & ZAVAREEI, LLP
                      2000 Pennsylvania Avenue NW, Ste. 1010
                      Washington, DC 20006

For Defendant:        EUGENE SCALIA, ESQUIRE
                      MAX SCHULMAN, ESQUIRE
                      GIBSON, DUNN & CRUTCHER, LLP
                      1050 Connecticut Ave., N.W.
                      Washington, DC 20036

Court Reporter:       Ruth A. Levy, RPR
                      701 East Broad Street
                      Richmond, Virginia 23219
                      804.916.2893

    Proceedings recorded by mechanical stenography; transcript
produced by computer.

APPEARANCES (Continued):


For Defendant:          HEIDI SIEGMUND, ESQUIRE
                        BRIAN EMORY PUMPHREY, ESQUIRE
                        MCGUIREWOODS, LLP
                        800 East Canal Street
                        Richmond, VA 23219

(Court convened at 10:21 a.m.)

DEPUTY CLERK:  Case No. 3:22-CV-532, *Peter Trauernicht, et al. versus Genworth Financial, Inc., et al.*

Plaintiffs are represented by Glenn Chappell and Alec Berin.

Defendant Genworth Financial, Inc. is represented by Brian Pumphrey, Heidi Siegmund, Eugene Scalia, and Max Schulman.

Are counsel ready to proceed?

MR. SCALIA:  Yes, we are.

MR. BERIN:  Yes.  We're ready to proceed.

MR. SCALIA:  We're ready, Your Honor.

THE COURT:  All right.  It's your motion.

MR. BERIN:  Sure.  Thank you.

THE COURT:  You don't have any objection to the motion for leave to submit supplemental authorities, ECF 181?

MR. BERIN:  We do not.

THE COURT:  All right.  The motion will be granted.

MR. BERIN:  Thank you, Your Honor.  Good morning. Alec Berin for the plaintiffs in the proposed class.  And with me is my co-counsel, Glenn Chappell.

Your Honor, I think it's important to begin with some certain fundamental facts about this case.  Plaintiffs here ostensibly advance one claim in this action:  Defendant failed to appropriately monitor the plan's investments and, as a

result, imprudently retained the BlackRock LifePath index funds in the plan at issue.

In the complaint and the expert evidence produced in connection with the motion, the BlackRock funds are analyzed compared to a series of alternative investments.  It is undeniable that every vintage of the BlackRock funds underperformed certain of those comparators.  Defendant's own expert, Dr. Wermers, concedes as much.  That's in Table 6 of his expert report.

Thus, defendant's contention that investors in certain vintages of the BlackRock funds would have about fared any worse under plaintiffs' theory of the case is simply false.

THE COURT:  Well, is it false or is it subject to dispute based on what their expert said?

MR. BERIN:  Well, Your Honor, plaintiffs' theory of the case proffers a series of alternative investments and their own expert concedes that under certain of the investments, the BlackRock funds performed worse, so...

THE COURT:  Well, then that doesn't mean that they -- that it's false that they would have fared worse under all of the comparators.

So don't overstate.  You're treading close.  You've got a difficult case.  Your credibility goes if you don't -- if you overstate.  Hyperbole doesn't go well with judges.  Facts go well.

Now, let's start with the very beginning.  Do you agree that people who -- members of the plan who didn't invest in any BlackRock TDFs are not properly a member of the class?

MR. BERIN:  Well --

THE COURT:  Yes or no?

MR. BERIN:  I agree with that proposition, Your Honor.

THE COURT:  Well, did you say that in your reply papers and I missed it?

MR. BERIN:  Well, Your Honor --

THE COURT:  It sort of sounded like to me -- maybe I misread what you said -- that you're trying to save them.  I think the Fourth Circuit, if I certify a class that contained people who didn't invest in the BlackRock funds would send somebody down here to take me off the bench on the ground that I didn't know what I was doing.  And when you have a situation like that, it's up to you to say, "I agree; they shouldn't be."

Now, so you agree that they're not in the class?

MR. BERIN:  I do agree, Your Honor.

THE COURT:  All right.  Now, what does that do to the numerosity analysis?  How many people are in that category?

MR. BERIN:  Very few if any, Your Honor.

THE COURT:  Excuse me.  But a long time ago a very wise judge told me that numbers are what count when you ask a question about how many and "very few" is not on any accounting

system I know.  It's not in the Latin numbers, like the Super Bowl; it's not in the Arabic numbers.

How many people fall out of the class if we do not include people who did not invest in the BlackRock TDFs; how many are out?

MR. BERIN:  That number depends on the records of the plan that aren't available at this juncture.  But I will say, Your Honor, on this --

THE COURT:  Depends on what?

MR. BERIN:  Depends on the plan's records maintained by the record keeper contemporaneous.  And so the evidence that we have on this motion is that there are over 5,000 members of the plan throughout the class period, and over 95 percent of those individuals were invested in the BlackRock funds.

THE COURT:  Well, I thought the paper said 4,000.

MR. BERIN:  I think some were in and out over the course of the class period, so at a minimum, at any given time, over 4,000 individuals that would be part of the class because --

THE COURT:  And you say there are approximately 5 percent who didn't invest?

MR. BERIN:  No more than five percent, Your Honor, is what the evidence in the record suggests.  So there's still --

THE COURT:  What's that record?

MR. BERIN:  That would be the defendant submitted

meeting minutes of their plan committee's meeting in opposing the motion.  That would be Exhibit --

THE COURT:  And what does it say?

MR. BERIN:  -- 4 to their opposition.

This is on Bates page Genworth 1729.  Mr. Gillespie shared that over 95 percent of plan participants have some or all of their assets in the BlackRock target date funds; that's from the plan's advisor.  Over 95 percent of the participants have some or all of their assets in the BlackRock funds. Exhibit 4 to their opposition.

THE COURT:  And that's Exhibit 4 to -- what's their opposition?  What is the ECF number?

MR. BERIN:  The ECF number, Your Honor, is 154.

THE COURT:  All right.  Now, it is also asserted that there are people who did not suffer any loss.  Wouldn't they send somebody down to take me off of the bench if I certified a class that had in it people who did not suffer loss?

MR. BERIN:  I generally agree with that, Your Honor.

THE COURT:  Now how many people does that encompass?

MR. BERIN:  Well, we assert that it doesn't encompass any.  And this is the dispute that I referenced in my opening comments.  And I apologize if at all I overstated.

The contention that I had wished to advance was that defendant's own expert doesn't dispute that against some of

plaintiffs' proffered comparators, all of the BlackRock LifePath vintages were underperforming those comparators.  So under that theory of the case, the plaintiff advances all plan participants invested in the BlackRock funds suffered losses.

THE COURT:  But wouldn't it be wise to frame the class all people who were members of the class who suffered losses?  I mean, don't you have to do that, even if you're going to certify the class you want?

MR. BERIN:  I generally don't disagree with that framing.

THE COURT:  Because otherwise you might pick up somebody who didn't suffer a loss under some circumstance that may later be found to be -- the loss would be found to be based on a comparator that shouldn't be used and then that person would fall out of the class.  And if the class is certified, and if it's certified in such a way as these people don't have a way out, you're jeopardizing the plaintiffs -- you're jeopardizing class members' rights to bring their own actions. So don't you have to say who suffered loss?

MR. BERIN:  I agree that the class would properly need to encompass individuals who suffered losses, but the choice of comparator, we would submit, is --

THE COURT:  Well, we haven't gotten there yet.  We're going to get to that issue, but we haven't gotten there yet.

So you agree that anybody who didn't invest in the

BlackRock TDF is out and that people who suffered no loss are out?

MR. BERIN:  I would agree --

THE COURT:  You agree with those or not?

MR. BERIN:  Well, on the individuals who suffered loss, Your Honor, from our perspective, sitting here today, that depends on the comparator ultimately used on the merits.

THE COURT:  No, but that depends on who you -- I'm just saying you certify a class as to people who suffered loss. And then later you prove the issue of who suffered loss.

MR. BERIN:  I can agree with that, Your Honor.

THE COURT:  Right?

MR. BERIN:  I agree with that, Your Honor.

THE COURT:  Well, that's the method I think you have to use.  So at this stage you have to cut out of the class those who suffered loss -- those who suffered no loss.

Now, under one scenario in the evidence, as I understand it, there were X number of people, according to the testimony of the defendant's expert, who did not suffer loss. How many people is that?

MR. BERIN:  It is not clear, to my knowledge, based on the defendant's expert report that the numbers that Dr. Wermers shared are based on the vintage of the BlackRock fund.  He doesn't pinpoint a number of individuals who he has --

THE COURT: I'm not talking -- I'm saying if you add all of them up -- the source of this information is the contention of the defendant's expert -- if you add up everybody that the defendant's expert says did not suffer loss, how many people would that be? Regardless of whether he's right, just what is the number?

MR. BERIN: Your Honor, he doesn't offer a number and I don't know the number.

THE COURT: Does he offer a percent?

MR. BERIN: I don't believe he does offer a percentage of the class that that comprises.

THE COURT: How can he say that there were people who suffered -- who did not suffer loss without saying I did a calculation and I identified people who did not suffer loss? How can he do that?

MR. BERIN: He says investors in certain vintages of the BlackRock suite. So for instance, every investor -- and this is just for sake of this discussion -- the 2040 fund didn't suffer a loss. He doesn't specify the time period or the certain number of people that is.

THE COURT: Well, how many people were in the 2040 funds?

MR. BERIN: Over the time period that he is referencing --

THE COURT: Over the class period.

MR. BERIN:  I don't have that information sitting here today, Your Honor.  He only specifies two individuals that he analyzes in particular; that's the named plaintiffs.

THE COURT:  He didn't analyze anybody else's account?

MR. BERIN:  Not to my knowledge specifically, not that appears in his report.

THE COURT:  All right.  Now, take me to your second amended complaint where you talk about the comparators, the alternatives.  I want us to focus on that issue.

MR. BERIN:  I can mention the paragraphs, Your Honor. I don't have the second amended complaint in front of me.  I think it's --

THE COURT:  When you come to court you have to have the operative documents and you have to have the rules of procedures.

MR. BERIN:  I sincerely apologize for that.

THE COURT:  Because that's the way that we function in this operation here.  So where do you talk about the comparators, so I can get to it on my copy of the complaint?

MR. BERIN:  Your Honor, would you permit me to ask my --

THE COURT:  I'm giving you my copy of the complaint. And I want you to tell me where in there to look.  Because that's going to be the framework for the next part of our discussion.

MR. BERIN:  Your Honor, the comparators that we're discussing, the discussion begins at paragraph 38.

THE COURT:  And continues?

MR. BERIN:  And it continues -- a description of the comparators continues between 38 and 45 and some additional comparisons are offered later in the complaint.

THE COURT:  Where?

MR. BERIN:  In paragraphs 52 through 62.  So 38 through 45 and 52 through 62.

THE COURT:  All right.  So let's go to 38 to 45 to start with.  I'm confused about what horse you've saddled up to ride in the case and why we have comparators that -- so many comparators.

So you say, "Throughout the class period there were many TDF offerings that consistently and dramatically outperformed the BlackRock TDFs."  So beginning there, where is it that we go to find your first comparator?

MR. BERIN:  There's a chart set forth in that section, Your Honor, that identifies the four comparators.

THE COURT:  Is there any text that deals with the comparators?  The chart you're talking about is on paragraph 41?  Or are you talking about something else?  Are you talking about page 18 of your second amended complaint?  Or where are you talking about?

MR. BERIN:  Your Honor, I don't have the complaint in

front of me; I apologize.  In that section, there's a chart setting forth the BlackRock LifePath Index Funds and Plaintiffs' Comparators.

THE COURT:  It's the flight path --

MR. BERIN:  The comparators are the American Funds --

THE COURT:  BlackRock TDF GlidePath versus Comparators; is that right?

MR. BERIN:  That's one that references the comparators.

THE COURT:  All right.  So then we have American Funds.

MR. BERIN:  Yes, Your Honor.

THE COURT:  Fidelity Freedom.

MR. BERIN:  Correct.

THE COURT:  T. Rowe Price, Vanguard Retirement, and then BlackRock --

MR. BERIN:  Yes, Your Honor.

THE COURT:  -- in that chart, right?  Now, of the four comparators, which ones are -- what kind of fund is the BlackRock; is it passive or active?

MR. BERIN:  It's a targeted fund that implements with passively managed underlying funds.  So if Your Honor would allow me, targeted funds that implement with passively managed underlying funds, we submit, still do include a degree of active decision-making, including the GlidePath, the specific

asset allocation and subasset classes and then the underlying funds used to populate the funds.  So it is the case that BlackRock implements with index underlying funds, but they're active decisions and this is subjective to some discussion.

THE COURT:  Well, aren't they both active?  That's the point.  Aren't both of them, and all of the funds, one way or the other, active --

MR. BERIN:  That is our position.

THE COURT:  -- under the allegations of the complaint and under your expert's testimony?  There's some that are more actively managed than others but all of them have some activity.

Why do you draw a distinction between active and passive then?

MR. BERIN:  We actually didn't, Your Honor.  That's a distinction that defendant's expert raised and we responded to in our response.

THE COURT:  So you say that they're all active?

MR. BERIN:  We do.  We do.  The degree of active management applicable to this analysis, from our perspective, means that all of these funds are active for purposes of comparison.

THE COURT:  All right.  So in your view, does the degree of activity and management provide a predicate to differentiate between different class members and what happens

in the plans?

MR. BERIN: From our perspective, it does not, Your Honor.

THE COURT: And that is because?

MR. BERIN: That is because the target date funds all have the same investment objective, which is to facilitate retirement as of a certain date indicated in the name of the fund. While they achieve that with slight different decisions that they make, fundamentally, they all pursue the same objective, facilitating retirement at a given year and they're selected as an entire suite for the plan at issue, rather than picking and choosing different underlying vintages from different providers. And so the one decision the fiduciaries in this case made at each juncture was to retain or not the BlackRock TDF suite or replace it with another TDF suite.

And so vis-a-vis the individual participants, the degree of decision-making that goes into the decision -- that goes into the suite of targeted funds that's ultimately selected as a suite by the fiduciaries is not something that creates different situations between individual participants, from our perspective.

THE COURT: But that would seem to me to be because of the nature of your claim, which is the failure to adequately monitor the claim and the failure to adequately monitor the committee.

MR. BERIN:  Yes, Your Honor.

THE COURT:  It makes no difference, because it isn't the committee or the company that is doing the active management; it is the fund that is actively or passively managed.  And passively managed is a euphemism that means basically less managed than others; is that correct?

MR. BERIN:  I agree, Your Honor.

THE COURT:  Well, is that provable in the record?  Does your expert explain it that way?

MR. BERIN:  He does.  He does.  He explains why all targeted funds have a sufficient degree of active decision-making to render them comparable.  That is in his expert report that was submitted with our reply.  Our reply is ECF number --

THE COURT:  What page are you talking about of his report and what page of your papers are proving that point, that all TDFs involve some active management of some sort?

MR. BERIN:  Sure.  This is Mr. Marin's report dated December 18th, 2023, sections B1 and B2, beginning at page 8 of his report.

THE COURT:  D1 and D2?

MR. BERIN:  B as in boy.

THE COURT:  B1 and B2?

MR. BERIN:  Correct, Your Honor.

THE COURT:  B1 and B2.  And you refer to it where?

MR. BERIN:  We refer to it in our reply brief, which was ECF 160.  Mr. Marin's opinions are described --

THE COURT:  Pages?

MR. BERIN:  Mr. Marin's opinions are described on page 3, and they're cited throughout the reply.

THE COURT:  There's a -- while I'm looking at it, there's a Russell Wermers who is their expert.  That name appears in the case that was just cited out of Wisconsin; is that the same person?

MR. BERIN:  I believe it is, Your Honor.

THE COURT:  Who are the lawyers in the case in Wisconsin?  You?

MR. BERIN:  It's not my firm and not Mr. Chappell's firm, Your Honor.

THE COURT:  How about for the defendants; do you know?

MR. BERIN:  I don't know the lawyers representing --

THE COURT:  I'll ask them; I thought maybe you might know.

All right.  So in the view of Marin, the invitation to delete from assessment the actively managed funds, which are different than the passively managed funds, is a red herring.

MR. BERIN:  That is Mr. Marin's opinion.

THE COURT:  Yes.  And in order to determine how many different funds -- or what do you call them levels, suites, or

something?

MR. BERIN:  The vintage is the individual funds.

THE COURT:  Vintage.  How many vintages are we talking about?

MR. BERIN:  Depends on the time period, Your Honor, because the committee --

THE COURT:  Well, let's take the class period. That's what I'm taking about.  It starts when?

MR. BERIN:  The committee added vintages during the class period, Your Honor.  I think it's a total of 13 vintages, but that number changed during the class period from time to time.

THE COURT:  At any time were all 13 vintages in exclusively either form of comparator, the actively managed or the passively managed?

MR. BERIN:  Of the BlackRock Funds, Your Honor?

THE COURT:  Yeah.  No, no.  Yeah, the BlackRock Funds.

MR. BERIN:  Throughout the class period, the BlackRock Funds pursued a passive implementation, so the underlying funds were passive.

THE COURT:  Throughout the vintage that we're talking about, does whether a loss occurred for a person depend upon whether you are measuring that person's performance against a passive or an active comparator?

MR. BERIN:  It would vary, I suppose, based on the comparator, but I don't think that it would be the same by virtue of merely being active or passive.  I think there would be funds that fall into both buckets that both create a higher and a lower measure of loss for an individual participant.  And it's not --

THE COURT:  In other words, if you look at all 13 vintages, no matter which vintage you're talking about, it had losses either by comparison with the active management funds or the passive management funds?

MR. BERIN:  It would depend on the specific comparator and the time period.  There's a report -- there's a table in defendant's expert's report, Dr. Wermers' report; it goes through the number of vintages that would out- or underperform compared to each of plaintiffs' proffered comparators from the complaint.  And he describes it as a number of the 9 or 11 vintages, depending on the time, which overperformed or underperformed.  And so in --

THE COURT:  Well, who overperformed or underperformed?  Nine or eleven, or what are you talking about?

MR. BERIN:  With respect to the two comparators that are actively implemented that he did not consider, 100 percent, 9 of 9 vintages of those replacement -- those proffered replacement funds outperformed the BlackRock Funds.  So in other words, investors in every single vintage of those two

comparator's funds would have suffered a loss according to that portion of plaintiffs' theory.

THE COURT:  But that's under Wermers' analysis?

