1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

PETER TRAUERNICHT, ET AL.        }
                                 }
v.                               }      Civil Action No.
                                 }      3:22 CV 532
GENWORTH FINANCIAL, INC.,        }
ET AL.                           }

                                        March 25, 2024

          COMPLETE TRANSCRIPT OF SUMMARY JUDGMENT
            BEFORE THE HONORABLE ROBERT E. PAYNE
              UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

James E. Miller, Esquire
Alex Berin, Esquire
MILLER SHAH LLP (CT-NA)
65 Main Street
Chester, Connecticut   06412

Glenn E. Chappell, Esquire
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC   20006
     Counsel on behalf of Peter Trauernicht, et al.


Eugene Scalia, Esquire
Jennafer M. Tryck, Esquire
Karl G. Nelson, Esquire
Max E. Schulman, Esquire
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC   20036

Brian E. Pumphrey, Esquire
Heidi Siegmund, Esquire
McGUIRE WOODS LLP
2812 Emerywood Parkway, Suite 220
Richmond, Virginia   23294
     Counsel on behalf of Genworth Financial Inc.

                  KRISTA M. LISCIO, RMR
                 OFFICIAL COURT REPORTER
               UNITED STATES DISTRICT COURT

(The proceeding commenced at 10:07 a.m.)

THE CLERK:  Case Number 3:22 CV 532.  *Peter Trauernicht, et al v. Genworth Financial Inc., et al.*

The plaintiffs are represented by Glenn Chappell, Alex Berin and James Miller.

The defendant, Genworth Financial Inc., is represented by Eugene Scalia, Brian Pumphrey, Heidi Siegmund, Jennafer Tryck, Karl Nelson and Max Schulman.

Are counsel ready to proceed?

MR. SCALIA:  Yes, we are.

MR. MILLER:  Yes, sir.

THE COURT:  All right.  We have a motion for summary judgment, ECF Number 213, from the defendant.

Who's arguing?

Good morning.

MR. SCALIA:  Good morning, Your Honor.  Eugene Scalia for defendant Genworth.

THE COURT:  All right.

MR. SCALIA:  Your Honor, there was no fiduciary breach at Genworth.  Genworth's process was robust, and if necessary to establish that at trial we are certain --

THE COURT:  Wait a minute.  Wait a minute.

We are assuming there was a breach for purposes of this motion though.

MR. SCALIA:  That's correct, Your Honor.  We're

not disputing that now.  I just wanted to make clear that we're not conceding it for purposes of the case as a whole.  We're just not engaging that issue now.

THE COURT:  I understand.

MR. SCALIA:  The plaintiffs, however, have not justified imposing on this Court and the parties and witnesses the burdens of trial.  This Court has given them every opportunity to make their case on the second essential element of their case, which is loss causation.

As you know, Your Honor, you've asked about the other cases that were filed at the same time making identical allegations, and none of those has survived a motion to dismiss at this point.  Six of the ten are now gone, most of them after being dismissed on the pleadings, but this Court, pursuant to its practices, has given these plaintiffs an additional opportunity --

THE COURT:  Not pursuant to practices.  Pursuant to decisions based on the merits of the individual cases that were presented in the briefs in this case.  Not pursuant to practices.

MR. SCALIA:  And where it leaves us, Your Honor is that pursuant to blackletter law, if the fiduciary is negligent, but he makes the same decision that a prudent fiduciary would have, there is no claim.  Put simply, no harm, no foul.  That's settled law, undisputed by the

parties.  There has to be loss causation.

In ERISA terms, if the fiduciary's conduct was objectively prudent, if retaining a particular fund was objectively prudent, if a hypothetical prudent fiduciary would have made the same decision, then there's not loss causation and summary judgment should be entered.

THE COURT:  Well, how do we decide that, is the question.  And what is the record respecting the decision on the would have as explained largely by the Fourth Circuit?

MR. SCALIA:  That's right, Your Honor.  The *Tatum* cases frame this.

THE COURT:  All right.

MR. SCALIA:  And they frame the inquiry as what probably would have happened.

THE COURT:  So what we do is we assume that there was a breach because there was no monitoring?

MR. SCALIA:  For present purposes, that's correct, Your Honor, obviously.

THE COURT:  All right.  And then we say, well, they would have made the same decision they made anyway, according to *Tatum*.  So how do you decide would have in that situation, where, as here, the plan investment policy statement says that you're to consider three things:

The benchmark -- custom benchmark based on

underlying asset allocation.  In addition, the underlying fund in which the portfolio is invested will be compared to its relevant universe applicable S&P target.  And then there's the peer group.

How do you decide what they would have done had they done what they were supposed to do by way of monitoring the assets?

MR. SCALIA:  And, Your Honor, I think that's where this case really stands apart.

THE COURT:  I know, but how do you do it?  I am having -- I understand what the rule is.  I'm having trouble understanding exactly how in this case I would do that.  For example, do I turn to the opinions of experts? I mean, to a certain extent, the would have analysis is a Ouija board.  You're doing -- you're engaging in an exercise about what the prudent person would have done under the circumstances.

Where does one, as a finder of the fact, draw that information from?  What part of the record do you look to, and then how do you decide whether there is a genuine dispute of material fact over that -- those particular issues?

And I don't think either one of you did so much good to help me along to way there, so our task is set out by the Fourth Circuit.  How we get there is not quite as

clear.  Can you help me?

MR. SCALIA:  What the Fourth Circuit says we do, Your Honor, is we look at the totality of the circumstances.

THE COURT:  All right.

MR. SCALIA:  So we look at the totality of the circumstances.  What we have here is an extraordinary circumstance where the overwhelming judgment of thousands of fiduciaries was that these BlackRock funds were a prudent and appropriate investment.

THE COURT:  What evidence is there that thousands of them were doing this?

MR. SCALIA:  The evidence is that --

THE COURT:  What is the evidence that there are -- you say "thousands."  That is not, I don't think, the quantification in the papers, but maybe I missed it. I thought it was 867, or something like that.

MR. SCALIA:  More than 800 added these funds during the year 2017, which is the year that the plaintiffs have focused on.  More than 900 already held these funds, so those are plans --

THE COURT:  And kept them?

MR. SCALIA:  That's right.  And retained them. So that's --

THE COURT:  And what is the source of proof on

that?

MR. SCALIA:  That is the expert report provided by Dr. Wermers, which is Exhibit 4.  It's ECF 217-4.  And he shows the extraordinary market embrace of these funds.

Your Honor, the --

THE COURT:  Now, does that show -- is his finding in dispute?

MR. SCALIA:  It is not.

THE COURT:  Is it in dispute as to the numbers?

MR. SCALIA:  No.  His conclusion --

THE COURT:  Does his opinion describe the context in which those 1,700 decisions were made?

MR. SCALIA:  His -- there is no dispute that that many plans --

THE COURT:  Does his decision describe the context in which those 800 decisions to add, and 900 decisions to keep were made?

MR. SCALIA:  Your Honor, it does in the sense that these were decisions made by plans that were subject to exactly the same duties as the plan here.

THE COURT:  You mean the duties imposed by the statute?

MR. SCALIA:  Exactly.  Imposed by the statute.

THE COURT:  We have the investment policy statements for those plans?

MR. SCALIA:  We don't, Your Honor.  But what we have is undisputed evidence that there's nothing unusual at all in the investment policy statement of Genworth. So, for example, --

THE COURT:  Being not unusual and being the onces that were at issue in the 1,700 decisions to which you point is somewhat a different thing, it seems to me, isn't it?

MR. SCALIA:  On the material points here, Your Honor, it's not.  For example, plaintiffs in --

THE COURT:  For example, in the 1,700 did it specify the plan that we don't have and don't know about, do we have any indication that in those decisional processes there was a requirement to look at the diversified premixed portfolio funds, to look at the custom benchmark, and to look at the S&P target-date index; do we know that any of those 1,700 had those requirements?

MR. SCALIA:  We do, Your Honor, know that those are common practices.

THE COURT:  How do we know?

MR. SCALIA:  For example, on their brief at Pages 5 and 7, plaintiffs concede a statement by Genworth's investment advisor that looking at Standard & Poor's trailing returns is a very standard practice among

their plans.

Aon testified that many, many of their clients look at that same Standard & Poor's tracking that the Genworth plan provides for.  The custom benchmark exists in every BlackRock TDF plan.  The *Pizarro* case, Your Honor, in Georgia just two years ago granted defendants summary judgment --

THE COURT:  That was a different standard than it was in the Fourth Circuit, it looks to me like.

MR. SCALIA:  But when you look at the evidence the Court considered there, Your Honor, it's the same evidence we're asking the Court to consider here.

THE COURT:  Well, it may be but you can't consider a case that decides something on an entirely different standard and make a decision on that, it doesn't seem to me.

MR. SCALIA:  But, Your Honor, respectfully --

THE COURT:  How do I determine -- what do I look at in the record to determine what the fiduciary would have done had it actually done what the plan required?  How do I do that?

MR. SCALIA:  You look at what other plans did in like circumstances, Your Honor.  And 1,758 either kept or added.  That is powerful evidence that --

THE COURT:  We do not know that those 1,700, or

which of them, had the same requirements.  So we don't -- we can't say, well, there are 1,700 people out there who had who the same requirements and did the same thing.  You can't do that here because we don't have that information.

What you're saying, as I understand, is on the basis of the testimony of the expert and Aon who said that a lot of the people -- a lot of the plans had similar benchmarks, we can then draw -- make the finding that these trustees did, had they done -- if they had done what was required, they would have reached the same result, is that what you're -- that's what your point is, right?

MR. SCALIA:  That is our argument, Your Honor.  And we have evidence as to which they have no opposing evidence.  Our evidence is that the things plaintiffs are claiming should have dictated when moving the funds, three- to five-year returns, the S&P index are the very things that is prevalent in the industry to look at.  So we have evidence that this IPS is not unusual whatsoever.

Plaintiffs have no evidence that there's anything in --

THE COURT:  -- doesn't cut it.  That's the point I'm trying to get you away from.  I understand that's your position.  But take for the purposes of argument that that doesn't work.  If you can't just say, well, it's like a lot of them, and live up to the context analysis that's

required by *Tatum*, as I understand it.  You have to have something more than that then to say, well, they're a lot the same or many of them are the same.

MR. SCALIA:  Your Honor, --

THE COURT:  Many of them are like it.

So confronted with that reality that the Fourth Circuit tells us to look at, that is, the actual context in which the comparator decisions were made, what can I look at other than what you've told me to date –

MR. SCALIA:  Your Honor, I'm sorry to --

THE COURT:  – if I'm assessing what a finder of the fact would have to look at to return a -- to return a verdict for the plaintiffs?

MR. SCALIA:  All evidence is that the exact features of the IPS, which plaintiffs claim dictated removing the funds, are features that are prevalent in the market.

THE COURT:  But that's just what you --

MR. SCALIA:  And plaintiffs have no evidence --

THE COURT:  Don't use that.  You can't use that as dispositive.  Is it relevant?  It certainly is.

You want it to be dispositive, and I'm saying I think the Fourth Circuit tells us it's relevant, but it's not dispositive.

MR. SCALIA:  And we're not claiming by itself

it's dispositive.  What we're saying --

THE COURT:  What else do I look at other than what you're saying then?

MR. SCALIA:  You look at the custom benchmark, which BlackRock offers, which was met here.  The plaintiffs' expert said that these funds were performing exactly as they were supposed to perform.  He said the fund manager seems to have been doing exactly what it was supposed to do.  This is evidence the Court looked at in *Pizarro*.  It is part of the totality of the circumstances, Your Honor.

You also look at all the different qualitative factors.  Not simply performance, but who the managers are, the consistent staffing of the BlackRock TDFs, the stability of BlackRock itself, the fact that it is a to fund rather than a through fund, which is consistent with the IPS terms.  These are other considerations in addition to performance that were incredibly important inputs to a decision whether to retain these funds.

And plaintiffs' expert conceded that they had no reason to believe that any of the terms of the IPS had not been met.  Moreover, Your Honor, it was not simply some --

THE COURT:  They agreed that every factor was met?  Plaintiffs' experts themselves agree that every factor was met?

13

MR. SCALIA:  They agree that BlackRock's --

THE COURT:  Tell me where they say that, because I didn't read that in what I read.

MR. SCALIA:  I can provide you a series of cites about different features --

THE COURT:  Well, let's take one by one what you're talking about there.

MR. SCALIA:  Their expert, Marin, said there was nothing, quote, out of line with BlackRock's organization, people or process.

That's Exhibit 2, Marin deposition.

THE COURT:  Exhibit 2 to what?

MR. SCALIA:  To our summary judgment brief.

THE COURT:  That's ECF what?  217?

MR. SCALIA:  Yes, it's 217-2.

THE COURT:  Yes.

MR. SCALIA:  In his deposition, he conceded that the BlackRock LifePath funds satisfied the IPS criteria for organization, people and process.

THE COURT:  That's one of the factors.

MR. SCALIA:  That's correct.

THE COURT:  Well, what about the other factors?

MR. SCALIA:  He conceded that they adhere to their investment guidelines.  That's again, his deposition --

THE COURT:  Who adhered to whose investment guidelines?

MR. SCALIA:  BlackRock's.  That was one of the benchmarks by which Genworth was to assess the fund, whether they were following their investment guidelines.  He said I have no reason to think they don't.

THE COURT:  They were adhered to -- the BlackRock management adhered to BlackRock's guidelines?

MR. SCALIA:  That's correct.

Same thing with respect to the BlackRock stated investment philosophy.  Again, in his deposition he said -- he admitted that they had adhered to that.  He admitted, Your Honor, again in deposition, that he saw no indication of the departure of investment professionals that would have been --

THE COURT:  Let's call that the internal operation of BlackRock factor.  You're saying he acknowledged that the internal operation of BlackRock factor is not at issue, is that right?

