```
                    UNITED STATES DISTRICT COURT

             FOR THE EASTERN DISTRICT OF VIRGINIA

                        RICHMOND DIVISION



* * * * * * * * * * * * * *
PETER TRAUERNICHT, ET AL.,   * CIVIL ACTION 3:22-CV-00532
                             * MARCH 29, 2024   10:09 A.M.
              Plaintiffs,    * MOTION HEARING
                             * VOLUME I OF I
vs.                          *
                             *
GENWORTH FINANCIAL, INC.,    *
ET AL.,                      * Before:
                             * HONORABLE ROBERT E. PAYNE
           Defendants.   * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * * EASTERN DISTRICT OF VIRGINIA


APPEARANCES:

For the Plaintiffs:      ALEC BERIN, ESQUIRE
                         Miller Shah LLP
                         1845 Walnut Street
                         Suite 806
                         Philadelphia, PA 19103

                         GLENN E. CHAPPELL, ESQUIRE
                         Tycko & Zavareei LLP
                         2000 Pennsylvania Avenue, N.W.
                         Suite 1010
                         Washington, DC 20006

For the Defendants:      KARL G. NELSON, ESQUIRE
                         Gibson, Dunn & Crutcher LLP
                         2001 Ross Avenue
                         Suite 2100
                         Dallas, TX 75201



Court Reporter:          Melissa H. Custis, RPR
                         701 East Broad Street
                         Richmond, Virginia 23219
                         (804)916-2278


          Proceedings recorded by mechanical stenography.
Transcript produced by computer.
```

Trauernicht v. Genworth - 3/29/2024

APPEARANCES (Continued):

For the Defendants:

                    JENNAFER M. TRYCK, ESQUIRE
                    Gibson, Dunn & Crutcher LLP
                    3161 Michelson Drive
                    Suite 1200
                    Irvine, CA 92612

                    ANNA L. CASEY, ESQUIRE
                    Gibson, Dunn & Crutcher LLP
                    1050 Connecticut Avenue, N.W.
                    Suite 200
                    Washington, DC 20036

                    HEIDI SIEGMUND, ESQUIRE
                    McGuireWoods LLP
                    800 East Canal Street
                    Richmond, VA 23219

                    BRIAN E. PUMPHREY, ESQUIRE
                    McGuireWoods LLP
                    2812 Emerywood Parkway
                    Suite 220
                    Richmond, VA 23294

(Court convened at 10:09 a.m.)

THE CLERK:  Case Number 3:22-CV-532, *Peter Trauernicht, et al. versus Genworth Financial, Inc., et al.*

The plaintiffs are represented by Glenn Chappell and Alec Berin.

The defendant, Genworth Financial, Inc., is represented by Brian Pumphrey, Heidi Siegmund, Anna Casey, Jennafer Tryck, and Karl Nelson.

Are counsel ready to proceed?

MR. BERIN:  We are.

MR. NELSON:  We are.

THE COURT:  All right.  This is the motion to exclude the expert opinions of Richard Marin, ECF-195.

I apologize for keeping you-all waiting.  Medical people have their own time; they don't use it.  Same system.

So before you begin, we have a young member in the audience -- young person in the audience today, and she's visiting here.  Who is she?

MR. NELSON:  We do, Your Honor.  This is the daughter of one of our client representatives.  I'll let him introduce her.

MR. BROWNLOW:  Good morning, Your Honor.  This is my daughter Genevieve Brownlow.  She's here to watch court today.  She has the day off from school.

THE COURT:  Genevieve, you've taken a holiday to

learn the law a little bit.  That's good.

MS. BROWNLOW:  Yes.

THE COURT:  We're glad to have you here.

MS. BROWNLOW:  Thank you, Your Honor.

THE COURT:  I hope we will conduct ourselves appropriately.

MS. BROWNLOW:  Yes.

MR. NELSON:  I certainly hope that we set a good example for her.

THE COURT:  I've read all these papers.  It seems to me to boil down to the methodology question and whether or not the *Kumho* test of reliability is met, and that all boils down to whether anybody else has ever used this method before.  What is the method referred to generally?  By Marin, what does he call it?

MR. NELSON:  Well, I'm not sure it has a name.  He calls it a framework, Your Honor.  You know, I don't believe he's labeled it, and he certainly hasn't pointed to --

THE COURT:  Well, he doesn't have to label it.  I'm labeling it.

MR. NELSON:  Sure.

THE COURT:  The cases labeled it.

MR. NELSON:  Sure.

THE COURT:  Just a minute.

MR. NELSON:  I think, Your Honor, one of our

fundamental points is that it hasn't ever been used anywhere else, so it doesn't really have a common name.

THE COURT:  Well, I guess that's the nubbin of it, is has it been used?  There are cases that suggest that it has been used.  It just hasn't been used under precisely the same factual situation as this one.  They cite several cases where the same methodology is used, but it has to be tailored to the particular IPS that is involved.  And this case presents a very difficult circumstance.  One, it's a situation where we don't have any monitoring here, according to the allegations, and fairly significant language and text that exists.

So now somebody has to come in and say under the test required by the Fourth Circuit, "Well, would they have bought it anyway," or retained it, not bought it.  But would they have retained the stock anyway?  And that means somebody then has to say, well, a company that doesn't have a plan, that doesn't have any test, anything other than this general structure about comparing favorably and not doing substantially worse than, how does that fit into the real world of decisions of trustees who had they been monitoring would have made a decision?

It seems to me that what the state of things is here with me is that this fellow says it's in such common use he doesn't even -- I don't think he even bothered to say where it came from, but there are cases where the same basic

methodology is used.  He just applied it to fit the particular circumstances of the case as presented here in a multi-suite investment operation that was -- that he's trying to say was not appropriately retained under the framework.

So the real issue to me is what about those cases where it has been used and what -- how does that data, that is, that fact fit into the methodology required by the *Kumho* decision and by *Wilson* and by other Fourth Circuit cases?  That, I think, is where we have to be focusing our attention here.  Do you agree?

MR. NELSON:  Absolutely, Your Honor.  Happy to do that.

THE COURT:  I don't think the rest of the criticisms of his report really don't deserve any further discussion than they've been given in the brief.  I'm adequately addressing them.

I would say this:  That it is a wise thing to do when one is presenting a case anywhere is not to attack every single thing and make a point of it, because when you attack something and make it a big deal and you lose on it, you lose significant credibility.

An example of that is the citation of the testimony of the other experts, the woman who said -- that testimony that your papers rely on was miscited.  A fair reading of her testimony in its entirety does not in any way support the

proposition of using her as a vehicle to attack the validity of the methodology of this man Marin.  And anytime you do that, when you take a swing like that and you completely whiff the ball, you lose your credibility and it affects every other aspect of every pleading that comes into the case.  I've had more of it from your side than I care to have, in the summary judgment motion, in the class certification motions, overstatement and exaggeration.

It isn't just that it's irritating, that's not the point, because that's not a fair ground for a judge to make a decision on.  It is that it causes an enormous amount of unnecessary work and have to sort through an enormous amount of points.  So it is the job of the lawyers in the case to winnow through and get the tough issues out, present the arguments, the tough arguments that the Court has to make, and don't fight over things that don't make any difference where you can't possibly win.

Now, let's deal with the methodology issue of Mr. Marin, which is, by the *Kumho* aspect of this case, is the one that I think, of his testimony, is appropriately assessed at this point.  With that, I will let you talk.

MR. NELSON:  Okay.  Thank you, Your Honor.

There was a lot there.  I will try to focus in on the points that you've asked for.

THE COURT:  The methodology is really all I'm

interested in hearing about.

MR. NELSON:  Yeah.  I will certainly try to focus my comments there.  Obviously, to some extent, that may require context.  But I hear what you're saying, Your Honor.

THE COURT:  Well, he uses the method that he uses.

MR. NELSON:  Right.

THE COURT:  And there are courts that have approved that method, according to the other side.  And let me get their brief.  What shorthand name do you-all give that?  What is it?

MR. BERIN:  I'm sorry, Your Honor?

THE COURT:  What's the shorthand name that you-all give his method in your papers?

MR. BERIN:  Fundamentally, there's an investment monitoring and removal framework and a framework for identifying suitability alternative investments.  There are two overarching frameworks.

THE COURT:  Yes, I know that.  Sorry.  Anyway, go ahead.  The cases that they cite in ECF-234 approve of that method --

MR. NELSON:  Well, Your Honor, there's --

THE COURT:  -- they say.

MR. NELSON:  There are several responses to that point.  The first is just simply that those cases were submitted in briefing after the fact, were never pointed to by

Mr. Marin as support for his methodology.

THE COURT:  That is a different issue.  That is an issue that you actually don't address.  That is an issue of the adequacy *vel non* of the report.  It is not an issue of reliability.  It is whether his report is accurate, because the purpose -- the rule says that you are to submit your opinions and the bases therefore.

MR. NELSON:  Your Honor, we --

THE COURT:  And that's what that attack is.  It isn't an attack on the methodology per se.  So if that's -- but you don't really press that point too much.

MR. NELSON:  Well, we do raise it in our reply brief, which was the first opportunity we had to raise it, because these cases were offered in the plaintiffs' response.  I can give you a pincite, if you need it, to the reply.

THE COURT:  Well, no, that's not the first time you had the opportunity to raise the question of the validity of his report.  You could have raised the validity of the report in saying it is devoid of particular references that show that he or anyone else has ever used this methodology.  You certainly could have done that.  You didn't do it and, therefore, that issue is behind us.  So we're not talking anymore about the validity of his report.

MR. NELSON:  Respectfully, Your Honor, that is the entire thrust of our motion, that he made this methodology up

out of whole cloth and never cited any authority for it.  When we made that argument --

THE COURT:  That is an attack upon the substance of it.  You are conflating two points.  One is, what does the rule require for a report to be accurate.  Rule 26, let's get it out and actually see exactly what it says.  Rule 26(a)(2)(B) says, "The report must contain (i) a complete statement of all opinions the witnesses will express and the basis and reasons for them."  If a report does not do that, then the report itself may be attacked as inadequate, and that is a different analysis than whether the methodology that is followed -- has been followed in the report is a reliable methodology under the *Kumho* test.  They're two different inquiries.  And the attack upon the report is made based solely upon the report.  And that is not what you-all make your attack in your papers under ECF-195.

You're making your attack on the fundamental -- at the next level, and that is that the methodology is not reliable, as I understand your papers.  Maybe I'm wrong.  Maybe you can show me that I'm misreading something.  If I am, I certainly stand to be corrected on it.

But I just want to get the analysis focused in the right rubric, because there are different principles that apply to an attack on the report than apply to the reliability analysis per se under *Kumho*.  And there are different remedies

that are available, and the Court is constrained by different principles in the exercise of its discretion in what to do with the motion under that circumstance.  So go ahead.

MR. NELSON:  Your Honor, in this case, with respect to this motion, I would suggest that the distinction between Rule 703 and Rule 26 -- evidence Rule 703 and procedural Rule 26 are interwoven, because the attack under Rule 703 that we made, the motion that we made was that this methodology was not widely accepted, generally recognized, you know, supported.  And I do want to address that point.

In response to that challenge, plaintiffs' counsel submitted cites to these cases and said, "Well, look here, there are some other courts that have allowed something like this in."  And in our reply, we said -- we addressed those cases, and I do want to address those cases specifically, but we also made the point that those weren't part of his support. He never identified those in his report or in his deposition as anything that he relied on.  So it's too late to try to backfill as support for his methodology these cases and other IPSs.

THE COURT:  You don't make that argument in a reply brief.  If you are attacking a report and you have a reason to attack it, you attack it up front.

MR. NELSON:  Right.

THE COURT:  That's your burden.  And you didn't raise

it in your opening brief, by your own acknowledgement.  You have raised it in your response brief.  Are the arguments conceptually related?  Yes, they are.  But there are different principles that the courts use to test the validity *vel non* of the report as opposed to the methodology and the reliability aspect of *Kumho* based on an attack on the methodology.  And their remedies are different.  One can involve committing an amended report.  One can involve striking a report.  So it's important that the analysis be structured in the way that it's presented.  Now, are they related?  Yes, they are related.  I don't have any question about that.

