IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

PETER TRAUERNICHT, <u>et al.</u>,

    Plaintiffs,

v.

                                     Civil Action No. 3:22-cv-532

GENWORTH FINANCIAL, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF RICHARD MARIN (ECF No. 195), and the supporting, opposing, and reply memoranda (ECF Nos. 199, 234, 256), and DEFENDANT'S MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF ADAM WERNER (ECF No. 201), and the supporting, opposing, and reply memoranda (ECF Nos. 205, 239, and 261). For the following reasons, the motions (ECF Nos. 195 and 201) will be denied.

## BACKGROUND

### I. Factual Background

Class Representatives Peter Trauernicht and Zachary Wright, on behalf of themselves, the Genworth Financial Inc. Retirement and Savings Plan (the "Plan"), and all other similarly situated individuals (referred to collectively as "Plaintiffs"), sued

Genworth Financial, Inc. ("Genworth" or "Defendant") for breach of its fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. ECF No. 103 ("Second Amended Class Action Complaint" or "SAC") ¶ 1. Plaintiffs claim that Genworth imprudently retained the BlackRock Target Date Funds (TDFs) in the Plan despite significant underperformance, and as a result, caused substantial monetary losses to the Plan. SAC ¶¶ 1, 6, 57-58, 63.

Plaintiffs retained Richard Marin as an expert witness "to analyze the performance of the BlackRock TDFs under the IPS [Investment Policy Statement] of the Plan, using an objective framework for an appropriate monitoring process, including standards for its removal and replacement, if necessary." MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF RICHARD MARIN (ECF No. 234 at 6). In sum, Marin's testimony is said to pertain to liability and damages issues. In pursuit of his assignment, Marin (1) "[r]eview[ed] and evaluate[d] the BlackRock LifePath Index Funds ('BlackRock TDFs') using metrics consistent with the Plan's investment policy statement ('IPS') and prevailing fiduciary investment principles," (2) "[d]evelop[ed] an objective framework for defined contribution plan investment monitoring consistent with the Plan's governing documents and applicable industry standards and appl[ied] this

2

framework to the Plan for purposes of determining whether the retention of the BlackRock TDFs was inconsistent with this framework and unreasonable under the circumstances of the Plan," and (3) "[d]evelop[ed] an objective framework for the identification of a suitable alternative investments [sic] to the BlackRock TDFs, and appl[ied] this framework to determine a putative replacement for the BlackRock TDFs as of the time when such funds would have been replaced pursuant to an objective and supportable investment monitoring framework." ECF No. 217-3 ("Marin Rpt.") at 4-5.

Unlike some IPS programs, the Genworth IPS contains no detailed investment monitoring framework. But the Plan does set forth certain general guidelines. On the basis of the Plan's general guidelines in the IPS and his own experience in the retirement plan industry, Marin opined on a specific "objective investment monitoring framework" for a proper monitoring of the BlackRock TDFs. Marin Rpt. at 10. According to that objective framework, the BlackRock TDFs would have been flagged and placed on a watchlist when "more than half of the vintages . . . generated three- and five-year returns that failed to beat the relevant S&P Target Date Index benchmark," and when "more than half of the vintages . . . generated three- and five-year returns that ranked in the lower half of their peer group." Id. at 11. After four

3

consecutive quarters on that watchlist, the BlackRock TDFs would have been replaced. Id. at 11-12. Marin concluded that, if properly monitored under the applicable framework, the BlackRock TDFs should have been placed on a watchlist in the first quarter of 2016 and removed from the Plan no later than the first quarter of 2017. Id. at 21.

Next, Marin determined a suitable replacement fund for the BlackRock TDFs based on the investment selection criteria in the IPS. Marin started with the universe of 5,609 target date investment and retirement funds, then filtered that group to funds with the same vintage categories as the BlackRock TDFs, a minimum of three years of performance history, and assets under management of at least $2 billion, among other things. Id. at 17-18. Marin ultimately selected five "Potential Alternative Funds:" the American Funds Target Date Retirement Funds, the Fidelity Freedom Funds, the JP Morgan SmartRetirement Funds, the T. Rowe Price Retirement Funds, and the Vanguard Target Retirement Funds.[1] Id. at 18. The Potential Alternative Funds encompass a variety of active and passive management styles and to- and through-retirement glide paths because, in Marin's opinion, the Committee

---

[1] Marin also used these five funds as a custom peer group for his objective investment monitoring frameworks methodology. Marin Rpt. at 19-20.

4

should have considered the full range of options available to it. Id. at 19, 23.