MR. BERIN:  Even under Wermers' analysis.  But he then attempts to distinguish the actively implemented funds and suggest that they shouldn't be considered for purposes of assessing losses.

THE COURT:  Well, why is it necessary to determine that issue at this stage of the proceedings?  Why isn't that something that's determined after more complete discovery and on summary judgment or at trial?

MR. BERIN:  Our position is that it is premature to determine which comparator is ultimately used for assessing losses.  At this juncture, we think the analysis is whether -- the appropriate analysis is whether, under plaintiffs' theory, which encompasses these different comparators, it is possible to show losses.

And so we do think that ultimately the determination of what the suitable alternative comparator for purposes of losses is in the case will be a merits determination.  That's actually the subject of additional discovery that is being completed right now.

THE COURT:  Well, suppose if we certify the class as you have it but it's as amended by this morning's discussion, and that is, we exclude therefrom any person who was a member

of the plan who did not invest in the BlackRock TDFs and any person who is excluded who suffered no loss, under your theory of the case.

Given that you have 13 vintages, how do we handle this as a class action and certify a unified class as opposed to several different classes?

MR. BERIN:  Well, Your Honor, the vintages together comprise the suite of funds.  And so the plan fiduciaries only ever selected the BlackRock target date fund suite for the plan as a whole.  And so the determination that they made throughout the class period related to the entire suite of funds, not particular vintages.

And so the differences between the circumstances of any investors in different vintages would just be the mathematical calculation of what the degree of loss is compared to the same vintage of the replacement fund.  Because all of the decisions at issue were directed at the plan as a whole, and the structure of targeted funds is as a total suite and not vintage by vintage.  We think it would be perfectly manageable to include all the vintages in the class.  And that's in fact how every single case we're aware of certifying a class to pursue investment monitoring claims related to targeted funds have gone about it.

The Third Circuit's recent opinion in *Boley versus Universal* actually contains a similar discussion in its

analysis of --

THE COURT:  What case?

MR. BERIN:  That's *Boley versus Universal*.  It's a Third Circuit opinion dealing with typicality, vis-a-vis investment monitoring claims related to target date funds, among other investments in that case.

THE COURT:  Foley?

MR. BERIN:  *Boley*, B-o-l-e-y.  And I'll give you the citation.  The Third Circuit opinion is 36 F.4th 124.

The *Prime Healthcare* case that we submitted as supplemental authority in the last month or so also relates to an investment monitoring claim concerning an entire suite of targeted funds.  And confronted with a similar argument, certified a class related to the entire plan; it didn't make distinctions among vintages of the target date suites.

So we think that piece of it just concerns the measure of losses after a suitable alternative replacement suite is determined on the merits.

THE COURT:  If the Court dismissed the claims for prospective injunctive relief, are the plaintiffs still seeking any equitable or declaratory relief of any kind?

MR. BERIN:  The declaratory relief sought would relate to the actions during the class period.  So it wouldn't be a prospective injunctive component, Your Honor; it would be declaratory relief concerning the actions of the fiduciaries at

the time.

THE COURT:  So it's a decision that they violated their duties?

MR. BERIN:  Yes, Your Honor.

THE COURT:  And that's not prospective; it's retrospective.

MR. BERIN:  In this case, I think under the Court's decision on the motion to dismiss related to the prospective relief, that's correct.

THE COURT:  So at this stage it's your view that, according to Marin, all members of the BlackRock TDF are all members of the class who did suffer injury or suffered injury because of the default of Genworth in monitoring the committee and in monitoring the investment?

MR. BERIN:  Yes, Your Honor, that it would be an injury that occurred with respect to every vintage and investors in each of the vintages.

THE COURT:  And Wermers says, well, there were some that didn't have injury, right?

MR. BERIN:  He says that.  We submit that he says that based on an incomplete reading of plaintiffs' theory of the case.  But I think his contention is that if you only consider certain of the comparators, that's true.

THE COURT:  All right.  It is asserted that the class representatives closed their accounts before the end of the

class period.  Would that lead to any unique affirmative defenses that might affect the adequacy analysis?

MR. BERIN:  I don't believe it does, Your Honor.

THE COURT:  Why don't we just stop with when they closed their accounts?  Why doesn't the class period stop when they closed their accounts, period?  That's as far as their injury -- they don't have any injuries after that, do they?

MR. BERIN:  Well, Your Honor, we do believe that the injuries that they had accrued up to that point would be subject to continuing interest and investment performance returns.  But I think --

THE COURT:  What?  It would be subject to what?

MR. BERIN:  After the date at which they left the plan or any participant left the plan, the damages or losses that they'd accrued up to that point under, I think, a theory of recovery consistent with all the case law here is that those individuals would still be entitled to interest on their accrued losses as well as --

THE COURT:  Well, of course, if they get a judgment, they're entitled to interest, if you prove it up, what it is.  But that doesn't have anything to do with what the class period is and whether or not it's appropriate to have people representing a class after they're out of the period of damage, the thing that caused damage, out of the thing that caused the losses, because they can't have any losses anymore after

they're out.  They do, yes; if they get a damage award, they're entitled to interest.  But that's not the same thing as whether or not it's an appropriate way to keep somebody in a class.  I would think you'd stop -- if you stop the class based on when these people got out, when would it stop, the representatives?

MR. BERIN:  I believe it would be in 2021.  But if I could address also the structural reasons I think that it would be necessary to have the class period continue beyond that.

THE COURT:  No, you can't have the class go beyond what a representative stands for, can you?

MR. BERIN:  I think in the context of an ERISA derivative claim, that is what routinely happens, Your Honor. The reason being --

THE COURT:  No, basically, I think the remedy that you -- what you have to do there is get a class member who was in there the whole time to be a representative member.  Don't you have to do that?  I've never heard of a class continuing beyond when the class person suffered injury.  Because some of these people suffered injuries, according to the theory, after the class representatives withdrew from the plan, right?

MR. BERIN:  Well, their injury relates to the same series of --

THE COURT:  No.  Answer that question.  They suffered injuries after the class -- there are putative class members who suffered injuries after the class representatives withdrew

from the plan, right?

MR. BERIN:  They would continue to suffer losses based on the retention of the BlackRock Funds, yes.

THE COURT:  All right.  Well, why is it proper for these people who are no longer in the plan to be representing the people who are in the plan, who are continuing, that at those times there was a lack of monitoring of the two types, i.e., of the performance of the fund and of the performance of the job of the committee, how could that be?

MR. BERIN:  Under ERISA Section 502(a)(2), which is 29 U.S.C. 1132(a)(2), plaintiffs bring their claims as any participant or the Secretary of Labor is entitled to do on behalf of the retirement plan.  And so in doing so, they seek to recover in cases like this and in plaintiffs' case all of the losses of the plan in the plan's account in each of the challenged investments.  And so this is a derivative claim under a pretty unique statute.

THE COURT:  Well, isn't it different when the Secretary of Labor brings it and individuals bring it?

MR. BERIN:  Well, the claim would be stated the same way, I believe, Your Honor.  But both are entitled to --

THE COURT:  But if the plaintiff -- if the Secretary of Labor and there's a class, the analysis is different, isn't it, with respect to whether it's a proper class action?

MR. BERIN:  That may be the case, Your Honor.

THE COURT:  Yeah, because you have an entirely different class representative, i.e., the Secretary of Labor, right?

MR. BERIN:  Well, sure.

THE COURT:  So the mere fact that the statute permits recovery when the Secretary of Labor brings it seems to me to be -- for a period of time after when certain people left the plan and were no longer in it -- is a different class analysis than whether an individual person was in the plan or withdrew from it.  Am I wrong in thinking that?

MR. BERIN:  Respectfully, Your Honor, I don't think that's the way -- I think those Courts have interpreted that statutory section as allowing participants to bring the plan's claim without limitation that's distinct to participants.  The way that that section is written, along with Section 409, which is 29 U.S.C. 1109, would enable any participant to bring the plans claimed for all losses suffered by the plan.

There's a particularly on point case --

THE COURT:  Well, how do you meet the class requirement of injury, and thus standing, and square that argument with the Supreme Court's holding that all class members have to have standing?

MR. BERIN:  Under this claim, all class members would have standing, Your Honor.  Plaintiffs' claim would be one for which they have standing to bring on behalf of the plan, and

all participants in this class, as limited by the earlier discussion, would have suffered a loss.  I think one --

THE COURT:  Well, the defendants contend that the fact that the plan representatives -- excuse me; class representatives left the plan early, before the end of the class period, leads to some unique affirmative defenses that would affect the adequacy of the representative class.  What do you understand those defenses to be?

MR. BERIN:  I understand their argument in that regard and their defenses to be that those individuals would be subject to unique loss calculations, and so there would be --

THE COURT:  What?

MR. BERIN:  Unique loss calculations.  So there would be differing financial interests, under their argument, between the named plaintiffs and other investors in the plan.  We submit, for all the reasons that we discussed earlier, that is only based on their expert ignoring two of the comparators the plaintiff proffers.

In terms of defendant's defenses on these claims, I think the one relevant one -- I reviewed their answer -- the one relevant one would be their second affirmative defense, which is that the losses suffered by the plan were the subject of economic conditions and something other than the decisions of the fiduciaries.  But those decisions affected --

THE COURT:  Well, how would that defense be affected

one way or the other by when the representatives closed their accounts?

MR. BERIN:  I don't think there is an affirmative defense in defendant's answer that would be affected by when the named plaintiffs closed their accounts in the plan.  That argument is about an intraclass conflict between individuals who might have suffered losses that were essentially set by when they participated in the plan.  But that is a circumstance that exists in every retirement plan.  Some participants are hired later; some participants leave employment earlier.

So the dates of one's participation in the plan in these cases is never an impediment to certification of a claim brought on behalf of the plan related to investment decisions that affected the entire plan during a period of time that the statute permits recovery for it.

THE COURT:  All right.  Well, you can go ahead.  What else do you have to say?

MR. BERIN:  Sure.  I'm happy to discuss any particular elements of Rule 23, either A or B, and we've discussed many of them so far.

The cases that I think really illuminate the issues here would be the *Boley* case that I referenced.  The *Prime Healthcare* case that we submitted --

THE COURT:  What?

MR. BERIN:  The *Boley versus Universal* case, the --

THE COURT: The *Prime* what?

MR. BERIN: The *Prime Healthcare Services* case, that's the case we submitted on supplemental authority. There's a particular discussion in that case which deals with this supposed intraclass conflict issue based on individuals participating in the plan during certain periods of time that we think answers this question; it cites to other authorities holding consistently that individual dates of participation in a plan, individual investment decisions, individual risk tolerances are not impediments to class certification of claims brought on behalf of an entire retirement plan for monitoring particular investments that were selected for the plan as a whole and not an individual.

THE COURT: Well, monitoring doesn't have anything to do with risk tolerance. That's why that's the case, right? Monitoring is a wholly different animal than investing beyond somebody's risk tolerance. One is actionable because of inaction; the other is actionable because of actions. So what -- how do those things fit together at all?

MR. BERIN: Well, it's the whole series of individual circumstances that defendants raise in arguing that typicality is not satisfied here. They raise a bucket of issues, including individual circumstances around participation dates in the plan --

THE COURT: What difference do any of those things

make when the claim is based on an alleged failure to monitor the performance of the fund and the performance of the committee?

MR. BERIN:  Our position, Your Honor, is that it doesn't make a difference.  Defendant's argument is contrary. And so I think the cases that we --

THE COURT:  But I don't understand their position.  I want you to help me; explain why it's wrong.

MR. BERIN:  As best as I can understand it, it's that there might be differing financial interests among individuals who participated in the plan at different times, who made different investment selections among the vintages of the BlackRock Funds.

THE COURT:  Well, we're not talking about why they made selections.  That's not at issue.  Whether or not they were misled into making selections, whatever the reasons, couldn't come up in the trial of the merits, could it?

MR. BERIN:  I don't --

THE COURT:  The issue is did you or did you not monitor?  Is monitoring -- the failure to monitor a breach of fiduciary duty; aren't those the two basic issues?

MR. BERIN:  I agree, Your Honor.  So I just wish to address defendant's arguments on those pieces of their opposition to the motion.

THE COURT:  All right.

MR. BERIN:  Really, I think, most of their challenges boil down to their contention that there are these conflicting economic interests between different investors and the BlackRock Funds at different times.  And I think we've had fairly fulsome discussion and I've cited a handful of cases we think address that issue.  And it just has not been a reason the courts have found certification is not warranted in a case like this one.

Defendants nominally challenge commonality, but their arguments are basically that some participants fared better than others.  That is wrapped into the same discussion we've been having this morning so far.

I would note the Fourth Circuit's case *Peters versus Aetna*; it specifically addresses commonality, and I think it squarely rejects the kind of reasoning that defendants are offering here.  That's at 2 F.4th 199.  The Fourth Circuit said while distinctions among proposed class members might affect the dollar amount or scope of relief available, that does not reflexively defeat class certification when the underlying harm derives, as we've been discussing, from the same common contentions that Your Honor noted.

Really, there's a disagreement among the parties' experts about what can be shown on the merits at trial.  This is not really a dispute that it's not possible to show that every participant in the plan during this period suffered

losses.  It's a dispute about the measure of loss, but that of course goes to issues that will be resolved at trial on the merits.

There are a few adequacy challenges, separate and apart from these conflicts that defendants raise about the named plaintiffs' knowledge of the claims and their interests in pursuing the claims based on their deposition testimony.

THE COURT:  That's another question.  Sounds like they don't think you're right.  That's what the -- is the testimony wrongly cited in the brief?

MR. BERIN:  I think we address in the reply, Your Honor, that that questioning, the excerpts of that questioning don't support the contention that defendants are making and that it goes much more to the way that the questions were asked.  And there was clarifying language that the named plaintiffs used in their responses that was omitted.

We think a fair reading of the testimony, which we've included as exhibits --

THE COURT:  Do you think they omitted parts of the testimony that I ought to look at in making the assessment?

MR. BERIN:  I think, Your Honor, the fulsome testimony reflects that the plaintiffs do agree with the fundamental contentions.

THE COURT:  What full testimony?  Where do I go to look at that, quote, full testimony?

MR. BERIN:  I suppose the full deposition transcripts haven't been submitted.

THE COURT:  Well, I don't think -- it's been my experience that there's an awful lot of depositions that don't really pertain to certain particular issues that arise in depositions, by virtue of particular questions and answers.  So I like to have cited for me the exact pages inclusive of where the testimony is that I need to review to see if your named plaintiffs think your theory is wrong; that's what the defendants say happened.

MR. BERIN:  Sure.  We have a citation -- we have several citations to those sections in our reply briefing at pages 13 to 16.

THE COURT:  And that's where I go look at those depositions?

MR. BERIN:  The depositions were attached.

THE COURT:  I don't have to look at anything else?

MR. BERIN:  The depositions were admittedly attached as exhibits to defendant's opposition.  That would be Exhibits 2 and --

THE COURT:  So I don't have to go to anything other than the deposition pages cited on page 13 through 16 of your reply brief?

MR. BERIN:  We think that those fairly illuminate the issue here, that the plaintiffs did have full enough

understanding of their claims in this case and don't disagree --

THE COURT:  Well, that's interesting that you say it that way.  Because the contention is not that they didn't have a full understanding; it's that they didn't agree with you. That's what they say the answers in the plaintiffs' testimony was.  I mean, that's the effect of it.  So...

MR. BERIN:  Understand, Your Honor.  I might have perceived both as being part of defendant's argument.  But on the subject of whether or not the plaintiffs agree with the theory --

THE COURT:  It says, "The named plaintiffs have disavowed or disagreed with the underlying theory of the case in deposition by stating Genworth should not have removed BlackRock TDFs from the plan."  Isn't that what they say?

MR. BERIN:  That is what they say, Your Honor.

THE COURT:  All right.  And that's at 157 ECF, pages 20 to 22 is where that argument is.

MR. BERIN:  To address that --

THE COURT:  Now, which part of the deposition testimony do they actually say that says that?

MR. BERIN:  Pardon me, Your Honor?  I didn't --

THE COURT:  That is a conclusion that the defendants cite.

MR. BERIN:  The defendants attached portions of the

plaintiffs' deposition to their opposition.

THE COURT:  Well, where in 157, page 20 to 22 does this appear?  It looks to me like it's at the bottom of 20. They say, "The plaintiffs disavowed the theory underlying the claims advanced by their counsel."  But that's not what the plaintiffs said.  That is their conclusion about what the plaintiffs said.

So have you looked at the underlying cited deposition testimony where it says that?  It says --

MR. BERIN:  I have, Your Honor.

THE COURT:  Well, what did he say?  They don't cite any page of the deposition there.

MR. BERIN:  Well, at page 15 of our reply we include a citation and a quotation.  If I may, Mr. Trauernicht's response --

THE COURT:  Just a minute.  15...

MR. BERIN:  Sure.

THE COURT:  Full testimony at page 15, I believe that there is -- "when asked whether there was anything that made the BlackRock TDFs unsuitable, Plaintiff Trauernicht's full testimony was, 'I believe that there is, but I will admit ignorance in not understanding the details.  I believe it has to do with the volatility of the investments or maybe just the nature in which they were performed, but my core understanding is that the root issue was that they weren't being monitored

properly by Genworth with regards to the best interests of the class.'"

Now are you telling me that the statement that I cited from the defendant's brief is based on the Trauernicht transcript 63:23-64:10?

MR. BERIN:  I think it's based on the same line of examination, Your Honor.  And I think that this was his clarifying comment about what he understands the claims in the case to be.

THE COURT:  Well, you see, in the defendant's brief there is no citation for me to go to, so I'm trying to ferret it out.  It seems to me like that what they're really saying is that the first part of the Trauernicht testimony cited on page 15 of your reply, ECF 164, simply shows that he doesn't have enough knowledge to be an adequate class representative.  And that's a different argument than that he disavowed the theory.

And I'm trying to find anyplace in the testimony where Trauernicht says, "I know what the theory is and I disavow it."

MR. BERIN:  Your Honor, I don't --

THE COURT:  Or, "I don't agree with what the theory is."  Is there any such thing in there at all?

MR. BERIN:  Your Honor, I don't believe there is.  We submitted --

THE COURT:  I didn't find it in what we were given.

All right.  And go ahead, sir.

MR. BERIN:  We submitted this and I think made clear that Mr. Trauernicht, in the absence of disavowing his theory, actually expressed that he understands the theory and he expressed agreement with the theory.  And so I think that aspect of the adequacy argument is not one that should serve to defeat Mr. Trauernicht's -- and there's a similar discussion with Mr. Wright -- defeat their ability to serve as class representatives.