MR. SCALIA:  That's correct, Your Honor.

THE COURT:  All right.  What else?  How about the -- you said that he conceded they were doing well, and what they were supposed to do according to the S&P index.  Where does he say that?

MR. SCALIA:  That's not what I'm saying.  I'm

saying according to the custom benchmark, Your Honor.

THE COURT:  Well, that's nothing more than saying they were doing internally what they were supposed to do is what that means -- is that what that means?

MR. SCALIA:  It means that the plan was -- the investment fund was successfully executing its investment strategy, which is critical, Your Honor.

THE COURT:  I understand.  But that's all part of the factor of whether they lived up to the internal operation measurement system.  And that includes everything from following your own plan if you're the fund, are you losing people, do you have good executives, et cetera, et cetera.  That's all one factor.  That's all it is.  It's not anything else.  It's not proof of anything else.  It's one factor.

And you're saying that Marin resolves that factor in favor of you, not them, am I right?

MR. SCALIA:  You're right, Your Honor, that Marin conceded these are resolved in our favor.

THE COURT:  Yeah.

MR. SCALIA:  Where I would adjust respectfully what you said is that they are not simply one factor.  These things are separately enumerated.

THE COURT:  You can't take one factor and break it down into 1,600 other ones and say they met 1,600.  If

1,600 comprised the whole, you look at the whole and then you consider it.  And that's what this is when considering the argument that Marin conceded, it seems to me.

And that's your argument in your brief is that to all of these things it was doing what -- the funds were doing what they were supposed to do in accord with their strategy that they had good management, the people stayed, the processes were good, they adhered to their own guidelines.  That's all one factor.  And that is how did the fund itself do, the custom benchmark do, as I understand your argument.

MR. SCALIA:  Your Honor, I'm sorry, respectfully I cannot concede that.  I simply cannot concede that.

THE COURT:  Tell me what the custom benchmark measurement is.

MR. SCALIA:  I will address that, and then I want to explain the importance of the other factors.  The custom benchmark, Your Honor, is a measure of whether the assets that are in the plan are actually tracking market performance in the manner intended.  And so it's not simply about --

THE COURT:  Well, why isn't that the same as they're doing what they were supposed to do?

MR. SCALIA:  Performance wise it is the same. And it's very important, Your Honor.  If you buy an

investment and it performs as designed and intended, then that investment is by, one, a very important measure.  And that's what the custom benchmark tells you.

The custom benchmark was part of the IPS, which is routinely consulted in the industry.

THE COURT:  When he says you argued that -- and your brief argues, that the funds were doing what they were supposed to do, that's what that is, right?

MR. SCALIA:  That's correct.

THE COURT:  All right.

Then also he said in the same part of your papers and in your argument that it was operating in accord with good practices.  Internally it was good management.  The people were good.  They weren't losing people.  The process they followed was good.  They adhered to -- that is, the fund adhered to its guidelines, and that's all part of looking at the -- the way you put that in a basket is to say it's many factors to look at in respect of how the fund internally was doing because that's the internal part as opposed to the external part, which is the asset's performance, is that right?

MR. SCALIA:  Largely.  However, the custom benchmark is a measure of how those assets are performing.  So I wouldn't want to suggest, Your Honor, that the custom benchmark is not one measure of performance --

THE COURT:  I didn't suggest otherwise by the question.  I assumed that it was a measure of performance.

Is it possible to kind of come to grips with the fact that what I'm trying to do is figure out a simple way of dealing with what you're raising, and you're raising this, this, this, this and this.  Every one of them have to do with the internal operation of the company except that benchmark so far, is that right?  The fund, not the company.

MR. SCALIA:  The internal operation and stability.  I think that's right, Your Honor.

THE COURT:  All right.

MR. SCALIA:  But let me emphasize this:  Those are arguably the single most important set of considerations because a prudent fiduciary does not principally judge an investment by past performance.  Past performance is not a prediction of future results.

If you look at Plaintiffs' Exhibit 86, this is a Morningstar report explaining how it judges pension investments.  And it talks about people, it talks about the process at the fund it's looking at.  And it makes clear we don't put excessive weight on past performance because these are 40, 60 or year more investments.  It would be a horrible fiduciary breach, Your Honor, to focus on a single year and say, oh, it wasn't good this year,

get it out of here.

THE COURT:  I think I understand that.  But we were on the topic of you're supposed to compare the underlying fund to the relevant universe which is the applicable S&P target-date index.  Now, that wasn't done by the defendants here, as I understand it, is that correct?

MR. SCALIA:  Your Honor, let me say first all --

THE COURT:  You're shaking your head, no, it wasn't done.

MR. SCALIA:  That's not correct.  That's not correct, Your Honor.

THE COURT:  Show me something that tells me -- I can look at and says these trustees compared the funds at issue here with the relevant universe, the S&P target index.  What evidence is there that says they did that?  Any piece of evidence.  Somebody's testimony, a document that says, oh, let's look at it versus such and such.  Did they or did they not do it?

MR. SCALIA:  They absolutely did.  The committee members testified --

THE COURT:  Well, bring me the proof.

MR. SCALIA:  The committee members --

THE COURT:  All right.  You talk until you finish, and then I'm going to ask the same question.  That

is, show me the proof.  I didn't see it in the papers.  I may have overlooked it.  What's the proof that they actually did it?

MR. SCALIA:  The committee members, Your Honor, testified that they looked at that.  It is reflected in --

THE COURT:  The committee members testified they actually made the comparison?

MR. SCALIA:  They looked at the S&P performance.  Absolutely.  They received --

THE COURT:  I didn't say that.  I didn't say they looked at the S&P performance.  I said they compared the Black -- did they testify that they compared the BlackRock performance with the S&P performance?  Did they say they did the comparison?  If they did, then maybe there's evidence of monitoring.  But I understand that that's not the case.

MR. SCALIA:  Your Honor, I'm sorry that you have been left with that impression.  The committee members testified they that looked at the performance of the funds relative to the S&P.  And every quarter they were provided reports by their investment consultant showing that comparison.  And by the way, the defendants' expert, it's undisputed that from 2019 to 2021, every single vintage of the BlackRock TDFs beat the S&P.

THE COURT:  I'm not interested in that right

now.  I'm interested in the testimony about the comparison.

MR. SCALIA:  Yes.

THE COURT:  Where is the testimony about the -- where they say they compared the target funds with the S&P index each quarter where they actually did it?  Not whether they were given documents that had it, but whether they did it.  Where they sat down and looked at it and said here's the fund, here's the S&P.

MR. SCALIA:  Your Honor, I --

THE COURT:  Give me the page and line for each board member, please.

MR. SCALIA:  Your Honor, I do not have that with me.  I will provide --

THE COURT:  Let's have somebody get them together.

MR. SCALIA:  I will provide it to you when we can.

The point is that --

THE COURT:  But that's the point you're making, that each and every one of them said that?

MR. SCALIA:  It's not the point I'm making, Your Honor.

THE COURT:  Well, it's what I interpreted what you said, so let's start again.

MR. SCALIA:  My principal point, Your Honor, is that we set that question aside.  That's a process question.  That's a question of fiduciary breach.  We're asking now what would a prudent fiduciary have done.  They would have looked at the S&P --

THE COURT:  You may now wish to set it aside, but we were talking -- you made the statement that they did it, and that the expert of the plaintiff agreed that they did it, and that that was right.  And that certainly has to do with the analysis if it -- that I have to make.  So now I'll set it aside.

So how do I go about looking at the record on what each of the comparator funds that are involved made the comparison called for by the IPS, how do I do that?

MR. SCALIA:  Your Honor, you don't have that specific record on all the different plans, and you never will.

THE COURT:  How about any?

MR. SCALIA:  You will never have that on any specific plan.  What you have --

THE COURT:  Well, you could go take the deposition of all those people or of some of them, or representative people, or you could have an expert, or somebody testify on it.  There has to be some way to prove this if you're going to satisfy the would have.  That's

what I'm looking for is how do I go into finding what a finder of the fact would look at?  That's all.

MR. SCALIA:  And I would take you back, Your Honor, to the plaintiffs' expert's own acknowledgment that the heart of their case, this question of whether how the funds performed over three to five years, the question of the custom benchmark, the question of other performance-related criteria that they identify, these were common in the market.  They've admitted that these were standard terms.  The plaintiffs have admitted that this IPS was a standard document.

And by the way, Your Honor, --

THE COURT:  Is your answer then that the universe of evidence that I consider in making the would have made the same investment anyway analysis for loss causation purposes is what other people in the market did, that's it?

MR. SCALIA:  Based on their investment decision. But we have additional --

THE COURT:  Is there anybody else?  Is there anything else other than what is in the record as to the market?

MR. SCALIA:  Yes, Your Honor.

THE COURT:  Okay.  What is that?

MR. SCALIA:  We have the Morningstar rating.  At

24

the start of 2016, Morningstar, which is arguably --

THE COURT:  What is the significance of the rating?  I know what happened with it.

MR. SCALIA:  It's arguably the single most closely followed analyst rating about the performance of investment options.

THE COURT:  Everybody agrees on that?

MR. SCALIA:  Yes, that it's the leading market indicator.  There's no dispute.  It was conceded by Mr. Marin, the plaintiffs' expert.  At the start of 2016 -- 2016, Your Honor, is the year plaintiffs are saying that these funds should have been put on a watch list and set on their way out the door.  At the start of that year, Morningstar, for the first time, rated these TDFs a gold, which meant it put them in the highest 15 percent in that category.  Also at the start of 2016, Your Honor, Morningstar said that it would be hard to find a deficiency in the BlackRock TDFs.

The plaintiffs, Your Honor, are trying to get this Court to look in the rear view mirror and judge a 40-year investment decision based on what happened in the past three to five years, and nothing else.  That is -- would be a gross fiduciary breach.  It's not how investors make decisions.

And Morningstar is something the market looked

at.  It's been cited by other courts, including courts that dismissed the cookie cutter cases similar to this one.  So that's a really important fact.  And Morningstar rated these TDFs gold in 2016, and every single year in the class period.  These are the only funds to have been rated gold that were a TDF by Morningstar every year in the class period.  So that is powerful evidence.

Additionally, Your Honor, Aon Hewitt --

THE COURT:  What evidence is there as to what the gold means?

MR. SCALIA:  Plaintiffs' Exhibit 86 sets forth in Morningstar's own words what it considers.

THE COURT:  What does gold mean?

MR. SCALIA:  It means that among the comparator funds in that category, that particular fund, the BlackRock TDFs placed in the top 15 percent.  And their overall assessment of the strength of this -- as an investment option, it also means that this is a fund that they think is particularly likely to perform well over the long-term.

THE COURT:  And that's Plaintiffs' Exhibit 86?

MR. SCALIA:  That's correct, Your Honor.

THE COURT:  To what?

MR. SCALIA:  To their opposition to summary judgment.

THE COURT: Okay.

MR. SCALIA: It's ECF 246-86.

THE COURT: All right.

MR. SCALIA: And again, undisputed that when you're considering an investment, when you look in the market, Morningstar is a leading judge of what good investments are. And they put this at the top of the list.

And then additionally, Your Honor, you have Aon Hewitt Investment Consulting, AHIC, other times known as Alight, this was the investment consultant that Genworth had in its committee meetings which, by the way, is not required by ERISA, is not required by the IPS, but they had an investment consultant meeting with them regularly and preparing reports.

Aon rated this, the BlackRock TDFs, a buy. They said it was a good investment to have. That, Your Honor, and the *Pizarro* case, was one of the important market indicators the Court looked at in addition to the custom benchmark, in addition to the wide approval in the market to determine this is an investment option that would have been kept. And so those are other external indicators of how strong this was.

And I appreciate, Your Honor, that this is not meant to be an ex post facto judgment. But the truth is,

they were right.  They were right.  Because when plaintiffs came to this Court, they told you about, you know, six or eleven years of dreadful underperformance. They've now shrunk this case down to one year.  They're trying to rush you to make a decision about one year about an investment decision being made for these retirees for their lifetimes.  That is the height of imprudence.  And they have no evidence, apart from the wide speculations of their expert.

Obviously, Your Honor, we have *Daubert* motions pending, and we're prepared to argue those as well.  But even supposing that their expert, Mr. Marin, were accepted as a witness, what you have is his speculation.  He invented this test that plaintiffs use to say they should have gotten rid of it at a year before it started beating the Standard & Poor's index, before it started beating the Dow Jones.  His criteria -- you've asked me about the IPS, Your Honor.  Mr. Marin's criteria, they have nothing to do with the IPS.  He admits that he ignored the criteria in the IPS.

Plaintiffs' other expert, Ms. Wagner, who is regularly exposed to planned fiduciaries, unlike to Mr. Marin who really hasn't been around pension plans much at all in the last 25 years, their expert admitted that she had not before seen an analysis such as Mr. Marin had

conducted.

And so, Your Honor, you've been asking today, and the Court has been asking since the outset of the case, how do we know?  How do we judge what would have been done?

And what I'm suggesting is that that question is always hypothetical, it's counterfactual, right?  But the evidence you have here is far stronger than Courts usually have when they have to make that decision.

The *Tatum* cases, the --

THE COURT:  What happened on the *Tatum* case on remand?

MR. SCALIA:  On remand the Court found that the defendant, which was RJR, had shown that there was not loss causation because it showed that a prudent fiduciary would have exited the *Nabisco* option.

THE COURT:  On the appeal it led to the Fourth Circuit's opinion the district judge had found could have.  That was determined to be error.  It was remanded for a determination under the would have standard, and he determined that they would have as opposed to could have.