MR. NELSON:  And that's simply my point, Your Honor.  We're not suggesting that the reply brief raises some new attack under Rule 26.  We're simply saying that this attempt to backfill support that he never cited or relied on can't be considered support under 703 for the reliability of his methodology.

THE COURT:  Well, until his reliability is attacked, why would he cite cases that use it elsewhere, that use it?  Why would anybody do that, the experts -- unless he testified in the case?  It's unusual for -- I've read lots of expert reports over the years, and I've not seen many that actually rely on lawsuits and decisions in other cases to say, "Well, I used this case and therefore made this decision."  But when those opinions are attacked, it's not -- expert opinions are

attacked, it's not uncommon to say, well, that's done in all kinds of cases of this sort, and it can be -- a court can consider the use of this methodology in other cases upheld by other judges in determining whether or not this methodology is reliable within the meaning of *Kumho*.  I believe *Kumho* teaches that the district courts have considerable reliability in deciding -- I mean discretion in deciding how to assess reliability as well as whether the reliability exists.

Let's take the fact that it's not mentioned in his report, this description, the methodology, and let's accept that.  And tell me why I can't consider the fact that the same kind of methodology is used in these other cases in assessing the reliability of Marin's use of it.  Why can't I do that?

MR. NELSON:  Sure, Your Honor.

THE COURT:  That's their main point.

MR. NELSON:  So a couple of steps in that analysis.

THE COURT:  Say again?

MR. NELSON:  Just a couple of steps in that analysis, in that response.

Under 703, it is the burden of the party proffering the expert to satisfy each element of 703, including the reliability of the method and the reliable application of that method to the facts of the case.  So the burden is on Mr. Marin to demonstrate that the methodology that he offers here is somehow reliable.  He didn't do that in his report.

The only support for the reliability is offered in plaintiffs' legal argument in response to the motion to strike.

Now, let's talk about *Kumho* because you mentioned that. And I agree that it's -- you know, it's very --

THE COURT: *Kumho* is the directive force in our analysis.

MR. NELSON: Correct. Correct. And in some respects I would say, Your Honor, that Mr. Marin's approach here is very much like the reference in *Kumho* to the fragrance tester. If you remember that passing reference, the court said, "Likewise, it will at times be useful to ask even of a witness whose experience is based purely on experience, say, a perfume tester able to distinguish among" --

THE COURT: Slow down.

MR. NELSON: Okay. "-- to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable."

THE COURT: That's one of the things you can use. That's not the only thing.

MR. NELSON: No, but there needs to be some demonstration that the methodology is reliable.

THE COURT: Well, their point I think is, at this stage, that there are courts that have held that it's reliable, and that I can consider, in determining whether Marin's report is reliable, the fact that other courts have

accepted this methodology, given whatever name it's given, even if he doesn't come out and say it in his report.  Maybe I'm missing their argument, but it seems to me to be the one that I read here.

MR. NELSON:  So, Your Honor, I mentioned there are several steps here in the response, and let me get to the next step, which I think goes to the heart of what you're asking.

The fact that counsel cites in its briefs these other cases doesn't actually tell us whether the methodology that was applied in those cases was applied under similar circumstances, in the context of a similar --

THE COURT:  Well, you read those cases to see that.  In reading the cases, it looks like they're very similar circumstances.

MR. NELSON:  But those cases --

THE COURT:  The *Pizarro* case, the court was evaluating an opinion -- assessing an opinion that evaluated whether to keep a fund in a retirement plan, and the opinion was based on the fund's performance over a set number of consecutive quarters.  And the court held that that was a common sense and well-established practice in the field of retirement investment advice.  That's the same method that he's using here.

And another court, *Reed*, calls it the scorecard analysis or approach, but finds that he used a composite

scoreboard of standard metrics and ranked the results to identify the replacements for the investments. His opinion was attacked as selective, and that was rejected over -- and that was, essentially, a challenge of the methodology and reliability.

In *Omnicom Group*, there was an issue of retention of the TDFs in a defined contribution plan. If you read the case, what the expert did there was analogous to what is being done by Marin and the court rejected an attack that it was not reliable.

So I can't ignore what I see in those cases in making the reliability analysis, can I, just because he didn't cite the cases in his opinion?

MR. NELSON: Well, Your Honor, none of those cases describe what the plan IPS in that instance actually called for. It's perfectly reasonable that if an IPS calls for that kind of rigid, sort of singular focus on short-term performance that -- so, again, if the methodology --

THE COURT: This IPS doesn't call for anything. This IPS is about as general and vague as you can get. What it calls for is an assessment in deciding what to do of -- it tells you what you can look at, but it gives you a benchmark, and the benchmark is comparable and not significantly less in its performance.

So there isn't much to go on in this one. So what

you have to do is look at what is there in the world that you're functioning in, that is, the investment world, that gives you measure.  And that's what he says he did, and he says that it's just used in everyday life in his profession.

Now, he doesn't cite a single decision that he's ever -- where he's ever used it, or named anybody whom he knows who has ever used it in his report, or I believe in his deposition.  So does that keep it from being considered to be a reliable method if other courts have found the method reliable under analogous circumstances but not identical?

MR. NELSON:  Well, Your Honor --

THE COURT:  Do you really want to take this to the Fourth Circuit, striking his report, when you've got these four, five cases here that hold that it's a valid method?

MR. NELSON:  Well, Your Honor, the fact that a method that is in some ways similar, not identical but similar, may have been appropriate in other cases doesn't mean it's appropriate for all cases.

THE COURT:  Right.

MR. NELSON:  And so you need to --

THE COURT:  That's a matter of the weight that you give to the testimony of people who sit there in front of you and adjust and say, "Well, here's what I think is the right way to apply this method in the circumstances presented here," because there's not a direct analog in the report anywhere.

And then the other one comes in and says, "Well, it's not and here's why it's not." But that doesn't mean that you strike the report. It means that you listen to the testimony of the experts and then you, at that point, make a decision which view you're going to accept. It seems to me like, I guess, I'm saying that it smacks of an argument relating to the weight be given to the testimony.

MR. NELSON: Well, Your Honor, in our view, you only get to that question of weight if the opinion meets the standards of 702 and *Daubert* and *Kumho* and one of those --

THE COURT: It has to be reliable first.

MR. NELSON: It has to be reliable, exactly. It has to be reliably applied to the facts of this case. And that's our challenge here.

As I was saying, the fact that it may have -- a court may have found some approach that's similar in facets reliable in another case doesn't mean it's reliable here until you've connected the dots and said the facts in that case, the IPS and the other surrounding facts, were the same as the facts -- at least very similar to the facts here. And, Your Honor, we respectfully but strongly disagree that the IPS in this case doesn't have any standards.

THE COURT: What standards would you point me to in the IPS other than the comparable and the not -- significantly lesser performance standard for the performance?

MR. NELSON:  So the IPS in this case specifically calls out, first and foremost, when it's identifying benchmarks, the custom benchmark, which we talked about on Monday.  Mr. Marin's report gives no consideration to the custom benchmark, and he specifically testified in his deposition that the reason he didn't was because it doesn't advance his conclusion.  It doesn't point to rejection --

THE COURT:  I don't think -- that's an example where I just think you're reading too much into his testimony.  When you say something like that, it's hard to follow the rest of the argument.  So that's what I'm having trouble with.

MR. NELSON:  Well, in any event, Your Honor, it's --

THE COURT:  His testimony is what it is about the custom benchmark.

MR. NELSON:  It is.  And it's undisputed that the custom benchmark is specifically called out in the IPS as the primary comparator/benchmark.

THE COURT:  What does the custom benchmark do?

MR. NELSON:  The custom benchmark essentially tracks whether this investment, the BlackRock investments, are applying -- are faithfully applying their strategy, their investment strategy, their asset allocations to achieve the long-term goals that they've espoused, that they've said that they're going to pursue.

The IPS also specifically calls out other factors.

THE COURT:  Is that in dispute in this case?

MR. NELSON:  I don't believe so, Your Honor.

THE COURT:  Why would he then use it as a factor if it --

MR. NELSON:  He did not use it as a factor, and that's our point.

THE COURT:  Why would he use it as a factor?

MR. NELSON:  Our suggestion is he would use it because the IPS says that that's what you're supposed to look at.

THE COURT:  Go ahead.

MR. NELSON:  The IPS also calls out other factors -- we talked about these on Monday.  The stability, consistency, and performance of the underlying investment managers, you know, the market perceptions of the particular fund in question.

THE COURT:  All those factors about the stability of the managers and whether they've kept their people, those aren't in dispute, as I understand it, from either side; is that correct?

MR. NELSON:  I believe that's true.  I believe that's true, Your Honor.  And so what Mr. Marin did here was he picked one of this list of factors that are called out in the IPS, the one that he thought suggests that the funds should have been jettisoned, ignored all the others that pointed in

the other direction, and said, "Based on just looking at this one factor, I conclude that these funds should have been jettisoned." Well, that's selective. That's exactly the kind of cherry-picking of the data, "I'm going to look at the data that helps me and not look at the data that hurts me," that courts regularly exclude experts on. And that's the heart of our motion with Mr. Marin.

THE COURT: All right. Thank you.

MR. NELSON: Your Honor, before I sit down and I apologize for prolonging this, but I feel compelled to respectfully respond to your point about our references to plaintiffs' other expert, Ms. Wagner. I apologize if in our briefing we didn't make the point clear, but there is certainly no intended and I don't believe there's any actual misrepresentation of what Ms. Wagner said.

THE COURT: I'm sure you misapprehended it.

MR. NELSON: I think the difference, Your Honor, may be plaintiffs are trying to spin that as an argument that we said that Ms. Wagner and Mr. Marin disagreed. And that's not our point. It's a bit more nuance than that.

THE COURT: And what was cited, though, not what your point was? What's the point?

MR. NELSON: The testimony that was cited shows that Ms. Wagner testified that she wasn't familiar with Mr. Marin's methodology.

THE COURT: Okay.

MR. NELSON: And it's just another, as you mentioned, just another piece of that weighting under *Kumho* and under *Daubert* of, you know, is this a reliable methodology. And if you've got somebody whose whole life has been spent advising these plans on fiduciary process and she says, "I've never seen that methodology," we're not saying that's determinative.

THE COURT: Why is it even relevant?

MR. NELSON: Well, again, it's --

THE COURT: You're offering her as an expert testimony -- as an expert opinion of your own and she's not your expert. So you're calling on her -- you want me to give it the weight I would give an expert opinion. It's not your expert, she's not done a report on it, she's not cited as an expert in the area, and so why would I pay any attention to whether she's seen it or not? Why is it entitled any weight?

MR. NELSON: Your Honor, she is cited as an expert.

THE COURT: Or still, the problem is that the part of the testimony that is cited leaves out the fact that she, essentially, says it looks reasonable to her.

MR. NELSON: And we acknowledge that, Your Honor. But, again, on the narrow point of is this a generally accepted practice, is it reliable because the industry recognizes it, she is offered as an expert on fiduciary process, who advises plans on their process, and she says in

the course of advising her many, many, plans on their fiduciary process --

THE COURT:  If you want her to give that opinion and whether or not this is a method, you can hire her, if she'll take you on.  We can have a whole new expert deposition on that subject.  But there's a limit to what you can make out of cross-examination.

MR. NELSON:  I understand, Your Honor.

THE COURT:  You can make a point, but that's all it is.

MR. NELSON:  I'm not going to belabor the point, but I did feel like we needed to respond to that characterization. Thank you, Your Honor.

THE COURT:  All right.

MR. BERIN:  Good morning, Your Honor.

THE COURT:  Good morning.  At what point in Marin's report does he tell us that this method is generally accepted, is used?  You cite in your papers there's a wide -- first, you said there's a widespread support for Mr. Marin's methodology and professional literature and case law.  What professional literature is in the record that permits me to support -- find that that's a fact?