Among the Potential Alternative Funds, Marin then selected the most suitable alternative fund for the BlackRock TDFs using a ranked scoring analysis. Id. at 21. To that end, Marin ranked each Potential Alternative Fund on a scale of 1 to 5 (five being the highest) in each quarter for the following criteria: Expense ratio, Annual five-year volatility, three- and five-year Total Return, three- and five-year Sharpe Ratio, three- and five-year Alpha, three- and five-year Information Ratio, and five-year Maximum Drawdown. Id. at 21-22. Marin then totaled the scores in each quarter from Q1 2016 through Q1 2017. Id. The American Funds TDF R6 suite had the highest total score in each quarter, so Marin expressed the view that the BlackRock TDFs should have been replaced with the American Funds TDF R6 suite by the first quarter of 2017. Id. at 23.

Assuming that Genworth would have replaced the Blackrock TDFs with the American Funds TDF R6 suite by the first quarter of 2017 (as Marin opined), Dr. Adam Werner then calculated losses to the Plan as of December 31, 2023. ECF No. 205-3 ("Werner Rpt.") at 8-9. Werner calculated losses of $34,617,032 to the Plan. Id. at 9.

Genworth objects to the objective investment monitoring framework used by Marin and to his ranked scoring analysis under

Federal Rule of Evidence 702, claiming that Marin's analyses are not the product of reliable principles and methods and were not applied in a reliable manner. ECF No. 199 at 4. Genworth also objects to the expert opinions and testimony of Werner under Rule 702 because Werner's damages analysis rests on the purportedly unreliable opinions of Marin. ECF No. 205 at 4. Specifically, Werner relies on Marin's opinion that, if properly monitored, the BlackRock TDFs would have been replaced with the American Funds TDF R6 suite in the first quarter of 2017 as inputs to his damages model. Id. Genworth says that if Marin's opinions are unreliable, then so are Werner's. Id. at 6.

## II. Procedural Background

Plaintiffs filed their SECOND AMENDED CLASS ACTION COMPLAINT (ECF No. 103) on April 17, 2023. On May 15, 2023, Defendant filed DEFENDANT'S PARTIAL MOTION TO DISMISS UNDER RULE 12(b)(1) (ECF No. 106) and DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(b)(6) (ECF No. 104). The Court granted DEFENDANT'S PARTIAL MOTION TO DISMISS UNDER RULE 12(b)(1) (ECF No. 106), dismissing Plaintiffs' request for prospective injunctive relief, and denied DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(b)(6) (ECF No. 104). ECF No. 139.

On February 20, 2024, Genworth filed DEFENDANT'S MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF RICHARD MARIN (ECF No. 195) and its supporting memorandum (ECF No. 199) as well as

DEFENDANT'S MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF ADAM WERNER (ECF No. 201) and its supporting memorandum (ECF No. 205). Plaintiffs filed their opposing briefs (ECF Nos. 234 and 239) on March 5, 2024. Genworth filed its replies (ECF Nos. 256 and 261) on March 11, 2024.

Also before the Court are PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (ECF No. 143), Plaintiffs' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF LORIE L. LATHAM AND RUSSELL R. WERMERS, PH.D. (ECF No. 207), and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 213). Because Marin's Report is pertinent to the issues raised in the briefing for class certification and summary judgment, it is necessary to address DEFENDANT'S MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF RICHARD MARIN (ECF No. 195) first.

DISCUSSION

## I. Legal Standard

"Expert testimony in the federal courts is governed by Federal Rule of Evidence 702." In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation (No II) MDL 2502, 892 F.3d 624, 631 (4th Cir. 2018). Rule 702 permits an expert to testify if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the

testimony is "based on sufficient facts or data," "is the product of reliable principles and methods," and the expert reliably applies "the principles and methods to the facts of the case." Fed. R. Evid. 702.

"In assessing the admissibility of expert testimony, a district court assumes a 'gatekeeping role' to ensure that the 'testimony both rests on a reliable foundation and is relevant to the task at hand.'" In re Lipitor, 892 F.3d at 631 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993)). To that end, an expert may be qualified based on professional studies or experience, but the court must "make certain that [the] expert, . . . , employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). Expert testimony cannot be based on "mere belief or speculation, and inferences must be derived using scientific or other valid methods." See Oglesby v. General Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999).

In the context of a bench trial, "the trial court's gatekeeping function is much less critical . . . because there [is] 'little danger' of prejudicing the judge, who can, after hearing the expert's testimony or opinion, determine what, if any, weight it deserves." Federal Trade Commission v. DIRECTV, Inc.,

2017 WL 412263, at *2 (N.D. Cal. Jan. 31, 2017) (citing F.T.C. v.
BurnLounge, Inc., 753 F.3d 878, 888 (9th Cir. 2014)); United States
v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005)("There is less need
for the gatekeeper to keep the gate when the gatekeeper is keeping
the gate only for himself."). Thus, "'in a bench trial the court
may admit expert testimony subject to excluding it later if the
court concludes it is unreliable.'" Quality Plus Services, Inc. v.
National Union Fire Insurance Company of Pittsburgh, PA., 2020 WL
239598, at *13 (E.D. Va. Jan. 15, 2020)(quoting 29 Victor J. Gold,
Federal Practice and Procedure § 6270 (2d ed. 2019)). Nonetheless,
even in a bench trial case, it is necessary that expert testimony
meet the fundamental admissibility requirements of Rule 702 and
the decisions in Daubert and Kumho.