They've also submitted declarations in which they expressed that they've understood the claims, they helped write the complaint, they've been involved in the litigation, they've produced documents, and sat for depositions, and that they are interested in pursuing these claims; far from disavowing the claims, they declared, in connection with the motion, and I think as corroborated by the deposition testimony, that they are interested in pursuing these claims on behalf of the class and they've sufficiently shown that they were adequate representatives of the class.

THE COURT:  In one of the papers that the -- when you address the question of loss by the named -- by the class representatives, I believe that you say in reply to the position of the defendants that each of the -- Trauernicht and Wright suffered losses, according to your expert, Marin, of between $100 and $200.  Am I reading your papers right?  Is

that what your contention is as to what their loss was?

MR. BERIN:  Well, Your Honor, I think that is correct with respect --

THE COURT:  Yes or no?

MR. BERIN:  With respect to Wright, yes.

THE COURT:  Well, what about Trauernicht, what did he suffer?

MR. BERIN:  Trauernicht, with two of the comparators that Mr. Marin identified, suffered between $700 and $1700 in losses.

THE COURT:  So we're talking about dealing with a class action here where people suffered between $100 and $1700 maximum?

MR. BERIN:  I believe there would be individuals who suffered more than Mr. Trauernicht's $1700 in losses.

THE COURT:  What reason do you have to believe that?

MR. BERIN:  Based on the average account balances in the plan.  Mr. Trauernicht's fell below, I believe, the average account balance in the plan.  And so this math is based on his personal assets which were directed through the plan to the BlackRock Funds.  And so an individual who had higher asset balance in the BlackRock Funds would have suffered more losses under the same model.

THE COURT:  What does it do to the case to terminate the class period as of the date that Trauernicht and Wright

withdrew from the plan?

MR. BERIN:  Your Honor, I confess that I don't know, sitting here today; that would be math that the experts would be likely tasked to do.

THE COURT:  Well, how many people -- so, really, what the issue is, in making that decision, is whether an individual rather than the Secretary of Labor, suing on behalf of the plaintiff, can pull out of the plan and still have a claim that transcends the time that he pulls out.  Because you want the class to stop -- you say at one point that you want it to stop on the date of judgment.  I mean, don't we have to stop it as of the date that you filed the complaint, at the latest?

MR. BERIN:  Well, the investments at issue --

THE COURT:  I can't do that though, see how I can keep it running.  It just makes -- it's really undefined.  It just keeps going and going.  And so we issue a notice, for example, to somebody; there's a class action; you can get in if you want to, but the class just keeps going.

So then when there are how many hundreds of people that get added to the class after I make a decision to certify the class and do what you want?  How does that work?

MR. BERIN:  It's quite common, Your Honor, involving retirement plans like this.  In fact, it's the norm among all the cases cited by both parties across the briefing.  And I believe the reason that is is, again, this is a derivative

claim on behalf of the retirement plan.  So much of the assets if not most of the assets that are subject to the claim are still within the plan --

THE COURT:  Well, suppose this -- they may be in the plan, but suppose that they've read your complaint and they've been monitoring ever since.  They've been monitoring every day since they read your complaint and said, oh, my goodness, we didn't do well; we got to do better, so we're going to monitor it.

There isn't any claim left for people who are in that period of time for failure to monitor.  It may be true if they committed some other kind of fiduciary duty violation, but how would that claim even exist?

MR. BERIN:  Well, I think claims --

THE COURT:  The answer is it wouldn't, right?  What claim would you have for failure to monitor when they're monitoring?

MR. BERIN:  Well, we wouldn't have a claim if they were monitoring, but we don't -- that's not -- that has not been proven.  That is part of the merits of the case, is the ongoing monitoring of investments.

THE COURT:  Well, have you a case that deals with specifically this issue?  You say it's discernible from all the cases, but my general experience in the practice of law is that when that is the argument that's made, it requires an awful lot

of review and reading and analysis and assessing what the different fact patterns were and whether there's any merit to the claim or not.  Do you have any cases, really, on point that says that the class continues until judgment in the case?

MR. BERIN:  The few cases we've been talking about so far, the *Prime Healthcare* case, the supplemental authority that we submitted, the class period here, I can read it; it's all participants and beneficiaries in the plan on or after August 18th, 2014, which was six years before that case was filed, to the present.  And the judge had some discussion about the derivative nature --

THE COURT:  Well, to the present.  The present then is of the date of the class certification, not to judgment. You see the difference?

MR. BERIN:  Well, I do see the difference between those.  And the date of certification --

THE COURT:  I have to handle a case.  I have to deal with the realities of a case and the people whose lives are affected by it.  And there's certain responsibilities that the Court has that transcend even responsibilities that class counsel have.  And I just can't -- unless you have some authority that permits this -- and you just said you don't -- I don't believe I can accept that position.

MR. BERIN:  I do, Your Honor.  See, here's another case.  This one actually was one cited heavily in the reply

brief, the *Munro versus the University of Southern California* case.  The class period there is all participants and beneficiaries in the University of Southern California defined contribution retirement plan and the University of Southern California tax deferred annuity plan from August 17th, 2010 through the date of judgment.

THE COURT:  Well, tell me this.  Did anybody ever challenge that date, that issue?  Is there an appellate court?  You see, it says that's what a court did; they signed some order that it was tendered to them or there wasn't an issue in it.  But now there's an issue.  The issue is what they raised and the issue is what I'm concerned about.

So is there any case where it has actually been contested and the ruling has been that it can be that way?

MR. BERIN:  Your Honor, I don't know if it's been contested head-on.  The *Boley* case, for instance, had some review of the issue, the *Boley versus Universal* --

THE COURT:  What review did it have?

MR. BERIN:  The arguments were that there were individuals who would have left the plan at different times and, for the same reason, the class representatives wouldn't be adequate representatives.  And I think that's the context of this discussion.  But the Third Circuit reviewed and affirmed the class that included the continue to the date of judgment.

THE COURT:  And it was litigated about if that was an

appropriate reach, time span?

MR. BERIN:  The question wasn't presented in the way that we're discussing, but it was presented on those issues.

THE COURT:  All right.

MR. BERIN:  Candidly, I don't think it's been presented this way.

THE COURT:  Okay.  Anything else?

MR. BERIN:  I think the last thing that I should discuss is the subpart of Rule 23(b) under which certification is proper.  I think there's some disagreement among the parties about what subpart is proper in cases like this.  We submit that it's 23(b)(1).

As we say in the briefs, the context of this claim brought on behalf of the retirement plan and a single set of fiduciary decision-making which the Court would be asked to assess and relief which would be accorded through a continuing retirement plan, we think there's plenty of support in the case law for certification under 23(b)(1), which is the mandatory class often applied to equitable situations.

The defendants argue that a Supreme Court case, *LaRue*, that was decided a number of years ago, prevents certification under Rule 23(b)(1).  There have been a number of cases to deal with that exact argument the defendants have made, which have each found that *LaRue* doesn't change the circumstance of certification with respect to a defined

contribution retirement plan claim that's brought on behalf of the entire plan for failure to monitor investments in the plan. And we think the circumstances of the *LaRue* case actually illustrate the difference.

The injury in *LaRue* -- and the claim was brought by one individual participant who had made an investment direction to the plan administrator.  The plan administrator failed to follow that direction, just with respect to his account, and he brought a breach of fiduciary duty claim against the plan administrator.

The defendants in that case then defended in saying that a 502(a)(2) ERISA claim can't be brought by one single individual.  The Supreme Court allowed the claim to be brought by the individual, but the claim at issue there was about one single action that affected one participant's account.  And for that reason, most courts that have looked at *LaRue* have found that *LaRue* doesn't prevent certification of plan-wide claims under Rule 23(b)(1).

There's some discussion of this in a Second Circuit case, *Coan versus Kaufman*, that's cited in our reply brief. There's also significant discussion of it in the *University of Southern California* case that I just mentioned.  The exact same argument was put the exact same way by the same counsel and the court certified under 23(b)(1) over the same objections.

There's a line of cases finding that the structure of

ERISA plans and the way that relief is accorded in cases like this all favor certification under Rule 23(b)(1).  So I just wanted to bring some of that discussion to the Court's attention today.

One issue the defendants note with respect to certification under 23(b)(1) is that there might be due process concerns around notice, because Rule 23(b)(1) doesn't absolutely require notice of a class to be given; that's 23(b)(3), I believe, that requires notice.  You know, if that's a concern that the Court has, we're aware of cases ordering that notice be sent out, even in a 23(b)(1) class so that all participants in a plan are aware of the action.

THE COURT:  And a right to opt out?

MR. BERIN:  Well, a 23(b)(1) doesn't contain an opt-out right, Your Honor; that's a mandatory class.

THE COURT:  But their argument is not only the lack of notice; it's the right -- what good does it do to me if I get a notice that says, we're bringing a suit; you can be bound by it, whether the results are good, bad, or indifferent, and you've got nothing to say about it; you may have a claim, you may not, but you can get your own lawyer and chase a rabbit the way you want to chase it.  And then you say, oh, but you really don't have that right.

MR. BERIN:  Well, those individuals who would be provided notice would have the right to intervene in this case.

They would have our phone number and our contact information, and we regularly talk to participants in retirement plans in cases like this where a mandatory class has been certified to keep individuals apprised of the litigation, to answer questions they have, even to represent some who want to come in and step up as named plaintiffs.

And so while there's not an opt-out right, we think there are good reasons for that under 23(b)(1) and the structure.

THE COURT: Why? Why are the reasons sufficient?

MR. BERIN: I'm sorry, Your Honor?

THE COURT: What is the reason? You said there are good reasons why there isn't.

MR. BERIN: Well, the circumstances that merit 23(b)(1) certification are when incompatible standards might arise as a result of a judgment in a case. We think that, in a case like this, where you would be asked to review one series of decisions by the plan's fiduciaries that affected the plan as a whole rather than any individual participants, that your decision concerning the fiduciary's conduct would affect -- would create, excuse me, incompatible standards sufficient to warrant certification under that part.

THE COURT: Well, what other part could there be certification where people could opt out, on the facts of this case?

MR. BERIN:  I don't believe that under the facts of this case an opt-out class --

THE COURT:  So it's nothing -- none of the other parts of 23(b)(1)?

MR. BERIN:  There are two subparts of 23(b)(1).  We think that both of them are met.  The two parts of that are the incompatible standards part that I just referenced.  The other part -- the incompatible standards is (b)1(A).  Then (b)(1)(B) is adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interest of other members, not parties to the individual adjudications or would substantially impair their ability to protect their interests.

In a case like this, again, where the Court is asked to review a single set of decisions made with respect to a retirement plan that continues to operate, we submit that that part is also satisfied under the circumstances of a case like this.

The Second Circuit case that I referenced, *Coan versus Kaufman*, had some discussion about this issue and does find that 23(b)(1) classes are an appropriate way for individuals to become what I believe the Second Circuit called bona fide representatives of a plan in a case like this.  I think the Second Circuit there recognized, under the unique circumstances of a derivative action brought on behalf of a

retirement plan, sensitive to these issues, that there are individuals who might not be standing in the shoes of the named plaintiffs, but the named plaintiffs fairly represent other individuals who might be affected by an adjudication with respect to the retirement plan as a whole.

THE COURT:  Why would it be certifiable under (b)2?

MR. BERIN:  Your Honor, (b)(2), I believe --

THE COURT:  "The class action may be maintained if Rule 23(a) is satisfied, and if:  (2), the party opposing the class has acted or refused to act on grounds that applied generally to the class" -- that's certainly the case here -- "so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

You tell me you want a declaration that they violated the law, under (b)(2).  And why not (b)(3)?

MR. BERIN:  If I can address (b)(2) first.  I don't -- I don't know, and I believe the case law bares out that (b)(2) doesn't provide for monetary relief to be accorded.  I think injunctive relief is --

THE COURT:  It doesn't mention monetary relief.

MR. BERIN:  And so consistent with the Court's decision on the motion to dismiss the prospective injunctive claim, not withstanding the fact that we do seek a declaration related to the issues during the period for which the Court's found it appropriate, I don't believe that (b)(2) would enable

the portion of plaintiffs' claims seeking recovery of losses to the plan to certainly be sought here.  I think the case law, my recollection of it, which --

THE COURT:  What if it's appropriate under both (b)(1) and (b)(2); what do you do then?

MR. BERIN:  Your Honor, I think, frankly, for the portion that seeks injunctive relief, it's perhaps the case that (b)(2) could also be appropriate.

THE COURT:  And how about (b)(3); why wouldn't (b)(3) apply?

MR. BERIN:  (b)(3), if I'm recalling, are class actions where the elements of 23(a) are met.

THE COURT:  I think you have to meet 23(a) for any class action to obtain.  And yes, the first section of 23(b) says, "May be maintained if Rule 23(a) is satisfied, and if" -- so why isn't (b)(3) appropriate?

MR. BERIN:  I think (b)(3) is the class actions where common issues predominate over individualized issues and a class action under that section is superior, if I'm remembering correctly.

THE COURT:  Well, that's exactly what you say is the case here.

MR. BERIN:  Well, in the context of a single retirement plan, where we've got a claim that, as we discussed earlier under 502(a)(2) of ERISA, is brought on behalf of the

plan and a decision by the Court affecting the plan has the ability -- has the potential of creating obligations, awarding relief related to the plan as a whole.  23(b)(1) is the section of that rule that we submit is designed for circumstances --

THE COURT:  That's not answering the question about why 23(b) isn't the appropriate vehicle to use.  You're saying you think -- you're just saying that you think (b)(1) is the right one.  You're not saying why (b)(3) wouldn't be appropriate.

MR. BERIN:  Well, if individuals are afforded the ability to opt out of the class like they would have under (b)(3), they would conceivably have the ability to bring actions separately from this case that differently affect the obligations of the plan.

And under those circumstance, we think the first subpart, (b)(1), is designed to prevent an outcome -- this is unlike, in our view, a consumer case where individuals bringing separate claims for recovery of their own individual losses can do so safely in different lawsuits.

Here we have a circumstance of a single retirement plan where obligations may be set and relief may be accorded that affect the plan as a whole.  And so if individuals are able to opt out and then bring suits separately, we could have a circumstance where exactly the incompatible standards contemplated by (b)(1) occurs.

THE COURT:  What is it that prohibits opt-out rights in a (b)(1) class?  What law actually does that?

MR. BERIN:  I think Rule 23 itself is the authority creating --

THE COURT:  What part of Rule 23?  You didn't bring your book.

MR. BERIN:  I have excerpts of the rule.  I don't have the full rule concerning --

THE COURT:  Give him my rules book.

Tell me what part of 23(b)(1) says you can't have an opt out.  How about one of the treatises?  Certainly the treatises would deal with that.  But in the papers before me, nobody talks about that.

Tell you what, we're going to take a recess and give you an opportunity to look at it.  20 minutes.

MR. BERIN:  Thank you, Your Honor.

(Recess was held from 11:39 a.m. to 12:06 p.m.)

THE COURT:  All right, sir.

MR. BERIN:  Morning again, Your Honor.  I believe when we broke we were discussing the subpart of Rule 23(b) under which certification is appropriate.  We'd left the discussion, I think, talking about the differences between 23(b)(1) class actions and 23(b)(3) class actions, the latter of which have the opt-out right.

In reviewing the rule and some of the advisory

committee notes, the opt-out right isn't an express right that comes from the rules, but it arises from the structure of the various rules. In the 23(b)(3) context, I believe the opt-out right was clarified in a Supreme Court case. But when you look at the notice and certification order provisions of Rule 23, those provisions discuss the opt-out right only in connection with 23(b)(3) class actions.

THE COURT: You can have a hybrid (b)(1)/(b)(3). *Newman* says you can.

MR. BERIN: Well, our position is that the opt-out right here is one that's inconsistent with the need for the actions against the fiduciary, as all claims potentially brought against the fiduciaries on behalf of the plan to come into one action under 23(b)(1).

I would note that the 1966 advisory committee notes to Rule 23(b)(3) indicate that (b)(3) is a subsection that is appropriately used when there's not a more appropriate or where the circumstances don't more closely call, I believe the committee used, for a different kind of class action.

THE COURT: I.e., where (b)(1) and (b)(2) don't apply.

MR. BERIN: Correct, generally. And so I think to your question of whether a hybrid of a (b)(1) class action with an opt-out right, again, from our perspective, since 23(b)(1) class actions were created to prevent the possibility that

inconsistent adjudications would create differing standards as it relates to the same parties for the same claims and the same conduct, an opt-out would effectively be at odds with that.

There's some other discussion that we think is relevant in some of the cases that have been drawn out.  There is discussion in the University of Southern California case that I earlier cited about whether 23(b)(1) or 23(b)(3) class actions are more appropriate.

The issue is teed up in a way quite similar to this action, and the Court has fairly significant discussion before concluding that 23(b)(1) class certification is appropriate and 23(b)(3) class certification is not.  And it reviews the doctrine and case law under the statute that supports the idea that these actions involve the claims of participants related to a single set of conduct on the part of fiduciaries; every participant has the right to bring a claim on behalf of the whole plan for those issues and relief that's sought would be accorded through the retirement plan itself.

And so those circumstances in virtually the view of all courts --

THE COURT:  Doesn't *Munro* also contain a right or have a viable injunctive relief claim in it and doesn't the Supreme Court sort of express concern about the absence of opt-out where monetary damages are concerned?

MR. BERIN:  I think both of those things are true,

Your Honor.  In terms of the context of this action, however, the portions of the reasoning in *Munro* I think don't distinguish among the types of relief sought and discuss the nature of each participant --

THE COURT:  No, but the Supreme Court has.

MR. BERIN:  I'm not familiar with the Supreme Court discussing that in the context of this kind of 502(a)(2) claim under ERISA and drawing a distinction --

THE COURT:  But the problem is though that -- I mean, the distinguishing feature seems to me to be that here, the monetary relief is monetary relief that goes to the plan.  And then it is up to the plan to parse it out in accord with the relative interests that are involved.  There isn't an individual right to bring a lawsuit here, is your theory.

MR. BERIN:  I think that's generally our theory.  I would note that that's --

THE COURT:  Well, if that's the case, how would we have inconsistent verdicts?

MR. BERIN:  If we were to allow opt-outs and individuals could press different lawsuits --

THE COURT:  Okay.  Thank you.