MR. SCALIA:  Exactly, Your Honor.  And it was affirmed by the Fourth Circuit.  The Fourth Circuit said you look at the totality of the circumstances.  And by the way, Your Honor, the Fourth Circuit said, among other

things, you look at analyst reports.  You even look at newspaper articles.

But the point I was making is that this case is from -- this question of how do we construct the counterfactual?  How do we handle the hypothetical?  This case is much easier than many cases that we see.  RJR, I believe it's the *Pipefitters* case that's also been cited by the parties which preceded the *Tatum* cases, or the *DiFelice v. US Airways* case, in all of those you had idiosyncratic investments.  RJR investing in *Nabisco*.  You had US Airways investing in US Airways.  Here you've got an extraordinarily widely held, widely admired investment.

So, Your Honor, when you asked the question, which we agree, it's the heart of the case, how do I ascertain that?  How do I know it would have been done?  What we're discussing is that you have a wealth of evidence here that you usually don't have.

THE COURT:  All right.

MR. SCALIA:  Which is market behavior by all of these other planned fiduciaries.  Remember, the plaintiffs have not identified any performance metric in IPS that's not a market standard.  And they've not identified a single plan.

THE COURT:  They've not identified what?

MR. SCALIA:  They've not identified any criteria

in the IPS that is not a standard market criteria that would have been considered by other plans.  They've conceded that some of these benchmarks we've been talking about --

THE COURT:  They have not identified the criteria under which the decision was made.  That is idiosyncratic as in the other cases that you're citing, is that what you're saying?

MR. SCALIA:  I guess I'm saying two things.  I'm saying that they've conceded that the three- to five-year consideration, the performance window, the S&P index, are prevalent standard considerations by people holding these very funds.  They've also conceded that the custom benchmark is widely consulted by people that hold these funds.

And so what we have is the whole market considering the same kinds of factors, and voting with their feet to retain these funds.  That kind of evidence, it's rare.  And remember, six out of ten of these cases have already been thrown out really for that reason, Your Honor, for the reason that these were judged to be terrific in the market.

This Court said, well, I'm not going to look at that extrinsic evidence.  I want discovery, and so we've not got the discovery which does indeed establish beyond

doubt what that widespread market practice was.

What's very frightening, Your Honor, is the path that plaintiffs want to take the Court down, which is to say, first, look at just one year.  Rush a decision in one year because, by the way, Your Honor, they know performance was better and better through the class period.  And then --

THE COURT:  That what?

MR. SCALIA:  That performance was better and better through the class period.  That's part of the reason --

THE COURT:  Better and better what?

MR. SCALIA:  Through the class period.

THE COURT:  Okay.

MR. SCALIA:  That's one of the reasons they're trying to hasten this decision into a one-year period for an investment.

THE COURT:  "Hasten this," what does that mean?

MR. SCALIA:  Well, their expert, Mr. Marin, we've Dauberted him.  But even if you were to let his report in for, you know, whatever purpose, we think it should be excluded.  But he hadn't cited anybody else that applies the benchmark he did that results in a decision to get rid of the plan after just a year.  And so that is a rushed, hasty, decision that plaintiffs are urging on the

Court.  So that is one very troubling aspect of their case.

But the other, Your Honor, is they are urging the Court to engage in a totally free form, free-flowing reconstruction of what, you know, six or eight planned fiduciaries would have done looking at only this particular document without considering what they concede is the key – the totality of the circumstances.

And once you look at the totality of the circumstances you look at all the objective benchmarks that help a Court judge something that's outside its expertise, Your Honor, with all --

THE COURT:  Your view is that they have nothing on the other side to weigh in the balance of the totality?

MR. SCALIA:  Nothing.

THE COURT:  Not one thing?  So you win?

MR. SCALIA:  We certainly think so, Your Honor. But let me tell you what they will say in response.

THE COURT:  So the next question is let's assume for a moment that there is something.  If there is something, what does that do to whether the judgment whether there's a genuine dispute of material fact that precludes summary judgment and necessitates judgment on the merits, which is what almost all of the cases that really have dealt with the would have in any significant

way have ended up being.  It's one thing to dismiss something as an inadequate pleading.  It's quite another if you get beyond that discovery and there's something on one side and something on the other side.

So you say nothing.  I'll give them a chance now.

MR. SCALIA:  But, Your Honor, I'll tell you what they'll cite.  And I'd like to respond to it.

THE COURT:  I'll let them tell me what they cite.  I think they'll do a better job of it than you will, and you'll have a chance to criticize it.

MR. SCALIA:  Well, Mr. Marin's report --

THE COURT:  You wouldn't be qualified to argue their side of it at this juncture.  Even though you're intellectually qualified to do it, I think you have a conflict of interest.

MR. SCALIA:  I concede they have a hard argument to make, and I'm probably not adequate to do it, Your Honor; however, --

THE COURT:  Maybe they're not either.

MR. SCALIA:  For all their talents, they're not. They're not.

THE COURT:  Let me hear from them.

MR. SCALIA:  Yes, sir.

THE COURT:  All right.

MR. MILLER:  Thank you, Your Honor.  James Miller for the plaintiffs.  Nice to see you again.

Your Honor, I don't know if you want me to go straight to that point in terms of the other side of the equation.

THE COURT:  Well, I want to know what you've got to make a jury issue out of it, Your Honor.

MR. MILLER:  Absolutely, Your Honor.

THE COURT:  He says you agree that it meets the general benchmark for performance.  Do you or not?

MR. MILLER:  We do not, Your Honor.  And Mr. Marin's report makes clear that we do not.

THE COURT:  Where is that?

MR. MILLER:  We can show -- I'll get you the exact citation, Your Honor.  But Mr. Marin's report specifically analyzes the fact that from our perspective the quantitative analysis that's included in the IPS with respect to the three- and five-year performance relative to the S&P 500 was not taken into account by the committee.

And I should note that Mr. Scalia mentioned the fact that he had testimony from committee members supporting the idea that the S&P 500 benchmark was considered.  There is no deposition testimony from any committee members cited by the defendants in support of

their summary judgment motion.  So that is not something that is in the record, Your Honor.

THE COURT:  All right.

MR. MILLER:  I also just want to note, Your Honor, that the defendants did not serve any affirmative expert reports, okay?  They have admitted reluctantly, but they've conceded in a Footnote 5 of their brief that they bear the burden in this instance to show an absence of loss causation.  They designated experts --

THE COURT:  Does that mean they have to -- does that mean they have to simply show that the decision to retain would have been made had they considered monitoring -- had they monitored the investment and made the comparison, is that what they have to show?

MR. MILLER:  I believe so, Your Honor.  And I think that --

THE COURT:  By what, a preponderance of the evidence?

MR. MILLER:  Yes, Your Honor.  And I think that the *Tatum* case speaks quite clearly to this issue.  The Court --

THE COURT:  Go ahead.

MR. MILLER:  The Court in *Tatum* emphasized the importance of planned documents, and said -- and I'm on Page 367 of the first *Tatum* appellate court, 761 F.3d 346,

at Page 367.

And the Fourth Circuit in *Tatum* said, "Moreover, we cannot hold that the district court's error in adopting the 'could have' standard was harmless when the governing Plan document required the Nabisco Funds to remain as frozen funds in the Plan.  ERISA mandates that fiduciaries act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.'  Accordingly, courts have found a breaching fiduciary's failure to follow plan documents to be highly relevant in assessing loss causation.  Tatum stipulated at trial that he would not assert that RJR's failure to adhere to the Plan's terms rendered RJR automatically liable.  But he expressly preserved his argument that the Plan terms are 'highly relevant' to the causation analysis and that 'a prudent fiduciary would have taken them into account' in deciding whether to divest."

And that -- that is really what we have here, Your Honor.  We have the fact that regardless what they said, they have nothing in the record suggesting that they filed -- they followed the quantitative aspects that were required in the IPS, as Your Honor pointed out.

THE COURT:  Well, that -- he says that the board of trustees testified in their depositions that they did

make the comparison.  You're saying that they did not.  Or are you saying that simply that information is not in the record and therefore can't be considered?  They're different thing.

MR. MILLER:  I'm saying both.

THE COURT:  They are different things.

MR. MILLER:  I totally agree, Your Honor.  I'm saying, one, that that testimony does not exist.  They did not testify to that fact.

And second, it is not in the record and is not before this Court.

THE COURT:  Well, it couldn't be in the record if they didn't testify to it.

MR. MILLER:  Right.  Well, they chose not -- as Mr. Scalia pointed out, they chose not to submit any testimony from committee members because they didn't want this Court to examine the actual process that they engaged in.  They didn't meet for over a year, right?  That's not in the record here because they've decided that they're going to move just on the basis of this subjective prudence argument.  But, Your Honor, they also suggest that --

THE COURT:  I know.  But a part of that argument is made, to me, is that the board members did compare the S&P to the target funds quarterly.  That's what -- and I

don't know if there was a quantification of the number of board members who testified to that, but I got -- I made the notation that all board members testified to that.  I don't know -- and then I have a question mark, so I don't know whether that's right or not.

MR. MILLER:  That testimony does not, one, exist period.  And, two, does not exist in the record because if they had been comparing the actual performance of the S&P 500 target index to the performance of the BlackRock funds, they would have seen that they were violating the terms of their own IPS.  The factor in *Tatum* that the Fourth Circuit identifies as being one of the most important factors --

THE COURT:  What's the proof that they would -- if they'd have done it they would have seen they violated it?

MR. MILLER:  Well, because as our -- because the IPS exists for a reason.  Mr. Scalia took you through, I think what Your Honor described, these internal factors that are in a basket, right?  Those are all internal factors that every single target-date fund that Genworth would have considered met, right?  Because all of the target-date funds have consistent -- what I'm talking about is all the large target-date funds, they all have consistent management.  They all somehow managed to

execute their own investment strategy.

When we're talking about the custom index, what we're talking about is a tracking index. We're talking about the equivalent of looking at the Vanguard S&P 500 fund and saying did the Vanguard S&P 500 fund track the S&P.? That's what they're talking about. They're talking about execution, not performance. So of course every single --

THE COURT: Tracking meaning what?

MR. MILLER: Excuse me, Your Honor? I'm sorry.

THE COURT: Tracking meaning what? Tracking what?

MR. MILLER: Tracking because what the BlackRock funds do is they have a glidepath, and they have certain component investments that they say --

THE COURT: You mean they were tracking the same process, not the same results?

MR. MILLER: Exactly. Exactly, Your Honor.

But basically, the custom index is a demonstration that the funds are performing as one would expect based on the investment philosophy adopted by BlackRock. It has nothing to do with the important performance factor identified in the IPS as to whether or not it's relative.

THE COURT: Well, they're going to give me -- at

recess, they're going to give me the list of citations where each board member testified that they compared these so I can see that.  I didn't see it in the papers.

MR. MILLER:  Okay.

Your Honor, I'd also like to point out that in Paragraph 10 of our response, the statements of facts, we do point out that despite their suggestion that there was this widespread market adoption, and that the BlackRock funds were university accepted, number one, 147 plans chose to leave the BlackRock custom index in 2017.  That was 14 percent of the plans.  When you're hemorrhaging 14 percent of your plans in a growing market, that is hardly an indication that --

THE COURT:  Fourteen percent chose to leave in what year?

MR. MILLER:  It was in 2017 following the year of performance in 2016, which we can address in a moment, Your Honor, if you'd like.

We also point out in Paragraph 10, and this is conceded by their expert, that while the BlackRock fund did grow during the class period, it did not grow at the pace of the rest of target-date fund market.  So rather than -- the numbers don't actually establish widespread acceptance.  They show that the BlackRock funds were underperforming other target-date funds in the same space;

thereby establishing that they were not being widely accepted and, in fact, were being accepted less than by other fiduciaries.

On the other --

THE COURT:  Let's take that that's the case. How does one -- if you're the finder of the fact, how do you use that fact in making the would have analysis?

MR. MILLER:  I think what you look at in that -- and, Your Honor, hopefully following a trial, we will provide more --

THE COURT:  What I'm talking about is how you look at it in making -- if you're the finder of the fact, which is a test here, would the reasonable finder of the fact be able to return a verdict for you?  And ordinarily it's a jury.  That's not what we have here.  So what does the reasonable finder of the fact look to to make an assessment of the factor that you're talking about?

MR. MILLER:  And I think the factors you would look at, Your Honor, is you would say, okay, well, first of all we have this expert testimony.  We have a demonstration that there's a very significant portion of the IPS, the investment policy statement, the governing document that's being violated.  The only category that's really related to performance relative to other available investments, which is blackletter law, that the

fiduciaries need to be looking at that, and then you would look at the arguments that Mr. --

THE COURT:  Let me --

MR. MILLER:  I'm sorry, Your Honor.

THE COURT:  You-all are so wrapped up on the generalities that you've lost track of the fact what the job of the finder of the fact is.  So I'm the finder of the fact.  What do I need to come to grips with a finding on the issue of the significance that they ignored -- they just did pay attention to the IPS?  Do I need a witness?  Do I need an expert to testify that that just is not done?  That if your plan tells you to abide to do the comparison then you must make the comparison?

And if you made the comparison you would see in this instance that in 2017, 14 percent of the market went the way opposite that they're asking.  In other words, do I have to have an expert to make this judgment and assess the credibility *vel non* of your expert?

MR. MILLER:  Yes, Your Honor.

THE COURT:  All right.  So in your papers you don't make much of a deal about the need for expert testimony.  I mean, I would have thought that you would have said you can't grant summary judgment in this case because of the experts' testimony that this just isn't done.  That one doesn't do this kind of thing.

Did your expert say that one who is a fiduciary just does not act opposite what the IPS says?

MR. MILLER:  Yes.  Ms. Wagner, who Mr. Scalia acknowledged as being a fiduciary expert, specifically testifies that when plans adopt IPSs, they follow them. And failing to follow the IPS is a breech of the standard of care.