MR. BERIN:  Your Honor, I concede that the professional literature I think in that citation refers to literature that's cited in the case law the plaintiffs raise

Trauernicht v. Genworth - 3/29/2024

in their briefing.

THE COURT:  Well, the statement, then, is widespread support for Mr. Marin's methodology in case law.  And by case law, you mean *Omnicom*, *Terraza*, and *Reed*; is that correct?

MR. BERIN:  I mean, those cases -- I think there's a citation to a case known as *Jones versus Coca-Cola* and potentially one or two additional cases.

THE COURT:  What are they?  And do they cite literature?  And where do they cite the literature?

MR. BERIN:  Sure.  I have the *Terraza* case opened in front of me.

THE COURT:  You have what?

MR. BERIN:  The *Terraza versus Safeway* case.

THE COURT:  Yes.

MR. BERIN:  The Westlaw pagination, I believe it's pages 2 to 3, reviews two studies of literature.

THE COURT:  What paragraph are you talking about?

MR. BERIN:  Just following the paragraph you read which reads, "This Court rejects the argument.  Evaluating whether to keep a fund in a retirement plan based on that fund's performance over a set number of consecutive quarters is both a common sense and well-established practice in the field of retirement investment advice.  For example, a 2002 article in the *Journal of Compensation and Benefits* describe the following approach:"

I could read, if the Court would like, but that paragraph proceeds to discuss the approach outlined in that article by Sheldon Geller in the *Journal of Compensation and Benefits*. And just following that, there is another review of a publication that's a treatise on retirement law and plan administration which provides a model investment policy including a framework for watch listing and removal, and then that is by a Robert Klausner, published in 2017.

THE COURT: So *Terraza* cites to Klausner, to Geller, and to the article in the *Journal of Compensation and Benefits*. And that's what you meant by literature, right?

MR. BERIN: I think -- correct, Your Honor. I think that's at least two instances of literature.

THE COURT: That's two.

MR. BERIN: The other cases in which --

THE COURT: That's not at least two or more than two. It's two.

MR. BERIN: The other cases cited in the papers --

THE COURT: In what papers?

MR. BERIN: The *Omnicom*, *Eversource*, *Jones* cases, I believe address --

THE COURT: What do they cite? *Omnicom*. What's *Jones*? What's the citation to *Jones*? Get your partner back there to work. He can find it.

MR. BERIN: Sorry?

THE COURT:  Unless you've got it.

MR. BERIN:  The *Jones* citation is the case in the Western District of North Carolina.  I believe that's *Jones versus Coca-Cola Consolidated*, 2022 Westlaw 441606, and that is a case in which a court denied a motion to exclude a similar framework for investment removal.  I think these cases recognize the same literature.

THE COURT:  Where does *Omnicom* -- what literature does it cite?  You said that you reference in the brief I asked you about referred to the articles in the case law.  So *Omnicom* -- what articles does *Omnicom* cite?

MR. BERIN:  I apologize, Your Honor.  I think *Omnicom* only cites case law.

THE COURT:  In the *Jones* case, Judge Whitney, as I understand it, he denied the motion without prejudice to refiling later when the filing might be ripe, according to the citation.  So what did they -- where did he -- where does that opinion contain any literature and help you in your argument?  You cited *Jones*, 2022 Westlaw 441606.  As I read it, it says, "Accordingly, the Court denies defendants' motion to exclude under Federal Rule of Evidence 702 the declaration and opinions of Gerald Buetow, B-U-E-T-O-W, without prejudice to defendants refiling their motion later in the proceedings when such refiling may be appropriate and ripe."

Where are the articles that are referred to in this

opinion?

MR. BERIN:  There are no articles in this opinion, Your Honor.

THE COURT:  Well, you see, did you listen to what I told them about when you say things that you can't back up?  So I go out and I look and I'm looking for articles.  I'm looking for a case citation and what do I see?  I see a denial without prejudice to a motion.  What purpose is there in that case?  What happened on the next go-round?  You-all were in that case, weren't you?

MR. BERIN:  We were.

THE COURT:  What happened in that case?  Was there a subsequent motion?

MR. BERIN:  There was not a subsequent motion, and that case resolved.

THE COURT:  All right.  So you see what I had to do?

MR. BERIN:  (Nods head up and down.)

THE COURT:  Do you see what's wasted?

MR. BERIN:  (Nods head up and down.)

THE COURT:  Don't do that.  It's not helpful.

You say there are no professional literature articles in the *Omnicom* citation.

How about *Reed*?  Are there any articles in the *Reed* case?

MR. BERIN:  I'm not recalling any offhand.  I will

submit that the articles I'm referring to are primarily in the -- potentially only in the *Terraza* case.  I think those articles.

THE COURT:  All right.  Well, so we checked that box.

So according to the deposition testimony cited, Mr. Marin says that this methodology is called in some of these cases the scorecard methodology, is used and is just used across the board so commonly that there wouldn't be any need for anybody even to write an article about it.  What in the record, in his report or anywhere, supports that statement, that is, that it's so widely used, that general scorecard approach that he's using, is widely used throughout the industry?  What evidence in the record supports that?

MR. BERIN:  I think the scorecard methodology can be addressed in the record at two levels.  One is the fundamental components of the scorecard, which appear -- there are references throughout the record to those components being the means by which investment advisers, BlackRock itself and others in the industry, assess the performance and other factors of the BlackRock funds.

THE COURT:  But the methodology describing it as using the scorecard to do generally what was done is even used by the BlackRock TDFs themselves according to the records. That's the way I read your papers; is that correct?

MR. BERIN:  I think the -- I don't know -- I don't

Trauernicht v. Genworth - 3/29/2024

know that the record reflects that BlackRock called it a scorecard or the exact same formulation.  The components of Mr. Marin's scorecard are components that BlackRock's representatives testified are means by which BlackRock analyzes --

THE COURT:  So a rose by any other name is still a rose.

MR. BERIN:  I think it's fair to call the analysis analogous.

THE COURT:  It doesn't make any difference whether you call it a rose or a peony.  If it's a rose, it's a rose, right?

MR. BERIN:  Yes.

THE COURT:  Okay.  So BlackRock uses this method, no matter what it's called, itself, right?

MR. BERIN:  I think it's fair to say that BlackRock analyzes the same metrics used by Mr. Marin.

THE COURT:  Was that in his report, that is, that BlackRock used the same method that he's using?

MR. BERIN:  I don't believe Mr. Marin relied on BlackRock testimony for that.  That is reflected in exhibits attached to the motion.  That is reflected in Ms. Wagner's report and that is reflected in the original transcript of the BlackRock depositions.  I don't believe Mr. Marin cited to that testimony.

THE COURT:  Did he cite anything about his own use or anybody else's use of the general methodology which we are short forming as the scorecard method?

MR. BERIN:  I don't believe for that portion he cited to others' use of the methodology.  I think he references his experience and its common usage.

THE COURT:  But he says he used it.

MR. BERIN:  He does.

THE COURT:  Does he ever tell us where he used it?  Does he ever tell us where he saw anybody else use it?

MR. BERIN:  In his report, I don't believe he does.

THE COURT:  All right.  The matter came up then in his deposition.  In his deposition, does he tell us where anybody else used it or where he used it?

MR. BERIN:  I'm not recalling specific instances that he provided, but --

THE COURT:  Well, after this attack was mounted in the papers, did you go back and ascertain is there any proof anywhere that anybody else has ever used it other than in these cases?  That is, did you ask Mr. Marin, "Hey, Marin, you said this is used everywhere.  Now it's become a big deal in the case because you didn't say so, say where you got it.  You didn't use it.  You didn't give me the name of anybody else who did use it.  And here's what they're saying.  They're saying it's not reliable.  Now, where is it used?"  Did you go

back and ask him that?

MR. BERIN:  I have spoken with Mr. Marin about that subject in connection with his deposition in this case and in connection with our trial preparation.  The sum and substance of those discussions included --

THE COURT:  The point I'm asking you -- I'm trying to get to is, if he were on the witness stand testifying, could he put names to the generalization that I did it and I did it when I was evaluating Mary Smith, John Jones, and this, and I know that Harvey Keck and Bill Jones, they used it too over at Merrill Lynch.  And I've seen it done.  Is that something he would testify to on the witness stand?

MR. BERIN:  I submit that he would.  I think this discussion highlights that it's a question of his credibility regarding how well established this method is and his observation.  I think that fundamentally goes to the issues raised by Mr. Nelson.  I think there's a question of how widely used his methodology is, which was the substance of much of Mr. Nelson's --

THE COURT:  But the predicate for even getting to that point is the representation by you as an officer of the court that if called upon to testify at trial about the flesh on the bones of his assertion that everybody uses it and he's used it, he could actually identify people who've used it?  Can he?

MR. BERIN:  Your Honor, I believe he could.  And I would like to clarify.  I can't make that averment with respect to the specific scorecard terminology or the name formulation --

THE COURT:  We're not talking about that now.  We're talking about the method itself and is that method reliable, because there then, as you point out and as Mr. Nelson points out, is another level and, that is, what's the significance of the specific application of it, the choice of the six, for example, suites in which to make the analysis.  That's level Number 2.  What's the significance of the application of the method here where he used certain things in the IPS but not other things?  That's the second level of the analysis in my mind as to reliability.

I perceive that the record is that -- nobody has used the precise -- the scorecard method, let's call it, as he precisely used it considering the precise factors that he had not used in making the analysis to which he testified rather fully, such as why choose the performance of six?  Why choose four quarters?  Why choose this?  Why choose that?  There's nothing in the record that shows that it's ever been used in that circumstance before; isn't that correct?

MR. BERIN:  That's generally correct, Your Honor.

THE COURT:  But that then gives us a circumstance where we're to learn is the -- is the scorecard method, which

is generally reliable and recognized by BlackRock and by these other cases, how do we determine whether to apply -- how to apply the *Kumho* reliability analysis to this phase where, as here, it's now undisputed that the precise contours of the framework used by Marin in this case have not been used in any other situation that is in the record.  That's where we are, right?

MR. BERIN:  I think so.  If I could make one clarification about that, Your Honor.

THE COURT:  Yeah.

MR. BERIN:  I think the record supports that all of the ingredients for the recipe are widely used, are all supported.  I think the formulation that we're talking about is what's tailored to the particulars of the case and the second level, I think that's correct.

THE COURT:  Yes.  People use a monitoring system and a watch list, and they use quarters, whether it's four quarters, two quarters, six quarters, or whatever.  And they put it on a watch list.  After it's -- if it stays -- if it doesn't get off a watch list after X period of time, whether it's one quarter, two quarters, or a year, then a decision is made.  These are commonly used factors according to the cases that are cited.  But the particulars of it, of how it was applied in this case he chose based on the unique factors of this plan.  And so it would be highly unlikely that it would

ever appear that the method would be applied in any other case unless it had the facts of this case and the actual plan of this case.

MR. BERIN:  I think that's a fair characterization, Your Honor, and I think --

THE COURT:  Your view is that doesn't affect the reliability of it?

MR. BERIN:  I don't in this instance, Your Honor, because Mr. Marin explains exactly the weight that he applied to each factor, explains each of the assumptions underlying determinations concerning, for example, the use of the custom benchmark, the use of an asset under management screen.  He derives each of those criteria from the IPS in this case, makes very plain in his report starting at paragraph 28 what each of those assumptions are and what their foundation is in the IPS of this case and at deposition explained that he didn't just gloss over unscrutinizing of these factors, but actually considered it.  His deposition testimony is quite clear, actually, that he didn't ignore the custom benchmark and didn't ignore supposed qualitative --

THE COURT:  Part of his deposition says that?

MR. BERIN:  So this is Exhibit 4 to plaintiffs' opposition, which was ECF-236, I believe it's 236-4, page 186 of his deposition.  The question was put to him, "So when evaluating which criteria from the IPS for your performance

standards, it is acceptable in your view to look at the S&P indices or to place greater weight on S&P indices than the custom benchmark?"