The proponent of expert testimony bears the burden of proof
in establishing its admissibility. Cooper v. Smith & Nephew, Inc.,
259 F.3d 194, 199 (4th Cir. 2001)("The proponent of [expert]
testimony must establish its admissibility by a preponderance of
proof.").

## II. Analysis

### A.   Whether Marin's Specialized Knowledge Will Assist the Trier of Fact

Genworth argues that Marin's experience is insufficient to
support his opinions regarding an appropriate investment
monitoring framework because Marin's experience with retirement

9

plan fiduciary committees is limited and outdated, occurring from 1993-2003. ECF No. 199 at 14. By 2003, Genworth says that Marin no longer provided relevant investment consulting services to retirement plan fiduciaries. Id. (quoting ECF No. 199-2 ("Marin Depo. Tr.") 49:8-24).

Rule 702 requires an expert to be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "The area of the witness's competence [must also] match[] the subject matter of the witness's testimony." 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6264.2 (2d ed. 2023). Therefore, if too much time has elapsed since the witness acquired specialized knowledge or if the witness's knowledge has become obsolete, a witness can fail to qualify as an expert. Id. Additionally, a witness may fail to qualify as an expert if that witness lacks specialization in the subject matter. Id. In most cases, however, a witness with general expertise is qualified to testify, and the lack of specialized knowledge will go to the weight of the testimony. Id.

Marin ran the Retirement Services Department at Bankers Trust from 1992 through 1993 and then served on the Fiduciary Committee of the Board of Directors where he oversaw all ERISA trust and fiduciary activities until 1999. Marin Rpt. at 6. During that time, he headed the department that advised plan committees on investment

10

selections, plan management, and investment policy statements. Marin Depo. Tr. 45:2-46:8. Marin subsequently ran the asset management departments of several large financial institutions. Marin Rpt. at 7. From 2007 through 2017, Marin was a Clinical Professor of Finance at the Cornell Johnson Graduate School of Management and taught courses focused on pension fund management and alternative assets. Id. at 8. He also wrote a book on pension issues that are relevant to this case. Id.

On this record, Marin's extensive experience and knowledge in asset management and fiduciary activities are sufficient to qualify him as an expert on investment monitoring criteria and the identification of investment alternatives. Though his direct experience in investment monitoring for retirement plans was acquired in the 1990s, there is no indication that Marin's experience is obsolete and irrelevant to current practices so that he would no longer qualify as an expert. To the contrary, Marin recently has taught courses and published a book on pension issues relevant to the topics at issue here. Thus, the Court finds that Marin is qualified to provide an expert opinion on investment monitoring and investment selection in the context of defined contribution retirement plans. The age and relevancy of Marin's experience goes to the weight, not the admissibility of his testimony.

11

**B. Whether The Objective Investment Monitoring Framework Methodology Employed by Marin Is the Product of Reliable Principles and Methods**

Next, Genworth says that Marin's objective investment monitoring framework is not the product of reliable principles or methods because it is arbitrary, has not been subjected to peer review or publication, and Marin did not cite to any authority or person who can endorse his methodology.[2] ECF No. 199 at 11-15; ECF No. 256 at 7-15. At bottom, Genworth says that Marin's methodology does not satisfy any of the Daubert factors and relies exclusively on Marin's purported "experience," which is not in and of itself a reliable methodology. ECF No. 199 at 13-14; ECF No. 256 at 7.

Daubert articulates several factors that courts may consider in evaluating whether proffered expert testimony is sufficiently reliable, including "(1) whether the expert's methodology can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and, (4) whether the theory or technique has gained general acceptance within the relevant scientific community." Wood v.

---

[2] Genworth relies heavily on the deposition testimony of Marcia Wagner, Plaintiffs' process expert, for the basis of its argument that Marin's approach lacks general acceptability within the industry. ECF No. 199 at 14-15; ECF No. 256 at 14. Although Wagner says that she had "never seen" the specifics of Marin's monitoring approach "called out that way" or "stated like that" before, she goes on to say that she nevertheless thought Marin's approach was "reasonable" and "in conformity" with the IPS. ECF No. 234-3 at 283:18-285:16. Thus, Wagner's testimony actually gives credence to Marin's objective frameworks approach. What Wagner had not seen before was Marin's specific application of the methodology, which makes sense given that it was applied to the Plan's IPS and the facts of the case.

Credit One Bank, 277 F. Supp. 3d 821, 856 (E.D. Va. 2017)(citing Daubert, 509 U.S. at 593-94). However, the inquiry is a flexible one, and "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Kumho, 526 U.S. at 141. The "trial judge [has] broad latitude to determine" "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case." Id. at 153.