MR. BERIN:  -- is the position on that.  In closing, I think -- and I'm happy to address any additional questions the Court might have -- I would just note, with respect to the class period, defendants point out that there is an error in

the way that the class period is stated in the brief.

The complaint pleads a class period beginning August 1st, 2016.  As a result of a typographical error in the moving papers, we indicated July 29th, 2016, a difference of two days. The correct date would be August 1st, 2016, which would be the limitations period set under the statute.  So I just wanted to agree with the defendants that an appropriate class would begin on August 1st, 2016.

THE COURT:  All right.

MR. BERIN:  And lastly, as it relates to some of the discussion on the end date of the class period that we've had, on further reflection during the recess, I just wanted to leave the Court with an analogy to the securities and consumer contexts.  The thing that coheres the class together here --

THE COURT:  What?

MR. BERIN:  The thing that coheres or brings the class together here is their claim.  Each participant's right to bring a claim for breach of fiduciary duty against the plan's fiduciary is on behalf of the plan.

And so typically in context where that's the case, the individual dates of participation, for instance, in a securities offering in sale and an individual's dates of purchase of a defective product typically wouldn't prevent a class period for individuals who have fundamentally the same claim to exist and be defined for dates beyond a purchase.

And so here, I think the analogy to be --

THE COURT:  Well, depending on what the allegation was.

MR. BERIN:  I'm sorry?

THE COURT:  It would depend upon what the allegation was.

MR. BERIN:  I agree, Your Honor.

THE COURT:  Or the fraud.

MR. BERIN:  I agree, Your Honor.  I think, in raising the analogy, the point that we would wish to leave the Court with is simply that the thing that coheres the class together here are each individual's potential or actual claims against the fiduciaries on behalf of the plan, and that's not a claim that differs based on an individual's participation dates in the plan.  That is a claim that relates to a uniform set of conduct that's the same for every participant.

And so we think the analogy would be appropriately made to a claim that would enable a class period to be defined relative to a recovery period or relative to claims as opposed to participation.

THE COURT:  All right.  Well, I have another question:  Tell me what's happened to the cases that were filed up in the Alexandria division.

MR. BERIN:  Those cases were resolved, Your Honor.

THE COURT:  What does that mean?  Dismissed?

Appealed?

MR. BERIN:  Judge Nachmanoff had dismissed the initial complaints in those cases consistent with this Court's decision.  Notices of appeal were filed in those two cases and the parties in the cases resolved the cases and dismissed the notices of appeal.

THE COURT:  Was there a class action settlement?

MR. BERIN:  There was not a class action settlement in either of those cases.

THE COURT:  Okay.

MR. BERIN:  Thank you, Your Honor.

THE COURT:  Are there any other cases like this around the country?

MR. BERIN:  There are pending.  Several have had subsequent complaints filed after an initial complaint and motions remain pending in the vast majority of those cases.  I believe there are five or six others.

THE COURT:  Who's the defendant?

MR. BERIN:  The defendants in those cases include large plan sponsors of 401(k) plans.  A couple of the others that come to mind offhand would be Citigroup.  There's a case -- I can provide, if Your Honor would like, a list of those cases.  I can't recall the defendants offhand in each of the cases.

THE COURT:  Do what now?

MR. BERIN:  I could provide the cases if the Court is interested.  There are five or six.

THE COURT:  Why don't you do that; send an e-mail to them and to me.  Send it to Mr. Teste.  All right.  Thank you.

MR. BERIN:  Thank you, Your Honor.

THE COURT:  For the defendant?

MR. SCALIA:  Good afternoon, Your Honor.  Eugene Scalia representing defendant Genworth.

THE COURT:  Yes, sir.

MR. SCALIA:  Respectfully, Your Honor, I believe that the discussion that you've just had with plaintiffs' counsel thoroughly demonstrates that they've simply failed to carry the burden that they have here.  It is plaintiffs' burden, as you know, Your Honor, to affirmatively demonstrate compliance with Rule 23 and to survive a rigorous analysis.

The many questions you've asked, Your Honor, have demonstrated all of the flaws in the manner in which plaintiffs elected in this case to move for class certification; simply, it does not fit within Rule 23 and particularly within 23(b)(1).

To give some examples, Your Honor --

THE COURT:  Well, let's take 23(a) first, since that's the first thing that has to be done.  What's wrong with their 23(a) analysis?

MR. SCALIA:  Well, I think, Your Honor, a core

problem with their Rule 23(a) analysis is their inability to carry their burden to affirmatively demonstrate injury.  If you look, for example, at plaintiffs' own reply brief --

THE COURT:  No injury?

MR. SCALIA:  That's correct, Your Honor.  If you look at plaintiffs' reply brief at pages 7, pages 11, plaintiffs themselves recognize that a common injury and a typical injury are necessary to satisfy the requirements of Rule 23(a).  They site the *Wal-Mart/Dukes* case.

THE COURT:  Is that ECF 164, ECF No. 164?

MR. SCALIA:  I have it as 160, your Honor.  It's the plaintiffs' reply brief.  It's possible there's a subsequent ECF for the version filed under seal, but I have it as 160.

THE COURT:  I have a sealed version as 164.

MR. SCALIA:  That's correct, Your Honor.

THE COURT:  So where do you want me to look?

MR. SCALIA:  If you go to page 7 of their reply brief, under commonality, the very bottom of the page, they say, "Commonality requires that purported class members, quote, 'have suffered the same injury,' end quote, citing Wal-Mart versus Dukes," which is a seminal Supreme Court decision.

THE COURT:  Why haven't they suffered the same injury here?

MR. SCALIA:  And Your Honor, the other cite, just to complete the discussion, is page 11 of that same document.

With respect to their failure on injury, it comes back again, Your Honor, to their burden.  It is their burden to affirm --

THE COURT:  I want to know what your theory is, though, about what it is -- why haven't they suffered the same injury?

MR. SCALIA:  Because, as has been shown by defendant's expert here, if you look at the only reasonable alternatives that Genworth might have used, conceivably, according to plaintiffs' own allegations, those funds result in a circumstance where approximately 42 percent of the class or at least the class holdings were not injured.  We lay this out in our brief, I believe, on page 7.  Our brief is ECF 157.  We lay out that, for the retirement vintage, for the 2050 vintage, and for the 2060 vintage, the BlackRock TDFs outperformed both of the passive comparatives that were put forward by plaintiffs.

And Your Honor, I would like to speak for a moment about this fundamental distinction between active investment funds and passive funds.

THE COURT:  Wait a minute.  He says 42 percent were not injured because, in those vintages, the BlackRock TDF outperformed the active comparator or the passive?

MR. SCALIA:  That's largely correct, Your Honor.

THE COURT:  Which one?

MR. SCALIA:  The --

THE COURT:  Active or passive?

MR. SCALIA:  Outperformed the passive comparators that were identified in plaintiffs' own complaint.

THE COURT:  Why are we restricted to passive comparators?

MR. SCALIA:  Your Honor, because the industry, defendant's expert, and numerous courts have recognized that active and index investments, it's comparing apples to oranges. Every single court that has ruled on whether you can properly compare active and index funds have said you can't; it's apples and oranges.

We actually, on page 7 of our brief, we cite cases to that effect.  That, by the way, is the ground on which some of these cases were already dismissed, these cookie cutter cases that were brought by plaintiffs' counsel.  The problem now is the burden was on them to come forward and demonstrate that active funds were an appropriate comparator and they failed to do --

THE COURT:  Well, their expert says that they are. Marin says that they're appropriate comparators.

MR. SCALIA:  Well, what he says --

THE COURT:  And he says that your fella is just wrong in what he's saying.  And am I to resolve that here?

MR. SCALIA:  Your Honor, it's, obviously, as you

recognize, at times necessary for a Court to decide merits-related issues at class certification. And as I say --

THE COURT: Right. That's true. But only -- but I don't understand why it's necessary to decide that at this point here. Why do I do that? Do I get Wermers and Marin on the stand and I have them present evidence and I say, okay, you're wrong, or you're right; is that what I do?

MR. SCALIA: What you do, Your Honor --

THE COURT: I'm not going to do it on the basis of reports. I don't think I can do that. I think if I'm going to make that kind of determination, at this stage, I think I have to do it. And I have a lot of questions for both of them.

But I particularly need to hear how -- would need to hear how your expert explains his position, because they've shot holes in it pretty effectively. So what do I do, listen to -- call them here as witnesses and have a supplemental hearing and decide the issue now, become the finder of the fact on which expert to believe, which is fundamentally a credibility question?

MR. SCALIA: Part of what the plaintiffs need to establish at this point, Your Honor, is that the Genworth plan administrators would reasonably have selected these active funds to replace the passive investments strategies that they've chosen.

Plaintiffs have not done that. Mr. Marin,

their expert, does not say that he believes that the Genworth plan can have been predicted to choose these active alternatives.  They cherry-picked, Your Honor.  They, in their complaint, they said, oh, these four funds are the right comparators.  Then they realized, oh, two of those don't really help us.  And so they said no, it's just two of them.  They picked the two highest performing active funds for this period.

What they didn't show you is any reason to believe that an investment committee that wanted index investments -- and by the way, wanted a so-called "to fund," that takes you just to retirement, not through, that they would not have only dropped the Genworth funds but they would have made the opposite decision in terms of investment strategy and gone to active funds.  So that's a failing on their part.

And the other, again, is the legion case law saying these are apples and oranges.  And here's part of the reason why, Your Honor:  Because active investing aims to beat the market, but --

THE COURT:  What is an active investment?  What are you talking about?

MR. SCALIA:  Well, it's an important distinction.

THE COURT:  But I'm not -- I need something in the record to explain what all that is.  I cannot imagine his theory is that all of the funds, one way or the other, the funds themselves, involve -- the TDFs involve active management

and that the only difference is there are -- just one's more active than the other.

MR. SCALIA:  If I can take that in two steps, Your Honor.  There's obviously a recognized fundamental difference between an investment manager who buys up stocks trying to beat the market, predict trends and the like.  And on the other hand, people who rely on modern portfolio theory to say, on average, you can never beat the market, so just try to track the market, use an index fund, a passive investment.  One of the really --

THE COURT:  Somebody makes decisions, what you track and when you're in and when you're out.  Who does that?

MR. SCALIA:  That is the second stage, Your Honor.  But the first stage, what will be the kinds of holdings in my basket; will they be funds that try to beat the market?  Or will they be funds that just track the market?

THE COURT:  If I've got an index fund and I look at it and I'm a manager, I'm a trustee, and I look at it and it's underperforming, I say, well, I like this BlackRock stuff, but I want to go to the active managed fund of BlackRock or I want to go to another kind.  I like the fund idea here, but I want to go to another fund, because the other funds are performing, whereas BlackRock passively is not.

And that's -- I can't imagine that -- I don't see your expert disagreeing with the assertion that that's how this

thing works.

MR. SCALIA:  What he disagrees with, Your Honor, and respectfully what the world of investment management and the courts disagree with is that to somebody in the situation at Genworth you just described, whether it's actively managed or passively managed is all the same.  The actively managed funds have higher fees.  Plaintiffs' lawyers --

THE COURT:  If they're all the same, then why does it make any difference in what they are compared -- what the chosen fund, the one at issue is compared to, if they're all the same?

MR. SCALIA:  Well, they're not all the same, Your Honor.

THE COURT:  That's what you just said.

MR. SCALIA:  I said that it would be wrong to assume that they are all the same and believe that the Genworth committee would believe that.

Your Honor, one of the problems in the view of many in the market with active funds is they charge more fees.  They involve managers trying to beat the market, trying predict the market; that takes more time; it costs more fees.

Ironically, there have been many cases, including cases that have been cited to this court and including cases by plaintiffs' lawyers in this case where funds were sued for having actively managed funds rather than indexed funds.

THE COURT:  Well, that's not what we have here, though.  So what's the point?  The point is the allegations that they make in their complaint is that Genworth and the committee made their decision only to buy only on the basis on the fees that were charged and then failed to monitor the situation going forward to see whether or not what the performance would be in the actively managed funds or on the passively managed funds; they just didn't look at it.

So why does what you're arguing make any difference at that point?

MR. SCALIA:  Because they failed to affirmatively demonstrate that a plan that cared about the fees charged by active funds, even if it determined that it should get out of BlackRock, would have decided that it also should have an active fund.  Plaintiffs' counsel have sued main companies for having active funds.  Active funds are a litigation risk today.

THE COURT:  But I can't consider that in this case.  That's not part of this case, any more than I can consider that -- what's the thing?  You-all ran an argument up the flag pole in California and got your hands smacked for it.  I mean, I make decisions on my own, not on what other people have done.

MR. SCALIA:  But, Your Honor, my point is those cases --

THE COURT:  Unless it's precedential.

MR. SCALIA:  Excuse me, Your Honor.  Those cases demonstrate why plan managers would view active and passive funds as very differently, because there have been a series of cases brought against fiduciaries saying, "Shame on you; you should have had index funds."  That's the *Boley* case.  You've heard referenced several times to the *Boley* case today out of the Third Circuit.  That is a suit saying it was a fiduciary breach to have actively managed TDFs.

The *CommonSpirit*, the Sixth Circuit refused to let that case go forward, but it was a case, again, saying it was a fiduciary breach to have actively managed funds.

So the distinction that plaintiffs are trying to say -- it's a distinction without a difference -- is recognized by the investment managers.  Again, it's the difference between active and index.  It's recognized by the courts.  And again, they have not cited a single court that has said this is anything other than an improper apples-to-oranges comparison when it actually comes down to making the decision.

Which brings us back to their failure of proof at the class certification stage.  They've given you no --

THE COURT:  That argument depends entirely upon your man Wermers, doesn't it?

MR. SCALIA:  It's undisputed, Your Honor.  It is undisputed that if the passive comparators identified by plaintiffs themselves had been used instead of BlackRock, that

a substantial portion of the class would actually have come out worse.

THE COURT:  That's what Wermers says?

MR. SCALIA:  And that is undisputed by plaintiffs' counsel, Your Honor.  What plaintiffs --

THE COURT:  Well, it is disputed, I thought.

MR. SCALIA:  Not his conclusion regarding the way that the absent class members and, indeed, even plaintiffs themselves would have fared under other index, that is, under other passive funds.  All their expert is saying is --

THE COURT:  Other passive funds alleged in the complaint?

MR. SCALIA:  That's right.  We took -- our expert took the other passive funds identified in the complaint and said, well, what would happen to the plaintiff class if those were used instead of BlackRock.  And what he showed and that's what's not disputed is that a large portion of the class would have been worse off --

THE COURT:  How can you say it's not disputed when they argued that Wermers is wrong?  And that that's just not right?  And when you calibrate, you recalibrate and adjust for what actually is right, his conclusion isn't right?  How can that not be in dispute, I guess, is my question.

MR. SCALIA:  Marin's dispute is only about consideration of the active comparators.  He does not look at

the passive funds that plaintiffs themselves identified and which Dr. Wermers evaluated.  He doesn't look at those and say, oh, they actually did better than the Genworth vintages.  He does not.  I'm sorry; the BlackRock vintages.  He says ignore that; he says it's true, just a year --

THE COURT:  You don't do that comparison.  He says that's wrong because you don't do that comparison.  That means, to me, that it's disputed.  Now, that's what I've taken from the papers.  Why isn't that right?

MR. SCALIA:  Well, Your Honor, what's not disputed is the performance of the passive funds identified in plaintiffs' complaint themselves as reasonable alternative investments; that's not disputed.

What is disputed is what to compare with.  And the problem that plaintiffs have there is that they are asking this Court to make -- they are claiming to have made an affirmative demonstration that a committee that wanted a passive investment strategy and a "to fund," would have chose an active strategy with a "through fund."  And there's no rational basis to believe that.  And their expert himself doesn't say that's what this committee would have done; instead, he just says, I think that's a comparator.

That's a different level of proof and their claims regarding the comparability of active and passive funds -- I'm starting to repeat myself on it -- but every court, to

definitively rule on whether you can draw that comparator, said no; said that those are not proper comparators; they are basically different investment strategies.

THE COURT:  Has all of this been stated in your briefs?

MR. SCALIA:  In footnote 1 of our brief, we cite three such cases, the *CommonSpirit* case --

THE COURT:  Well, you say every one.  What are you talking about, the 157?

MR. SCALIA:  That's correct, at page 7, your Honor. And we cite an Eighth Circuit case, a Sixth Circuit case, and a Tenth Circuit case that recognize that active and passive are not proper comparators as a matter of law.

And the same has been said with respect to "to" and "through" funds, by the way.  That's the problem.  What plaintiffs did here, Your Honor, is classic Monday morning quarterbacking.  They went out.  They found some funds that performed better for a short period of time by certain metrics and said, oh, these should have been there instead.

What they failed to do is show that Genworth would have chosen those, given Genworth's demonstrated investment strategy to use an indexed approach.

THE COURT:  *Davis versus Washington University*, *Smith against CommonSpirit*, and *Matney against Barrick Gold*, are those every case that's addressed; is that what you're talking

about?  Is that what those cases are?

MR. SCALIA:  Those are three of them, Your Honor.

THE COURT:  I didn't ask you that.  You said every case that's addressed it, and I said does that mean every case?  Is that every case?

MR. SCALIA:  There are additional cases, Your Honor.

THE COURT:  Well, they aren't cited.

MR. SCALIA:  They're not cited here, no.  But plaintiffs, they didn't cite -- your Honor, they didn't cite a single court that has held these to be appropriate comparators, certainly at a class certification stage.

In prior briefing they cited some district court decisions that on motions to dismiss let things go forward, but they haven't cited a court holding that these are appropriate comparators.  We've cited right here three court holdings that they are not -- and again, there are reasons --

THE COURT:  The Fourth Circuit has no case on that issue?

MR. SCALIA:  The Fourth Circuit has not addressed it, Your Honor.  But every Court of Appeals it has, has held --

THE COURT:  That every court is the Eighth, the Sixth, and the Tenth.

MR. SCALIA:  And also in the Ninth, Your Honor.

THE COURT:  That's not cited.

MR. SCALIA: It's not cited here, that's correct.

THE COURT: Well, what is it?

MR. SCALIA: I believe it's called *Davis* also; I don't know the defendant's name. We cited it in our motion to dismiss briefing. We also, in that briefing, cited --

THE COURT: What's the cite? Davis, your Davis, Ninth Circuit?

MR. SCALIA: I think we should have it here. It might take a moment; I don't have it in front of me.

THE COURT: Okay. You can get somebody to look it up for you. Go ahead; excuse me.