THE COURT:  But is it also -- how does it play into the loss causation analysis and whether they would have made the same decision anyway, even if they had done what they were supposed to do and notwithstanding that they did not?

MR. MILLER:  I think that it plays in in this way, Your Honor.  The would have analysis doesn't happen in a vacuum or in a universe.  The would have analysis happens with respect to this plan.

So the question before the Court is if these -- would these committee members have reached the same result if they had done what they were supposed to do?  And I think the answer will be following the expert testimony. And I apologize we didn't emphasize that as we should have, Your Honor, but the Court would reach the conclusion that if they had followed their own governing plan documents, they would have seen performance issues here. They would have then looked and seen that the BlackRock

funds were not being as widely adopted as other funds, and they would have reached the conclusion that this was not a suitable investment for the plan.

I wholeheartedly agree with Your Honor's comments that none of their objective prudence arguments at this point, and none of them are in their expert reports, which I do want to emphasize, are not affirmative reports. They admit that they bear that burden, and they have no expert report to produce in terms of actually establishing objective --

THE COURT: Well, here they have to prove that the decision to retain would have -- the funds would have been made even if they had followed the plan documents.

MR. MILLER: Yes, Your Honor. They need to --

THE COURT: And they offered no evidence to prove that with respect to expert testimony, right?

MR. MILLER: They did not, Your Honor.

THE COURT: And then they say, well, you don't really need any testimony. What you need to do is to look at the rest of the market and see what was going on. The first thing is that 800 people added BlackRock and 900 -- or funds added BlackRock, and 900 people kept them, and you say in response to that, but 14 percent of the market in 2017 jettisoned BlackRock.

So as a finder of the fact, what do I have to do

if I'm the finder of the fact to make the analysis about whether that 14 percent would have -- knowing about the 14 percent, making the comparison with the S&P, seeing the results that I saw, would have actually allowed me to nonetheless keep the fund, what do I have to -- how do I do that?

MR. MILLER:  I think what you would have to do, and it's obviously a result we prefer you not reach, Your Honor, but in order to reach that conclusion you would have to basically go through that analysis and say despite the fact that there was a governing plan document indicating that this investment was failing, the only specific quantitative criteria identified in the IPS that was meaningful, despite that that these fiduciaries would have somehow determined that they should have kept the investment, and nevertheless despite the fact that they were losing market share relative to other target-date funds because some other fiduciaries were choosing the plans.  I guess that's what you would have to do to reach that conclusion.

But to go back to your --

THE COURT:  How does that square with the analysis required by *Tatum* is the question, isn't it?

MR. MILLER:  Well, and I think -- I don't think that's under *Tatum*.  I think the section that I read from

really speaks to the fact that the critical aspect to evaluate in terms of causation is whether the planned documents have been followed. And that's -- that discussion is totally absent from the defendants' papers.

I do want to point out, and I don't want to be too rhetorical, but if you accepted Mr. Scalia's argument regarding objective prudence, then you would say that everybody -- every hedge fund and pension fund that invested in Bernie Madoff's funds, they were objectively prudent because there were a lot of people doing it, right? But that, to me, would be a ridiculous argument.

THE COURT: What about the rating the Morningstar gave it for the whole period?

MR. MILLER: If you look at -- can I refer you to Paragraph 8 on Page 8 of our response, Your Honor? We explained that the gold -- that, number one, they don't provide any evidence that the Morningstar gold rating is quote, unquote prestigious. And we then go on and explain that --

THE COURT: Does your expert say it's not prestigious?

MR. MILLER: No. What our expert says -- and respectfully, I don't think that Mr. Scalia accurately characterized what our expert said. Our expert said that Morningstar and Bloomberg are reputable companies. But

the fact that they're reputable companies doesn't mean that their rating is the be-all and end-all.  And when you look at the actual rating, as we've described in the --

THE COURT:  Well, I have a pest control company that comes to my house and it has a gold star rating, but after it comes to my house I determine that its reviews on-line are terrible.  And so its self-touted gold star rating doesn't mean anything.  Is this a self-rating of gold?

MR. MILLER:  It's not a self-rating, Your Honor. But I guess what I would say is your analogy I think is apt about the pest control company, but it's even worse in this case because what Morningstar tells you about their rating system, which is on Page 8 of our response, is that Morningstar says you should not use these analyst ratings as a sole basis for evaluating the fund.

THE COURT:  So it's just a factor that you consider?

MR. MILLER:  They also make very clear that the gold ratings are associated largely with qualitative factors, and do not relate to the performance of the funds.  In fact, the committee here, the record establishes that the committee itself, Genworth's plan committee, eliminated the Harbor International Fund during the class period because of its poor performance, even

though it was a Morningstar gold-rated fund.

So it is one factor.  It's not --

THE COURT:  One could say in this case, considering the testimony of everybody that is going to testify at trial, the fact that the Morningstar rating did not save the Harbor fund from rejection -- removal from the plan, is probative evidence of what would have been done had the accurate comparisons been made if -- as to the BlackRock funds and the Standard & Poor's?

MR. MILLER:  I agree, Your Honor.

THE COURT:  Notwithstanding the Morningstar rating that would have stayed.  So that's a fact issue that some finder of the fact has got to decide, is that right?

MR. MILLER:  I agree, Your Honor.  And, you know, as we point out in Paragraph 8 on Page 9, that Morningstar rating, with respect to the quote, unquote performance pillar for the BlackRock funds, Morningstar rated it as neutral.  It did not rate it in a positive way.

So the fact that Morningstar was rating the fund as having good management, all the internal factors that Your Honor identified --

THE COURT:  It doesn't rate -- Morningstar doesn't rate performance.

MR. MILLER:  The gold rating does include really performance factors.  But when they --

THE COURT:  They say right here that Morningstar considers performance in its evaluation of the people and the process, but performance receives no explicit weighting in our analysis.

I'm taking from what you're saying is the use of the performance in that last clause is the performance of the asset itself?

MR. MILLER:  Yes, Your Honor.

THE COURT:  Where does it say that?  Because that isn't what it says.  It's just says performance.

Where does is say that that means asset performance?  There's a difference between whether you've got a staff, whether you've got a good process.  And I'm looking at you and you really do hunky-dory, you're great people, you all belong to the country club, you swing a good golf club, sell a lot, or whatever they decide, doesn't make any difference, but they reach these quantifications on the internal operation of the fund; where does it tell me that performance of asset does not factor into the gold rating of Morningstar?

MR. MILLER:  I think you're right in the sense, Your Honor, it says two things:  It says it receives no explicit weighting in our analysis.  So when it says no

explicit weighting, I guess what it suggests is that there may be a undefined consideration of performance, but not something that in Morningstar's rating is quantifiable or knowable.

THE COURT: Well, let's go back. Looking at your sentence on Page 9 where it says, Morningstar considers performance in its evaluation of the people and process components of its analyst rating, but performance receives no explicit weighting in our analysis, I have read that in accord with the argument that you're making to mean that the performance used in the concluding clause means asset performance. That is, how does the asset do as opposed to how well they measure up in the good management department. And is that what that sentence means, and is that borne out by the record?

MR. MILLER: Yes, that is what that sentence means. So there is a performance consideration of some kind, but I think what they're saying is they look at the performance of the asset, but they don't provide an explicit -- there's no explicit weighting.

But importantly, Your Honor, I think --

THE COURT: The gold rating does not explicitly factor into the -- does not explicitly take into account the asset -- the performance of the asset itself?

MR. MILLER: Right. It may -- it may have some

intangible value.  I would presuppose that if they were rating a manager in terms of people and process, and the person had had historically terrible performance and had been Bernie Madoff's right-hand person, then that might -- that person's performance might rate in in some kind of undefinable way.

THE COURT:  Yeah.

MR. MILLER:  But the performance pillar that we refer to in the last sentence, which is the last sentence of Paragraph 8, that's the expectation of performance in the BlackRock funds.  And here, it was rated as neutral by Morningstar.  Meaning that even Morningstar didn't have a positive opinion of that.

So I think that that is really, you know, indicative of some of the information that the Court can consider on a full record with expert testimony as to whether or not the subjective prudence defense can lie. And I think, you know, Your Honor will have to decide whether -- what happened is we all designated experts, named experts, for affirmative reports, and then we produced our affirmative reports and the defendants produced none, even though they had identified experts.

They then, in response to our expert reports, came in with all this evidence, essentially trying to manufacture an objective prudence defense.  I think in

connection with motions *in limine* pretrial, Your Honor is going to have to reach the conclusion as to whether that's proper.  And whether or not since they bear -- they acknowledge they bear the burden, grudgingly so in Footnote 5 of their brief.  But I think Your Honor will have to address, and we will argue, that they're precluded from producing that expert testimony because they didn't do so in an affirmative way.

The way this all kind of happened is we --

THE COURT:  They can't produce expert testimony if they don't produce an expert report.  They're precluded from doing that.

MR. MILLER:  Right, Your Honor.  And what they did here is we produced a process expert and an investment expert and a damages expert, and what they tried to do is shoehorn affirmative testimony in their responsive reports.

THE COURT:  Affirmative testimony of what?

MR. MILLER:  Affirmative testimony in support of their defense of objective prudence.

THE COURT:  Affirmative testimony of whom?

MR. MILLER:  The affirmative testimony in this case was --

THE COURT:  Wait a minute.  Let me go back. Hold your finger on that one and answer it.

But are you saying they did not submit opening reports but they did submit responsive reports?

MR. MILLER:  Yes, Your Honor.  I'm sorry.  I had a senior moment there for a minute.  But it's Mr. Wermers who is their objective prudence.  I almost said the wrong name, so I apologize, Your Honor.

THE COURT:  Well, since they have the burden of proof on the issue of lost causation, don't they have to produce an opening report?

MR. MILLER:  I believe so, Your Honor.

THE COURT:  And the failure to do so is fatal to the ability of the expert to testify.

MR. MILLER:  I agree, Your Honor.

THE COURT:  So that eliminates their ability to use anything from Wermers in the summary judgment process.

MR. MILLER:  I think that's correct, Your Honor.  And perhaps we should have specifically argued that.

Frankly, we thought that's why they take an interesting approach in the motion for summary judgment.  They seem to rely more on our experts than their experts with some sort of passing references to Mr. Wermers because the only evidence regarding, you know, these plans, and everything, came in in responsive reports to which we were not permitted under the order to respond.

So even the evidence that's helpful on --

54

THE COURT:  You weren't permitted to respond to the responsive reports?

MR. MILLER:  Right.  I don't believe we had a reply right, Your Honor.  Perhaps we should have sought leave under the circumstances, but we did not.

THE COURT:  If they have the burden on something and then they don't file an opening report, but you file a report that addresses the topic and they file a response report, then certainly you would have a right to reply to that and to challenge whether or not they could even have that report in the record because they haven't complied with the requirement that you have the burden, you have to file the report as the person with the burden.

So I guess I'm wondering whether or not I don't have to deal with these motions *in limine* on the expert reports, the *Daubert* reports, before I can decide summary judgment.

MR. MILLER:  I think in fairness, Your Honor, I think you do.  And I think Mr. Scalia and I are probably unlikely to agree on much today, but I think we probably agree that the expert -- that the *Daubert* motions, the motions *in limine*, would need to be addressed in connection with the summary judgment motions because they are fairly critical.  I think both --

THE COURT:  Are you ready to address them?  He

said he was.

MR. MILLER:  Excuse me, Your Honor?

THE COURT:  Are you ready to address them?  He said he was.

MR. MILLER:  I think my colleague, Mr. Berin, is going to address them because, you know, he only gives me the easy arguments.

THE COURT:  Well, I want to hear the rest of what you've got to say, but I think we'll take a 20-minute recess and then I will tell you that you might as well make arrangements for lunch later at about 1:00, and then I'll hear some more from you this afternoon on the motions *in limine*.

And you're going to get me those citations to the board members' testimony or the trustees' testimony about that?  And give them to Mr. Miller, too.

We'll take a 20-minute recess.

MR. MILLER:  Okay.  Thank you, Your Honor.

(Recess taken.)

THE COURT:  All right, Mr. Miller, whatever is on your mind.  I interrupted you.  Go ahead.

MR. MILLER:  Okay.  And, Your Honor, you had asked for where our expert testified about the failure to file the IPS.  And it's Exhibit 69, Ms. Wagner's report, starting at Page 30, Paragraph 66, all the way to

Paragraph 99.  She goes through an explanation.

THE COURT:  Who is that?

MR. MILLER:  Ms. Wagner.  Marsha Wagner.

So, it's from Pages 30 to 55 she talks about the fact that the committee failed to establish an applied processes to follow the plan's IPS with respect to monitoring of the BlackRock TDFs.

THE COURT:  Well, right now that's established for purposes of this motion that they did that.

So here's the question though:  What I'm looking for from you is what does a finder of the fact look at in order to determine whether Genworth has met its burden to establish that no reasonable finder of the fact could conclude that they would have done anything other than they would have made the same decisions, i.e., kept the BlackRock funds otherwise; what's the other side of that?  He's told me what he needs to look at, what's the other side of that?

MR. MILLER:  To me, the other side, Your Honor, I think is -- I think the answer is that you look at, as Mr. Scalia said, the totality of the circumstances.  But looking at the totality of the circumstances does not just mean you look at the marketplace through the view of one expert without taking into account negative market factors, but more importantly I think that you have to

look at the market and then you also have to look at the plan itself because when we're talking about what a hypothetical prudent fiduciary would have done, it means would have done with respect to this plan and not with respect to any plan and any circumstance.

And as Your Honor pointed out in that *Home Depot* case, the Northern District of Georgia applied a standard, I believe, and I don't want to misquote it, but they said no prudent fiduciary would have concluded that these BlackRock funds could be held.