Mr. Marin responded, "I wouldn't put it that way.  I would say given that I looked at the custom benchmark tracking error and saw that it was not out of line and that it was an acceptable tracking error level, then I would argue that looking at the relative performance against the S&P TDF index and against peer group performance were the most important performance criteria to be used in that evaluation."

Then concerning specifics so-called qualitative criteria, Mr. Marin testified -- this is 187, lines 5 to 13 of that same deposition exhibit, "Like I said, I incorporated all those qualitative issues into my review of the performance because almost all of those issues get reflected in the performance in the same way that fees get netted in the same way the glide path creates over or underperformance.  That's all part of the performance review.  So if they had suddenly lost the key portfolio manager, it would just" -- this might be an error in the transcript, "it was just heightened the level of concern."

So I think to suggest that Mr. Marin in some way didn't explain the recipe here in a reliable way and disregarded certain IPS criteria while importing others is inaccurate and fundamentally that next step under *Kumho* that

connects the ingredients which are well established with a formulation that's reliable is the exact explication of how he derived his framework, which he will be on the stand at trial to testify about and which defendants can ask him about, but those are all very clear and reliable assumptions.

I just think the conversation earlier to me seems to be mixing two things, whether Mr. Marin's methodology is purportedly well established, I think that's why the references to Ms. Wagner's testimony were raised.  That's why these other cases were raised.  I think that Mr. Marin's formulation tracks with all of those other sources validates that it is a well established and widely used framework.

I think the second question of reliability, which wasn't addressed quite as much, is well established considering Mr. Marin's clear explanation in his report and again at deposition of how he connected all of the ingredients to the formulation that pertains under the IPS in this case.

THE COURT:  Can you kind of put that last component in a simpler way that my mind can understand?

MR. BERIN:  Sure.  I think to defendants' assertion -- to address defendants' assertion that Mr. Marin cherry-picked, selected certain parts of the IPS to emphasize and disregarded others, he testified that he considered each of the components that they suggest he did not and explains both in his report and at deposition how he places certain

weight on each factor that goes into his analysis and why each factor is prioritized the way that it is in his analysis, which he testifies and stated in his report is consistent with the IPS of this case.  Thank you, Your Honor.

THE COURT:  All right, sir.

MR. NELSON:  Just a few points, Your Honor.

Going back to the questions that the Court had for counsel about these articles that are referenced in cases, I think the Court's questions to counsel addressed in large part some of the points I was going to make, that at least in two of the three cases that plaintiffs focus on, you know, there isn't actually citations to professional articles.  Those cases are each also distinguishable just on their facts, you know, again, because they either didn't deal with similar factual situations as this one or the issue presented was a different one.

So, for example, in the *Terraza* case, the plaintiffs cite that for the proposition that measuring a fund's performance by quartile over a period of consecutive quarters is neither new nor exotic.  And, you know, we don't necessarily take issue with that general statement, but the question is, you know, how does it fit the facts of this case?  And, Your Honor, I think you pointed out in one of your questions just now that what's to say you should look over four quarters or over six quarters or over one quarter or some

other period, how does it fit to the facts of this case?  Does it fit to the guidance provided in the IPS and what have you? I think that issue is illustrated in some of the cases that plaintiffs cite themselves.

So, for example, in the plaintiffs' opposition brief, they cite to a *Baird* case, saying that the IPS there specifically required removal decisions in four quarters. Then they cite to another *Tussey* case where the committee provided for removal in six months.

Again, so, you know, it's -- I think I agree --

THE COURT:  The IPS doesn't specify any removal period, any quarter, any watch list or anything such as that.

MR. NELSON:  No, it doesn't, Your Honor.

THE COURT:  What does that mean?  Does that mean that a method that seems to have been approved by courts is not to be used in a particular case simply because an IPS doesn't contain it as an element?

MR. NELSON:  No, Your Honor.  I think what it means is that this IPS makes very clear that this is a multifactor analysis.  You don't just rigidly look at one test.

THE COURT:  Wait a minute.  What do you mean "rigidly look at one test"?  He picked out parts to look at and weighed them more heavily than others --

MR. NELSON:  Right.

THE COURT:  -- according to what was just cited to me

in the exhibit to the brief that the defendants filed.  That's not the same thing as rigidly doing what you said.

MR. NELSON:  Your Honor --

THE COURT:  That overstatement doesn't help me any.

MR. NELSON:  Well, Your Honor, every committee member, every Genworth committee member who was deposed in this case testified that the IPS in this instance, with regard to this plan, was intended to be and was read by them as a flexible guidance document that considered multiple factors with respect to a fund in this instance that had a multidecade investment horizon.

THE COURT:  Well, why can't he consider it the same way?  It's a multifaceted -- he says he considered the facets, but that the analysis -- some of the facets weighed less than others in his opinion about what to do.  As I understand it, he's also saying -- given the test that has to be applied in this case -- is that had these people actually gone through the analysis that they should have gone through, they probably would have come to the same conclusion, that it wouldn't make -- that's what he's saying.  Now, whether or not that would happen or not, I don't know.

MR. NELSON:  Well, Your Honor --

THE COURT:  Why can't he consider the same factors that they consider?  Why can't he consider it flexible just like they consider it flexible?

MR. NELSON:  Well, we submit that he should, should have, but he didn't.

THE COURT:  Well, he did, according to him.  He may not have, but he says he did.

MR. NELSON:  Well, let's talk about specifics for just a minute.  Mr. Marin in his analysis, his framework, scorecard, whatever we're going to call it, again, gave no weight to the custom benchmark.  He says, "I looked at it.  It didn't suggest they should get rid of it, so I gave it no weight in my analysis."

He gave no weight in his analysis to --

THE COURT:  He's free to give no weight to it just as your adviser -- your trustees are, isn't he?  Isn't he free to say that doesn't weigh anything in the balance?

MR. NELSON:  I would submit not when the IPS specifically calls it out as a factor to be considered.

THE COURT:  I consider things every day, and I say that doesn't play a role in this.  I consider it.  It's the fact that I consider it that's important, at the first instance.  And the next thing is, what do I do with it?  You do that in every case that you advise anybody on.  You've got a list of elements of a claim or a defense and you choose to press or to put your marbles where two or three of them are, maybe throw away five of them.  That's the decisional process.  Whether he put the weight in the right place doesn't mean that

he didn't pay attention to it.  It means that he gave consideration to it, according to his testimony, weighed the issue, and in the balance found it not to be a factor of the decision that would have been made by the board had they done -- the trustees had they done the monitoring they're required to do.

It seems to me that that's -- that then it's perfectly fair game for you to have someone come in and say, "Well, that's not right.  You have to pay attention to this factor and here's why."  And then that gets decided in the factual analysis of the testimony.  But the fact that he didn't give it the weight that you think it needs to be given and, in fact, gave it no weight doesn't mean he didn't consider it.  It's a strange argument for a bunch of people who didn't consider any of it to be making anyway, quite frankly.

MR. NELSON:  Well, Your Honor, those are not --

THE COURT:  That's the definition.

MR. NELSON:  Those are not the facts, but for purposes of this argument, I understand we're not talking --

THE COURT:  For purposes of this issue it is.

MR. NELSON:  Your Honor, I think the thing that makes it so pronounced in this case is, again, as I mentioned earlier, that Mr. Marin focused on one of a number of factors listed in the IPS that he concluded.

THE COURT:  Which one do you think he focused on only?

MR. NELSON:  The performance of the BlackRock funds against the S&P composite indices.

THE COURT:  Is there any one factor that's more important than that in your view?

MR. NELSON:  Well, I would say that the performance against the custom index is more important at least because it's listed first on the list, then the IPS goes on to say, "The committee can also consider:"

THE COURT:  Well, he considered the peer.

MR. NELSON:  I'm sorry?

THE COURT:  He considered the peers.

MR. NELSON:  He did not.

THE COURT:  He did not?

MR. NELSON:  Well, he gave it no weight.  Again, if it entered his mind, I can't say, but he certainly testified --

THE COURT:  He said he considered it.  I mean, that's what his testimony was.

MR. NELSON:  He says that he -- as Mr. --

THE COURT:  The only way that I'm going to sort this out is to listen to him testify and see, because I cannot spend the time it takes necessary to sort back through which one of you is properly reading the record to me.  I have to go

back and study every bit of the record to do that.  Every single thing that they say, you say no.  Every single thing they say, you say no.  None of you come to grips with the real issues in the case.  He just read testimony that says he considered what he considered.  When you overplay your hand, most of the time you lose.  So I think I've got an understanding of it now.

Go ahead.

MR. NELSON:  May I just respond?

THE COURT:  Yes.

MR. NELSON:  Because I am trying to sort of cut through -- parsing through, you know, what does it mean to consider versus give weight?  I think the fundamental kind of bottom line here is that the IPS calls for, you know, consideration of these different factors.

THE COURT:  They call for consideration.  Comparison to what?

Do you have the IPS, a copy of it in here?  I left mine back in the office somewhere with those other papers. Let me have a copy of it.

All right.  Give me the factors now.

MR. NELSON:  Sure.

THE COURT:  You just keep --

MR. NELSON:  So among others --

THE COURT:  No, all.

MR. NELSON:  All of them.  All right.  Under plan objectives, the IPS says, "The objective of the plan is to help participants accumulate savings to achieve financial security upon retirement."  I submit that Mr. Marin's approach violated that.  I'm happy to talk about why, but I'll just tick off right now the factors.

That same section says, "Each investment fund offered by the plan other than the Genworth common stock fund, which is not at issue here, will seek to provide long-term competitive rate of return."

The next bullet says, "The committee shall take into account the expense ratios."

Continuing on in, I guess, the next section of the IPS, there's a provision that says, "Each investment will be reviewed to ensure that the stated investment philosophy of the fund is appropriate.  In addition, actual investment style will be monitored."

Continuing on, the IPS says, "The committee shall also assess the organization, its people, and its processes.  Adherence to investment guidelines, maintenance of stated investment philosophy, stability of company and any significant changes, effectiveness within the capital market environment."

And under the section on removal or replacement, it ticks off factors including departure of one or more key

investment professional, significant changes in the investment style of a fund, changes in the ownership or control of the investment manager organization, and then specifically it calls out with respect to target-date funds, "The committee will assess the continued appropriateness of the glide path, fees, and underlying investment options."

And my point, Your Honor, was that what Mr. Marin did was, whether he considered or evaluated, whatever language we use, ultimately, his decision turns exclusively on a comparison of the BlackRock fund's performance to this one stated comparator, the S&P composite index, and he doesn't weigh against that decision. The fact that the plan -- I'm sorry, that the fund was meeting all of these other enumerated objectives. And that's precisely the kind of selective consideration that many courts find unacceptable in weighing reliability of an expert's methodology.

THE COURT: Why is that an issue of reliability? What you just said is he's gone through every one of these things and he picked out the one that he thought -- let's take it your way, the one that he thought was determinative and said that one alone warrants removal. The answer -- that's a substantive assessment, not a methodology assessment, because he went through each of the areas but came up with a different conclusion. That's what they say, if I understand it.

Is that right, Mr. Berin?

MR. BERIN:  That's right.

MR. NELSON:  Your Honor --

THE COURT:  I think we're considering -- there's a conflation or a confusion of method and end result of the application of the method, and that always isn't, in the opinion of an expert, the end result of the method.  That's attackable by counter expert testimony as well as by cross-examination of the expert to determine whether or not he or the expert has done what he should have done.  That looks to me like that's where we are.

MR. NELSON:  Well, Your Honor, I would submit that this very much falls into the teaching of the Fourth Circuit in the *Lipitor* MDL cases.

THE COURT:  In what?

MR. NELSON:  *Lipitor* MDL cases.  The cite is 892 F.3d 624.

THE COURT:  892 F.3d what?

MR. NELSON:  624.  And that's a Fourth Circuit decision from 2018.