For "testimony that is primarily experiential in nature as opposed to scientific," there are "meaningful differences in how reliability must be examined." United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007). Inquiries into testability, peer review, and error rates may not necessarily apply. Id. Instead, a court may focus on whether the experiential expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" and whether the expert's reasoning or methodology has general acceptance in the relevant professional community. Kumho, 526 U.S. at 151-52. Additionally, Rule 702 requires a witness "relying solely or primarily on experience" to "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Committee Notes on Rules – 2000

Amendment; see also Wilson, 484 F.3d at 274 (stating the same); Reed v. MedStar Health, Inc., 2023 WL 5154507, at *12 (D. Md. Aug. 10, 2023)("[E]xperience is not a methodology. Methodology is the process by which the expert relates his experience to the facts at hand in order to reach an expert opinion.")(quoting Dean v. Thermwood Corp., 2012 WL 90442, at *7 (N.D. Okla. Jan. 11, 2012)).

As an experiential expert witness, Marin's methodology need not necessarily be supported with peer-reviewed journals and testable methodologies. Instead, Marin can show that his methodologies are generally accepted and that he applied them with the same intellectual rigor as he would in the field. Marin states that he relies on "standards and criteria that are widely used in the retirement industry and which [he] used throughout [his] career," and he explains that his methods are so common and basic "that it's not something that one would bother writing a research paper about." Marin Rpt. at 10; Marin Depo. Tr. 110:12-14.

The methodology used by Marin—removing a fund after a certain number of quarters for violating specified performance criteria—has been held to be reliable under Rule 702. In Terraza v. Safeway Inc., the court evaluated an objective methodology for determining when to remove an investment option from a retirement plan and held that "[e]valuating whether to keep a fund in a retirement plan based on that fund's performance over a set number of

14

consecutive quarters is both a common-sense and well-established practice in the field of retirement investment advice." 2019 WL 1332721, at *2 (N.D. Ca. Mar. 25, 2019). The court found this framework, which is quite like the one used here by Marin, "neither new nor exotic," noting that it was supported by the academic and professional literature. Id. at *2-3. For example, a 2002 article says that:

> Trustees should define responses to changes in a fund by designating the funds to a watch list or to terminate that fund as an option under the plan. The watch list may be based upon performance, three-year peer ranking below the medium for three consecutive quarters, three-year index under performance for three consecutive quarters, violating risk guidelines, style drift for three quarters or loss of key investment people.

Sheldon M. Geller, Prudent Management of 401(k) Plan Fund Selection, 18 J. Compensation & Benefits (July/August 2002). And, a treatise on plan administration describes a model investment policy that provides as follows:

> If at any time, any of the following criteria are triggered, the Investment Manager shall be notified of the Board's concerns or shall be terminated, in the discretion of the Board, in consultation with the Investment Performance Consultant: . . . Four consecutive quarters of performance below the ___th percentile in performance rankings for the Investment Manager's specified universe.

Robert D. Klausner, State and Local Government Retirement Law: A Guide for Lawyers, Trustees, and Plan Administrators § 17:15 (2017).

The Plaintiffs also have shown that it is not at all unusual that some investment plans themselves actually specify a removal framework based on the failure to meet evaluative criteria over a set number of quarters.[3] That fact significantly supports a finding that "whether to keep a fund in a retirement plan based on that fund's performance over a set number of consecutive quarters is both a common-sense and well-established practice in the field of retirement investment advice." Terraza, 2019 WL 1332721, at *2.

Thus, on the record here, the Court is assured that the objective investment monitoring framework methodology used by Marin is the product of reliable principles and methods under the requirements of Daubert, Kumho, and Rule 702. Genworth's

---

[3] See Baird v. BlackRock Inst'l Trust Co., N.A., 403 F.Supp.3d 765, 779 (N.D.C.A. 2019)(involving an IPS stating that the "Retirement Committee may make a decision to retain or replace a fund that is on watch within four quarters of the fund being placed on the watch list."); Lauderdale v. NFP Retirement, Inc., 2022 WL 17260510, at *2 (C.D.C.A. November 17, 2022)(involving an IPS where a fund would be considered for possible removal if it "remained on a 'watch list' for three consecutive quarters or four of the following seven quarters"); Tussey v. ABB, Inc., 2012 WL 1113291, at *17 (W.D. Mo. March 31, 2012)(Deselection process involved "examining a three to five-year period, determining if there are five years of underperformance, and if so, plac[ing] the fund onto a 'watch list,' and then remov[ing] the fund within six months."); ECF No. 234-2 at 3-4 (applying a similar "watch list" approach with the option of removal after twelve months).

criticisms about the "idiosyncrasies" of Marin's approach go more to the specific application of Marin's methodology to the facts of the case, which is addressed in the next section.