MR. SCALIA: And so Your Honor, I appreciate that you've got a couple of different expert reports; you've got disagreement.

I did want to address your question about the active element to a so-called passive investment strategy. A manager who decides to use a passive strategy is investing only in indexed funds.

However, it is true that person has to decide which index funds to invest in. And in a TDF, that blend, as you know, changes over time over the same glide path.

THE COURT: But don't you have to monitor it? If you're going to say, okay, I'm going to use an index; that's the right way to go. And I'm going doing it because the fees are cheaper.

But you have to monitor it regularly to live up to your fiduciary duty, right?  Yes?

MR. SCALIA:  That's correct, Your Honor.

THE COURT:  Okay.  In monitoring it, you have to compare it to something.  I compare it to other index funds, and I compare it to what we're calling actively managed funds.

And I look at it, and I say, well, gosh, the fees are less here in the index, but if I move it to the active fund, we're going to get a bigger return on our investment, and that will overcome the added fees we have to pick up.  And so that's what's in the best interest of the fund.

And the allegation is your company and its committee did not do that monitoring; they didn't even look at the issue for three years.  And so what difference does any of what you're saying make if I assume that, among what I have to look at, is not the comparatives to determine liability but the comparatives to determine whether to move?

That's the comparative, it seems to me, that has to be made by any fiduciary.  I have to do that.  And they say you didn't do it.  And your guy doesn't dispute any of what they're saying on that front; your expert, Mr. Wermers doesn't dispute that.

MR. SCALIA:  That's not the areas as to which he testified, Your Honor, but look, there's --

THE COURT:  Well, he tries to suggest -- he's making

the argument, he's the linchpin for your argument that index is index and active is active and never the twain shall be it or meet or have any connection in life at all.

And then your cases are cases, as I understand it, where -- that don't involve an allegation of failing to monitor and see whether the decision to stay with the index fund is the right decision.

MR. SCALIA:  Your Honor, I believe that those cases do involve an allegation of failing to monitor.  And the way that the plaintiffs try to establish it was by pointing to actively managed funds or through funds.  And the Court said sorry, we don't make those kinds of comparisons.  With respect to --

THE COURT:  But that's crazy.  That's absolutely crazy.  I have a million dollars and I'm a trustee and I have it in a stock.  All of a sudden, the economy changes and the interest rate on savings accounts and certificates of deposits are entirely different.  They're no longer 1 percent or .05 percent; they're 6.75 or 5 percent.  I'm obligated, as a trustee, a fiduciary, to look at the investment I have and say, gosh, in the environment I'm in, I have to move that where I can get a much better rate of return, because this stock is not paying me, with all of its dividends and its appreciation, it's not even approaching 5 percent.

Now, is that wrong?  Isn't that what a fiduciary is

supposed to be doing?

MR. SCALIA:  Your Honor, not necessarily at all, actually.  A short-term decision based on current market conditions can, at times, be a fiduciary breach.  But with respect to Genworth's monitoring, you'll hear some --

THE COURT:  But you've got to monitor it, and you didn't monitor it.

MR. SCALIA:  That's false, Your Honor.  That's false.

THE COURT:  That's what they say.  That's what they allege.  And in order to get into the merits of that, you have to have a trial to resolve it.

MR. SCALIA:  Well, we'll --

THE COURT:  They've got some pretty impressive evidence from your own documents that your committee was somnolent on the whole thing, which means that a fact issue exists to be resolved; it may be that you've got evidence to the contrary, but I didn't see much of it.

MR. SCALIA:  Your Honor --

THE COURT:  What part of the record shows that you-all were actively monitoring this and they're wrong in that regard?

MR. SCALIA:  Yeah, that was plaintiffs' --

THE COURT:  What part of the record shows that?

MR. SCALIA:  Extensive deposition testimony.  Your

Honor, you're talking about plaintiffs' complaint.  As you said in ruling in the motion to dismiss, you have to accept that as true.  A lot of that is untrue.  Let's talk about damages for a moment.  They stood at this lectern; they told you a $100,000 million in damages, $100,000 million.  They told you that more than once, I think.

You know what their expert says?  30 million.  He uses the rosiest scenario, the most adverse scenario he can find, and he comes up with 30 million; not a hundred million, Your Honor.  There's all kinds of stuff in that complaint that you cannot any longer give credence to.

The burden is on them.  They have to base their case on facts now.  They have to affirmatively demonstrate that certification is appropriate.  Our expert --

THE COURT:  Well, isn't one of the common issues what the damages are?

MR. SCALIA:  Well, if I could just --

THE COURT:  And 30 million is -- you know, I realize it's a lot smaller than a hundred, but it's not sneezing material.

MR. SCALIA:  Well, and my point, Your Honor, is we're past the stage where it's your obligation any longer to take for granted what they said in their complaint.

Our expert, when he looked at the passive alternatives that plaintiffs themselves identified found either

small losses or, actually, again, that the Genworth participants would have been worse off with plaintiffs' alternatives.  So his analysis is close to a zero damages analysis or negative damages.  So that's just one example of why the complaint, Your Honor, it was one thing.  And by the way -- well, I'll come at it later.

So on class certification, you should not, obviously, rely any longer merely on their allegations.  They had to come forward with facts.  With respect to your question about injury, Your Honor, I think this colloquy you had earlier with Mr. Berin really illustrates how the class certification motion they brought does not lead you to a satisfactory class action.

At the status conference, you asked plaintiffs' counsel whether they would have subclasses.  And because, as you know, there are these different vintages.  Each vintage is like a different investment.  The retirement vintage for people in retirement is really pretty conservative.  The 2060 vintage is pretty aggressive; these are young people who are trying to build up equity.

These are very different investments.  They result in very different experiences for plan participants.  You said to plaintiffs' counsel at the status conference, are you going to have subclasses?  They said, nope, we're not going to do that.

Now, Your Honor, you asked about that now, but we

would respectfully submit, it's too late.  That's not the motion that plaintiffs brought.  It's the same thing with --

THE COURT:  You have to consider it.  At this stage you have to consider what the evidence shows and whether subclasses would be appropriate or not.

MR. SCALIA:  And of course, they would need a representative from the different subclasses; they don't have them.  And then with respect --

THE COURT:  They don't have that.  They haven't come forward, but it's appropriate to consider it if it's brought forward.

MR. SCALIA:  And then, Your Honor, with respect to 23(b)(1) and 23(b)(2), as I believe you mentioned when we came back from the break, the Supreme Court was emphatic in the *Dukes* case, that you can't use 23(b)(2) for monetary damages.

And one of the reasons that plaintiffs' case is so different than a lot of the cases they cite, as you noted, Your Honor, they're not in the plan anymore.  They're not plan participants anymore.  Many of the cases they rely on, there was injunctive relief being sought going forward.  But not here.  And so (b)(2) --

THE COURT:  What difference does it make?

MR. SCALIA:  Well, it's the one of the reasons --

THE COURT:  It just means, at worst, the class is -- the time difference, time period for the claim.  The class

period becomes limited to the time the person came out of the fund.

MR. SCALIA:  That's one impact, Your Honor.

THE COURT:  Well, that's what it does; it has to do that, I guess.

MR. SCALIA:  And we agree --

THE COURT:  He says no, you can do otherwise because the suit here is on behalf of the plan, go all the way to judgment.  But I don't know about that.

MR. SCALIA:  Well, and we agree it's not appropriate for them to purport to bring up suit on behalf of the plan for periods of time that they weren't even participants in that plan anymore.

But Your Honor, with respect to (b)(1), for the same reason as (b)(2), there are not opt-out rights; it raises due process concerns.  That's why -- it's one of the reasons that (b)(1) is inappropriate for even monetary --

THE COURT:  You can opt out of (b)(1); it just gets to be impracticable.

MR. SCALIA:  Respectfully, it's --

THE COURT:  *Newman* explains how it does; cites the cases, shows how it can be done.  The question is whether it makes any sense to do it.

MR. SCALIA:  Your Honor, that's highly disputed.  And it's an example of why --

THE COURT:  What case holds that you can't?

MR. SCALIA:  Your Honor, I don't have a case in front of me.  It's certainly an issue that I've looked at in the *Wal-Mart/Dukes* case.  I know that it came up.  And I know it's disputed.  It wasn't briefed to Your Honor.

And I think that's the problem that plaintiffs have now, is that you've identified a number of flaws with the way they've tried to package this.  And it would respectfully require more briefing than this current schedule allows.

THE COURT:  They agree that if you weren't a member, if you didn't invest in a TDF, a BlackRock TDF, you're not a member of the class.  So that eliminates the standing issue for the rest of -- that you were basing that argument on.  And I think they've agreed that if there's no loss, then you can't be a member of the class.

Their theory is that your expert's approach to defining loss is wrong, and their expert shows that everybody in the class did have a loss.  And so at that juncture, there's a dispute between basically your expert and their expert as to whether there was -- there were or were not people who have a loss.

So am I to resolve that dispute now?  If I do, how do I do it?  My assessment is, is if I do it now, I have to cite something.  What I would cite is your expert report; that would be the way I would do that.  I'm unaware of any case that

really allows me to do that.

Now, by the same token, I suppose I could have a hearing at which I entertain your expert and their expert and find out that it's so fundamentally implausible that what one of them is saying that the other one is right, and that that is the basis I use to determine whether there is an injury or not and as to whom.

But the way to deal with that in class certification seems to me to be to define the class as people who suffered loss and then have it determined on the merits whether or not -- maybe by summary judgment.

MR. SCALIA:  Yes, Your Honor.

THE COURT:  And then exclude those people from the class.  If you're going to grant a class, it would seem to me to be that's what you would do with your "there was no loss" aspect of your standing argument.  What's wrong with that approach?

MR. SCALIA:  What's wrong with it is, first, Your Honor, it's not the class that plaintiffs proposed to this Court.

THE COURT:  I bet you that 80 percent of the cases that come here, we end up at the class certification with something other than what's proposed.  So in the words of Bear Bryant, I don't think that a nickel will get you anywhere. Won't even get you a Coke.

MR. SCALIA:  Secondly, Your Honor, and I'll add more importantly, I suppose, that that's not an ascertainable class.

THE COURT:  A what?

MR. SCALIA:  An ascertainable class.

THE COURT:  Why isn't it?

MR. SCALIA:  Because we would not know evidently until the end of a trial who the class members are.  You can't certify a class where you don't even know who's in the class.  And remember, plaintiffs are trying to deny notice to the class members and even their opportunity to opt out of the case; they're trying to adjudicate individual men and women's retirement benefits without them knowing about it and without their saying no, no, I didn't want them litigating my case, which, when we're talking about monetary damages, is extraordinary.

But I'm not aware of any case, they've not cited a case where the certified class was those who were injured.  That's the notice, if one were to be given, which we think this should be a (b)(3) class, how would you know who the notice would go to?  If you send it to everybody, what would you say?  If you were injured, as will be determined at trial --

THE COURT:  Those who suffered loss, that's how you do that.  That's what most of the notices of that sort say.  You define the injury as the loss that is asserted in the

complaint. And the injury loss is what the complaint says they lost.

MR. SCALIA: Your Honor, this case is very different than most of the ERISA cases that have been cited to you for a couple of reasons. One is all of the different investments that we're actually talking about -- they've said as many as 13 -- the *U.S. Airways* case, for example -- both parties have cited it -- it's one company's stock. It's *U.S. Airways'* stock; it was in their pension plan; *U.S. Airways* was headed to bankruptcy. Everybody invested in that had a similar experience. They lost during that period of time. That's one kind of case that gets certified.

Another kind of case that gets certified, Your Honor, is you have active funds, they charged fees that were too high, and as the Third Circuit said in the *Boley* case, everybody was injured by those high fees, because the high fees affect everybody's account.

What we're talking about here, the plaintiffs, to my knowledge, have not cited a single case where a court certified a class action involving a passively managed TDF. Once it's passively managed, you don't have that argument about high fees that you have in some of the other cases they've cited to you.

And then it's a TDF, you don't have a case about one company's stock. You know, why did U.S. --

THE COURT: That's not what their theory is. The

theory is you didn't monitor, your people didn't monitor and you didn't monitor the committee, and because things happened and changed in the marketplace while you were somnolent and being irresponsible, that these people, their retirement plans lost money.

And among the things they say, if you had looked at other plans, you might have -- you would have bought other plans and shifted from your index.  I mean, it's a different case.  It's far different.

MR. SCALIA:  Your Honor, it's just not.  It's just not.  The monitoring allegation is in all of these cases that are being cited to you.  *U.S. Airways* didn't discharge its responsibility to monitor and remove the company's stock.  In the *Boley* case, the fiduciaries didn't exercise their obligation to monitor and stop paying high fees.  That's a common feature; that allegation gets made frequently.

The distinguishing feature is, as the discussion earlier brought out, there are so many different moving parts in this case that make it poorly suited to class certification.  We have highly individualized questions about --

THE COURT:  Those are --

MR. SCALIA:  -- damages.

THE COURT:  That's an entirely different issue.  That is a manageability superiority question.  It isn't a whether there's an injury question.  It isn't whether you can properly

define the case with respect to those who suffered loss.  It is an entirely different component of an entirely different test.  And they didn't address that much.

MR. SCALIA:  No.  No, Because --

THE COURT:  At all.  And you are addressing it and it is a matter of concern, because how do you manage a case like this?  And how do you actually get the right -- a fair trial for everybody who's involved?  And in particular, for the people whose rights are being adjudicated and they don't have any say-so because it's being certified under 23(b)(1).  And if you can't come up with an appropriate superiority and the manageability component thereof, then I've got a separate problem.  And it's not any -- and it's not the one you're talking about.

MR. SCALIA:  And as you say, Your Honor --

THE COURT:  It's under a different component.

MR. SCALIA:  But plaintiffs, as you say, are trying to dodge that whole problem by sneaking under (b)(1) rather than going under (b)(3) where a Court ordinarily addresses these individualized issues.

But having said that, Your Honor --

THE COURT:  Yeah, but you still have to address it under (b)(1).  You still have to think under (b)(1), what on earth kind of animal am I living with here?  Because that particular animal happens to involve the future of a whole lot

of people.  And they're bound by what you're doing.  So you have to really reflect up what is it?  How are you going to handle something like this?

MR. SCALIA:  Well, and that's right.  And they don't even --

THE COURT:  Here's one of the questions that comes to mind, is do you really have 13, if there are 13 --

MR. SCALIA:  Vintages, they're called.

THE COURT:  -- vintages, yeah, do you have 13 subclasses?

MR. SCALIA:  Well --

THE COURT:  I do not know.  Nobody's really addressed that.

MR. SCALIA:  Well, they certainly didn't.  And again, it was their burden.

But there's an added problem, Your Honor, which we talk about in our brief and which they don't dispute, which is those vintages evolve over time.  Remember, the whole idea is this so-called glide path, where when I'm a young person, I'm going to invest pretty aggressively to try to aggressively build up that nest egg.  As I approach retirement, I gradually get much more conservative.

So when in time you were in any one of those vintages also effects how you might have fared with a different investment.  The 20 --

THE COURT: Let's assume that's correct. You still have the obligation as the fiduciary to monitor it and to compare it to all other reasonable alternatives. And their contention is you didn't do it.

And you have offered nothing to say if we had compared it, here's what we would have done that would have ultimately fulfilled our responsibility. What you've done is you've taken shots at what their expert has said and your expert has, they say, twisted a lot of facts to get to the conclusion that there isn't any loss.

MR. SCALIA: Your Honor --

THE COURT: So I'm concerned about how you manage this case, is what I'm really concerned about, whether or not -- it looks to me like they probably made -- let's assume there's a class. You've got 13 different vintages, and what is the significance of that? That's something that nobody has determined, has assessed.

And I understand it's not assessed, in part, because the model for assessment is posited by the plaintiffs as 23(b)(1), but even in a case like that, the manageability of a case has got to be considered, even though it more traditionally is an analysis that is made under 23(b)(3).

MR. SCALIA: And Your Honor, to come back to the monitoring issue for a moment, we vigorously dispute plaintiffs' characterization of Genworth's monitoring, but

that's a liability issue.  Even supposing, even supposing they're right about that, they've still got to satisfy Rule 23 and standing.  And that's what we're here for today.  And that's what they've not carried their own burden.

THE COURT:  They've got all the people who are out now; they've agreed, if you didn't invest in the fund, you're out.  So that doesn't include the class.

They've agreed, if you suffered no loss, you can't be in the class.  So why isn't the class that advised class?

MR. SCALIA:  Well, because of the requirements of Rule 23(a) that themselves separately haven't been met.  And I would like to address adequacy or argument of these particular plaintiffs.  Respectfully, plaintiffs' lawyers' view of this case is -- it boils down to one where what the parties believe and what the parties say doesn't matter; that this should just be turned over to plaintiffs' counsel and their arguments.  I can quote you --

THE COURT:  Well, let's take that.  Because the linchpin of your argument on that point is found at -- just a minute.

MR. SCALIA:  It's ECF 157, your Honor.

THE COURT:  Yes.

MR. SCALIA:  And I can read you the deposition testimony.

THE COURT:  Let's see; where is your assertion?

MR. SCALIA:  It's ECF 157, pages 20 to 21.  And I have the deposition testimony here.  These are exhibits to our motion, Your Honor.

THE COURT:  Here you say, "First, both plaintiffs have directly disavowed the theory underlying the claims advanced by their counsel in this case."

MR. SCALIA:  And so Mr. Trauernicht, for example, Your Honor --

THE COURT:  "Mr. Trauernicht repeatedly testified that Genworth should not have blacklisted or removed the BlackRock Funds from its plan and that the participants in the Genworth plan should have the right to choose to invest in the BlackRock target funds if they want to."

Well, how is that disavowing the theory?  When you view it in connection with the rest of his testimony where he says that the theory of the case is that they didn't monitor it?  It may be a layman's inarticulate way of saying things, but it looks to me like the assertion that he's disavowed with the theory of the case isn't right.

MR. SCALIA:  Your Honor --

THE COURT:  What pages of your reply brief is that testimony cited?

MR. SCALIA:  In our opposition.

THE COURT:  I'm sorry; I'm asking the other lawyer.

MR. SCALIA:  Your Honor, they never address it.

THE COURT:  Yes, they did.

MR. SCALIA:  They attempt to contextualize it.

THE COURT:  Wait a minute.

MR. SCALIA:  They never dispute --

THE COURT:  Wait just a minute.  I need to find it first.