So it was sort of the opposite. They said that the standard that they applied in that case -- incidentally, that's being argued before the Eleventh Circuit this Thursday. So that case is on appeal.

THE COURT: That isn't what the Fourth Circuit said has to be decided.

MR. MILLER: Exactly.

THE COURT: It's would they have done the same thing anyway.

MR. MILLER: Right.

THE COURT: It's a hard thing to figure out what they would have done. He's essentially saying that had they monitored, which they didn't do, that they would have kept them anyway because 800 people -- funds added them, 900 people kept them. Your expert says that the BlackRock

funds complied with what I referred to as the internal assessment factors, which he says each have to be considered. And my guess is they do have to be considered because they are one. But I was just looking for a category to talk about them readily without listing them.

And that the nature of the fund, the to nature of it versus the through nature of it, I'm not quite sure why that applies, but that needs to be considered, and that they performed all right according to your own expert. That's what he says I need to consider, and all of the -- what happened in the marketplace.

But you say, yes, the marketplace is considered, but you have to consider negative, what, market forces?

MR. MILLER: Yes.

THE COURT: What is that?

MR. MILLER: The factors identified before Your Honor that there were plans that were leaving.

THE COURT: That's the 14 percent were leaving?

MR. MILLER: Exactly.

THE COURT: What else?

MR. MILLER: And the fact that the BlackRock funds were not growing in terms of market share the same way the rest -- relative to the TDF marketplace. So they were actually losing in the competitive marketplace. That would be a factor that would be counterbalancing. But

most importantly, I think that *Tatum* provides the answer.

The other factor that should be considered is when you have a plan document here, the IPS, that specifically requires evaluation of performance on the basis of the three- and five-year period of time, relative to a specific metric, and it's failing that metric, and that's set forth in both Ms. Wagner's report in detail, and Mr. Marin analyzes why that replacement should have occurred, I think *Tatum* provides the answer.

We've got market forces and qualitative factors on one side. And the qualitative factors, nobody -- I agree with Mr. Scalia, nobody disputes the fact that nobody is claiming that BlackRock was a disreputable fund. That is not the fundamental argument here.

The market forces are a little bit of a mixed bag. And that's something that has to be evaluated. But then what *Tatum* says is that the plan documents are the most critical documents with respect to analyzing lost causation. And that's not an item that's really touched by --

THE COURT: Okay. So then what do I do? What else -- is that now the list of things that I need to consider?

MR. MILLER: Yes, Your Honor.

THE COURT: Well, what do I do though? I'm the

finder of the fact, what do I do?  Just say, well, they would have done it anyway, so I guess the analysis has to be, well, the plan said to look at the S&P metric and it's failing the S&P metric.  But I'm going to keep it anyway because most of the other people in the market are keeping it even though it's not performing as well as some of the other funds in the market, and it's a reputable company, and it has been recommended to buy by our consultant and it's been given a gold star rating, so notwithstanding that it doesn't measure up to the plan, I'm going to keep it anyway; is that what I have to conclude?  And that a reasonable prudent investor would do that -- I mean, a trustee would do that at that time?

MR. MILLER:  You would have to conclude that a reasonably prudent fiduciary --

THE COURT:  And they have the burden of proving that?

MR. MILLER:  Exactly, Your Honor.

And based on the expert testimony, as Your Honor pointed out, we believe that there's, at a minimum, a material issue of fact.  And frankly, we don't think that they can meet the burden since the critical plan document is something that they consequently violated.

I should also point out, just as another factor, Ms. Wagner points out that there was a lawsuit filed about

the BlackRock funds that the committee failed to consider. And that's another piece of what I would say is --

THE COURT:  When was that filed?

MR. MILLER:  Let me pull that for you, Your Honor.  I know the case is called *Baird v. BlackRock*.

THE COURT:  B-A-I-R-D?

MR. MILLER:  Yes, it's B-A-I-R-D.  And let's see if I can get you the date.  It's referenced at Footnote 199 in -- in -- on Page 55 of her report.  And the case settled in 2021.  And I'm trying to get the exact date of the filing.  But it's *Baird v. BlackRock Institutional Trust Company*.

And I apologize, Your Honor, I don't have the --

THE COURT:  What's that got to do with anything?

MR. MILLER:  Well, it was challenging the BlackRock LifePath Index Funds, which were basically these funds.  So you had the prudence of those funds was challenged in a lawsuit because they were being offered by BlackRock.

The other thing that we point out in our summary judgment papers is that, you know, we went out and adduced marketplace evidence, unlike the defendants.  We deposed a representative of BlackRock, and we said what should your funds be compared to?  And they said they should be compared to the S&P target-date index.  That if they had

been compared to that in a -- and in a meaningful way, then it would have been a signal to the fiduciaries, as our experts say, that they should be removed.

THE COURT:  You're saying that a person from BlackRock said that if you made the comparison to the Standard & Poor's target-date fund index that BlackRock would have said remove us?

MR. MILLER:  I don't want to misrepresent that, Your Honor.  All that the BlackRock representative said is that the S&P target-date index was the appropriate comparator.  And it was how BlackRock compared itself.  So she did not go that one step further and say, by the way, the product for which I'm a manager is a failure.  But I guess, you know, we can only hope for so much good testimony from her.

The only other point I wanted to address in the summary judgment papers, I know it wasn't addressed by Mr. Scalia, but there's this argument made about the timeliness of our complaint on the statute of limitations. And, you know, with the Court's indulgence I just wanted to take a moment --

THE COURT:  I've read that.  I don't need any argument on it.

MR. MILLER:  You don't?

THE COURT:  No.

MR. MILLER:  Okay.

THE COURT:  So you've told me you think these *Daubert* motions are necessary to be decided as part of deciding the summary judgment, but that isn't something that you really impress in your papers at all.

MR. MILLER:  I'm sorry, Your Honor.  I didn't --

THE COURT:  You just told me earlier that I probably have to decide the *Daubert* motions *in limine* in order to be able to decide the summary judgment decision, but I didn't understand that to be the argument you were making in your summary judgment papers.

MR. MILLER:  And I think in fairness, Your Honor, if you'll indulge me, I think I'll take my previous statement back halfway in the sense that --

THE COURT:  Well, take it back whatever way you want, but I need to know what the position is.

MR. MILLER:  The defendants did not move to exclude Ms. Wagner, who is our process expert, who goes through that violation of the IPS.  So in that sense, the Court does not need to reach the issue.  But Mr. Marin's testimony, who they do move to exclude, also speaks to the violation to the IPS, and how he constructed what they should have been looking at in terms of an alternative.

So I don't think that the Court needs to reach those issues in order to decide summary judgment.

THE COURT:  I thought that Mr. Scalia interpreted Mr. Marin to take the view that you really didn't need to look at the S&P -- to look at it to make his evaluation.  Is that what he said?

MR. MILLER:  No, Your Honor, I don't believe so.

THE COURT:  Well, what is this about you're rushing or hastening, or something?  Anyway, you're trying to use a one-year period when your complaint cites a multiyear period?  What year period are we looking at for the purposes of making the would have evaluation?

MR. MILLER:  I think if I'm understanding Mr. Scalia correctly, what he's arguing is that because the class period starts in 2016, and Mr. Marin applies a methodology and talks about when a removal date should have occurred, Mr. Scalia is arguing that it's too early a trigger, which to me is sort of a fundamental -- you know, that's really a weighing of expert testimony.

As we point out in our brief, what Mr. Marin says is that if you're failing on a one quarter basis and then you fail again, then you should consider removal within a year.  And the reason you do that, as we point out in our summary judgment opposition, is because you're also looking at a three- and five-year return.  So you're not really looking at a one quarter performance.  You're looking at a trailing performance in the past.

This isn't a matter of predicting the future. This is looking at a period of a three- to five-year performance, and looking at it on a quarterly basis.

So I think when he's talking about hastening the removal, he's talking about the fact that just as was done in the *Terraza v. Safeway* case, and is regularly done in these cases, the experts have to opine based on the IPS and based on their expert -- their investment expertise when a prudent fiduciary would have removed the item.

Now, Mr. Scalia talks about these investments as being 40-year investments, and how it would be imprudent to look at something in a period of a year. Honestly, I think that's a bit of a red herring and fundamentally misunderstands the nature of investment in a 401K.

Most participants in a 401K only participate in a 401K for a period of five or six years because of job mobility, and things like that.

So to look at things in a 40-year period with a hypothetical investor who doesn't really exist in the terms of the averages, I think, you know, respectfully would be a foolish way to look at things. And the IPS provides the answer here. The IPS doesn't say this is a 40-year investment. Let's invest and check in 40 years from now and see what happened. It says you look at three- and five-year trailing returns. And that's exactly

what they failed to do.

THE COURT:  What does your evidence show about what was going on with the three- and five-year trailing returns?

MR. MILLER:  Ms. Wagner goes through the performance in that section that I just provided, and shows that it was --

THE COURT:  Pages 30 to 55?

MR. MILLER:  Exactly.  The performance charts actually, I believe, start on Page 34, and continue on to Page 38 or 39, and demonstrate consistency in which the funds are failing to meet their own performance metrics.

The other thing I should point out, and I believe it's Footnote 101 because I know it --

THE COURT:  You mean BlackRock's own performance or to meet the Standard & Poor's?

MR. MILLER:  It's BlackRock's performance relative to Standard & Poor's.  So it actually goes on a quarter by quarter basis for each vintage of the BlackRock funds.

THE COURT:  It's a failure to meet the S&P.

MR. MILLER:  Failure to meet the S&P.  And also -- it also evaluates them against the Dow Jones, which is another index.  So it shows fairly consistent failures.

The other thing I know the Court had asked about testimony.  And, you know, I'm sure the defendants are going to address that themselves.  But I would point out that on Page 30 of Ms. Wagner's report in Footnote 105, she goes through demonstrating that during the critical period of time, that 2016 to 2017 period, the committee did not meet.  And that there's no evidence in the record that they even considered the performance of the BlackRock funds.

And she quotes in her expert report Mr. Turner's deposition testimony testifying that he didn't recall any discussions with other committee members during the gap in meetings.  And -- I apologize, Your Honor.  And Mr. Turner's explanation was that the materials showed that the investments were performing at a level that didn't require them to come together.

But as Ms. Wagner points out, if you apply the IPS metrics on three- and five-year periods, just looking at them you would see that they were failing the IPS during this very period.  So that is, I think, the sum and substance of the testimony.

As Your Honor pointed out to Mr. Scalia, they say they got reports.  They don't have any testimony or evidence that they read them or considered them, and perhaps that's why that defendants are turning --

THE COURT:  If Turner said that the analysis of the reports didn't call -- wasn't sufficient to require the committee to meet at all, doesn't that connote that they read the reports and analyzed them?  Can I infer that?

MR. MILLER:  Well, he testified that the investments were performing in a way that did not require the committee to come together.  So that is in the report, and that was his testimony.

What Ms. Wagner points out is that when you look at the actual performance during that period relative to the IPS standards, that testimony doesn't hold up.

THE COURT:  I know you said that, but that's not the question I was asking.  Doesn't the fact that he made the statement that the performance was such as to not require a meeting connote -- permit the inference that he, at least, read the reports so he knew what was in them and analyzed them?

MR. MILLER:  I think at trial, based on a credibility finding, you could make that inference, Your Honor.

THE COURT:  Well, you would have to believe him.

MR. MILLER:  Right.  And respectfully, I think it --

THE COURT:  That's a credibility question.

MR. MILLER:  I agree, Your Honor.  Respectfully, in light of the fact that the performance data shows exactly the opposite to be true during the time, at least at summary judgment I don't respectfully believe that would be a reasonable inference based on that one snippet of testimony explaining a lot --

THE COURT:  Well, loss causation under the would have test applied by the Fourth Circuit, how many cases have granted summary judgment in favor of the defendant?

MR. MILLER:  I am not aware of any.  Just trying to think if that one case by Judge Bredar granted summary judgment.  I don't believe so.  I'm not aware of any, Your Honor, but I will --

THE COURT:  How many cases have granted summary judgment in favor of plaintiff?

MR. MILLER:  I would imagine not many, Your Honor.  That's why we don't move for summary judgment.  I think they are intensely factual issues where --

THE COURT:  If all the cases they say, beginning with the motion to dismiss on through, go their way, including the *Tatum* case when it was remanded, then you can't win, so why don't you lose on the law?

MR. MILLER:  Let me sort of unpack that, Your Honor, if you'll allow me to.

THE COURT:  Sure.

MR. MILLER:  On the motion to dismiss decisions, you know, respectfully, I don't believe the motion to dismiss decisions in these cases are -- that defendants are accurately characterizing them.

Judge Nachmanoff, you know, his principal, and from my perspective, essentially sole basis for dismissal of the cases was the fact that we were not able to establish that the S&P 500 was an appropriate comparator, and that he believed that we had to do more in the complaint to establish the appropriateness of the comparator.

Here, we had the IPS and an established fact in terms of the comparator.  I wish before we drafted our complaint before Judge Nachmanoff we had had BlackRock's testimony saying that it was an appropriate comparator. So I think we can put all of those decisions aside, and --

THE COURT:  How many of these cases have you won?

MR. MILLER:  In terms of trial?

THE COURT:  Or settled.

MR. MILLER:  Well, I've tried some of these cases, but they've always resolved before we've actually had findings of fact and conclusions of law issued.  So I always thought that was a reflection of the fact that I won.  But, you know, these are challenging cases and, you

know, there have been some recent losses not by us.

THE COURT:  How many monitoring cases have you tried to a Judge?

MR. MILLER:  Just one monitoring case that I've tried to a Judge, Your Honor.