THE COURT:  And what is the *Lipitor* decision?

MR. NELSON:  And there the Fourth Circuit made clear, and this is a quote, "Result-driven analysis, or cherry-picking of data, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion."

THE COURT: That's correct. Is the *Lipitor*, that's the one out of the Maryland court, is it?

MR. NELSON: It may be, Your Honor. I'm looking at the Fourth Circuit decision.

THE COURT: I'm fairly sure I remember the case. The answer is that it was a result-driven analysis. It wasn't an analysis that resulted in a result. It was a result reasoning backwards analysis on the record of that case, I believe. So I don't think that what I see here is a *Lipitor* case, but I'll certainly look at it and see.

MR. NELSON: So, Your Honor, obviously, you will make your judgment. We just submit that given the singular focus on one factor to the exclusion or lack of weight or, you know, considered, disregard, whatever it was, of all of these factors, is just that kind of cherry-picking that the Fourth Circuit was speaking to in *Lipitor*.

THE COURT: All right.

MR. NELSON: One final point, Your Honor. There was some discussion in your questions to counsel about what would Mr. Marin say if he took the stand, would he point to other people who have applied his methodology? He was asked that in his deposition, and he said no. We can provide that cite. It's not in the record, but we can provide that cite to you, if you'd like.

Also, there was a representation --

THE COURT:  That's why the question was asked, is that it isn't in the record.

MR. NELSON:  Happy to provide that cite to Your Honor.

The other point is that --

THE COURT:  No.  I don't think there's any dispute that he couldn't identify anybody by name.

MR. NELSON:  Right.

THE COURT:  The question I asked plaintiffs' counsel was, after that all occurred at his deposition, had they determined whether or not Marin could identify instances in which the methodology had been applied or identify any names of anybody he knew who had applied it.  And the answer was yes.  I asked him to answer that as an officer of the court.  Now, he's permitted to do that, I would think, at trial.  Now, you may say you want to depose him on that topic or they may have to answer -- provide in writing what they're going to say, but that's a topic for a different day.

MR. NELSON:  Your Honor, in that same vein, counsel --

THE COURT:  I don't know that it's necessary for the adequacy of a report, which is what you are examining at the time of your deposition, that the person say, "Well, there have been 1,732 instances when this has been applied, and it was done by Ben, Mary, and Joe," as long as he describes the

method, but then when the topic comes up, it's fair game for the person who's called upon and can't remember at his deposition those details to be able to provide them at trial.

MR. NELSON:  And I think, Your Honor --

THE COURT:  It's arguable, I suppose, that that information ought to be provided by a supplemental report and you ought to have an opportunity to examine it, but that has never been presented to me because there never was an attack on the validity of the report.  So I haven't had occasion to deal with it.  I just thought about it as we're sitting here in response to what you were saying.

MR. NELSON:  Understood, Your Honor.  My point was simply that -- as I think you've acknowledged, you know, Mr. Marin was asked in his deposition, can you point to anybody else who's ever used this methodology?  And he couldn't.

The fact that now, after consulting with counsel, counsel represents --

THE COURT:  Would you like to ask me if I could think of anybody else who ever decided a case in a certain way as I'm sitting here today, the answer is no.  I can't necessarily identify the judge for you, but I know there are a lot of cases out there that hold that.  I mean, that doesn't mean that that's the end of the inquiry nor does it mean that the answer to the question is irrelevant.  It just means that's

part of the data that you have to use in making a decision of reliability.

Anything else?

MR. NELSON:  Just the last point in response to, again, one of the representations by counsel.  The witness for BlackRock who was deposed --

THE COURT:  What now?

MR. NELSON:  The witness for BlackRock funds who was deposed in the case did not testify that she or that BlackRock uses a scorecard framework like Mr. Marin has offered here. She simply testified that BlackRock considers, among things that it uses in evaluating performance, the S&P index but not with a rigid framework like Mr. Marin has where you have to beat a certain threshold for at least -- or can't beat it -- can't not beat it for at least -- for four quarters, and then you get on a watch list and, you know, all of the mechanics that he put in, no one at BlackRock ever testified that they used that.

THE COURT:  That's really the second level of the attack.  The first is the method itself, and it seems to me that the method itself is a reasonable and a reliable one that has been approved by the courts.  The question is, what is the -- how does -- how does the -- that method that is reliable apply to the facts of this case?  And that really is an analysis of the doctrine in *Kumho* -- I mean *Daubert* called

fit, which came from Judge Becker's fine analysis in assessing how expert testimony operated to play a role in the realities of the particular facts of a case.

And it seems to me that your real -- if I were considering it, your real complaint or concern is whether or not because of the -- I don't want to use the wrong term, but because of the factors that he used and considered, is that an appropriate fit when you consider the constraints -- the provisions of the IPS that's involved in this case. That is a case-specific analysis and is a fit issue as much as it is a reliability issue, I think.

MR. NELSON: I think that's right, Your Honor. I mean, the fit notion flows from Rule 703(d) [sic], whether the methodology was reliably applied to the facts and circumstances of this case, and that was -- you know, this is certainly part of our challenge that was briefed in our motion with respect to Mr. Marin.

Thank you, Your Honor.

THE COURT: Thank you. All right.

Anything else?

MR. BERIN: Your Honor, there was another motion that was going to be the subject I believe of today's hearing. I don't know if you want to hear that now.

THE COURT: No, on this issue.

MR. BERIN: I just think one thing I would point out,

Trauernicht v. Genworth - 3/29/2024

I recognize Your Honor didn't have the IPS in front of him as Mr. Nelson reviewed it.

THE COURT:  I do now.

MR. BERIN:  There were substantial portions that were omitted from the recitation of factors to you a few moments ago.  So I would just ask that you review the IPS in the context of that response and that line of discussion.

THE COURT:  We'll take a 15-minute recess, then I'll hear the next point.

(Recess taken from 11:32 a.m. until 11:52 a.m.)

THE COURT:  All right, sir.

MR. BERIN:  Your Honor, is this the motion for exclusion of Dr. Wermers?

THE COURT:  Yes.

All right.

MR. BERIN:  Good morning again, Your Honor.  I think we covered good ground in terms of the standards and rules that apply to these motions in the last session, so I'll try to be relatively tailored in light of our earlier discussion.

THE COURT:  This is plaintiffs' motion to exclude opinions of Latham and Wermers, 207.

MR. BERIN:  Yes, Your Honor.  And we understood from the Court's --

THE COURT:  We're dealing with Wermers.

MR. BERIN:  Yes.  Yes, Your Honor, principally.

Dr. Wermers' central concept in his opinion is called economic reasonableness, which is a stand-in for the so-called objective prudence defense that defendants raise in their motion for summary judgment, and we anticipate they will at trial.  As an initial matter, and I will address the substance shortly, we just note, again, following up on the mention of this on Monday, that Dr. Wermers' opinions are offered in a rebuttal report which we think presents certain issues, no affirmative opinion was offered by Dr. Wermers in this case.

Addressing the substance, we think that Dr. Wermers' opinions in this case are unreliable for two broader reasons. First, it is not an objective testable method.  Again, it's called economic reasonableness and it boils down to Dr. Wermers' assessment subjectively of a particular investment fund.  Dr. Wermers doesn't articulate what the specific inputs into economic reasonableness are in his report nor does he articulate any particular weighting that he places on any various inputs that he considers.  His best efforts to define the term "economic reasonableness" are to call it an attractive combination of risk and return, but he wouldn't go any further to explain what makes something attractive versus unattractive in the context of the trade-off between risk and return.

So we would contrast this with Dr. Marin's analysis, which is very clear about the inputs, the assumptions, the

factors, and the weighting; all of which are clearly spelled out in Dr. Marin's report.

Dr. Wermers, on the other hand, doesn't provide any itemization of the specific inputs nor the weighting that any supposed analysis considers.  He just arrives at a bottom line conclusion about whether the BlackRock funds in this case are economically reasonable and, of course, he concludes they are.

We think he also turned his back on the IPS in this case.  We heard a lot of discussion earlier about the degree to which Mr. Marin construed the IPS, as defendants put it, considering which factors --

THE COURT:  Well, does Wermers' opinion apply the inputs to be -- that are articulated in the IPS?

MR. BERIN:  I'm sorry, Your Honor.  I didn't quite catch the question.

THE COURT:  Does he apply the factors that are outlined in the IPS?

MR. BERIN:  We believe he reviews some of them, some of them in his report and addresses certain contentions about Mr. Marin's opinions, but it's not clear based on --

THE COURT:  No.  In arriving at the economic reasonableness, does he use any of the factors mentioned in the IPS?

MR. BERIN:  He discusses at length the custom benchmark primarily.  It's not clear, however, that that's the

basis on our read for his opinion about economic reasonableness.  He reviews various market data, some of which was discussed during the summary judgment hearing on Monday, but we would submit that it's not clear based on a read of his report what factors he's actually considering nor how those factors interplay in reaching his conclusion about economic reasonableness, as opposed to Mr. Marin's who -- Mr. Marin's analysis which specifically delineates what factors are being considered.

Defendants' arguments about those factors is how Mr. Marin weights them, how he considers them, but not that he doesn't express the way in which he does.  Dr. Wermers, on the other hand, doesn't explain the relative weighting that he accords to any given factors, doesn't explain what the specific factors are, so we think this is a fundamentally different challenge than the one made in the motion to exclude Mr. Marin.

In terms of the IPS, and I would note that defendants made much in their argument about Mr. Marin's treatment of the IPS, but they don't ever suggest he doesn't purport to use it. In defendants' opposition briefing on this motion, we see an effort to rehabilitate Dr. Wermers' opinion in this regard, and we see suggestions that his opinions track the IPS or are consonant with the IPS.

THE COURT:  Does he cite the IPS?

MR. BERIN:  I believe the IPS is cited for the custom benchmark during --

THE COURT:  That's it?

MR. BERIN:  Your Honor, I would have to look back to see the instances in which he cited the IPS, but from our perspective, he doesn't make clear that he's relying on any methodology utilizing various factors from the IPS to reach the economic reasonableness conclusion which is -- is, really, his core opinion in this case.  I think --

THE COURT:  What does economic reasonableness have to do with the case as a whole?

MR. BERIN:  Our understanding, and this was, obviously, the subject of much discussion on Monday, is that it comes in when the burden shifts to defendants to establish that there was no loss causation.  Once plaintiffs in cases like --

THE COURT:  You mean to show that the -- would have retained the decision anyway?

MR. BERIN:  Exactly, Your Honor.

THE COURT:  I mean the investment?

MR. BERIN:  Exactly.

THE COURT:  What case holds economic reasonableness as the benchmark of that?  A decision?

MR. BERIN:  I'm not aware of any case that particularly stands for that proposition, Your Honor.  Our

understanding of the arguments defendants have made here is that Dr. Wermers' opinion of economic reasonableness would enable the Court or assist the Court in finding that the challenged investments were objectively reasonable or objectively prudent, as the Fourth Circuit puts it.

THE COURT:  Well, objectively reasonable, that's not the test, though.  The test is where there's no monitoring.  That's the way this issue is -- summary judgment is posited, that there's no issue whether there was monitoring or not.  It's assumed there's no monitoring.  Then the issue is, would they have made the decision anyway?  That's different than whether it's objectively reasonable or not.

MR. BERIN:  I agree, Your Honor.

THE COURT:  I'm asking.  Is it different or is it objectively -- is it also -- is it just another way of saying -- is objectively reasonable another way of saying the investment would have been retained even if it had been monitored?

MR. BERIN:  I understand defendants' position to be something akin to your latter proposition, that if the investments were found to be economically reasonable, the Court could conclude that the fiduciaries in this case would have selected those investments anyway.  We have certain arguments about that that we are prepared to make at trial.  We think that is not -- they are not identical principles.