Genworth nevertheless says that Marin's testimony must be excluded because Marin did not cite the articles, other IPS documents, and cases cited by the Plaintiffs and that the Plaintiffs are now attempting to improperly supplement Marin's Report with those sources. ECF No. 256 at 11-12. It is true that Marin did not cite those authorities, but Genworth's argument for exclusion based on that fact ignores the significance of Marin's testimony that the methodology he employed is "used by almost every committee and every consultant"[4] and that he has used the same framework in other situations. Of more importance, however, is that Genworth's complaint overlooks the point for decision: whether, on the record as it exists, the methodology used by Marin has been shown to be a reliable one. The record shows that the method used here by Marin has found acceptance by other investment plans, the profession, scholars, and the judiciary. Thus, at this stage of the litigation, it is not a ground for excluding Marin's testimony that he did not cite certain articles or decisions that

---

[4] ECF No. 234-4, Marin Depo. Tr. 98:1-11.

support his testimony that, in his experience, the method is widely used in the retirement industry.[5]

That being said, Marin does not explain in much detail *how* his experience informs his opinions and assumptions. See Wilson, 484 F.3d at 274 (requiring an expert to explain how his experience is applied to the facts to form an opinion); Reed, 2023 WL 5154507, at *12 ("Methodology is the process by which the expert relates his experience to the facts at hand in order to reach an expert opinion."). But the Court does not find that lack of explanation to be a sufficient basis to bar Marin's testimony in this case. The "rejection of expert testimony is the exception rather than the rule." In re Lipitor, 892 F.3d at 631; see also Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999)("the court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence."). In the context of a bench trial, that is especially true because "the trial court's gatekeeping function is much less critical . . . because there is

---

[5] Genworth, however, is correct that Plaintiffs cannot supplement Marin's report through their briefing, and Marin cannot rely on information at trial which he did not disclose in his report. See Fed. R. Civ. Proc. 26(a)(2)(B)(ii) (requiring an expert to include in his report facts or data considered in forming his opinions); Fed. R. Civ. Proc. 37(c)(1)(prohibiting a party from using information not disclosed as required by Rule 26(a) or (e) at trial). Therefore, the Court will not assume that Marin relied on the sources supplied by the Plaintiffs in forming his opinion, but that does not mean that the Court cannot take into account case law and other authorities bearing on the reliability of the method. In this instance, Marin claims that, in his experience, his methodology is widely used in the industry, and the case law simply gives credence to that claim.

'little danger' of prejudicing the judge, who can, after hearing the expert's testimony or opinion, determine what, if any, weight it deserves." DIRECTV, Inc., 2017 WL 412263, at *2 (citing F.T.C. v. BurnLounge, Inc., 753 F.3d 878, 888 (9th Cir. 2014)); United States v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005)("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

Plaintiffs have represented that, at trial, Marin will be able to elaborate on his experience by describing specific instances in which his methodology has been applied before (ECF No. 293 48:9-15), and Genworth can challenge whether Marin has reliably applied his experience to the facts through cross-examination and the presentation of contrary evidence. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination [and] presentation of contrary evidence . . . are the traditional and appropriate means of attacking shaky but admissible evidence."). The Court, as the factfinder, can then determine how much weight to give to Marin's testimony. If Marin's specific objective investment monitoring framework turns out to be as unsupported as Genworth claims, the Court can give the testimony no weight. See In re Salem, 465 F.3d 767, 777 (7th Cir. 2006) ("[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude

it or disregard it if it turns out not to meet the standard of reliability established by Rule 702."); Quality Plus Services, 2020 WL 239598, at *13. In the absence of a jury, there is little to no concern about Marin's testimony being overly misleading or influential to warrant exclusion. See Westberry, 178 F.3d at 261 (explaining that the court's gatekeeping function is concerned with unreliable expert testimony misleading the jury).

For the same reasons, Genworth can address on cross-examination whether the number of quarters or the performance quartile selected by Marin are appropriate as discussed below. And, likewise, it can address, on cross-examination, the extent to which Marin is aware of the authorities which Plaintiffs cite in opposition to Genworth's motion. Neither of those issues, however, warrant a conclusion that the methodology employed by Marin was, as Genworth would have it, made up uniquely for this litigation. To the contrary, the methodology used by Marin is neither new nor unique. Instead, it is a well-established method reflective of common-sense.

C.   **Whether The Objective Investment Monitoring Framework Used by Marin is Reliably Applied to the Facts of the Case**

Genworth next argues that, even if Marin had articulated reliable principles and methods, he did not reliably apply his methodology to the facts of the case. ECF No. 199 at 15; ECF No.

256 at 15. In support of that view, Genworth says that Marin's objective investment monitoring framework included new arbitrary criteria of his choosing and that he cherry-picked criteria in the IPS helpful to his position. ECF No. 199 at 15; ECF No. 256 at 15-16.