Mr. Berin, what page is -- oh, here it is.  ECF 164, he says, page 15:  Trauernicht said, "I believe that there is" -- I don't know what the question was -- "I believe that there is, but I will admit ignorance in not understanding the details.  I believe it has to do with the volatility of the investments or maybe just the nature in which they performed. But my core understanding is that the root issue was that they weren't being monitored properly by Genworth with regards to the best interests of the plaintiff."

Now, how is that disavowing the complaint?

MR. SCALIA:  Because their entire theory of the case, Your Honor, is that had Genworth monitored it, it would have gotten rid of the BlackRock Funds, that no reasonable fiduciary could have the BlackRock Funds; and therefore, the damages should be awarded on the theory that the BlackRock Funds should have been taken away from the plaintiff class.

But here, the two named plaintiffs, they both testified that the BlackRock Funds should have been left. Question:  "Do you think participants in the Genworth plan

should have the right to choose to invest in the BlackRock target date funds if they want to?"  Answer:  "Yes."

THE COURT:  That's not disavowing the theory.  That's asking for a layman's opinion on an issue that doesn't lie at the core of the theory.  And Wright says, BlackRock TDFs could potentially be retained, quote, "if Genworth has a more managed approach to it, emphasizing again that the primary issue is defendant's failure to prudently select and monitor the investments in the plan."

I mean, that doesn't sound to me like they're disavowing what's in the complaint.

MR. SCALIA:  Your Honor, they are seeking to determine the fate of thousands of people's retirement accounts.  And their only argument for any monetary recovery, their only argument for injury is that those BlackRock Funds should have been shoved out of there at the start of the class period.

Who would want that case to be decided by people who gave this testimony?  If it were my retirement account and that were true, would I want somebody who testified in deposition, oh, yeah; no, should have left it in.  That's terrible.

THE COURT:  Where does it say that they had to throw it right out, the baby with the bath water?

MR. SCALIA:  Your Honor --

THE COURT:  What they said is, as I understand it,

that they didn't monitor; because you didn't monitor, you let the BlackRock Funds stay in when they weren't performing, and you had alternatives that you could have put them in that would have done better.  That's not the same thing as saying you should have never invested in the TDFs that you did or that they should have been thrown out at any particular point in time.  That's quite different than what you said.

And that seems to me to be what their complaint reads; that's what these people understand it says; and I don't know how you get to some of the strong position that you just asserted as to what these plaintiffs were actually saying in respect of whether they agreed or disagreed with the fundamental theory of the case.

MR. SCALIA:  Your Honor, Mr. Trauernicht did not even become a plan participant until the third quarter of 2018. Plaintiffs' position in this case -- I should say their lawyers' position -- is that that plan should have been -- that investment option should have been removed in 2016.  That is what they will argue on summary judgment; it's what they'll argue at trial.

The plaintiffs' lawyers, again, they're driving this case; it's clearly not the plaintiffs --

THE COURT:  Have you ever been in a case in which you weren't driving the case?  Or if you were, weren't you just utterly miserable?

MR. SCALIA:  Your Honor, I --

THE COURT:  Didn't you want to fire your client for not paying attention to your advice?

MR. SCALIA:  Your Honor, I can truthfully tell you, I've every now and then had a disagreement with a client.  I mean, not with Genworth, ever.

THE COURT:  I'm glad you put that one in there.

MR. SCALIA:  I've certainly had a disagreement with a client every now and then.  I've never had a circumstance where my client testified under oath, people should have had the ability to invest in this, and my case before the Court was, no; Mr. Trauernicht should never have been able to invest in this fund.  That's their argument.  Same thing for Mr. Wright.

THE COURT:  What question was he asked?

MR. SCALIA:  Pardon?

THE COURT:  What question was he asked?

MR. SCALIA:  "Question:  Do you think participants in the Genworth plan should have the right to choose to invest in the BlackRock target date funds if they want to?"  "Yes."

THE COURT:  Okay.

MR. SCALIA:  Yes.

THE COURT:  That doesn't get you where you want to go, because now you're saying that he expressed the view that he shouldn't have -- that the funds shouldn't have been

jettisoned in 2016.  It's the same rule as cross-examination; if you're going to touch the king, kill him.  Well, you didn't do it though.  Because that's just an amorphous, "do you think this;" that's an opinion.

And so the real -- maybe the root is I got to get Trauernicht and Wright in here, let you-all cross-examine them, and see if they do understand it.

MR. SCALIA:  Question -- here's a different one.

THE COURT:  Okay.  Give me another one.

MR. SCALIA:  "Do you think Genworth should have removed the BlackRock Funds from its plan?"

"No.  I don't think that's the case.  I think that it was a case of monitoring and oversight that was inadequate, not of, you know, blacklisting any particular fund."

I ask you again:  Who's controlling the litigation? If it were my retirement account, would I want its fate to be determined by people who testified no, it should have been left in, when my lawyers' theory is that it should have been taken out before Mr. Trauernicht even was at the company.

And Mr. Wright, I believe, started in the company in January of 2016, and my recollection is that the plaintiffs' lawyers and expert's theory is that the investment should have been removed in 2016.

And so the lawyers are driving the case.  The clients either don't understand it or they certainly, certainly, Your

Honor, they don't control it, which is what was asked in the *Shiring* case, for example.  Again, are these the people that are adequate to represent the interest of thousands of people?

By the way, Mr. Trauernicht is a law school graduate, University of Richmond.  So he's no mere layman; he's a perfectly intelligent person capable of answering these questions, Your Honor.

THE COURT:  Well, if he's that qualified, perhaps he knows what he's doing.  All right.  What else?

MR. SCALIA:  Your Honor, we've talked about the commonality requirement, the injury requirement; I've explained to you that plaintiffs themselves have emphasized that those are both necessary in common and you need typical injuries to go forward --

THE COURT:  Let me ask you something:  How much longer do you think you have?

MR. SCALIA:  At this moment --

THE COURT:  Yeah.

MR. SCALIA:  -- to speak?

THE COURT:  I mean, I'm not trying to cut you off.  I just want to know your estimate.

MR. SCALIA:  I can wrap up in less than five minutes.

THE COURT:  Well, I thought it would be a good idea for us all to go to lunch.  And if you'd rather have lunch

before you wrap up, that would be fine, too.  Which do you want to do?  I don't want to put you under pressure for the time.  I don't want -- I'm not telling you you have to finish in five minutes.

MR. SCALIA:  Yeah, I think I can finish with what I have to say in less than five minutes, Your Honor.

THE COURT:  Okay.  We'll stay here then.  If that's your preference.

MR. SCALIA:  Just a couple of points that I want to emphasize in closing, Your Honor.  First, again, we're in a very different circumstance than on the motion to dismiss because now it's plaintiffs' burden, not defendant's.  They've got to affirmatively demonstrate class treatment is appropriate and no longer are the facts alleged to be assumed as true.  Very different posture, and I think it dictates a very different outcome.

Secondly, Your Honor, you, through your questioning of both sides, identified many problems with how plaintiffs are trying to certify this case.  We would say that, because they failed to address all of these problems, class certification should be denied.

But Your Honor, if the Court is considering going forward with like a hybrid class or subclasses or a notice to people who only those have been harmed, all of these are new issues that we believe are incompatible with Rule 23 and with

due process requirements. And I think it would be preferable that there be briefing about such an approach before it happened. I just see it creating a lot of problems for the case if we were to go forward.

In my mind, it's a reason to deny their motion. It was their duty to come forward with a reasonable class certification motion, not one that has all of the problems you've identified, particularly these plaintiffs; I mean, come on, these are not the people you want representing thousands of others.

The last point I wanted to mention, Your Honor, is a small one, but I did want to draw your attention to one particular case. That's the *Boley* case. I'm sorry; it's the *Peters* case; it's a Fourth Circuit case. The plaintiffs rely on it a lot.

Before this Court were to rely on it, let me suggest a couple of things. First, that this Court review what happened in that case on a remand. Because on a remand, the district court identified intervening Supreme Court decisions that had a big impact on how to go forward.

And then second, Your Honor, there's a Fourth Circuit decision called *Rose* -- I don't have a cite; I can provide it to you in just a moment -- that actually overruled *Peters* in part.

There's a part of *Peters* that says that everybody

paid too much so everybody is injured, but there's another part that talks about more speculative injury and class interests.

THE COURT:  Talks about what?

MR. SCALIA:  More speculative class injuries and interests.  And the Fourth Circuit determined that it had to overrule part of *Peters*, and it did so in the *Rose* case.

THE COURT:  Was *Rose* an en banc case?  Was *Rose* en banc?

MR. SCALIA:  It wasn't, Your Honor, but --

THE COURT:  How can it overrule another panel?

MR. SCALIA:  Because the Supreme Court essentially overruled itself.  There's a decision that plaintiffs rely on --

THE COURT:  That's a Supreme Court decision?

MR. SCALIA:  Exactly, Your Honor.  It's 80 F.4th 488.  80 F.4th 488.

And then last point, Your Honor:  A lot of discussion today has assumed that plaintiffs can have the best of both worlds; that plaintiffs who are better off in the BlackRock TDFs get the benefit of that.

But if plaintiffs' lawyers that are experts can search around and find another plan that, for at least some of them would have been better, then plaintiffs' class gets the benefit of that.  They have a best of both worlds approach.

We don't accept that.  Their argument is the

BlackRock TDFs had to come out and something else had to come in.  If people ended up better off, as many did, we believe, under the BlackRock TDFs, it's not equitable to certify a class where they keep their money but then other people go and get more money under an alternative theory for investment that was never put in the fund.

That is yet another problem with the theory that plaintiffs are proposing to you; that their putative clients ought to get the best of both worlds, you know, pick your investment option, whichever one works best, you get it. That's not equitable; we don't think it's a proper basis for certification.  Thank you, Your Honor.

THE COURT:  All right.  It's 1:16 now.  I'll see you at 2:15.

MR. BERIN:  Yes, Your Honor.

(Luncheon recess from 1:16 p.m. to 2:21 p.m.)

THE COURT:  All right.  Do you want to reply?

Do you have anything else to say, Mr. Scalia?

MR. SCALIA:  Thank you for the break, Your Honor. And just two points that I neglected to mention:  One is you had asked about the other cases that were filed at the same time.  As you heard, two other cases in the Eastern District of Virginia, after the district court's decision dismissing them evidently were settled on a nonclass basis.  Several other cases have also been dismissed and are not proceeding further.

Case 3:22-cv-00532-REP   Document 194   Filed 02/16/24   Page 101 of 144 PageID#
3266
Trauernicht, et al. v. Genworth  - 2-12-24      101

THE COURT:  Against Genworth?

MR. SCALIA:  No.  Of the 11 cases that were filed at the same time on the same theory.

THE COURT:  They were different people, different defendants.

MR. SCALIA:  Different companies, Microsoft, Citibank, Capital One, other companies.  In none of those cases has the complaint moved forward over a motion to dismiss.  As you heard from plaintiffs' counsel --

THE COURT:  You mean they were dismissed?

MR. SCALIA:  Either dismissed or there are motions pending.  So amendment was permitted; there's a new motion. But in none of them have they been permitted to go forward past the motion to dismiss stage at this time.

The other point that I should make clear to the Court, Your Honor, we've talked about these different vintages, up to 13 vintages.  We've talked about how each vintage itself changes over time.  So when somebody was in the vintage will affect what their experience was.

But as plaintiffs themselves noted and will tell you, an added complication is that it's an all-or-nothing proposition.  When a company selects a particular TDF, it gets all of those vintages.  And so the conflicts within the class that we say are present here are not something you'd be able to get away with by subclasses because all of those classes

essentially came together; it's another reason we think that this particular type of class action is just not amenable to certification, under either Rule 23(a) or (b).

THE COURT:  Okay.  So what do you say is the monetary range of the damages here, in total, considering what's known now?

MR. SCALIA:  Well, first of all, Your Honor, obviously, we don't believe there's liability.  There was --

THE COURT:  Okay.  You know, you think I'm sufficiently slow that I don't understand that?  I know that. I mean, assuming, what's the range of potential damages?

MR. SCALIA:  Our expert identified two scenarios where damages, I believe, were negative and a third where damages, in total, were, I believe, approximately $6 million. But even then, the difference was due to the through nature of the comparator rather than the to nature of the comparator.  So that was our expert's work.

As I said, our expert was relying on comparators that the plaintiffs put forward in the complaint.  The plaintiffs said here are four investments that would have been reasonable that you should have had Genworth do instead.  And we took the two that were most like the strategy that Genworth indicated it wanted, we took two of plaintiffs' examples and said there's no injury as to people holding 42 percent of the assets.

And so on their own theory of the case, there's not

injury to, we think, thousands of people in the class, Your Honor. Their expert --

THE COURT: All that means is that the class is smaller, because they don't have stand -- 42 percent don't have standing.

MR. SCALIA: Well, that's right. And when that much of the class is not injured and lacks standing --

THE COURT: What are we left with? Let's assume 42 percent are not injured and they're not properly in the class. Why does that fact, if found in your favor, result in dismissal of the class action for the other people who were injured? I mean, it may be that that's an argument to make on liability, but why does it result in a noncertification of a class for those people who were injured?

The other way to look at this is that your expert acknowledges that over 50 percent of the people in the class were injured.

MR. SCALIA: Not at all, Your Honor. Not at all.

THE COURT: It sure is. If you say 42 percent were not, then the other side of that is the remaining percentage was. Isn't it? Looks to me like that's a logical conclusion; maybe it's not right, but...

MR. SCALIA: I mean, Your Honor, obviously, it comes back in part to the liability question we've been talking about.

THE COURT:  No, I know that.  But I'm telling you, I know that.  I know you don't believe you're liable.  I'm talking about if you are liable, what's the law?  You're saying that 42 percent have no injury.  They, therefore, have no standing and can't be in the class.  That means that 58 -- he came to the conclusion that 58 percent of the people sustained some injury.

MR. SCALIA:  It's actually not quite right, Your Honor, because --

THE COURT:  Why isn't it?

MR. SCALIA:  Because he focused on the vintage, what was the experience of the vintage.  Remember we've got these as many as 13 different vintages.  But then we've got the point that people came in --

THE COURT:  Well, you dodge the issue then.  You can't make the argument that there are 100 percent of people in the class; 42 percent of them had no injury and then stand -- do you just don't have a position on the other 58; is that what Mr. Wermers did?  Is what Wermers did, is he's got no position on the other 58 percent?

MR. SCALIA:  He focused on the vintages, Your Honor.

THE COURT:  That's not what I asked you.  I asked you if he has a position or no position on the other 58 percent.

MR. SCALIA:  He did not take positions on the class

on a person-by-person basis, Your Honor.  That kind of individual --

THE COURT:  But he took a position -- he did, in fact, arrive at 42 percent weren't injured.  And the fact that he did it and the way that you talk about doesn't change anything in the fundamental math, it seems to me.  And the math is, if you have a class and 42 percent of them are not injured, then 58 percent of them are injured or something else applies to them.

MR. SCALIA:  Your Honor --

THE COURT:  Because of course, that's -- I don't understand why that's not so.

MR. SCALIA:  Let's start with the 42 percent.  That's not 42 percent of the participants.  What he found was that 42 percent of the investments in the BlackRock TDFs were in vintages where there was a gain, not a loss compared to the two passive comparators.  Now, it's quite possible --

THE COURT:  Well, what does that tell us?

MR. SCALIA:  That tells us that the people that held 42 percent of the assets had no injury even on -- or in those vintages; that those vintages, which account for 42 percent of the assets, came out ahead.  It doesn't speak to individual people.  That's a separate issue.  Because as I said --

THE COURT:  Well, then if that's a separate issue, how can you use his study as the basis to say that nobody has

an injury?  That's just guesswork.  You know what, he's playing around the edges, is what he's doing.  He is not addressing the issue.  And you see it in the very case you cited as well, from Wisconsin, I think.  Is he a roving expert, Wermers?

MR. SCALIA:  Pardon?

THE COURT:  Is he a roving expert?  Does he just testify in all --

MR. SCALIA:  He certainly does other expert work. He's an expert.  Your Honor, we have a chart on page 7; it's very straightforward.

THE COURT:  Page 7 of?

MR. SCALIA:  ECF 147.  I'm sorry; 157.

THE COURT:  All right.  Yes?

MR. SCALIA:  And Your Honor, this is page 7.  And it's comparing the performance of the retirement vintages and the 2050 and 2060 vintages of the BlackRock TDFs against the two passive comparators that plaintiffs themselves identified and shows that those vintages performed better.  Those vintages account for 42 percent of the assets in the plan.

So the people holding those vintages presumptively were not injured.  As to each individual, you'd probably need to know more:  When did they enter?  When did they exit?  But these vintages, obviously, were not imprudent; they performed well against plaintiffs' chosen comparators, Your Honor.

Now with respect to what you're calling the other 58

percent, remember, it's 50 percent of assets in the plan, not strictly 58 percent of the plaintiffs.  But again, we're not willing to stipulate that those people were all necessarily injured because their own experience will depend on when they came in and out of the investments.  These vintages, their performance changes over time.

There may well have been periods when people who, if they held through the class period, would not have done as well as plaintiffs' cherry-picked comparators.  But for a shorter period of time may have done as well or better.

I'm sorry it's a bit painstaking, Your Honor, but it does have to do with the individualized issues that are presented in this case, which are different than you see in other kinds of cases where you don't have so many different investments and where those investments are not changing over time.

THE COURT:  Whether there are individualized interests is quite different than whether somebody has suffered an injury.  It's a different part of the calculus.  It's a different issue.

MR. SCALIA:  But whether those people --

THE COURT:  So what did your fellow do about figuring out injury to the class members?

MR. SCALIA:  You have to --

THE COURT:  Let me go this way.  I'm sorry; let me

take another one.  How do you use the 42 percent of investments

doing better to decide whether or not -- or to argue whether or

not somebody's injured?  You're saying that because 42 percent

of the investments did better at one point in time or another

that there are a lot of people who weren't injured.  My

question is how do we know how many aren't injured?

MR. SCALIA:  You would -- we know from this that

that's a significant number, but --

THE COURT:  But that's --

MR. SCALIA:  -- to actually get to who those people

are, you would have to examine it on an account-by-account

basis.

THE COURT:  And your man didn't do that?

MR. SCALIA:  No, he didn't do that, Your Honor.  And

that kind of individualized assessment -- not of damages, but

of injury -- is inappropriate in a class action, especially a

23(b)(1) class action.