But I believe, Your Honor, that these are intensely factual questions.  And I'm happy to answer any other questions Your Honor may have.  But I don't think that just because the good cases resolve, or resolved when they've been tried --

THE COURT:  In your view, would the IPS have required Genworth to drop the BlackRock TDF pursuant to the IPS terms given the BlackRock TDF performance at the time?

MR. MILLER:  Yes.

THE COURT:  What evidence is that, that's Wagner?

MR. MILLER:  Wagner, and then also Marin.

THE COURT:  Even if the IPS would not require that result, that is, to drop it, does it somehow recommend or suggest that -- in other words, does the text of it suggest in any way that it ought to be done?

MR. MILLER:  Yes, Your Honor.

THE COURT:  What part of the text suggests that?

MR. MILLER:  Let me pull that section for Your

Honor.  Sorry, Your Honor.  I lost the notebook with the IPS in it.  It's hidden underneath here.

Your Honor, it's Defendants' Exhibit 14.  And if you look at Page 2 of the IPS, which the Bates Number is Genworth --

THE COURT:  I've got it.

MR. MILLER:  And that says that each investment offered by the plan, other than the Genworth common stock fund, will seek to provide a long-term competitive rate of return net of investment of expenses versus funds with similar levels of risk offered by comparable investment options.

THE COURT:  What page is that?

MR. MILLER:  That is on Page 2 under Plan Objectives, Investments for 401K Savings Feature.

And then under -- on Page 5 to 6 it talks specifically about the target-date funds.  And again, talks about the fact that they have to provide a long-term competitive rate of return net of investment versus target funds with similar levels of risk.

THE COURT:  So you read that to say the plan itself recommends dropping some fund that doesn't do that?

MR. MILLER:  Yes, Your Honor.

THE COURT:  Okay.  And what does it mean in the plan to say compare favorably to a benchmark of some kind;

what does that mean?

MR. MILLER:  Well, I think the way that Mr. Marin explained it is that you have to show that the target-date suite was outperforming and was better than the other available funds in terms -- that were --

THE COURT:  So compare favorably means outperform?

MR. MILLER:  Yes, Your Honor, assuming that all the qualitative factors are the same.  And Mr. Marin goes through that analysis and explains why the -- because of the size of the Genworth plan, you're only going to invest in a plan like this that has hundreds of millions of dollars in a target-date fund, in a target-date fund that has a concern level of AUM, assets under management.  And Mr. Marin explains why he chose a $2 billion asset under management.  All of those target-date funds that have that much in terms of assets under management are target-date funds that meet all the other qualities and the criteria.

THE COURT:  Well, but compare favorably is doing about the same as the others.  They're not outperforming, but it's not doing any worse than the others.

MR. MILLER:  Right.  And --

THE COURT:  Is that okay too?

MR. MILLER:  I think that if it was -- if you were saying that they were doing --

THE COURT:  I'm talking about what it means. Compare favorably, --

MR. MILLER:  I think compare favorably means you have to do a little bit better, at least.  I don't think it could mean doing the same.

THE COURT:  Why not?

MR. MILLER:  Just the way that I would read compare favorably.  It has to be more favorable.

THE COURT:  Well, that's your reading.  Where do you get that?  Is that an industry standard?  Does somebody testify that that has meaning?  Is that so vague I can't really give it any real credence anyway because I don't know what it means?

MR. MILLER:  Well, I think Mr. Marin would testify to that, as would Ms. Wagner, who is a process expert.

THE COURT:  Testify to what?

MR. MILLER:  Would testify that when you have that language in an IPS, compare favorably, that it has to perform better.  And in this case with respect to the designated index, the S&P 500 index, showing that this consistent underperformance -- I guess we don't really need to reach that issue, Your Honor, in terms of whether it's equal or better because here we have much worse performance.

THE COURT:  It doesn't compare favorably because it performed worse?

MR. MILLER:  Yes, Your Honor.

THE COURT:  Did it significantly underperform?

MR. MILLER:  Yes, Your Honor.

THE COURT:  How do we measure significantly underperform?  What does that mean?  Is that an industry term?  Does it have a definition somewhere in the literature or an expert opinion, or what?  Five percent, one percent?  What?

MR. MILLER:  Well, I think it's going to be a matter of expert opinion, Your Honor.  And I think sometimes courts, you know, have tried to address that factor.  And I think, frankly, in terms of percentage terms it really depends on whether you're talking about -- I'm not trying to give you a nonanswer.  But I think it depends on whether you're talking about a single year return or a compounded return because, you know, a negative one percent return can be a negative eight or ten or twelve percent over the course of six years compounded. I think it's a measure of both persistence and magnitude.

THE COURT:  What about the fact that in making a comparison you look at the to versus the through strategy, what's the significance in your -- of the difference in approaches in the analysis?

MR. MILLER:  I think again, Your Honor, that's going to be resolved through expert testimony.  But I can tell you that although the BlackRock funds were identified as being a to, they were constructed in terms of their investment components more like a through.  And that the BlackRock person, when we deposed her, she identified the S&P 500 index as being the apt comparator regardless of to or through.  So we'll sort of take BlackRock at their word.

THE COURT:  Can we read in the IPS anywhere, guidance about how long a plan should wait before it removes a fund because of underperformance?

MR. MILLER:  I don't believe that guidance is present, Your Honor.  I think that's really a matter of expert testimony and triggers and --

THE COURT:  Well, expert testimony then has to be accorded to some standard applicable in the industry or somewhere.  Is there evidence in the record of what that standard is?

MR. MILLER:  I believe so in the sense, Your Honor, that we're sort of getting into the motion to exclude Mr. Marin, but Mr. Marin talks about the time in which he would take action, and --

THE COURT:  The time in which he would take action is not the same thing as the time when a prudent

professional under the circumstances would take action.

MR. MILLER:  And I think his opinion is based on the standard of care and how a prudent professional would take action based on investment standards.  And that methodology was acknowledged in the *Terraza v. Safeway* case by Judge Tigar in the Northern District of California.  He went through a pretty significant analysis in response to the challenge of the different expert, Mr. Dirks, about why that is an accepted methodology in the investment field that, you know, you put -- and Ms. Wagner will testify to this, as will --

THE COURT:  What is an acceptable strategy?

MR. MILLER:  That when you're looking at performance in a 401K plan, that investment professionals who were acting prudently will evaluate performance, will then -- based on a period of underperformance, especially when you're looking at three- and five-trailing years of return, will then put an investment on a watch list.  And if it continues to fail after being put on a watch list, then that investment will be recommended for removal, and will be removed.  And that is precisely what Mr. Marin testifies to in terms of his approach.

THE COURT:  So the failure to do that by the committee, if they'd monitored they would have seen the lack of performance, it would have been put on the watch

list.  Did it improve and hence would be dropped?

MR. MILLER:  Yes, Your Honor.

THE COURT:  Marin says that?  Any dispute?

MR. MILLER:  I'm sorry, Your Honor?

THE COURT:  Marin says that, Wagner says that, who says it?

MR. MILLER:  Yes, Wagner says it and Marin says it.

THE COURT:  So the standard is in the *Safeway* case in California discussed, and it discusses how you proceed before you remove a fund.  And the usual way, you say, is to put -- check the trailing returns for three to five years.  If it's down, then put it on a watch list, wait one year, and if it's still down you take it off, is that right?

MR. MILLER:  Really, one quarter.

THE COURT:  One quarter?

MR. MILLER:  Yeah.  Because if you've got really negative performance and it's consistent performance over that three to five years, and then it continues to replicate, then you begin the process of replacing it.

THE COURT:  After waiting a quarter and looking at it?

MR. MILLER:  Yes.  Exactly.

THE COURT:  So, did that scenario happen here?

MR. MILLER:  Not with respect to the BlackRock funds, no.

THE COURT:  So did it continue to deteriorate?

MR. MILLER:  Yes, Your Honor.

THE COURT:  All right.  So in considering what -- I consider that they don't do any of this.  They didn't put it on a wait, they didn't look at it, they didn't assess it, they didn't put it on a watch list and look it at for a quarter and then see what happened; what does all that do to the ability to find that the committee would have made the same recommendation even if it had monitored and followed that procedure?

MR. MILLER:  For summary judgment purposes, I think it eliminates the possibility of reaching that conclusion.  And at trial, I would suggest, Your Honor, that the IPS and the expert testimony provides the guidepost as to what a prudent fiduciary would have done.

THE COURT:  And it would take contrary expert testimony or factual testimony to make the factual issue; otherwise, perhaps you get judgment as a matter of law at a trial?

MR. MILLER:  Yes, Your Honor.

THE COURT:  I see.

Given that the IPS recommends comparing to the S&P index, and that the trailing results didn't compare

favorably, how do you reconcile that with the fact that all these other plans retained the BlackRock TDFs, particularly when you say BlackRock itself says the proper management is the Standard & Poor's?

MR. MILLER:  Well, I guess let me take that backwards, if you will allow me to, Your Honor.

THE COURT:  You can take it any way you want to.

MR. MILLER:  Okay.  Thank you, Your Honor.

I think, first, BlackRock admitted that in deposition testimony.  I don't think that they advertise in their materials that they're trailing.

We also have shown the evidence regarding plans leaving and the decline in relative market share.  So I think those are persuasive facts.

THE COURT:  What do you mean a decline in market share?

MR. MILLER:  What I mean by that, Your Honor, is that they lost 14 percent of the plans, but then we showed that in --

THE COURT:  Who lost 14 percent of the plans?

MR. MILLER:  BlackRock lost 14 percent of its plan customers in 2017.  And then during the class period, while the target-date fund market, you know, grew exponentially, BlackRock's market share grew at a much slower pace.

THE COURT:  How much slower?

MR. MILLER:  I think that the target-date marketplace grew almost three times in terms of size.  And BlackRock grew less than two.  Grew, like, 1.6, or 1.7.  We have that number right in there.  So not --

THE COURT:  So what is the significance of that?

MR. MILLER:  Well, the target-date funds have become sort of the investment of choice by participants because they're kind of like the closest thing to a defined benefit plan.  You just invest in one fund, and that's supposed to provide adequately for your retirement.

And so the fact that the product has become popular and that BlackRock, despite its size and marketing expertise, is not able to grow at the same rate as the rest of the marketplace, I think demonstrates that it was not accepted widely and that the loss of plans is indicative.  I think it's certainly at least a fact issue.

THE COURT:  On the statute of limitation issues, how do we reconcile *Tibble* and *David*?

MR. MILLER:  I think, Your Honor, that actually the cases that the defendant cited in their reply brief are quite helpful in that regard.  If you look at *Cassell v. Vanderbilt*, because, you know, candidly when we saw that argument we thought -- we do believe that *Tibble* squarely addresses *David* with respect to a failure to

monitor claim in the *David v. Alphin* case.

So in Footnote 8 of the *Cassell v. Vanderbilt* case, which is on Page 1068 of that decision, the Court specifically distinguishes between prohibited transaction claims and duty to monitor claims, and says essentially that *David v. Alfin* is still good law with respect to a prohibited transaction case. But it doesn't explicitly say this, but it essentially says that it doesn't apply to duty to monitor claims.

And the reason is quite clear because we're just claiming -- we're not challenging the selection of the BlackRock funds 20 or 30 years ago. We're challenging the failure to monitor during the statute of limitations.

Then the next case that the defendants cite for the proposition that the *David* case somehow survives *Tibble* with respect to duty to monitor is *Feinberg v. T. Rowe Price*, which I believe was a decision by Judge Bredar in the District of Maryland.

And at -- the citation is 2018 WL 3970470 at Page 11. Judge Bredar specifically distinguishes between prohibited transaction claims and duty to monitor claims because a prohibited transaction claim would be sort of like, you know, I'm the trustee of my 401K plan, and I invest in a shopping center I own. That happened 10 years ago. That's a prohibited transaction because its

breaching my duty of loyalty.  It's probably an imprudent investment.  But if a participant becomes aware of that act, you know, 10 years later or 12 years later, that claim would be barred.

But if differently if I had made that investment and then maintained it in the 401K plan and then myself and the other trustees failed to monitor its suitability going on into the future, independent -- you wouldn't be able to bring a claim for the prohibited transaction, that discrete action.  But if it was an imprudent investment and continued to cause losses to the plan, then that would be a duty to monitor claim.

The final case that the defendants cite on that point is *Reetz v. Aon Hewitt,* which is a recent case by the Fourth Circuit.  That's 74 F.4th 171 at Page 184.  And I candidly don't know why the defendants cite that case because all that it does is recognize the continuing duty to monitor under *Tibble.*

So I don't believe there's any support for the proposition that *David v. Alphin* somehow allows a summary judgment with respect to a timely duty to monitor claim, which is what we have here.

THE COURT:  All right.  Thank you.

MR. MILLER:  Thank you, Your Honor.

THE COURT:  Mr. Scalia.

MR. SCALIA: Your Honor, if I could, I would like to begin by focusing on a very important and lengthy exchange that you had with Mr. Miller. You put it to him very directly. You said how do I know that a prudent fiduciary with this IPS would have moved the funds? How do I know, and you focused again, with this IPS.

He said you don't just look at an expert report. You look at the market. That was his first answer.

And if I could just pause on that because that is our case. You look at the market. You don't just look at an expert report, but that is principally what they've offered is the speculation of this one expert who is purpose-built for this case, this model that forces you to put a fund on a watch list after a month and get rid of it after a year.

THE COURT: A quarter, I think he said.

MR. SCALIA: Pardon?

THE COURT: A quarter, I think he said.

MR. SCALIA: Yeah, after a quarter. After a quarter you put it on a watch list.

Now, their other expert --

THE COURT: -- if it's trialing three- to five-years, so you watch it for another quarter, and if it continues to go down then you get rid of it.

MR. SCALIA: And, Your Honor, that's how fast

the process is they're talking about.