Our concern here, however, is that that fundamental principle, which we anticipate defendants will use in an effort to disprove loss causation and establish objective prudence, is not one that's based on a reliable method as both untestable in terms of its inputs in weighting and inconsistent or at least one that doesn't embrace the investment policy statement in this case, which we know from the Fourth Circuit's pronouncement in *Tatum* is irrelevant if not a critical factor in considering loss causation issues in cases such as this.

And so I don't mean to avoid the question at all about whether economic reasonableness equates to objective prudence. We would submit it doesn't, but we hope to address the defendants' argument that it may. We understand that Dr. Wermers is being offered for that element of the case, for loss causation. We see that in the summary judgment motion that they have filed and anticipate that that will be their defense at trial.

THE COURT: What do you say about the opinions that Wermers offers opposite Marin?

MR. BERIN: So I don't know that it's clear on the face of Dr. Wermers' opinions that there is a separate set of opinions from economic reasonableness. I think, really, the bottom line of his report is an opinion about the economic reasonableness. I think his particular comments about

Mr. Marin's report --

THE COURT:  They use it to say in their summary judgment motion that -- they use Wermers to say that Marin can't be considered because he's all wet.

MR. BERIN:  I think that, Your Honor, is using his economic reasonableness opinions to cast doubt on Mr. Marin's methodology.  I don't think it necessarily speaks to Mr. Marin's methodology.  I acknowledge that Dr. Marin's [sic] opinions in his report do, on their face, purport to address Mr. Marin's conclusions, but ultimately, what Dr. Wermers says about Mr. Marin's opinions is that he disagrees with factors and inputs.  It, frankly, tracks the argument you heard earlier from defendants' counsel about whether the assumptions, inputs, weighting would be appropriate in a case like this.  I suppose that is not the main thrust of our challenge to Dr. Wermers' opinions here.  It's really the core economic reasonableness opinion.

THE COURT:  It's his affirmative opinion in support of the economic loss --

MR. BERIN:  Such as it is.

THE COURT:  -- loss causation question that your motion attacks.

MR. BERIN:  That is primarily what we're concerned with.  It's this concept of economic reasonableness.

THE COURT:  How about primarily is a loaded word.

Trauernicht v. Genworth - 3/29/2024

MR. BERIN:  I'm sorry?

THE COURT:  Primarily is a loaded word.  Does it address anything else other than that?

MR. BERIN:  I appreciate the clarification.  I think that it largely does not except that certain principles from this conclusion about economic reasonableness are used to rebut Mr. Marin's opinions.  And so to the extent that -- you know, in addition to the affirmative opinion about economic reasonableness to the extent that that same concept is used to rebut Mr. Wermers -- Mr. Marin, excuse me, we would have the same concern.  I think that is an encapsulation of our challenge to Dr. Wermers' opinion here.

THE COURT:  Where in your motion do you identify the opinions that he asserts opposite Marin as something that ought to be stricken?

MR. BERIN:  I apologize if we didn't make this perfectly clear.  I don't think there are specific opinions addressing Marin --

THE COURT:  I don't either.

MR. BERIN:  -- that we take issue with.  I think it's -- it's if the economic reasonableness opinion is applied in rebutting Mr. Marin, if that affirmative opinion or that opinion about economic reasonableness is one found not to be reliable, it then also would not be reliable in rebutting Mr. Marin's opinions.  I don't think there's a greater

challenge than that in our motion --

THE COURT:  I don't either.

MR. BERIN:  -- or that I want to maintain.

THE COURT:  All right.

MR. BERIN:  Those are the primary points here.  I'm mindful of the discussion earlier.  Really just want to draw attention to the differences between Dr. Wermers' opinion and Mr. Marin's opinion.  We think that it's a fundamentally different challenge that should be resolved differently than that motion.

THE COURT:  All right.

MR. BERIN:  Thank you, Your Honor.

THE COURT:  All right, sir.

MR. NELSON:  Thank you, Your Honor.

I think it's helpful to start by understanding the series of events here.  There was a representation that Dr. Wermers never filed an affirmative report.  He actually filed the first report in this case.  He filed a report in connection with the class certification briefing which overlap substantially with the points that he made in his merits report.

The idea that economic reasonableness is some magic word or, you know, has some greater meaning is false.

THE COURT:  Well, that's what he calls his result, isn't it?

MR. NELSON: He uses the term "economically reasonable" in his reports, that's right. But he doesn't hold that out as a test or a standard or a methodology. He simply says that, you know, this was reasonable for an economic or econometrics perspective, and then he describes --

THE COURT: What difference does that make when you talk about the duty of a fiduciary? Why does economic reasonableness walk in the shoes of whether the trustees would have retained the particular investments if they had done their monitoring job?

MR. NELSON: So what Dr. Wermers has done is respond to Mr. Marin's -- you know, harkening back to our discussion before the recess, our criticism and, frankly, Dr. Wermers' criticism of Mr. Marin is that he just focused on this one aspect. Dr. Wermers says that's too narrow. You need to look at this the way the market would look at it, and he talks about how the market would look at an investment. They wouldn't look narrowly on a sliver of time in performance.

THE COURT: What relevance is it that you look at what the market would look like? It looks to me like you look at what a trustee would look at.

MR. NELSON: And in this --

THE COURT: Trustees are different than the market. Markets are volatile, fickle, unpredictable, wonderful when they go our way and awful when they don't, but why would you

look at what a market thinks?

MR. NELSON:  Well, Your Honor, I may have been too casual when I said market.  Specifically, he's talking about the investment market for institutional investors, you know, like retirement plans.  Dr. Wermers literally wrote the book on this topic.  He wrote the book entitled *Performance Evaluation and Attribution of Securities Portfolios*.

So he was responding to Mr. Marin's kind of narrow myopic focus by saying, "Look, that's not the way the market" -- in this case investment portfolio market -- "views these things."

THE COURT:  So you're not offering him as presenting economically reasonable as the basis for a decision by a trustee to have retained the investment anyway?  You're not offering him as a matter of the substance of your "would have retained" defense.  You're offering him only in response to Wermers.  Is that what you're saying?

MR. NELSON:  Not exactly, Your Honor.  The same points that he makes in responding to Mr. Marin illustrate what other actors in this market, other fiduciaries in this market were doing.  We don't rely on him exclusively.

THE COURT:  You're talking about offering -- that's in the context of attacking Marin.  My question is, you're not offering -- according to what you're saying, you're offering Wermers as a counter to Marin, not as a piece of affirmative

evidence in your case as to which you have the burden of proof to show that you would have retained -- the trustees would have retained the investment if they had, in fact, monitored it.  Is that correct or not?

MR. NELSON:  It's not what I'm saying, Your Honor. What I'm saying is --

THE COURT:  I'm not asking what you're saying.  The object -- there are two -- an expert can be offered for several reasons.  One of them is to support a point on which you have the burden of proof.  Here you have the burden of proof to show that the trustees would have retained the BlackRock TDF investments if they had monitored them.  Is he being offered -- Wermers being offered in support of that proposition affirmatively?

MR. NELSON:  His testimony in rebuttal to Mr. Marin --

THE COURT:  I didn't ask you that.  I asked you a question, is he being offered as support for that proposition for which you have the burden of proof affirmatively?

MR. NELSON:  Your Honor, yes.  The same testimony that he gave in -- the same opinions that he gave in rebuttal to Mr. Marin serve a dual purpose.  They also go to that question.  There's no division.  These opinions relate to rebuttal --

THE COURT:  I think you're wrong.  You have to

Trauernicht v. Genworth - 3/29/2024

understand something.  The way the procedure works, the procedure says and the rule says that if you have the burden of something, you have to put out the first report on it, and then you have -- they respond to it and then you reply to it, because when you have the burden on something, it's your job to carry it.  If you're using the evidence to carry it, you posit it at the front end of the case.  If you don't do that, it's not admissible for that purpose.  That's the point.  As I understand it, you didn't posit it as something on which you had the burden of proof.  You posited it only as a counter to the opinion of Marin.

MR. NELSON:  I don't believe that's accurate, Your Honor.  The points for which --

THE COURT:  Start again.

MR. NELSON:  Okay.

THE COURT:  Let's try it this way.  How many reports did Wermers submit?

MR. NELSON:  Two, Your Honor.

THE COURT:  And one of them had to do with something in connection with the class certification.

MR. NELSON:  It was submitted with -- in the context of the class certification.  It didn't speak only to class certification.

THE COURT:  I don't understand how this litigation is being approached by the defense.

MR. NELSON:  Well --

THE COURT:  Where is his report, the class certification?  Let me see it.

MR. NELSON:  Your Honor, it's ECF-157.

THE COURT:  Let me get somebody to get it.  Let me look at it.

Mr. Berin, was there an order on tendering expert reports entered in this case, an agreed upon order like I usually require?

MR. BERIN:  Your Honor, there was.  And it both had the parties disclose who their affirmative and rebuttal experts would be and then a separate deadline for affirmative and rebuttal reports, and I have the parties' disclosures.

THE COURT:  Let me have them.  Show them to him.  We got to get -- go ahead and get the rules straight and play according with the rules.  If you don't do it the right way, you can't do it at all.

What's the order?  Okay.  Scheduling order, it's ECF Number 142.

Ms. Brown, will you print that for me?

THE CLERK:  Yes, sir.

THE COURT:  Wermers.  Plaintiffs' area of expected testimony.  Plaintiffs' ability to prove economic harm or damages including on a classwide basis, quantitative and qualitative metrics for evaluating investment performance

particularly for target-date funds, relative performance of the BlackRock LifePath Target Date Funds over the class period.

Okay. That's what you said he's going to testify about. Now, how many reports did he submit? One?

MR. NELSON: Professor Wermers?

THE COURT: Yeah, after you tendered this. What's the ECF number of this thing?

MR. BERIN: This was just served on the parties, Your Honor.

THE COURT: Huh?

MR. BERIN: This was just served among the parties.

THE COURT: Oh, it was.

MR. BERIN: I would note that subsequent to this disclosure there were dates for disclosures of the actual reports on affirmative and rebuttal issues, and Dr. Wermers did not disclose an affirmative report.

THE COURT: Okay. Is that correct?

MR. NELSON: Again, Your Honor, Dr. Wermers submitted two reports. Can I just walk through the chronology? Would that be helpful?

THE COURT: Yes.

MR. NELSON: So on October 3rd -- as you've seen, October 3rd, 2023, the Court issued its scheduling order. Genworth disclosed Professor Wermers both as an affirmative

Trauernicht v. Genworth - 3/29/2024

expert and then at the later deadline for rebuttal experts. Dr. Wermers submitted his first report, his affirmative report on December 4th, 2023, well in advance of the deadline for affirmative reports on January 15th of 2024. That was the report that spoke in part to the issues in the class certification briefing, but it also addressed many of the same issues that appear in his rebuttal report. If you'd like, I can tie together --

THE COURT: I don't want to know that. I don't want to know what they did. I want to know what you said he was doing as he's tendering -- in the report, what does he say he's doing? I don't want to go back and reconstruct something from the tail end to determine what might have been intended. I want to know what was intended based upon what was said at the filing. That way I can understand what it is that we are dealing with.

MR. NELSON: In Dr. Wermers' first report submitted in December of last year, he describes his assignment as to analyze economic issues related to the claims brought by the proposed class of plaintiffs and fiduciaries -- I'm sorry, plaintiffs and beneficiaries of Genworth Financial, to evaluate how the investment experience of the BlackRock LifePath Index Retirement Target Date Funds compares to the returns of the alternative funds identified by plaintiff. The extent to which these comparative funds provide economically

Trauernicht v. Genworth - 3/29/2024

reliable evidence of classwide harm and how certain groups within the proposed class would be affected differently by the choice of alternative target-date investments.

THE COURT:  That isn't what his report said.  That is what he was retained to do.  Now, what does the report he submitted on that date say?

MR. NELSON:  It addresses all of those points, Your Honor.

THE COURT:  What do they have to do with class certification?

MR. NELSON:  Again, his report wasn't exclusively focused on class cert.  It touched on the class cert issues, but it also offered affirmative opinions on other issues.

THE COURT:  Okay.  All right.  Then what?