First, Genworth says that Marin included new criteria in his analysis not found in the IPS. ECF No. 199 at 16. Those supposed new criteria include: (1) the requirement that the BlackRock TDFs be "placed on watch for greater scrutiny" when "more than half the vintages . . . failed to beat the relevant S&P Target Date Index benchmark," (2) the requirement that the BlackRock TDFs perform in the top half of peer funds, and (3) the limitation of the Potential Alternative Funds to funds with assets under management of at least $2 billion for each vintage. ECF No. 199 at 7-8, 16-18; ECF No. 256 at 16-18. Genworth says that these thresholds are arbitrary.

The IPS does not provide objective guidance for when to replace a fund for performance reasons. But, the IPS does provide that an existing fund could be removed or replaced from the Plan when the fund is unable "to meet performance objectives" or "[s]ignificant[ly] underperform[s] relative to objectives." ECF No. 217-11 at 7. The "Plan Objectives" for the BlackRock TDFs include "compar[ing] favorably" to a "Peer Group" of "Diversified Pre-mixed Portfolio Funds (Target Date Funds)" and two benchmarks,

the custom benchmark and the applicable S&P Target Date Index. <u>Id.</u> at 12; Marin Rpt. at 10. Based on that guidance from the IPS, Marin opines, using an established objective investment monitoring methodology, that the BlackRock TDFs would be placed on a watch list when (1) "more than half of the vintages . . . generated three- and five-year returns that failed to beat the relevant S&P Target Date Index benchmark," and when (2) "more than half of the vintages with a sufficient performance history generated three- and five-year returns that ranked in the lower half of their peer group (<u>i.e.</u>, the 51st percentile or lower)." Marin Rpt. at 11. He further opines that the BlackRock TDFs would be dropped from the Plan after four consecutive quarters in breach of those criteria. <u>Id.</u> at 12.

Genworth is correct that those objective criteria do not appear in the IPS. ECF No. 256 at 16. But the whole point of Marin's testimony is to apply the IPS's criteria to the BlackRock TDFs the way that a reasonable fiduciary would have done, if proper monitoring had been done. ECF No. 234 at 6. Marin is thus using his expertise and experience to give an explicit meaning to the IPS's subjective language. If the IPS had provided unambiguous guidance, no expert testimony would be needed.

At this stage, the Court need not determine whether Marin's interpretation of the IPS is correct or whether Marin adopts the

best investment monitoring approach. <u>See</u> <u>Westberry</u>, 178 F.3d at
261 ("the court need not determine that the expert testimony . .
. is irrefutable or certainly correct."). The inquiry is whether
Marin applied his methodology reliably. <u>Id.</u> Requiring "more than
half" of the BlackRock TDF vintages "to beat" the applicable S&P
Target Date Index or perform in the top half of peer funds is fully
consistent with the requirement in the IPS that the BlackRock TDFs'
performance "compare favorably" to the stated benchmarks. Nor is
the view that the BlackRock TDFs would be replaced after four
quarters in breach of those criteria lacking in logic or
reliability. Marin is permitted to use his experience and industry
knowledge to select those objective criteria based on the IPS's
requirements, particularly where, as here, the IPS is less than
complete on the topic and the objective investment monitoring
frameworks method has received previous judicial approval.

Where to draw the line for those types of performance
thresholds goes to the correctness of Marin's views. And the proper
way to test the correctness and thoroughness of an expert's
opinions is through cross-examination and rebuttal evidence.
<u>Terraza</u>, 2019 WL 1332721, at *3 (stating in a similar case that
the defendant "can address on cross-examination whether the
particular number of quarters or the particular performance
quartile [] selected were appropriate or optimal".). And, as stated

before, if Marin's views are shown to be as arbitrary or as groundless as Genworth claims, then the Court can give the testimony no weight. See Oglesby, 190 F.3d at 250 ("inferences must be derived using scientific or other valid methods" and cannot be based "on belief or speculation."); Quality Plus Services, 2020 WL 239598, at *13 (holding that the court may admit expert testimony subject to excluding it later in a bench trial).

Genworth also takes issue with Marin's selection of Potential Alternative Funds and the criteria he uses to identify them. Marin constructed a group of five Potential Alternative Funds from among the universe of retirement funds to which the BlackRock TDFs could be compared and by which the BlackRock TDFs could potentially be replaced. To identify this custom peer group, Marin limited the universe of target date investment and retirement funds to those with at least $2 billion in assets under management per vintage and those with the same vintage categories as the BlackRock TDFs, among other criteria. Marin Rpt. at 17. The $2 billion limitation reflected the IPS's requirement that a fund selected for the Plan have "[s]ufficiently large net assets such that Plan assets do not represent a disproportionately large percentage of total fund assets." ECF No. 217-11 at 6. Since the IPS does not provide a specific numerical threshold for that requirement, it was appropriate to give a reasonable meaning to the general guidance

of the IPS. So, Marin, relying on his experience and industry knowledge, determined that a retirement fund with at least $2 billion in assets under management for each vintage would be "sufficiently large" to fit the IPS's requirements. Marin Depo. Tr. at 168:7-169:19. For the same reasons as above, if Genworth thinks that the $2 billion threshold is an incorrect or groundless interpretation of the IPS's terms, it can challenge that assumption on cross-examination or with contrary evidence.