THE COURT:  Well, why is it?  I mean, it may be that

they haven't done what they need to do to do it.  But why would

it be?  Let's suppose that you've got somebody who cares enough

to do the analysis properly and they come up and say, okay,

there were 42 percent of the people in the class or X percent

of the people in the class who were in the 42 percent of the

investments that did well.  That means that there were Y

percent of the possible class that were in the rest -- that

were in the investments that didn't do well measured against the comparators.

If they'd done that, could we have a class of those people?

MR. SCALIA:  We would say no, because there's another problem, Your Honor, which is ascertainability of the class, which I mentioned before our lunch break.

I don't think it's proper to define the class as essentially those who have a claim.  What we're understanding is that to understand whether any individual person is injured, you have to first make a liability determination, obviously, which awaits trial or summary judgment; and then second, make an individualized examination of their account.

You can't have a class where you don't know who's in it at the time of notice, nor can you have a so-called fail-safe class where you're in the class if you have a winning claim, but you're not in the class if you don't.  Both of those violate bedrock principles under Rule 23, your Honor.

THE COURT:  That isn't what they're asking, though. Are you saying that the individual members of the class are not provided regular statements of where their account stands in any given time, monthly or quarterly or annually?

MR. SCALIA:  They do receive those, Your Honor.  But if I could give you an example to explain what I'm talking about.  The 2030 vintage on this chart, it so happens that the

Fidelity Freedom Fund Index, its 2030 vintage for the duration of the class period performed better.

But let's suppose that's only because of how it performed in the last two years of the class period.  And let's suppose you're a retiree who was only invested in it in the first four years of the class period; that would mean even though the Freedom Fund did better over the whole time, it did worse potentially during the time that you held it.

That's why knowing how the vintage performed tells us a lot, but it doesn't tell us about any individual person.  Or another example:  You --

THE COURT:  Did Wermers say that?

MR. SCALIA:  I believe he does.

THE COURT:  Where does he say that?

MR. SCALIA:  And we certainly discuss it in our brief, yes.

THE COURT:  Whether you discuss it in your brief doesn't make any difference.  You have to have some support for it.  Where does he say that in his report?  I have it here.  He may do it; I just need to know what you're talking about.

MR. SCALIA:  Your Honor, my colleague is looking for a particular cite.  But respectfully, I think if we just talk it through, I think it's actually self-evident.

THE COURT:  Well, I'm not interested in self-evident right now.  I'm interested in proof; that's all.  And I want to

know where -- the only source of proof on that point that I know that exists is Wermer's.

MR. SCALIA:  Okay.  If we could go to paragraph --

THE COURT:  If you tell me where it is, I can understand the point.

MR. SCALIA:  If we go to page 25 of Dr. Wermers' report.

THE COURT:  25.

MR. SCALIA:  And this, Your Honor, this chart breaks down investments performance in the way that I've been describing.  Instead of looking at the entirety of the class period it looks at how particular vintages did at particular times.

And you see from this that, for example, in the case of the 2040 vintage, even though the 2040 vintage was one that over the entirety of the class period underperformed the Fidelity Fund, if you look at the period in 2021, it outperformed it.  And so this chart is meant to show how at different points of time, if that's when you held the investment, you might have done differently than it performed for the whole class period.

THE COURT:  How does it show that?  My chart has a bunch of names in each column.

MR. SCALIA:  Paragraph 54, he explains, quote, "Collectively, the comparison set forth above showed a

Case 3:22-cv-00532-REP   Document 194   Filed 02/16/24   Page 112 of 144 PageID#
3277
Trauernicht, et al. v. Genworth  - 2-12-24      112

hypothetical investment experience of plan participants would vary based on the vintage and time period of the participant's investment."

THE COURT:  How does it show that?  Where does it show that?

MR. SCALIA:  By showing that, at different time periods, which was the best performing of these three funds varied.  And so I'm looking at the top of the chart, the retirement fund; this is for people who have retired.  And you'll see that darkened portion shows that from the first four years of the class period, from August 2016 to January 2020, it was a top performing.  However --

THE COURT:  Where does it say that?

MR. SCALIA:  That's what the chart is meant to indicate by --

THE COURT:  But where does it say that?  Where does it explain that?

MR. SCALIA:  The table is --

THE COURT:  Let's go back to square one.  Is this chart prepared in such a way as to have shading in part of it and the other parts of it have no shading?

MR. SCALIA:  That's correct, Your Honor.

THE COURT:  What does the shading versus the no shading tell us?

MR. SCALIA:  That tells you LifePath.

THE COURT:  Where does it say that?  Where in the report does it say that?  I mean, it may tell you that, but it doesn't show me that.  But maybe I just don't understand how to read the chart.

MR. SCALIA:  Every shaded box says LifePath, Your Honor.  It's, I think, plain what he did, because this is about LifePath.  He highlighted them.  The chart is titled Highest Investment Returns, LifePath Funds and Plaintiffs' Comparators.

And as you'll see, for each vintage and each year-long period, he's put which was the highest performing passive fund.  Sometimes that's Fidelity.  Sometimes that's Vanguard.  And actually, more often -- and it's either one of those -- it's the LifePath Funds that are the BlackRock Funds.

On the preceding paragraph where he introduces this chart he says --

THE COURT:  You mean paragraph 53?

MR. SCALIA:  52, where he introduces the chart.  He says, quote, "For each vintage and time period, the TDF suite with the highest return among the Vanguard Target Retirement Funds, the Fidelity Freedom Index Funds, and LifePath Funds is identified by name."

And so my point, Your Honor, is that --

THE COURT:  I'd have to say that I'd give the author an A plus for obscurity of communication in what that chart means.  I find it, even after having re-gone through it again

and heard you explain it, I still don't understand what it says.  So whatever it is, it doesn't help me much.  All right. Go ahead.

MR. SCALIA:  I'm sorry that I took you to the chart without walking through the explanation beforehand, but again, Your Honor, what this does --

THE COURT:  Oh, I'm talking about the explanation.  I don't think the explanation explains -- helps me understand what the chart does.  It may you and all of you, because you're far more into this than am I.  I think I understand what you're saying though.  Anything else?

MR. SCALIA:  I had cited another case, Your Honor, I didn't have a cite for at the time.  I can now provide that to you.

THE COURT:  What is that?

MR. SCALIA:  This is the *Davis v. Salesforce* case.

THE COURT:  All right.

MR. SCALIA:  It's the Ninth Circuit case I mentioned. 2022 Westlaw 1055557.  That is the fourth opinion of a circuit court -- fourth different circuit.

THE COURT:  That goes with footnote 1 --

MR. SCALIA:  Exactly.

THE COURT:  -- on page 7.

MR. SCALIA:  Thank you, Your Honor.

THE COURT:  All right.

MR. BERIN:  Thanks, Your Honor.  Alec Berin again, representing the plaintiffs in the proposed class.

Each time Mr. Scalia just read from the charts in Dr. Wermers' report and from their briefing, he omitted a word. The chart reads, Highest Investment Returns, LifePath Funds and Plaintiffs' Passive Comparators.  He omitted the word "passive."  He's asking the Court to make a merits determination about what the appropriate comparators are at this juncture --

THE COURT:  Let me ask you something:  You used four comparators.  What's the legal effect of your having asserted four comparators, two of which, if you follow the analysis of Wermers, cause you to lose?

MR. BERIN:  Well, those comparators were pled in the complaint with respect to a specific time period when the fiduciaries made the decision to retain the BlackRock Funds and the damages model that we would proffer at trial and Mr. Marin, in his expert report, goes through what the class-wide proof of loss would look like, is an analysis that determines what the time -- what period was when the BlackRock LifePath Funds should have been removed from the plan because they failed the investment monitoring framework.

And then at that juncture, he utilizes a composite scoring system to determine what the reasonable alternative investments were from the universe of available alternatives.

And so while we recognize that the comparators pled in the complaint, the passive ones had mixed performance over the subsequent period of time, they were pled in the complaint with respect to what information the fiduciaries had about those investments at the time of their decision to retain the BlackRock Funds.  It didn't continue throughout the class period.  In fact, some of this data postdates the filing of the complaint.

THE COURT:  Are we in paragraph 38?

MR. BERIN:  That discussion there, Your Honor, 38 to 45.  And then the later charts.  Those comparators concerned the plausibility of our allegations that the fiduciaries would have been confronted with all of the information concerning those comparators.  And the paragraphs that followed that set forth charts, I think going up to about paragraph 68 of the complaint, concerned performance that would have been known to the fiduciaries or knowable to the fiduciaries at the time that we alleged they failed to monitor the funds.

And so we would submit that those are pled in the complaint for a different purpose than showing the plan's losses subsequent to their retention decision and that that proof of loss need not ignore certain comparators the plaintiffs pled in the complaint or rely only on certain comparators pled in the complaint, certainly not at the class certification stage, where, even Dr. Wermers would agree that

Case 3:22-cv-00532-REP    Document 194    Filed 02/16/24    Page 117 of 144 PageID#
3282
Trauernicht, et al. v. Genworth  - 2-12-24      117

if you considered the comparators he calls active, every

vintage suffered a loss compared to the alternative identified,

even in the complaint.

And so Mr. Marin's analysis in his report, for

purposes of class certification, walks through the kind of

common loss methodology that you would apply in a case like

this.  And in fact, he submitted a subsequent report and

defendants deposed him last week about his findings regarding

the plan's losses using that analytical framework.

We don't think that there's really any tension

between the comparators identified in the complaint for

pleading purposes based on the then contemporaneous information

that was knowable to the fiduciaries and a loss methodology

that would be deployed, again, using information based on what

was knowable to the fiduciaries at the time that the reasonable

monitoring framework that Mr. Marin identifies would have said

that a prudent fiduciary would have replaced the BlackRock

Funds with another investment.

And so Dr. Wermers simply ignored --

THE COURT:  What?

MR. BERIN:  Dr. Wermers' simply ignored several

comparators in the complaint and ignored comparators that were

identified through Mr. Marin's subsequent expert analysis in

order to conclude that any vintages underperformed -- any

vintages of proposed replacements underperformed the BlackRock

Funds at issue in this case.

And I would submit, a lot of the discussion that I heard before lunch between Your Honor and Genworth's counsel was about what plaintiffs needed to show in order to establish that Genworth would have replaced the BlackRock Funds with a particular comparator at this juncture.  And we submit that is exactly what will be shown at trial.

At this point, what we've identified through Mr. Marin's analysis and Dr. Wermers' analysis ignored is that it is not only possible but, using certain comparators, it is evident that all vintages of the BlackRock Funds underperformed comparators that a reasonable fiduciary would have considered as replacement funds.

And so the 42 percent that I just heard in discussion is based only on a self-selective reading of certain comparators and really ignores the way that we've offered proof of a readily applicable common loss methodology in order to show that the class here meets the standards under 23(a).  And then the choice of the comparator will ultimately be an issue at trial on the merits.  And we think it's beyond the inquiry before the Court at present.

THE COURT:  Why?

MR. BERIN:  Why?

THE COURT:  Yeah.

MR. BERIN:  Well, for the reason that Mr. Scalia was

Case 3:22-cv-00532-REP    Document 194    Filed 02/16/24    Page 119 of 144 PageID#
3284
Trauernicht, et al. v. Genworth  - 2-12-24      119

making assertions about the prudence or not of the BlackRock

Funds based on these comparisons and Dr. Wermers suggesting

that you can't compare the BlackRock Funds with certain of the

passively managed alternatives offered -- or certain of the

actively managed alternatives, the Court will ultimately

determine whether those comparisons are reasonable and what

conclusions flow from those comparisons, whether it is the case

that the defendants acted in --

THE COURT:  I guess my question is why don't I have

to decide now, at this stage, which ones of these experts'

views adequately supports the class certification analysis?

MR. BERIN:  Well, first and foremost --

THE COURT:  And then how is that done, given the

record that's here?

MR. BERIN:  First and foremost, Your Honor, the

experts don't disagree that when you consider the active

comparators or the so-called active comparators, that loss can

be shown with respect to each vintage and all the investors in

those various vintages.  The second issue that defendant

raises --

THE COURT:  Say again.

MR. BERIN:  Neither expert disagrees with one another

about whether, when considering the active comparators, that

loss can be shown with respect to all of the vintages of

BlackRock Funds.  Mr. Wermers' chart at Table 6 of his report

shows that.

And so that evidence alone establishes the sufficiency of the showing for purposes of 23(a) insofar as defendants have asserted that there are certain members of the class that might not have standing here.  Investors in all of those vintages, even if you consider Dr. Wermers' own report can be shown to have suffered a loss.

Mr. Marin then explains exactly how the analysis would go to show plan-wide losses and exactly how he would identify the time of replacement and then ultimately what the suitable alternative fund would have been.

And this discussion around the margins of when a participant entered a certain vintage of the fund or what their specific circumstance would have been, there's one that's been had in countless of these cases.  The *U.S. Airways* case that, as defendant acknowledges both sides have relied on for various reasons, addresses this typicality argument.

And it dovetails with table 9 that the Court was just reviewing with defense counsel.  There the Court found that, of course, there will be a, quote, unquote, optimal and prudent date.  In other words, courts in these cases do make findings about when a fund became imprudent for a retirement plan to hold and a date on which the fiduciaries would be deemed imprudent by virtue of that retention.

And then it rejected the arguments that that means

that investors who entered or exited that investment or the plan at different periods of time couldn't fairly be in that class, because that's a determination that's made with respect to the fiduciary's decision-making that affected the entire plan as a whole.  That's why they're not to include the BlackRock Funds, the whole suite in the plan at any given time.

And so we submit that the evidence does establish a practical and a well-accepted common loss methodology.  And from our read, both experts agree about that.  They don't agree on which comparators you would absolutely use to establish losses at trial and, frankly, we think that is a merits issue.

THE COURT:  Why?

MR. BERIN:  It involves -- you know, there was a lot of discussion earlier today by Mr. Scalia about what the industry believes about some of these investments, about what is accepted in the industry in terms of distinctions between active and passive implementations and the differences between these funds in terms of their comparability.

And so experts are going to present evidence at trial on what the industry believes about these funds, whether or not that it's appropriate to compare certain of these funds.  And I know this isn't in the record, but I just offer it for what its worth:  I deposed a third-party representative of BlackRock in this case just several weeks ago and asked her questions about

Case 3:22-cv-00532-REP Document 194 Filed 02/16/24 Page 122 of 144 PageID#
3287
Trauernicht, et al. v. Genworth - 2-12-24 122

the differences between active and passive implementations. And even she took the position that passive implemented target date funds involve degrees of decision-making about the glide path, the asset allocations, the subasset classes, and even the choice of funds with which to implement.

And so she was hesitant to say that there's any bright line rule that certain targeted funds could never be compared for evaluative purpose. And I only offer that not to answer the question, but because this is the kind of question that will be answered at trial based on all the evidence before the Court, but for purposes of class certification, showing that we submit and which defendant's expert agrees with is that there are comparators that were pled in the complaint which are knowable based on an analysis of the investments in the universe that would be potential replacements for the BlackRock Funds against which losses can be shown with respect to all vintages of the BlackRock Funds.

And for those reasons, I think it's ultimately a merits determination, but the showing --

THE COURT: So you withdraw from that assertion what? With respect to class certification issues, what would you have me find then?

MR. BERIN: I would have you find that there is a common loss methodology that can be applied to the plan and that there are --

THE COURT:  And that common loss methodology, if the testimony of Marin is accepted, would show that there were losses across the board in each vintage?

MR. BERIN:  That's correct, Your Honor.  Mr. Marin --

THE COURT:  And Mr. Wermers says differently; that there were not losses across the board.  And he does that in each vintage; he does that because he does what?

MR. BERIN:  Because he omits certain comparators, Your Honor.  There's a chart in Dr. Wermers' report that includes the actively managed so-called comparators.  And he acknowledges in those charts -- it's Table 6 of Dr. Wermers' report -- that every vintage of the BlackRock Funds underperformed the American Funds target date funds and the T. Rowe Price target date funds.

And that's evidence that concurs with Mr. Marin's findings in that regard and it concurs with the possibility of showing loss for every plan participant.  Defendants' arguments really boil down beyond that to a degree of loss question, which is common in class action litigation, be it a securities class action or else.

We're talking about a mechanical calculation based on what participants' account balances were in the BlackRock Funds and when they had assets in the BlackRock Funds in order to determine which portion of the plan's losses in a particular vintage would be attributable to an individual participant.

But I'm not aware, really, of any courts and not in the cases cited by defendants that found that that kind of question precludes class certification, because that's the nature of plans like this.  The participants are hired and leave an employer at different times.  Participants make certain elections at different times.  But that doesn't fundamentally change the nature of the claim, which is about Genworth's conduct in selecting an entire suite of funds for the plan as a whole.

And so we think that the theory of recovery in the expert evidence here establishes for purposes of class certification and then will at trial; that the plan's losses can be readily determined based on investment in the BlackRock Funds for certain periods of time and that questions pertaining to individual participants' account balances and in any other individual circumstances the defendants have raised or were discussed here today, really, are questions that go to an allocation model that's common after a settlement or after a judgment in a case like this.

THE COURT:  What is your understanding as to the standard that is to be applied in determining whether it's appropriate to certify a class or not?

MR. BERIN:  I acknowledge that the plaintiffs bear the burden to establish that the --

THE COURT:  And to what level?

MR. BERIN:  I think it's --

THE COURT:  Reasonable doubt?  Preponderance of the evidence?  Reasonable certainty?  What is the standard to which you have to be held?

MR. BERIN:  My understanding is it would generally be the same standard applied to the claims at issue in the case. I think ultimately --

THE COURT:  What does that mean?  Preponderance of the evidence?

MR. BERIN:  I think ultimately, the ultimate issues will be decided under a preponderance of the evidence standard. But I think for class certification, if the plaintiffs offer evidence that establish that the requirements of Rule 23(a) are met, that common questions exist that plaintiffs --

THE COURT:  Well, from which -- it is your burden to prove what now?

MR. BERIN:  I think the plaintiffs are required to prove that each of the prerequisites of Rule 23(a) are met.

THE COURT:  Right.  With respect to the two experts, you take the view then that Marin's report would permit a jury to find by a preponderance of the evidence that each of the plans -- each of the vintages there were losses in for the class period; is that right?

MR. BERIN:  I think that's what Mr. Marin's report will permit -- and his testimony, ultimately, in the case will

permit the jury to find.  At this stage though --

THE COURT:  Yeah, that's what I'm asking.  You said that a jury could find that.  Okay.  Now, he takes the position -- Mr. Scalia does -- that his expert's report would permit a jury to find that 42 percent of the investments outperformed.