But he didn't talk about the IPS. He talked about his expert. Remember, Marin cast aside the IPS. He flouted the IPS in his report. He's a terrible guide to how that IPS should be considered. He didn't consider the custom benchmark.

Then, Your Honor, he mentioned their other expert, Ms. Wagner. And unfortunately, Mr. Miller repeatedly suggested that Ms. Wagner supported removal of the funds. She did not. She backed away from that issue repeatedly.

And just to quote their brief. Ms. Wagner, quote, is not an investment advice fiduciary and accordingly was never in the position to caution any plan that engaged her services about BlackRock TDFs, or offer an expert opinion the defendants should have removed the BlackRock TDFs.

And so you asked them how do I know using this IPS? And they cited two experts. One was not an expert on the point. She backed away. By the way, she advises, she says, you know, hundreds of plans. She doesn't know any that dump they funds for performance reasons, and nor did Marin. And then the other person they cite is Marin himself, who again, he flouted the IPS.

So, Your Honor, you keep asking the question,

and it's so important, how do we know what would have been done.  And you will never know, even if you were to have a trial, with certainty what a prudent fiduciary would have done, not with certainty.

What *Tatum* says is what is probable.  Remember the first *Tatum*, the district --

THE COURT:  I'm not asking certainty versus probability.  I'm asking what evidence in the record do we take into account in making judgment that has to be made here; and that is, whether summary judgment is appropriate?  That's what I'm asking.

MR. SCALIA:  Understood.  And then you're also asking about the would have test.

THE COURT:  Yeah.

MR. SCALIA:  And that is a question of what is probable.  What is probable.

Here we know that I believe it's more than 1,700 plans either retained or added the BlackRock TDFs in the year that plaintiff said the BlackRock TDFs should have been removed.  They cite 147 that removed.  That's less than 10 percent of plans that addressed these TDFs.

THE COURT:  He says it's 14 percent.

MR. SCALIA:  Well, it's 14 percent of those who retained it.  I'm sorry, I think it's 14 percent of those who added it.  But if you consider together those that

kept it and those that added it, 147 is less than 10 percent of 1,758.

It is not probable - it's not probable - when about 8.4 percent of plans moved on from the BlackRock TDFs. It's certainly not probable that that's the judgment that would have been reached here.

THE COURT: Why not? I'm looking at it and I say, wait a minute. There's something wrong here. We have a duty to take care of these people and their investments and handle it right, and we are seeing the harbinger of a real problem here that eight to ten percent of the people have recognized already. It would be probable for me to do a little bit more examination than just look at what the market is doing and stick my head in the sand and follow the lemmings off the cliff, so I'm going to go do something else. So what do I do?

MR. SCALIA: Well, we've talked about that, Your Honor. Obviously, the Morningstar ratings, you have the advice of their investment consultant that this remain --

THE COURT: He says the Morningstar ratings themselves do not give any explicit weight to asset performance in the section of his brief that he cited there -- that he quoted from Morningstar's own report. Is that correct?

MR. SCALIA: I very much want to address that,

Your Honor.  I've got it right in front of me.

THE COURT:  Well, go ahead.

MR. SCALIA:  First though, could I finish the points about the comparison to the other 1,758 funds?

THE COURT:  Yes.

MR. SCALIA:  The decision to retain those TDFs or to get them necessarily requires, under the law, a judgment that it's prudent.  On the other hand, to decide we're not going to have these BlackRock TDFs anymore, that's not necessarily a prudence judgment that was made by the 147 other plans.  We have undisputed evidence on that.  Our expert said that sometimes there's a merger, sometimes there's a bankruptcy, --

THE COURT:  What expert?

MR. SCALIA:  Pardon?

THE COURT:  What expert?

MR. SCALIA:  Dr. Wermers provided that testimony.

THE COURT:  How do I consider that?

MR. SCALIA:  For multiple reasons, Your Honor.

THE COURT:  Did you file an opening report on her?

MR. SCALIA:  We provided him --

THE COURT:  You have to provide an opening report on most things that you have the burden on.  And

did you do that?

MR. SCALIA:  We provided him as a rebuttal report regarding --

THE COURT:  I didn't ask you that question.  I asked you did you provide her as an opening report on the matter that you have the burden on, which is loss causation?

MR. SCALIA:  Your Honor, he is not an expert on what a prudent fiduciary would have done.  He did not offer testimony specifically to that point.  Moreover, this --

THE COURT:  My question I asked you was different.  On the topic of whether -- that you have the burden, which is the loss causation would have analysis, did you offer an opening report from anybody?

MR. SCALIA:  We did not offer an opening report from anybody, Your Honor.

THE COURT:  Okay.

MR. SCALIA:  But what we would dispute is that at that stage of the case we bore that burden.  Plaintiffs had not established, and still have not established, the first part of their case, which is a breach.

Second, Your Honor, that Wermers' report is part of the record.  It's properly considered at summary judgment.

THE COURT:  I don't know that it is.  That's what I'm saying.  If you have the burden on something, you have to put up the opening report on it.  And if you don't, you don't get to put up a reply.  And what you did is to put up some kind of response to another report that they made, and I'm not quite sure how that fits in the obligation that Rule 26 imposes upon you.  So we'll deal with that after lunch.

But in any event, let's assume that you have expert testimony that is to be considered on this issue, and go forward from there at this stage.

MR. SCALIA:  And so my point simply, Your Honor, is when we ask what probably would have happened, what was probable, we have on the one hand this huge number of plans that went toward the funds, and we have a small number that went away, a much smaller number, and we don't even know that that was a performance-based judgment.  We don't know that.

THE COURT:  Do we know that the people who kept them were making it on a performance-based judgment?

MR. SCALIA:  We know they were making it, and they were obligated by law to make it on a prudence-based judgment.

THE COURT:  I didn't ask that question though, did I?  You said you can't consider these who jettison the

holding because we don't know they did it on a performance basis. And I said as to the ones who retained them do we know whether or not they were retained because of performance?

MR. SCALIA: Absolutely, Your Honor.

THE COURT: We do?

MR. SCALIA: Yes, we do because --

THE COURT: How do we have that proof?

MR. SCALIA: As fiduciaries it was the legal duty to consider whether this was an appropriate long-term investment.

THE COURT: Well, make that argument in the Fourth Circuit because I'm asking you have you got any evidence? You just want to argue that they should have done it. That's not what the issue is.

The issue is have you got any evidence that the ones that were retained or bought were bought because of performance basis of the BlackRock funds, yes or no?

MR. SCALIA: Respectfully, Your Honor, when people add funds to their plan, it is in seeking appropriate performance. I think it's a completely reasonable, logical inference that every single fund that decided to add it did so because it was confident that long-term --

THE COURT: There's an inference from the fact

of purchase or the fact of retention.

MR. SCALIA:  That's correct, Your Honor.

THE COURT:  There is no affirmative evidence to support the judgment that it was performance-based, that someone retained it or bought it during the period?

MR. SCALIA:  There's no statement by them that that was their reason, but we know they did it.  And we know that they were obligated to consider performance.  And I don't know any other reason other than the expected performance over a long period of time that someone selects an investment option.

Your Honor, with respect to Morningstar's assessment of performance, --

THE COURT:  Well, one reason might be I looked at the performance and it didn't look good compared to the S&P, but I think it will look better in the future.  I think it will be better notwithstanding that it is not measuring up to the S&P.  And so I'm going to bet on to come, and I'm going to keep it, and I'm going to buy it.  That's one possible.  Whether it's probable or not I don't know at this juncture, but it's certainly one possible reason for retaining it or buying it, isn't it?

MR. SCALIA:  Certainly.

THE COURT:  All right.

MR. SCALIA:  And that's exactly what we want

prudent fiduciaries to do is to look at the long-term prospect.

THE COURT:  Where I have a record that the decision could be based on the come as opposed to the past performance, and the plan says look at the past performance, what reason would I, as the fiduciary, have to bet on the come as opposed to doing what the plan said, is the question I think I have; what's the answer to that?

MR. SCALIA:  The --

THE COURT:  Now, you're focusing on her question and not on mine -- or her cue.  I asked my question, and you can get to hers later.

MR. SCALIA:  I understand, Your Honor.

And the IPS itself is a document that is forward looking, intended to provide a successful long-term investment.  So we're back to the fact that we directly asked plaintiffs' counsel what in the IPS tells you that a prudent fiduciary would have jettisoned the funds?  They were at a loss to identify specific provisions.

For example, you asked them about favorably.  Compare favorably.  And that does not mean outperform.  When it comes specifically to the standard of performance, the IPS on Page 5 refers to significant underperformance.  Significant underperformance.

THE COURT:  So compare favorably can be not

doing as well but not doing significantly underperforming?

MR. SCALIA:  That's correct.  And looked at over a proper period of time, and also considering different plan objectives.  You'll notice that when plaintiffs' counsel read to you from the IPS, he referred to the language on Page 6 which says, quote, provide a long-term competitive rate of return, net of investment expenses, versus target date funds with similar levels of risk.

The S&P TDF index is certainly something to look at.

THE COURT:  What are you reading from?

MR. SCALIA:  That's on Page 6 of the IPS, which is ECF 217-11.

And the point is here you look at funds with similar levels of risk.  Active funds, Your Honor, don't have --

THE COURT:  I don't see that language.  Are you talking about Page 6 at the top of the page, not at Page 6 at the bottom of the page?

MR. SCALIA:  It's the first full paragraph.

THE COURT:  Investment Selection and Monitoring on Page 6 of 14?  I'm just trying to find what page you're on.

MR. SCALIA:  In the document that I have, Your Honor, --

THE COURT:  You're using a page number.  Are you using the page number at the bottom of the page or the top of the page?

MR. SCALIA:  I'm using the page number at the bottom of the page.  There's also a Bates Number on what I'm looking at.

THE COURT:  I don't have that.  It's 217-11.  What paragraph is it?  The first full paragraph is "As described above."

MR. SCALIA:  Exactly.  That's the paragraph, Your Honor.

THE COURT:  All right.

MR. SCALIA:  That's the paragraph, and it refers to "versus target date funds with similar levels of risk."

And again, Mr. Miller glossed over that.  That S&P TDF index includes active funds.  It includes through funds.  Those have different levels of risk.

And so you do look at the S&P index, and I will provide you from the record after lunch citations where folks said they did, but we're now looking at what the hypothetical prudent fiduciary would do.  They would take that S&P index with a grain of salt.  They would say is that composed of funds with similar levels of risk?

If you look at Plaintiffs' Exhibit --

THE COURT:  Take it with a level of salt?  With

a grain of salt?

MR. SCALIA:  The S&P index, Your Honor, --

THE COURT:  Who would take it with a grain of salt?

MR. SCALIA:  A prudent fiduciary would not require one-to-one performance or superior performance at all times.

THE COURT:  What proof if there of that other than your view?  What testimony provides that what a prudent fiduciary would do would fit what you just said?  You have to have evidence.  It can't be you.  I want to know what record evidence actually supports that.

MR. SCALIA:  Dr. Wermers, Your Honor, his report and his testimony speaks at length about considering the nature of the alternatives.

You know, you asked plaintiff if any of these cases got to trial.  No.  They've been thrown out on pleadings.  And one of the reasons --

THE COURT:  He says they have been settled as well.

MR. SCALIA:  Six out of the ten are closed.  Most were dismissed with prejudice.  None has gotten to this stage.  None has survived a motion to dismiss, Your Honor, and that's because in these cases --

THE COURT:  How do they settle if don't -- if

they all dismissed on the motion to dismiss?

MR. SCALIA:  For peanuts, I think is a fair prediction of what the settlements were, Your Honor.

THE COURT:  Oh.  So they were settled?

MR. SCALIA:  I think there were a couple of settlements.  I think that the cases that were thrown out by Judge Nachmanoff were subsequently settled, I would expect, for peanuts because none of these cases --

THE COURT:  Do you know they were for peanuts?

MR. SCALIA:  I don't know that, Your Honor.

THE COURT:  Then you shouldn't say that.  You just say you don't know whether they were settled or not.

I have already written on why the decisions in *Hall* and -- and what's the other case?  Turner?

MR. SCALIA:  *Turlock*, I believe.

THE COURT:  *Turlock*.  Why I don't think those decisions apply here, and I don't.

MR. SCALIA:  But --

THE COURT:  And they were settled.  In any event, if they were settled, they were settled.

MR. SCALIA:  But in those cases, Your Honor, and so many other cases we have cited over time, including the *Smith v. CommonSpirit* decision from the Sixth Circuit, the *Meiners* decision from the Eighth, the *Davis* decision from the Eighth, the *Davis* decision from the Ninth, so many

different courts have said as a matter of law comparing active and passive funds is apple to oranges.

And then if you look at Plaintiffs' Exhibit 39, Your Honor, it's in evidence.  Plaintiffs' Exhibit 39 is the quarterly report by Aon, the investment consultant. And they specifically say that right now plan managers aren't trying to -- passive TDF managers aren't trying to beat the S&P.  And they say the reason is that the international equities market, I believe they say, has done poorly.  And that's resulted in passive TDFs not doing well against the S&P.

So it's widely recognized that, particularly when you have a passive strategy, there are going to be ups and downs and ebbs and flows.  And again, they have only their own expert for the theory that you take such a tiny snapshot and jettison a plan on that basis.

So back to the question of significant underperformance, Your Honor.  If there was significant underperformance, the market would have been leaving these funds.  That's how you know it was not significant underperformance because so many were adding it, so many were keeping it.  And the small number that left, we don't even know the reasons that they left.  That alone indicates this was not significant underperformance.

And remember as well that the IPS, nowhere were

the plaintiffs able to point to anything in the IPS which said that you must, you must, jettison the funds.

When you asked them about the IPS, at the end of the day they didn't talk about the IPS.  They said you should look at the market, and we agree.