MR. NELSON:  Then Mr. Marin, plaintiffs' expert, filed a rebuttal report to Dr. Wermers in conjunction with the plaintiffs' reply to class certification, all of that happened before the class -- I'm sorry, before the expert report deadlines.  Then at the deadline for affirmative reports, Mr. Marin, plaintiffs' expert, because he had never filed an affirmative report, filed an affirmative report, and then by the deadline in the Court's scheduling order for rebuttal reports, Dr. Wermers, who had already filed an affirmative report, filed a rebuttal report.  So that's the chronology.

THE COURT:  The affirmative report that you're

talking about was filed in connection with the class certification decision --

MR. NELSON:  So that is --

THE COURT:  -- issue?

MR. NELSON:  That was Dr. Wermers' affirmative report, correct.

THE COURT:  But when time came to file reports on the merits of the case, he did not file an affirmative report?

MR. NELSON:  He did not refile the earlier report, no, Your Honor.

THE COURT:  All right.  And Marin did?

MR. NELSON:  Marin had not filed an affirmative report.

THE COURT:  Marin filed an affirmative report --

MR. NELSON:  That is correct.

THE COURT:  -- on the merits --

MR. NELSON:  That is correct.

THE COURT:  -- issue.

MR. NELSON:  That is correct.

THE COURT:  And then Wermers filed a response to it.

MR. NELSON:  That is correct.

THE COURT:  Is that motion that they are -- is it that the opinions in that report, that is, the one that he filed as a response that are the subject of the motion that I'm hearing now?

MR. NELSON:  That is correct, Your Honor.  There's been no challenge to Dr. Wermers' original report filed in December of last year.

THE COURT:  All right.

MR. NELSON:  Now, what makes this more confusing, I suppose, is that there is substantial overlap between what the experts -- both sides, what they say in their, you know, in their two reports, right?  They repeat themselves.  Something lawyers would never do, but I guess experts are subject to that.  And so there are elements that are in Professor Wermers' rebuttal report that either mirror or follow from the opinions that he rendered in his original report.

And Genworth's motion for summary judgment cites some of those, doesn't rely exclusively on that, but cites some of those opinions in the rebuttal report.  Because as I mentioned, they were addressed to Mr. Marin's approach and to the market's perception, which is also relevant evidence to that question of what's objectively reasonable.  Most of those -- probably all of them, I can give you the cites, the places that his rebuttal report is cited in the summary judgment motion tie back to opinions rendered in his original opinion.  I'm happy to give you those comparisons if it would be helpful, but this is not a new opinion.  This is information that was disclosed back in December, weeks before the deadline for affirmative reports.

There were some questions asked by the Court earlier to counsel about to what extent does Mr. Wermers -- Dr. Wermers, I keep demoting him -- Dr. Wermers referenced the IPS in his report.  Counsel acknowledged that he speaks about that custom benchmark, which we've talked about before.

Some other examples.  He specifically focuses on the IPS's discussion of the glide path that's been identified as preferable for the Genworth plan.  That's paragraph 27 of his rebuttal report.  He specifically talks about the assets under management by the BlackRock funds, which is another one of those elements that we ticked off earlier when we were going through the IPS.  That's in paragraph 97 of his rebuttal report.

And so the point is, he's specifically pointing out in his report elements of the IPS that Mr. Marin -- again, I don't want to get caught in the word -- you know, didn't -- either didn't weigh or gave consideration and disregarded or however we want to describe it, he's calling out that those were important things called for by the IPS and then he explains how the market views those with respect to the BlackRock funds.

THE COURT:  Why does it matter what the market viewed the BlackRock funds as when the issue is what the trustees would have done?

MR. NELSON:  Sure, Your Honor.  I think that goes

back to some discussion on Monday.  The Court is put in this position of a counterfactual hypothetical, what would have happened in a different universe.  And no one can know that with certainty.  But you could look at the evidence, you know, that would suggest what that outcome would be.  And one very significant piece of evidence is what was the rest of the world doing?  How were other people viewing this as an investment alternative?

So in trying to answer that very, admittedly, difficult question, Your Honor, we think it's highly relevant what other fiduciaries, other plans --

THE COURT:  That's different than what the market was doing.  What other fiduciaries were doing was not what the market was doing.  That's what I'm having trouble coming to --

MR. NELSON:  Again, Your Honor --

THE COURT:  -- you're telling me there needs to be a look at a market.  What is the market and why am I looking at it when you're telling me in response to that, "Well, you look at what other fiduciaries were doing."  Well, that's not the market.  Those are participants in the market but not all of the market.  So I'm having trouble grasping that.

MR. NELSON:  I take your point, Your Honor.  I'm being too casual by use of the term "market."  Here what we're talking about are these BlackRock retirement funds.  They are specifically designed as an investment tool for retirement

plans.  So the market for them is other retirement plans guided by fiduciaries, governed by ERISA.  So when I say "market," I'm sorry if I'm not being clear.  But the market here is the market for retirement plan investment vehicles like target-date funds.

THE COURT:  All right.

MR. NELSON:  Again, without suggesting that the notion of economic reasonableness is, you know, some magic word that has more meaning than those two words suggest, it is -- it is a concept that courts have acknowledged and accepted expert testimony on, including expert testimony by Dr. Wermers.  An example of that is -- we cite several examples in our briefing, but a particularly pertinent example is the *Garthwait* case, which we cite, which is -- I've got the Westlaw cite.  It's 2022 Westlaw 3019633.  And that's at pages 12 through 14 of the Westlaw pagination.

So, Your Honor, I think going back to the plaintiffs' actual briefing on this matter, the attack seems to be that in comparison to Mr. Marin, who created this kind of formal framework, that Dr. Wermers didn't say you have to consider, you know, this factor and weight it this much and this factor and weight it this much and this factor and weight it this much and, again, the point is that that wasn't what he was intending to do.  That wasn't what he was trying to convey his expert opinion on.  He was trying to say how does the

retirement investing market, fiduciaries for plans who buy this product, this target-date fund, how do they view it? What did they look at? What did they consider? And he enumerated those factors. He said based on my extensive professional experience, you know, my -- you know, the fact, again, that he wrote the book on it, that he served with the Department of Treasury, that he served with the U.S Securities and Exchange Commission, that he's a tenured professor in this subject, he said here's what -- based on all of that experience and knowledge, here's what folks in the retirement investment market look at and here's how, under these facts, this particular investment, these BlackRock Target Date Funds, how did they stack up using those criteria that that market uses. That was his opinion.

THE COURT: All right.

MR. NELSON: Thank you, Your Honor.

I'm sorry, Your Honor, before I go, did you want a copy of Professor Wermers' original affirmative report? You had asked for it at one point.

THE COURT: No, we have it. I just didn't have it up here. Thank you.

MR. BERIN: Thank you, Your Honor.

Just a few points. First, in terms of the sequencing of the reports, there was a scheduling order in this case that Your Honor is well aware of that provided for affirmative

disclosures, responsive or rebuttal disclosures, affirmative reports, responsive or rebuttal reports. That's the exchange we're talking about. The class certification reports, such as it is, was not disclosed pursuant to the Court's scheduling order, was not accompanied by the process contemplated under Rule 26. He wasn't deposed at that time. It was disclosed in connection with their opposition to class certification. And so I think both in terms of the cadence of reports, it's fairly clear that that was not an affirmative opinion directed at the element of the case for which they have the burden of proof.

THE COURT: Was there an order setting out the discovery and the expert reports for the class certification phase?

MR. BERIN: I don't believe there was, Your Honor.

THE COURT: Usually there is.

MR. BERIN: I'm sure my friends will correct me if I'm wrong. I don't believe there was in this case.

MR. NELSON: We agree, Your Honor, there was not.

THE COURT: All right.

MR. BERIN: I think it's also clear -- and I don't want to dispute or construe that class certification report, I think it's clear on the face of that report that the opinions are not the economic reasonableness opinions or these market-based opinions that are in the rebuttal report.

They're directed at whether there are supposed interclass conflicts in the investment experiences of particular participants directed at their opposition to class certification.  And so I think a fair read of that report bears out that it is not an affirmative report directed at the issues we're discussing now.

THE COURT:  So in your view, what's the significant -- your view, the class certification opinion for purposes of class certification doesn't address anything having to do with the merits and the merits discovery order laid out a schedule for affirmative response and rebuttal reports or rebuttal and reply reports, and he only submitted a rebuttal report.

MR. BERIN:  That is our position, Your Honor.

THE COURT:  What is the schedule on the rebuttal report?  What order is that?

MR. BERIN:  I believe that was the scheduling report -- scheduling order you referenced earlier.  Rebuttal reports were disclosed at the end of January of this year. Affirmative reports were disclosed some weeks earlier.

THE COURT:  That is ECF Number 142.

MR. BERIN:  I believe that is, Your Honor.

THE COURT:  And the Wermers' report that's under attack here was disclosed on what date?

MR. BERIN:  The later date for rebuttal reports.  I

believe it was January 30th or 31st.

THE COURT:  January 30, paragraph 5.

MR. BERIN:  That might have been delayed by a day on agreement of the parties for a holiday, but it was that date or that event, Your Honor.

THE COURT:  Then the depositions of the experts on the merits occurred after that, those reports were filed?

MR. BERIN:  Certain of plaintiffs' experts were deposed, I believe, before that date and defendants' experts, including Dr. Wermers, were deposed the week after that.  And then expert discovery closed, I believe, on the 10th and might have been extended by a couple of days, actually.

THE COURT:  So what is the significance, then, of the fact that Wermers didn't file an affirmative report?  The way you're arguing it is I shouldn't consider anything in the expert report that he filed in association with the class certification because it doesn't involve what is asserted in the -- excuse me, in the rebuttal report that he filed at the end of January; is that right?

MR. BERIN:  I believe that's right.  I believe if Your Honor compared the reports side by side, Your Honor would not see the economic reasonableness opinion or the market-based opinions in the class certification report.

THE COURT:  Have you done that?

MR. BERIN:  In preparation for this hearing, I

reviewed the class certification report.  I don't have exact paragraph citations with me at the podium currently, but --

THE COURT:  Well, have you done a redline version to see how they compare?

MR. BERIN:  I don't believe they purport to be the same report or in the same format whatsoever.  I think it's fairly clear that the class certification report was different --

THE COURT:  So what's the significance, then, of the fact that this report, the one covered by paragraph 5 of ECF-142, responsive expert reports, paragraph -- the order says identify experts for rebuttal reports by December 15th.

MR. BERIN:  Uh-huh.

THE COURT:  And then the order says that the affirmative reports will be January 15 and responsive reports will be the 30th.  That's all that's provided.  So he filed a responsive report.

MR. BERIN:  Yes, Your Honor.

THE COURT:  So what is it -- what is the import, the significance of the fact that the report you're attacking is one that was filed as a responsive report?

MR. BERIN:  I believe for purposes of summary judgment, the motion that defendants brought was to attack the loss causation element of the proof structure, one for which they bear the burden of proof.  So our position is that

because there was no affirmative opinion directed at the issues or areas which they now raise in support of their loss causation defense for which they have the burden, the rebuttal report would not be permissible to consider because it wasn't sufficient to disclose the affirmative opinions going to the defense of loss causation or objective prudence.

THE COURT:  Then would that then require that I have some copy of Wermers' report that contains just the things in it that would be considered in addressing the Marin report?

MR. BERIN:  I believe that would be what Your Honor would consider for that.  There is not, as far as we understand, a separate report.  There was one report disclosed regarding --

THE COURT:  I know, but I guess I have to know what part of the responsive report is -- it can't be considered in support in affirmative -- as an affirmative piece of evidence in support of summary judgment by Genworth.  It can be considered to the extent that it attacks Marin, which is your report, but in order to know that, I have to know what you-all as lawyers consider to be that part of Wermers' report that is the attack on Marin.  In order to do that, I think I would have to have Genworth give me a highlighted copy that has highlighted just the parts that relate to attacking Marin.