Additionally, Genworth claims that Marin did not follow his own criteria when identifying the Potential Alternative Funds. ECF No. 199 at 12. Marin's Report says that he limited the list of Potential Alternative Funds to those available in the same vintage categories as the BlackRock TDFs (e.g., 2020, 2030, 2040, 2050, and retirement). Marin Rpt. at 17. However, the identified alternatives included some funds that did not have a so-called "retirement" vintage, something that Genworth claims was an arbitrary decision. ECF No. 199 at 12. Marin explains, however, that he included those funds because they have the "functional equivalent" of a retirement vintage. Marin Depo. Tr. 168:1-4. Such funds are through-strategy funds and include vintages with bygone target retirement dates (e.g., a 2010 vintage), which Marin says are the functional equivalent of a retirement vintage. Marin Depo. Tr. 167:6-168:4. Whether such vintages are functional equivalents

(or whether through-strategy funds are suitable replacements at all) is a matter for the experts to debate, but it is not grounds to exclude Marin's testimony.

Second, Genworth claims that Marin ignored criteria in the IPS that did not support his conclusion, and therefore, engaged in cherry picking. ECF No. 199 at 15-16. In particular, Genworth says that Marin did not incorporate the non-performance-related monitoring criteria in the IPS into his objective investment monitoring framework. Id. at 16; ECF No. 256 at 16. Those criteria include assessments of a fund's "organization, its people, and its processes," "[a]dherence to investment guidelines, [m]aintenance of stated investment philosophy," and "stability of company and any significant changes." ECF No. 217-11 at 6-7. Relatedly, the IPS states that the following events could result in the removal or replacement of a fund: "[d]eparture of one or more key investment professionals; [s]ignificant changes in the investment style of a fund; [c]hange in the ownership or control of the investment manager organization; and [a]ny legal, SEC and/or other regulatory agency proceedings affecting the firm." Id. at 7. Genworth also says that Marin cherry-picked by excluding the custom benchmark from his analysis even though it was defined as a benchmark in the IPS to evaluate the performance of the BlackRock TDFs. ECF No. 199 at 18.

Marin testified in his deposition and stated in his report
that he did consider those qualitative factors and the custom
benchmark. Marin Depo. Tr. 82:3-86:12; Marin Rpt. at 10-11.
However, Marin believed that the BlackRock TDFs satisfied those
criteria, so he did not separately analyze them in his report. Id.
Marin explains that, as he understands it, the "investment policy
is written in such a way as to suggest that a breach of any of
[the listed criteria] can be grounds for concern and therefore,
removal." Marin Depo. Tr. 86:7-10. Thus, under Marin's
interpretation of the IPS, any breach of the IPS's criteria could
be an independent basis for removal, and a full analysis of all
the IPS's criteria is therefore unnecessary. That interpretation
certainly is not inconsistent with the language in the IPS. ECF
No. 217-11 at 7.

The only alleged defect with the BlackRock TDFs was their
underperformance relative to their peers. So, Marin identified the
IPS criteria relevant to that issue and examined whether the
BlackRock TDFs' performance breached such criteria in a way that
would warrant removal from the Plan. The omission of other non-
performance-related factors and the custom benchmark from Marin's
analysis—when those factors did not raise any concerns—does not
make Marin's analysis unreliable as Genworth claims.

Genworth's cherry-picking argument assumes that the decision to remove a fund from the Plan requires a holistic consideration of all of the IPS's criteria. But that assumption involves a factual dispute over the proper interpretation of the IPS and the weight to accord to each of the listed removal criteria—something as to which the experts may reasonably disagree. Consequently, that dispute is not to be resolved in a Rule 702 motion that seeks disqualification of an expert or exclusion of the expert's opinions. See Bresler v. Wilmington Trust Co., 855 F.3d 178, 195 (4th Cir. 2017)("'questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility.'")(quoting Structural Polymer Grp. v. Zoltek Corp., 543 F.3d 987, 997 (8th Cir. 2008)); Cooper Crouse-Hinds, LLC v. City of Syracuse, New York, 568 F. Supp. 3d 205, 221 (N.D.N.Y. 2021)("A contention that an expert did not weigh a certain piece of evidence adequately does not take an expert opinion into the realm of 'speculative or conjectural.'"). At trial, Genworth can present contrary evidence that a fund which may be in breach of the IPS's performance criteria may nevertheless be maintained in the Plan when that fund complies with the IPS's other criteria, such as the custom benchmark and non-performance related factors.