MR. BERIN:  Dr. Wermers'?

THE COURT:  Yeah, Wermers'.  And so from that, he concludes that there were a large number of people unknown who had no losses.  Right?

MR. BERIN:  Dr. Wermers' makes that assertion only with regards to passive comparators.

THE COURT:  I understand.  But that's his point, right?

MR. BERIN:  That's his contention.

THE COURT:  So you-all are at issue over what it is that a reasonable jury could find as to the matter of losses?  You base yours on Marin; he bases his on Wermers.

What law says to me exactly, when I'm confronted with that situation, I should do with respect to making a finding on class certification where on the issue that there were people who -- that plan participants suffered losses across the board or they didn't suffer such losses?  What law tells me what to do there?

MR. BERIN:  Well, I should clarify.  I think the

standard, for purposes of class certification, would be that the damages are susceptible or the losses are susceptible to calculation on a class-wide basis, not that they need to be proven at this juncture.

THE COURT:  I'm not saying that.  But at least we have to say that we conclude that all the -- he says that there are a great number of people who suffered no loss.  He draws that from Wermers' report.  Your expert says otherwise.  You draw that from his report.

At this juncture, what do I do about the competing expert reports?  And what case law do you rely on for that?

MR. BERIN:  This is quite similar to the dispute among the parties in the University of Southern California case.  It was a case in which there were competing experts.

THE COURT:  *Munro*?

MR. BERIN:  *Munro*, correct.

THE COURT:  Where is it?  I've got it.

MR. BERIN:  You have that decision, Your Honor; the discussion part occurs under the Adequacy heading.

THE COURT:  Under what?

MR. BERIN:  Under the heading of Adequacy.  This would be in the Westlaw reported version, star page 6.  In the fourth paragraph of that section the Court discusses that the parties' interpretation of the claims are at odds.  The court writes, "Defendant's analysis of the injuries that could befall

putative class members under a class-wide proceeding appears to rely to a degree on a misreading of the SEC or deponent statements."

The court in that section, as well as other parts of this decision, discusses that the defendant's expert takes a partial view of the plaintiffs' theory of liability and recovery in the case.

THE COURT:  Where?  Nothing that I see in that -- I've read that before.  Nothing that I see in that section tells me what to do with the experts' opinions.  I don't see that in *Munro* at all.

You see, it seems to me as if you have -- this is on the issue of whether there are people who have standing because they have no loss.  This also -- this report of Wermers' -- pertains to how convoluted and fouled up the administration of the trial might be in having to prove the losses that occur in the plan.

His view is, the defendant's view is you'd have to look at the individual analysis of each plaintiff to be able to determine that because some people didn't suffer any loss, even if others did.

So what case tells me what to do where that's the issue that I have --

MR. BERIN:  Well, in --

THE COURT:  -- at the class certification stage?

MR. BERIN:  Without trying to seeming to avoid that question, I think there are other portions of the *Munro* decision that I would cite on that.

But I think the reality is, in terms of what proof at trial would look like, it's consistent with Mr. Marin's discussion of whether the Court would need to -- well, he doesn't say what the Court would need to find, but he describes how the Court would identify when a retention decision for an investment became imprudent.

And that would be the Court finding -- and this is my own interpretation of what the proof would look like -- the Court would find that, as of a certain time period, it was imprudent to retain the BlackRock Fund suite for the plan.  And that's the suite as a whole.  I acknowledge that there are a number of vintages.

THE COURT:  Does he opine as to when those time periods were in this report?

MR. BERIN:  He doesn't, Your Honor, but he does in a subsequent --

THE COURT:  He would have to at trial.

MR. BERIN:  Yes, Your Honor.

THE COURT:  And he has already issued a report on that?

MR. BERIN:  He has issued a report that bears on that issue.

Case 3:22-cv-00532-REP    Document 194    Filed 02/16/24    Page 130 of 144 PageID#
3295
Trauernicht, et al. v. Genworth  - 2-12-24        130

THE COURT:  And has he been deposed on it?

MR. BERIN:  He was last week.

THE COURT:  So I don't know, but I'm back to where I deal and how I deal with the views of the experts on these two issues; one is standing because there's no injury.  And the choices seem to me to be to read the reports and see if in fact the reports confirm they say what you say and what Mr. Scalia says and then decide, whether on the basis of those reports, a reasonable jury could conclude that losses were sustained.

You say Marin shows there are losses across the board in all of the entities, right?

MR. BERIN:  Yes, Your Honor.

THE COURT:  He says that in 42 percent of the investments, there were no losses.

MR. BERIN:  Yes, Your Honor.

THE COURT:  That's quite a conflict of interest. Now, how do I resolve -- I mean of testimony.  So how is it that I resolve that conflict?  Do I have them come in here and testify and listen to them testimony and let you-all cross-examine them and make a finding of fact?  Or am I confined to what I see in the papers here, including the reports to which you both point?

MR. BERIN:  Well, Your Honor, I think for purposes of this motion, on these papers and reports.  You need to look no further than plaintiffs' actual theory of the case.  I think --

THE COURT:  Wait.  Don't you remember that we were instructed that in some places we have to get into the merits of the case?  But only so far as is necessary to deal with class certification.

So wouldn't that mean in this case, where the issue that is asserted stands in the way of class certification is that there are no losses, therefore no injuries mean that I have to ascertain at least is there viability to your theory of the case based on what Marin says?  And if that's so, don't I have to hear what Marin says, and don't they have the right to cross-examine him and I make a finding that a jury reasonably could find, based on Marin's testimony, that there were losses across the board or I make a finding based largely on Wermers' testimony that there were 42 percent of the people that had no loss and then decide where do we go from there, using the same method, listening to them testify?

Is that the extent to which we apply the rule that you have to get into the merits of the case sometimes but only to the extent necessary for a class certification?

MR. BERIN:  I think here the question of what the appropriate comparator is ultimately on the merits is one that will be answered with respect to the entire class as a whole.  It addresses the claims on behalf of the plan, vis-a-vis the BlackRock Funds, in the same way for all participants.

And so I recognize that the law suggests that we have

to look at the merits, but that's cabined to the extent necessary.  That's what many of these --

THE COURT:  You're repeating what I said; you're not helping me too much.

MR. BERIN:  Well, the reality is --

THE COURT:  What do I do is the question.

MR. BERIN:  -- whether or not the American Funds, for instance, or the T. Rowe Funds against which even Dr. Wermers' concedes that a loss can be shown for every vintage of the BlackRock Funds, whether or not those funds are suitable alternative investments will be answered up or down with respect to the plan in the same way for all participants.

THE COURT:  But I can't answer them on this record.  So I don't delve into it, into that aspect of the merits in order to decide class certification; is that what you're saying?

MR. BERIN:  I think the parties agree that the Court need not go so far as to answer what the appropriate comparator is at this stage.  Taking just the example of the *Dukes versus Wal-Mart* case, that was a Title VII employment discrimination case and that's a case that's been cited favorably by the defendant today as well as in their papers.

The merits-related inquiry looked at the nature of the claims that all class members had.  And that employment discrimination claim concerned individuals who were in

Case 3:22-cv-00532-REP   Document 194   Filed 02/16/24   Page 133 of 144 PageID#
3298
Trauernicht, et al. v. Genworth   - 2-12-24      133

different positions with respect to their treatment by the defendant in that case.

And so I think the analogous merits inquiry, in that case, which was one that looked at the nature of the claim to try to understand whether or not the claims were sufficiently typical among class members to be certified is analogous to the decision that looks at the character of the claims that the potential class members here share, which concerns the retention of the BlackRock Funds as a whole.

It's not, as it was in the case in the *Dukes versus Wal-Mart* case, that the claims were different among individuals and that's what rendered -- that's what rendered commonality and typicality failed in that case.

But I think the merits inquiry that needs to be made here is only that there is a proof structure that fits typical claims among all class members relative to the plan, and that's the evidence that generally the experts agree on; that's the framework that Mr. Marin proffers. But I don't think the Court needs to resolve the question of what the favored comparator is. I think that question -- and I've got some responses to the few cases --

THE COURT: Excuse me. But to find that there were 42 percent of the investments as to which there was a better performance than the comparators, and therefore there are a lot of people, we don't know much, how many, who had no

loss, is it proper for me to say, to judge the expert report on which it is -- that assertion is founded and to determine that's either acceptable or not acceptable?

MR. BERIN:  Well, I think the --

THE COURT:  In other words, the expert reports in this case are analogous to the claims issue in the *Duke/Wal-Mart* case.

MR. BERIN:  Well, I think the --

THE COURT:  Or are they?

MR. BERIN:  I think the claims for all class members here are a mirror image of one another.  All class members claims here would be the fiduciaries of this plan breached their duties.

THE COURT:  I know, but that's not what I'm asking. I'm asking you about the expert reports and how I use them to -- or let's try it another way:  Is there any aspect of this case that the *Duke* rule about looking at the merits of the case for purposes of only insofar as is necessary for class certification comes into play?  Is there any aspect of this analysis that comes into play in this case?

In *Duke*, it was the claims.  You look at the claims; the claims were so different, and then you apply, okay, there are different claims; then typicality isn't met.  Boom, that's the end; that's as far as you need to go.

But here we have something different.  The linchpin

of the arguments here are the expert reports. And on one side, the expert says, if you match up, use certain comparators, every one of the claim -- every one was outperformed, every comparator outperformed the base fund, the BlackRock TDF. He says, on the other side, there's an expert that says that's not right.

So how far do I delve into the expert issue in order to decide the issue on which that evidence is proposed as a dispositive function? And that is, the question of injury, and hence, standing.

MR. BERIN: I think it's perfectly appropriate for the Court to look at the expert reports to make the determination as to whether they fit the theory of liability and recovery in the case. I think if the Court were to read the expert reports and determine that one of them did not fit the theory of liability and recovery in the case, it can certify the class on the basis of the evidence in front of it about a class-wide damages model and the susceptibility of these claims to common proof.

If it made that determination, I think the court in the *Prime Healthcare Services* case that we submitted as supplemental authority was confronted to very, very similar expert reports. The defendant's expert report cited percentages of the individuals who, in the expert's view, wouldn't be harmed when considering only certain comparators.

And the court certified the class, recognizing that that wasn't a fit to the circumstances of the plaintiffs' claim in that case.  There was opposing expert -- opposing expert reports on that issue before that court on that motion.  The posture was substantially similar to this case presently, and the court determined on the basis of the fit of the expert reports to the --

THE COURT:  You think I can use *Prime Healthcare* as the guide to how to decide this particular aspect of this case?

MR. BERIN:  I think the court's discussion in *Prime Healthcare* is incredibly instructive.  I recognize that it's binding on this Court, of course, but I think it's quite instructive and deals with two astonishingly similar expert reports and assertions about percentages of individuals who purportedly weren't harmed using only certain comparators.

THE COURT:  All right.  What else?

MR. BERIN:  I did just want to address the manageability questions that came up earlier.  It sounded to me from Mr. Scalia's presentation just following lunch that defendant's position is not that subclasses are necessary, but I did just want to address that issue from our perspective.

And I acknowledge that subclasses weren't addressed in the briefing because I think our position is certainly that subclasses aren't necessary here and I'll explain why and it sounds like --

THE COURT:  Are not necessary?

MR. BERIN:  Are not necessary here.  And that is because, unlike cases where -- and these cases are fewer and farther between where there are subclasses based on different investments in a plan.  The investments at issue here, the BlackRock TDFs, were elected as an entire suite.  And so the analysis that the Court would undertake at trial would relate to the decisions of the fiduciaries to retain or not the entire plan as a whole.

The evidence that we submitted -- a couple of deposition citations on our reply brief may go to this point as well -- but the evidence in this case that the Court would review at trial would concern a series of decisions regarding the monitoring of the BlackRock target date suite as a whole.

Defendants and Dr. Wermers would agree that it's not customary and possibly not feasible, it's virtually never done that a retirement plan fiduciary would select different vintages from different providers.  So the activity of monitoring the target dates funds in the plan occurred as one single set of decisions with respect to the entire BlackRock target date fund suite.  And so we think the structure of the plan and the structure of the product here corroborates --

THE COURT:  Is the same?

MR. BERIN:  Is the same?

THE COURT:  You say it's the same?

MR. BERIN:  We say it is the same with respect to the different vintages.  Of course, we acknowledge that there would be different returns experienced by different vintages, but in all of the target date funds cases that we've cited, those differences just amount to a readily calculable loss related to the plan's account in a particular vintage.

But there would be no different proof about Genworth's monitoring of any specific vintage of the target date funds.  And so given that that is the structure of the investment that we're dealing with, we think that further supports that subclasses wouldn't be necessary in this case.

And I did just want to address the question about notice, if the Court is interested.  Mr. Scalia mentioned that we hadn't suggested that we would do notice.  We're happy to, Your Honor.  And in similar cases -- in fact, in the *Prime* case, which did concern a target date fund suite -- notice went out; class was certified as a 23(b)(1) class.

We're happy to do notice here and I think it would be quite easy to determine what investors -- or what participants should receive notice, even under the current definition of the class.  While losses would be proven at trial, because over 95 percent of this plan's participants invested in the BlackRock Funds, if notice was sent to the participants that invested in the BlackRock Funds -- and that's readily ascertainable based on the plan's records -- it would be an entirely practical way

to affect notice in a case like this.  That's what was done in the *Prime* case.

And so notice and that due process question in our view is answered.  We've had the discussion about the opt-out, but I just wanted to raise the point about notice and, you know, the specific manageability concerns around a retirement fund suite that included different vintages.  Based on the structure of the investment product at issue here.

THE COURT:  Well, there are concerns that are expressed by the Supreme Court about the importance of notice and a right to opt out where monetary damages are involved.  My understanding of those cases expressing their concern is that those are cases where there are individuals with individual claims and their monetary damages would be affected.  And so they might not want to participate in a trial in a class action.

Whereas, in this case, you're talking about assets for a fund, and the fund, it doesn't make any difference to the individual members of the fund.  And they don't need a right, they don't need to opt out; is that your position?

MR. BERIN:  That is -- that's a fair summation of part of our position.  I would also submit the plan itself, the assets are held in trust.  ERISA, the statute, is a creature of trust law.

While we're stylizing this conversation -- I think

it's been carried through some of the briefing, particularly with the first motion to dismiss -- is the claim for money damages, it's still fundamentally to restore the losses of a trust.

And so for all the reasons I discussed earlier about incompatible standards and decisions that would affect a distribution of relief among other things through the plan, my best understanding of why those concerns articulated by the Supreme Court around opt-out rights with respect to claims for money damages not permeating this area is because of the trust-like structure of these plans and the nature of the claim and the way that relief is accorded in cases like this.  So I would just add that context.

But I think Your Honor's summation was correct concerning our position on the opt-out.

THE COURT:  Well, go to the end of the trial and you've won it.  What relief do you ask for?

MR. BERIN:  The principal relief sought would be restoration of the plan's losses.

THE COURT:  So that, in effect, causes the movement of money from Genworth and the defendants into the plan?

MR. BERIN:  Correct.

THE COURT:  Is that an award of money damages?  Or is that an equitable remedy?

MR. BERIN:  In essence, Your Honor, I think it is an

equitable-like remedy.  It's the reason that many of these cases' plaintiffs who've made jury demands have their demands struck.  These claims have a real equitable character.  And so I acknowledge that money would be returned --

THE COURT:  Well, if it's a claim for money damages, who decides that?

MR. BERIN:  Your Honor, this trial would be a bench trial.

THE COURT:  So it is an award of restoration of funds?

MR. BERIN:  I think that's a fair characterization.

THE COURT:  Like restitution?  That's an equitable remedy, not an award of money damages.  So the cases that talk about concern respecting opt-out rights that are based on the availability to the class members, having money damage possibilities just don't apply to this situation.  That seems to be what you're saying without saying it.  Is that what you mean?

MR. BERIN:  That's generally what I mean, Your Honor, yes.

THE COURT:  Okay.  Anything else?

MR. BERIN:  No, I think that addresses the additional points that I had.  Thank you very much.

THE COURT:  All right.  The matter is submitted. I'll get you an opinion shortly.

Yes?

MR. SCALIA:  Can I just mention a couple of procedural timing issues that might be --

THE COURT:  Sure.  Housekeeping.

MR. SCALIA:  Yes.  Thank you, Your Honor.  I did want to clarify something that emerged at the end of the discussion just now --

THE COURT:  Wait a minute.  Are you easing this into a substantive argument as opposed to housekeeping?

MR. SCALIA:  No, no, I'm not.

THE COURT:  Okay.  Because if you wanted that, that's California rules, and I usually don't apply them.  But if he doesn't -- as long as he has the last word on the point, we do it.  So what is it?

MR. SCALIA:  You had referred at a number of points, Your Honor, to what the jury might do.  And I just wanted to confirm what Mr. Berin mentioned --

THE COURT:  The finder of fact.

MR. SCALIA:  -- that this is a bench trial, Your Honor.

THE COURT:  Yes.

MR. SCALIA:  The other thing that I wanted to mention, just from a timing point, you've asked a lot about the experts.  Motions for summary judgment and *Daubert* motions are due a week from tomorrow.

THE COURT:  Due when?

MR. SCALIA:  A week from tomorrow.  So our summary judgment motion, I believe, and any *Daubert* motions that we may file.  And I think we are likely to address Mr. Marin's expert report in our filings next week.  That is something that might be relevant as you weigh this question.

THE COURT:  What is relevant as I weigh the question?

MR. SCALIA:  Well, Your Honor, you've asked --

THE COURT:  What are you asking?  Are you asking me to do anything or just informing me of that?

MR. SCALIA:  No.  You've, obviously, Your Honor, for understandable reasons, spent a lot of time asking us how to weigh what the experts had to say.  And I just wanted to make sure that you were aware that there will be filings a week from tomorrow that will address the expert's or at least some of them.

THE COURT:  Are you going to attack the expert testimony of Mr. Wermers, Mr. Berin?

MR. BERIN:  We are contemplating a merits report motion, but I don't know that we'd anticipated addressing class certification issues in forthcoming motions.

THE COURT:  All right.

MR. SCALIA:  Thank you, Your Honor.

THE COURT:  Thank you very much.

(Court adjourned at 3:30 p.m.)

**CERTIFICATE**

I, Ruth A. Levy, RPR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/  Ruth A. Levy, RPR                    Date:  02/16/2024