They said you should look at experts, but one of their experts really invented his test, and the other didn't even speak to this issue.  They themselves did not engage in language of the IPS, and they failed to show you any language here that would compel a prudent fiduciary dropping these funds.

And they've also not responded to my point that their own expert conceded that the provisions of the IPS they're pointing to here are standard in the industry, looking at the S&P, looking at three- to five-year returns.

Your Honor, with respect to Morningstar and performance, that's Exhibit 86.  And just to read a couple things that Morningstar said about that.  It's just not true, as Mr. Miller suggested, that Morningstar doesn't consider performance.  It considers it in a variety of ways.  They said it's referenced in our evaluation of people and process.

They said we should have clear expectations for performance in different market environments based on our

analysis of the strategies, process and portfolio.  These expectations are checked against actual performance.

They say trailing returns and calendar year returns are of interest.  And they also say that it's extremely important that performance be viewed within the context of risks taken, which is a point I was making a moment ago that this is in the record.

And elsewhere Morningstar says, I'm not sure it's in this document, they state what everybody knows about investments, which is past performance is no indication of future results.  And that's where, again, plaintiffs err in their insistence on looking at a short-term period of past performance.

THE COURT:  Usually that statement or that caveat has to do with -- where the past performance has been good, and you can't count on it being good in the future.  I don't think I've ever heard it said when it's bad that means it's going to go up, but maybe it does.

MR. SCALIA:  Your Honor, it doesn't mean it's going to go up, but it also doesn't mean it's going to go down.  That maxim does in fact run both ways.  Certainly when Morningstar cites it, it doesn't suggest that it only works against an investment and never for it.

THE COURT:  All right.

MR. SCALIA:  In fact, at the very top of that

page, Page 10, they said we do not believe past performance is necessarily predictive of future results.

Your Honor, with respect to the *Tatum* decision, the plaintiffs have --

THE COURT:  Which decision?

MR. SCALIA:  *Tatum*.  The Fourth Circuit's decisions.

The plaintiffs have suggested to you that that decision mandates giving overriding weight to the IPS. Well, first of all, they've been unable to point to anything in the IPS that shows that a prudent fiduciary probably would have dropped the funds.  They've been unable to show that.

But secondly*,* *Tatum* actually stands for the opposite proposition, Your Honor.  Because when *Tatum* came back to the Fourth Circuit, what had happened was although the plan had indicated that *Nabisco* was supposed to remain in the fund -- and this was the actual plan document.  Not the IPS.  The actual plan document.  Nonetheless, the committee said, sorry, we're going to remove *Nabisco*.

And on appeal the second time around, so-called *Tatum* six, plaintiff's whole point was wait a minute. They overrode the plan which said that the *Nabisco* funds should be frozen.  And the Court said, look, you've got to look at the totality of the circumstances, including what

analysts said, and the like, and the fiduciaries could override the plan terms themselves.  In fact, they would have done that.

And so plaintiffs cannot use *Tatum* the way that they're suggesting.  In fact, it runs in exactly the opposite direction.

Your Honor, unless there are any other questions, I just want to close by referring to plaintiffs' somewhat sheepish suggestion that this case is like the *Madoff* case.

THE COURT:  Like what?

MR. SCALIA:  The Madoff scandal.  You heard Mr. Miller bring up the *Madoff* scandal.

THE COURT:  I don't have the *Madoff* case cited to me, so I'm not worried about it.

MR. SCALIA:  Well, it was a case of gross, serious widespread fraud.  There's no such evidence in this case.  These funds have been scrutinized by fiduciaries, by analysts, by investment advisors, and they remain the market standard.  And in fact, they did have increasing market share.  The only record evidence on --

THE COURT:  "These funds," meaning BlackRock?

MR. SCALIA:  The BlackRock funds.

In Dr. Wermers' report, Page 22, quote, Specifically, the market share, increased from 7.7 to

9.8 percent between the fourth quarter of 2016 and the second quarter of 2022, end quote.  That's on Page 22.

So their market share did grow.  But, Your Honor, this case, as plaintiffs are presenting it, is a dangerous case.  It's a dangerous case for the prudent management of benefit plans in this country.  These BlackRock TDFs are extremely well-regarded and highly rated by those who know best, and yet plaintiffs, using just a single expert's cobbled together method are putting in peril the confidence that fiduciaries across the country have in being able to rely on their investment consultant, in being able to rely on Morningstar, in being able to rely on the market's view --

THE COURT:  They didn't rely on anything, according to the state of the record right now.  They just ignored it.  They didn't meet for a year.  They didn't monitor it.  So why is that an issue here?

MR. SCALIA:  Your Honor, because this case --

THE COURT:  It might be in a case of people who did what they were supposed to do.  But I don't know what the bottom line is, but at least as for purposes of this motion they didn't do what they were supposed to do.

MR. SCALIA:  Two parts to that answer:  First, we disagree with that characterization of the evidence, Your Honor.  Mr. Miller said they didn't meet in 2016 and

2017.  They met twice in each of those years.  We'll come to that evidence later.

THE COURT:  I know.  What I said is for right now I have to assume they didn't live up to what they were supposed to do.  That's all that I was saying.

MR. SCALIA:  And what I am saying --

THE COURT:  The fact that you're going to try to do something else in the future doesn't get me anywhere in the analysis.

MR. SCALIA:  And what I am saying is the extraordinary extreme legal theory that plaintiffs are offering here, which didn't survive a motion to dismiss in any other case, they haven't cited a single case where such a widely held investment option was held to be imprudent --

THE COURT:  Well, are you saying that every case in which this expert testified was dismissed on a motion to dismiss?

MR. SCALIA:  No.

THE COURT:  If he did, how did he get to be -- how did he testify in it?

MR. SCALIA:  No, Your Honor, I'm talking about plaintiffs themselves.  Every single case that they have brought on this theory was dismissed.  It is a radical theory.  And the reason I say it is dangerous is because

other plans, other companies, are watching this.  This case has drawn attention because their theory is so outlandish within the vast body of ERISA law, which we have cited to the Court where these cases are thrown out on the pleadings and they do not go to trial.

If a case like this goes to trial, you're going to have fiduciaries across the country constantly second-guessing people who know better than they what the best performing funds are.  It will incentivize fiduciaries to think short term.  It will incentivize fiduciaries to sell low and buy high.

THE COURT:  The plaintiff would say in response to that it would incentivize plans to live up to their monitoring obligation.  Wouldn't that be the other side of it?

MR. SCALIA:  They can't argue that, Your Honor, because the market as a whole was monitoring these funds.  It was finding them very good.

But based on a radical theory about how rapidly you have to throw a fund out, which has no support beyond this single expert -- remember, their other expert, Dr. Wagner -- or Ms. Wagner, not only said that she wasn't going to say these funds should have been replaced.  She wasn't going to say that.  She said I'm not an expert on that.  She doesn't know anybody who replaced them for

performance reasons.

When she looked at Marin's methodology, the one they use which says after a quarter on a watch list, after a year gone, she said I've never seen that before.  And so it is radical, and for a case like this to go to trial will impose an impossible second-guessing standard on fiduciaries who are not as expert in the market.

THE COURT:  Why wouldn't going to trial and winning establish for all time that what happened here was okay?  That they would have done it anyway?

I mean, I don't know that it's a harbinger of doom that you suggest it is for the trial process to work its way, but that's not really the test that I have to apply either.

All right.  Thank you.

MR. SCALIA:  Thank you, Your Honor.

THE COURT:  Now, I have listened to you-all talk about these expert reports, and it seems to me that we need to have -- to address the whole question of the expert reports.  And I'm not so sure we're prepared to do that.

There are two defendants' motions to exclude Marin, and the other one to exclude Werner.  That's Number 195 and Number 201.

And then there was a plaintiffs' motion to

107

exclude Latham and Wermers.  That's Number 207.

And now the way you-all -- your briefs in summary judgment don't take the -- don't place the emphasis on results of the expert -- of the motions to exclude the expert testimony that your verbal presentations do.  So I think it's probably prudent at this point to hear these motions and get them sorted out before I do anything else in the case.

If I were to decide right now, I'd be inclined to let the case go to trial on the basis of disputed facts, but you-all have raised these expert reports to a level that they did not assume in your papers, and so I need to get that resolved first.  So let's set a date for -- they are all fully briefed, and maybe you-all are ready but I don't feel like I am.

So how about Monday the 1st of April, can you do that?

MR. NELSON:  Your Honor, I was intending to handle the *Daubert* motions.  I'm set for -- I've got other obligations set for depositions on Monday the 1st.

MR. MILLER:  Your Honor, we're -- Mr. Berin and I are starting a trial on one of these case on April 9th because we heard your words and so we decided we should try one just to prove to you that we could.  But we can have somebody here on whatever date is convenient.  It

just may not be us.

THE COURT:  March 29th?

MR. MILLER:  The 9th is the day we're starting the trial.

THE COURT:  29th of March.  This is the 25th.  That's this coming Friday.

MR. MILLER:  That would work for plaintiffs, Your Honor.

THE COURT:  Can you-all do it?

MR. NELSON:  We can be here.

THE COURT:  All right.  10:00 a.m.

MR. SCALIA:  Your Honor, --

THE COURT:  Yes.

MR. SCALIA:  If I could just raise the question of the case schedule as a whole.  And I know you're mindful of it, but we're set for a pretrial in early May and so we rapidly have a number of dates upon us.  And so I'm wondering if --

THE COURT:  Well, we have a motion for class certification that has to be decided.  And that's pending.  We have heard that one.

MR. SCALIA:  You have, Your Honor.

THE COURT:  Yes.  So what do you want to know?

MR. SCALIA:  Simply whether if we push the *Daubert* hearing out toward the end of the week, given the

large number of pending motions we have, and the obligations that we have --

THE COURT:  What are the large number of pending motions that you have other than the *Daubert* motions?

MR. SCALIA:  We have summary judgment, class certification, the --

THE COURT:  You've got the summary judgment argued.

MR. SCALIA:  Correct.  Understood, Your Honor.

THE COURT:  What do you want me to do, is I guess what I'm trying to say?

MR. SCALIA:  We are obviously evaluating the obligations that are quickly upon us in April to prepare for trial.  And it will be hard to meet some of those if we don't have rulings, which raise the question in my mind whether we remain on a schedule that the Court thinks is the right one for the case.

THE COURT:  Well, it may not be.  Why don't we hear where we stand on Friday, and go from there.  You don't have anything that's due before then, do you?

MR. SCALIA:  We don't, Your Honor.

MR. MILLER:  No, Your Honor.

MR. SCALIA:  Thank you.

THE COURT:  I don't have the pretrial schedule with me.  Do you-all have a pretrial schedule?  Was there

one entered and isn't the consent order entered on it?

MR. SCALIA:  Yes, we do have that schedule.  I don't personally have it with me.  I'm sorry I don't.

THE COURT:  I can look it up on the --

MR. MILLER:  And then we have a final pretrial conference on May 6th, Your Honor, and a trial starting on May 20th.

THE COURT:  You've had all your depositions, and so what --

MR. MILLER:  Everything is done.  And I think we're going to be meeting and conferring this week about stipulations, and some of the other pretrial materials.  So we're on schedule.  I apologize that I don't have my -- the dates.

THE COURT:  Well, I can get it.  I can get it.

MR. SCALIA:  Motions *in limine* are due April 5th.  So that's the first date.

THE COURT:  All right.

Well, if the class is certified, it's just going right to trial, is that correct?

MR. MILLER:  Yes, Your Honor.

THE COURT:  It would be the first class action in the history of the Eastern District of Virginia that didn't go to the Fourth Circuit if that were to occur.  It would go to the Fourth Circuit, wouldn't it?

MR. SCALIA:  Obviously, we hold out hope on summary judgment, Your Honor.  That's with you, though.  And of course at times there are appeals taken from class certification --

THE COURT:  At times there are, yes, every once in a while.

Is there any reason to believe that's not going to occur in this case?  We won't favor the Fourth Circuit with an option to deal with the case?

MR. SCALIA:  We're hopeful that's unnecessary, Your Honor.

THE COURT:  Well, hope springs eternal.

I think maybe we may have to revisit where we're going in the case given where we stand right now.  So I don't see any sense in you wasting your client's money on matters, and I need to continue assessing what I'm doing.  And by Friday, I'll know what to.

But the motions *in limine* are due on April 9th?

MS. TRYCK:  The 5th.

MR. SCALIA:  The 5th, Your Honor.  I think that's a week from this Friday.

THE COURT:  Yeah, that's from someone who knows what needs to be done on that and who has to do it, stay up late to do it, right?

MS. TRYCK:  Yes, sir.

112

MR. SCALIA:  There's also a conference of undisputed facts a week after that.

THE COURT:  Okay.

Well, I'm of the view that it's unrealistic to expect this case to go to trial in May, and I will continue it generally until we get some of these preliminary matters sorted out.  It's an important case, and I don't see any sense in you spending your clients' money getting ready.  We can run once we get the decisions made, and we can get things done.

Is it Tryck?

MS. TRYCK:  Yes, Your Honor.

THE COURT:  Ms. Tryck has a lot to do, and she wants to do it right.  So I think the correct thing to do is to set the framework, and that now lies with me.  So, Happy Easter.

MS. TRYCK:  Thank you, Your Honor.

THE COURT:  We'll be in adjournment.
(The proceeding concluded at 1:09 p.m.)

REPORTER'S CERTIFICATE

I, Krista M. Liscio, OCR, RMR, Notary Public in and for the Commonwealth of Virginia at large, and whose commission expires March 31, 2024, Notary Registration Number 149462, do hereby certify that the pages contained herein accurately reflect the notes taken by me, to the best of my ability, in the above-styled action.
Given under my hand this 28th day of March, 2024.
/s/
Krista M. Liscio, RMR
Official Court Reporter