MR. BERIN:  I think that would be a fair course of action, Your Honor.

THE COURT:  Then I would give you an opportunity to object to that.

MR. BERIN:  I anticipate that we would disagree as to which part.

THE COURT:  You disagree.  All right.  Thank you.

MR. BERIN:  Yes, Your Honor.  If I may just address the substance of the *Daubert* motion going to the actual economic reasonableness analysis.  We determined to address this on the substance as well, of course, and so there was less discussion I think about the actual core methodology, such as it is, that is at issue here.  In fact, Mr. Nelson said that Dr. Wermers does not hold this out as a methodology.  He suggested that Dr. Wermers' opinion is that Mr. Marin looked at something too narrow and that it's necessary to look at the market.  I would submit that under the proof structure and Fourth Circuit guidance in *Tatum*, that the loss causation inquiry must consider plan documents and governing circumstances that's tantamount to an assertion or a concession that Dr. Wermers' analysis doesn't consider the IPS and does not track what the facts of the case and fit the case.

When Dr. Wermers talks about the IPS's report, it's on general background.  It's not part of his economic reasonableness opinion.  I would stipulate that the part of this that we're concerned with is the economic reasonableness

opinion that we believe defendants intend to use to establish the objective prudence defense, if they can.  And so the parts of the IPS that Dr. Wermers discusses for the custom benchmark and glide path and the like are not -- as far as we read it and it doesn't appear to be organized -- directed and involved in his economic reasonableness opinion.  And so we certainly acknowledge, as I did earlier, that Dr. Wermers references the IPS in his report, but we submit he does not reference it as part of the analysis subject to attack here.  And that is --

THE COURT:  Subject to what?

MR. BERIN:  Subject to attack here, our challenge. And that's the fundamental difference I think between the two motions before the Court and what renders Dr. Wermers' opinion unreliable.  It is not based on any formulation of factors that we can discern and it is not grounded in the IPS.

I also would just note in terms of the market evidence and the discussion by Mr. Nelson was largely targeted at looking at a broader view of the market and what other plans were doing.  I would just highlight again, as we did on Monday, that there is no evidence the defendants have developed about the IPS for any other plan about the governing circumstances for any other plan.

And so here we sit in the Fourth Circuit with guidance from the circuit to review the specific circumstances of the plan in determining what prudent fiduciaries would have

done in order for defendants to establish their defense.

Looking at the broader market without any understanding of the

circumstances of those plans says very little about the

circumstances and facts before the Court.  And so I think

that, again, highlights that Dr. Wermers' analysis here is not

reliable for its disconnect from the IPS.

And then lastly, I would just address with respect to

the *Garthwait* case and the other cases that defendants raise,

first and foremost, not one of the cases they raise embracing

Dr. Wermers was in the Fourth Circuit, that deals with the

burden shifting framework that exists.  And any opinion of

economic reasonableness that was accepted in those cases was

not pursuant to an analysis of the circumstances and the law

that we are governed by in this case.

So I think that's a distinction that's important in

the context of the *Garthwait* case and the other cases they

cited.  And, actually, in that case in particular, summary

judgment was denied despite the admission of Dr. Wermers'

opinions in that case.  And so we also think the cases they

cite for Dr. Wermers, as embraced, are not applicable within

the context of the analysis governing here.

THE COURT:  All right.

MR. BERIN:  Thank you, Your Honor.

THE COURT:  Thank you.

How long will it take you to get me a redline version

of the report that's at issue here that just identifies for me those portions of it that purport to attack Marin?

MR. NELSON: Your Honor, mechanically, it may not take that long. I want to make sure --

THE COURT: Come to the lectern, if you would.

MR. NELSON: -- we understand what --

THE COURT: Come to the lectern.

MR. NELSON: I'm sorry.

THE COURT: No, you, so we can hear you.

MR. NELSON: Sorry.

I'm saying that mechanically that process may not take a terribly long time, but I want to make sure I understand because Dr. Wermers' rebuttal report, all of it rebuts Mr. Marin. As I said earlier --

THE COURT: That won't do. I don't want a redline version that's all one thing, if that's what you're saying. That doesn't cut it. I want to know the parts of it that you say constitute direct response to something that he said --

MR. NELSON: Sure.

THE COURT: -- specifically, line by line. And if it doesn't, leave it out.

You can also say, when you file it, that the entirety of the report or all of paragraph such and such and such and such have to be considered as attacks upon him and explain why, if you want to do that. But I want to see first the

parts that just relate to taking a shot at what Marin has said.

MR. NELSON:  Understood, Your Honor.  Then we can do that, but again, I want it to be clear that I strongly anticipate that our answer is going to be all of it responds directly to Mr. Marin.

THE COURT:  Then your response is this:  There is nothing in the report that is specifically directed to something that Dr. Marin said specifically, that one has to read the entire report to get to that result.

MR. NELSON:  I think the last part of what you said is true, that there are going to be some portions where he specifically says, "Mr. Marin did this, and I think it's wrong."  There's going to be other portions --

THE COURT:  That's what I want marked in red.

MR. NELSON:  Right.

THE COURT:  Highlighted.

MR. NELSON:  Right.  And there's going to be other portions where he describes what, in his view, was the correct way that Mr. Marin should have done his analysis.

THE COURT:  That's different.

MR. NELSON:  I'm certainly not trying to be difficult, Your Honor.

THE COURT:  One is where he was wrong, the other is here's what he should have done.  They're two different

things.  I want to see what it is, and you say here's what he was wrong about.

MR. NELSON:  We will endeavor to do that, Your Honor. I think it's difficult to articulate what was wrong without describing what is right or what should have been done.

THE COURT:  No.  That's not correct.  They are two different things.  You say A, B, C, D, E, and F, and I say you are wrong about A, B, C, D, and F.  I say then, you should not have used A, B, C, D, E, and F.  You should have used Y, Q, Z, and T.

MR. NELSON:  Right.

THE COURT:  Those are entirely different analytics and entirely different ways of promulgating an idea.  I want to know where you stand on those because reading the report, I can't tell.  I cannot tell what's what.  This is one of the most strangest setups of expert analysis that I've ever seen. You have the affirmative burden to prove under the Fourth Circuit law certain things and, under the rules, if you have the affirmative burden, you've got to posit an initial report, and you didn't.  You have every right to address the things that they are -- have the burden on and that they posit in an initial report in a rebuttal report of your own, but those are two entirely different propositions.  They may and, ultimately, connect and be related, but you can't merge them. And that's what's wrong here.

MR. NELSON:  Your Honor --

THE COURT:  I need to make the analysis in perspective of the reports and what they actually say on the topics as to which the burden is obtained.

MR. NELSON:  Your Honor, I think as a matter of logic, Dr. Wermers couldn't articulate what the correct approach should have been until he saw what Mr. Marin's approach was in his report.

THE COURT:  That too is wrong.  And you know why it's wrong?  Because you have the burden to prove what would have been done.  That's what the Fourth Circuit rule is.  The rule is I am to look at what would -- they would have bought it or retained it -- in this instance retained -- anyway.  It's your job to put that out, and you have to come forward with proof on it.  You don't have any expert proof on it.  You don't, because his report, he never filed a report on it.  And he certainly could have said they would -- considering this, this, this, and this, they would have done this anyway.  And there are ample cases that allow that to be done in the Fourth Circuit.

MR. NELSON:  Your Honor --

THE COURT:  Now, they -- the plaintiffs have the burden of proof on certain other things.  They came forward with an expert who said this is the way it was done.  You have every right to posit, using the same expert if you want to,

Trauernicht v. Genworth - 3/29/2024

this is why he's wrong.  Absolutely.  You're right.  And that's what you did.  But in doing that, you didn't cover the situation that left you with no expert evidence on the matter as to which you had the burden of proof, I don't think.

MR. NELSON:  Your Honor, two points in response to that.  First, as I mentioned earlier, the points for which Dr. Wermers' rebuttal report is cited in a summary judgment motion also were addressed in his affirmative report.

THE COURT:  He didn't make an affirmative report on the merits.  He made a report on the class certification and it doesn't relate to the merits.  There's two orders -- I mean two different proceedings that were going on here.  ECF Number 142, I believe, sets up a schedule for things that happen beyond the class certification period.  And that's the way it works.  And that's the consequence that you have when you do what you do and choose what you choose, but that's what is required by this order.

And the importance of it, for this analysis, so that I understand where precisely he rebuts, responds to Mr. Marin's report that is at -- Mr. Marin's initial report on which the plaintiffs had the burden of proof.  As I said, if you also take the view that I should have to consider everything, then you can write that out.  If I were you, I wouldn't do it because I cannot believe that everything that's in that report is something that is pertinent to respond to

Mr. Marin. But there may be concepts and it's -- if you want to say here is what he says should have been done, that's a different thing than saying he was wrong in doing what he did do. One explains why he was wrong in doing what he did do, the other explains what should have been done in the view of your expert. That's not at all uncommon. Do you understand the mission?

MR. NELSON: I do, Your Honor. I do.

THE COURT: When are you going to get it to me? I think you just need to be careful to make sure you follow the instructions and do what you're asked to do, because if you do the wrong thing, you may lose everything. I don't want to have to go back through this battle again. There's an awful lot of work to be done, all right?

MR. NELSON: Your Honor, I will try to answer your question about timing.

THE COURT: What's that?

MR. NELSON: I will try to answer your question about timing, but in order to get to it, I think I do need to make a record of a couple of points.

Certainly, we apologize if we misunderstood the Court's scheduling order, but we did not read anything in that order as precluding Dr. Wermers from addressing merits issues in part with his initial report that was served in the context of class certification.

THE COURT:  As I recall, you-all prepared the order, the basic outlines of the order.

MR. NELSON:  Right.  And it says nothing -- as I think the parties agreed, it says nothing about a class cert deadline for experts or limiting the experts' opinions at that point to only those relevant to class certification.  And his opinions that were submitted in connection with class certification but expanded beyond that and talk about other merits issues were submitted well in advance of the one deadline for affirmative reports in the Court's scheduling order.

THE COURT:  Then I would suggest that you go do the following as well:  Show me the parts of his report in the class certification that go to the merits as your affirmative.  Let me see those highlighted, because my recollection of most of that report has to do with topics absolutely unrelated to it.

MR. NELSON:  We will do that.

THE COURT:  And then we will see if you've done anything that's worthwhile and give them an opportunity to talk about it, but you have to submit them both.

MR. NELSON:  We will do that, Your Honor.

THE COURT:  But insofar as awareness is concerned, it is fundamental in every case that I've ever been involved in that if you are -- have the burden on a point, you have to

provide the opening evidence -- and you have an expert, you have to provide the opening shot so that the other side can know what you're saying.

MR. NELSON: Well, Your Honor, I would --

THE COURT: It is simply wrong, in my judgment, for you to say that Wermers couldn't have looked at the issue, the record and have said, "Well, these people would have made this investment anyway even if they had monitored it and here's why." You could have done that. He didn't.

MR. NELSON: Your Honor, as a matter of the Fourth Circuit's law as set out in *Tatum*, the burden that we're talking about is a conditional burden, a burden that only arises for the defendant if and when the plaintiff makes adequate showing of both breach and loss to the plan. So it's logical that once plaintiff shows its evidence of those points, then the defendant would say, okay, we don't necessarily agree factually, but if that gives rise to this burden, this conditional burden that only comes up if they meet their showing requirements, here's our response to it. The order didn't, you know, address --

THE COURT: Do you understand what I've asked you to do?

MR. NELSON: I do. I do, Your Honor.

THE COURT: Will you do it?

MR. NELSON: We will.

THE COURT:  Good.  That will help.  Is there anything else that needs to be done today?

MR. NELSON:  I don't think so, Your Honor.  Thank you.

THE COURT:  All right.  Thank you very much.  We'll be in adjournment.

(Court adjourned at 12:58 p.m.)

CERTIFICATE

I, Melissa H. Custis, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/  Melissa H. Custis, RPR          Date:  4/8/2024