28

**D.    Whether The Ranked Scoring Analysis Is Reliably Applied to the Facts of the Case**

Next, Genworth challenges the methodology that Marin used to select the American Funds TDF R6 suite as the most suitable replacement for the BlackRock TDFs in the first quarter of 2017. ECF No. 199 at 18. Marin selected the American Funds TDF R6 suite by using a ranked scoring analysis, a methodology that Marin testified is regularly used in the industry and that he has used throughout his career. Marin Rpt. at 21-22. This analysis scores various investment performance criteria on a scale of one to five for each of the five Potential Alternative Funds. Id. The criteria include Expense Ratio, five-year Annual volatility, three- and five-year Total Return, three- and five-year Sharpe Ratio, three- and five-year Alpha, three- and five-year Information Ratio, and five-year Maximum Drawdown. Id. at 21-22. Each Potential Alternative Fund was given an aggregate score, and the highest scoring fund was deemed the replacement fund for the BlackRock TDFs. Id. at 22. The American Funds TDF R6 suite had the highest total score and therefore was selected as the replacement fund. Id. at 22-23.

Genworth says that Marin's ranked scoring analysis is unreliable because it does not take into account the IPS's qualitative criteria for selecting a fund for the Plan. ECF No. 199 at 18. Those considerations include whether "[t]he management

29

of the investment fund . . . demonstrate[s] quality and stability"
and has "[a] history of reliability and a sound financial
background." ECF No. 217-11 at 6. Genworth also claims that Marin
could not identify any evidence that would suggest that the
Genworth Committee would have chosen an actively managed fund with
a "through-retirement" strategy, like the American Funds TDF R6
suite, to replace a passively managed, "to-retirement" fund like
the BlackRock TDFs. ECF No. 199 at 18-19; ECF No. 256 at 18-19.
That, says Genworth, is important because the IPS explicitly states
that "[t]he objective of the Plan is to help participants in
accumulating savings to achieve financial security *upon*
retirement," not *through* retirement. ECF No. 217-11 at 4. So,
according to Genworth, Marin, in selecting a replacement fund,
failed to consider the Plan's own stated objectives. ECF No. 199
at 18-19; ECF No. 256 at 18-19.

Genworth's argument fails for several reasons. Each is
addressed in turn.

First, the record is that the scorecard metrics used by Marin
do, to some extent, factor in the reliability and stability of the
portfolio manager. See Marin Rpt. at 22 n. 26 ("The information
ratio . . . attempts to identify the consistency of the portfolio
manager. . . . The higher the IR, the more consistent a manager
is."). Whether, and how, if at all, the methodology takes account

of, or needs to take account of, all pertinent qualitative factors goes to the weight of his testimony. Second, though the IPS states that the "objective of the Plan is to help participants in accumulating savings to achieve financial security upon retirement," it also states that "[w]ith regard to Target Date Funds, the Committee will assess the continued appropriateness of the glide path, fees, and underlying investment options." ECF No. 217-11 at 4, 7. Thus, it appears that the IPS leaves some room for the Committee to have considered other investment strategies. The words "upon retirement" appearing earlier in the IPS do not necessarily limit the Plan to to-retirement or passively managed funds. And, as Marin explains in his deposition, the BlackRock TDFs were compared against the S&P Target Date Index and other peer groups provided by the Plan's investment advisor, Alight/Aon Hewitt, which included both "to" and "through" glidepath approaches and active and passive management strategies. Marin Depo. Tr. 200:16-202:1. Thus, it is not unreasonable to believe that Genworth would have considered those various types of peer funds to be potential alternatives. Whether Genworth would have actually replaced the BlackRock TDFs with a differently managed fund goes to the weight rather than the admissibility of Marin's opinion.

Lastly, courts have accepted similar "scorecard" analyses as reliable. See Reed v. MedStar Health, Inc., 2023 WL 5154507, at *9, n.6 (D. Md. Aug. 10, 2023) (finding a similar "scorecard" analysis used to identify a suitable replacement fund reliable when the expert stated that the methodology was commonly used in the industry and cited to various publications).

For the foregoing reasons, Genworth's argument that the ranked scoring analysis used by Marin was unreliable and thus necessitates exclusion of Marin's testimony is without merit. So that argument too is rejected.

### E.   Whether Werner's Opinions Are Unreliable

Genworth claims that Werner's damages analysis should also be excluded because it rests on Marin's supposedly unreliable opinion that the BlackRock TDFs would have been replaced with the American Funds TDF R6 suite in the first quarter of 2017. ECF No. 205 at 4. However, with the complaint about Werner's testimony in mind, and given that the Court has found Marin's opinions and testimony to be sufficiently reliable, Genworth's objection to Werner's testimony also fails.

## CONCLUSION

For the foregoing reasons, DEFENDANT'S MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF RICHARD MARIN (ECF No. 195) and DEFENDANT'S MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF ADAM WERNER (ECF No. 201) will be denied.

It is so ORDERED.

/s/ _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 29, 2024