IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

PETER TRAUERNICHT, et al.,

    Plaintiffs,

v.                        Civil Action No. 3:22-cv-532

GENWORTH FINANCIAL, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiffs' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF LORIE L. LATHAM AND RUSSELL R. WERMERS, PH.D. (ECF No. 207)(the "Motion"), and the supporting, opposing, and reply memoranda (ECF Nos. 211, 231, 250). For the following reasons, the Motion will be denied.

## BACKGROUND

### I. Factual Background

Class Representatives Peter Trauernicht and Zachary Wright ("Plaintiffs"), on behalf of themselves, the Genworth Financial Inc. Retirement and Savings Plan (the "Plan"), and all other similarly situated individuals, filed suit against Genworth Financial, Inc. ("Genworth" or "Defendant") alleging that Genworth breached its fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. ECF No. 103

("Second Amended Class Action Complaint" or "SAC") ¶ 1. Plaintiffs claim that Genworth violated its fiduciary duties under ERISA by failing to appropriately monitor, and as a result, imprudently retaining the BlackRock LifePath Target Date Funds ("BlackRock TDFs") in the Plan despite their significant underperformance. SAC ¶¶ 1, 6, 57-63, 84-86. According to Plaintiffs, the retention of the BlackRock TDFs caused the Plan to incur substantial losses. SAC ¶¶ 63, 90.

To help prove their claims, Plaintiffs retained three expert witnesses: Marcia S. Wagner, Richard A. Marin, and Dr. Adam Werner. ECF No. 211 at 7. Wagner submitted a report addressing fiduciary governance and process standards applicable to investment monitoring and opined on whether Genworth's monitoring of the BlackRock TDFs comported with minimum fiduciary standards. Id. Marin submitted a report which depicted appropriate frameworks for determining when investment removal should occur based on the Plan's Investment Policy Statement ("IPS"), applied those frameworks to the Plan's retention of the BlackRock TDFs, and identified suitable alternative investments to the BlackRock TDFs. Id. Werner submitted a report estimating the Plan's losses as a result of the alleged conduct. Id.

2

Genworth produced two expert reports in response to Plaintiffs' experts.[1] Genworth retained Lorie L. Latham to offer opinions regarding the Plan's governance structure and monitoring process in response to the opinions of Wagner and Marin. ECF No. 231 at 8. Latham opined that the Plan's governance structure and monitoring processes of the BlackRock TDFs were reasonable and consistent with widely accepted retirement plan fiduciary practices. Id. Latham also identified, in her opinion, various inaccurate claims made by Wagner and Marin on those topics. Id. at 9.

Genworth also retained Dr. Russell R. Wermers who submitted a rebuttal expert report in response to Marin's, Werner's, and Wagner's expert reports. Id. at 5. Wermers primarily offered criticisms of Marin's analysis of the BlackRock TDFs' performance and the methodology used by Marin to select suitable alternative investments. Id. at 6. Wermers explained that the BlackRock TDFs are economically reasonable investments once you account for their specific risk-balancing strategies and features, including their asset allocations and glide paths. Id. at 5. Put another way, Wermers claims that the BlackRock TDFs performed as expected when

---

[1] Genworth also produced an affirmative expert report from Dr. Russell R. Wermers in support of Genworth's Opposition to Plaintiffs' Motion for Class Certification. ECF No. 231 at 4. Plaintiffs do not challenge the admissibility of Wermers' opinions in this report in their Motion. Id. at 5; ECF No. 250 at 6-7.

3

you consider their particular objectives and strategy. Id. Wermers also presents data from various industry sources to argue that the broader retirement investment industry and market analysts viewed the BlackRock TDFs positively, which Wermers says undermines Marin's claims that the BlackRock TDFs were "unreasonable" investments during that time. Id.

Plaintiffs argue that Wermers' and Latham's opinions are not admissible under Federal Rules of Evidence 702 or 403. ECF No. 211 at 3-5. Specifically, they argue that Latham's and Wermers' opinions are not helpful to the trier of fact, are not based in objective principles or methods recognized within their industries, and fail adequately to consider important documents and evidence in the record. Id. at 18. Plaintiffs also claim that the opinions and testimony of Wermers and Latham threaten to mislead or confuse the issues in this action. Id.

Genworth responds that its experts' opinions are readily admissible under Rule 702 and 403, and that Plaintiffs' criticisms go to the weight rather than admissibility of their testimony. ECF No. 231 at 1.

## II. Procedural Background

On April 17, 2023, Plaintiffs filed their SECOND AMENDED CLASS ACTION COMPLAINT (ECF No. 103). The Court granted DEFENDANT'S PARTIAL MOTION TO DISMISS UNDER RULE 12(b)(1) (ECF No. 106),

4

dismissing Plaintiffs' request for prospective injunctive relief, and denied DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(b)(6) (ECF No. 104). ECF No. 139. On May 29, 2024, the Court denied DEFENDANT'S MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF RICHARD MARIN (ECF No. 195) and DEFENDANT'S MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF ADAM WERNER (ECF No. 201). ECF No. 310. On August 15, 2024, the Court granted PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (ECF No. 143). ECF No. 312.

Also pending is DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 213).[2]

## DISCUSSION

### I. Legal Standard

"Expert testimony in the federal courts is governed by Federal Rule of Evidence 702." In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation (No II) MDL 2502, 892 F.3d 624, 631 (4th Cir. 2018). Rule 702 permits an expert to testify if "the expert's scientific, technical, or

---

[2] At the summary judgment hearing, Plaintiffs suggested for the first time that Genworth could not rely on Wermers' rebuttal report to support its affirmative burden on loss causation. ECF No. 281 51:23-52:8. The Court ordered additional briefing to clarify which parts of Wermers' report were direct rebuttal and which parts of his report were affirmative opinions. ECF No. 283. In PLAINTIFFS' RESPONSE TO GENWORTH'S SUBMISSION ON EXPERT REPORT MATTERS (ECF No. 294), Plaintiffs clarified that they intend to file motions in limine at trial seeking to preclude Dr. Wermers from providing affirmative testimony on issues for which Genworth bears the ultimate burden of proof. ECF No. 294 at 5. Therefore, the Court will address Plaintiffs' Federal Rule of Civil Procedure 26 objection after Plaintiffs have filed such motions and the parties have had the opportunity to fully brief the issue.

other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is "based on sufficient facts or data," "is the product of reliable principles and methods," and the expert reliably applies "the principles and methods to the facts of the case." Fed. R. Evid. 702.

"In assessing the admissibility of expert testimony, a district court assumes a 'gatekeeping role' to ensure that the 'testimony both rests on a reliable foundation and is relevant to the task at hand.'" In re Lipitor, 892 F.3d at 631 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993)). For expertise based on professional studies or experience, the court must "make certain that [the] expert, . . . , employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). Expert testimony cannot be based on mere "belief or speculation, and inferences must be derived using scientific or other valid methods." See Oglesby v. General Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999).

In the context of a bench trial, however, "the trial court's gatekeeping function is much less critical . . . because there [is] 'little danger' of prejudicing the judge, who can, after hearing the expert's testimony or opinion, determine what, if any,

6

weight it deserves." <u>Federal Trade Commission v. DIRECTV, Inc.</u>,
No. 15-CV-01129, 2017 WL 412263, at *2 (N.D. Cal. Jan. 31, 2017);
<u>United States v. Brown</u>, 415 F.3d 1257, 1269 (11th Cir. 2005)("There
is less need for the gatekeeper to keep the gate when the
gatekeeper is keeping the gate only for himself."). Thus, "'[i]n
a bench trial the court may admit expert testimony subject to
excluding it later if the court concludes it is unreliable.'"
<u>Quality Plus Services, Inc. v. National Union Fire Insurance
Company of Pittsburgh, PA.</u>, No. 3:18-cv-454, 2020 WL 239598, at
*13 (E.D. Va. Jan. 15, 2020)(quoting 29 Victor J. Gold, <u>Federal
Practice and Procedure</u> § 6270 (2d ed. 2019)). Nonetheless, even in
a bench trial case, it is necessary that expert testimony meet the
fundamental admissibility requirements of Rule 702 and the
decisions in <u>Daubert</u> and <u>Kumho</u>.

Additionally, Rule 403 provides that courts "may exclude
relevant evidence if its probative value is substantially
outweighed by a danger of one or more of the following: unfair
prejudice, confusing the issues, misleading the jury, undue delay,
wasting time, or needlessly presenting cumulative evidence." Fed.
R. Evid. 403.

The proponent of expert testimony bears the burden of proof
in establishing its admissibility. <u>Cooper v. Smith & Nephew, Inc.</u>,
259 F.3d 194, 199 (4th Cir. 2001)("The proponent of [expert]

7

testimony must establish its admissibility by a preponderance of proof.").

## II. Analysis

### A. Whether Wermers and Latham Have Specialized Knowledge That Will Assist the Trier of Fact under Rule 702(a)

Rule 702(a) requires that an expert's knowledge, skill, experience, training, or education "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In other words, an expert's qualifications and opinions must be relevant to the inquiry at hand. "An expert's opinion is relevant if it has 'a valid scientific connection to the pertinent inquiry.'" Sardis v. Overhead Door Corporation, 10 F.4th 268, 281 (4th Cir. 2021)(quoting Daubert, 509 U.S. at 592); see also 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6264.2 (2d ed. 2023)("[t]he area of the witness's competence [must] match[] the subject matter of the witness's testimony."); Casey v. Geek Squad Subsidiary Best Buy Stores, L.P., 823 F. Supp. 2d 334, 341 (D. Md. 2011)("To be relevant, the expert's testimony must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"). In most cases, generalized knowledge on the subject matter will satisfy the relevancy requirement, and the lack of specialized knowledge will go to the weight of the expert's testimony. Charles Alan Wright & Arthur R. Miller, Federal Practice

and Procedure § 6264.2 (2d ed. 2023); see also Iannone v. AutoZone, 344 F.R.D. 319, 340 (W.D. Tenn. 2023)("An expert need not be a specialist in every subject to which their testimony might relate.").

### 1. Wermers' Qualifications and Opinions

Plaintiffs argue that Wermers lacks the relevant qualifications to address the issues in this case because he has no experience with retirement plan investing, including the monitoring responsibilities of investment fiduciaries governed by ERISA. ECF No. 211 at 13-14. He has never served as a fiduciary nor advised a retirement committee. Id. at 14 (citing ECF No. 211-7 ("Wermers Tr.") 26:18-28:6). Wermers' experience, according to Plaintiffs, is in general investing and economic concepts, and his opinions on "economic reasonableness" are based on that general experience and knowledge rather than anything specific to fiduciary duties or investing under ERISA. Id. (citing Wermers Tr. 24:25-26:4). Furthermore, Plaintiffs argue that Wermers' testimony on "economic reasonableness" in the abstract is not relevant to determining whether the BlackRock TDFs violated the specific criteria in the Plan's IPS. ECF No. 250 at 16.

Wermers is the Paul J. Cinquegrana '63 Endowed Chair in Finance at the Smith School of Business, University of Maryland at College Park. ECF No. 231 at 2. Wermers' research focuses on

analyzing investment strategies of professional asset managers, including how to properly measure the risk-adjusted performance of such strategies. Id. He has published in academic and professional journals on investment fund performance evaluation, equity strategies, the drivers of mutual fund and hedge fund investor flows, and the behavior of institutional investors. Id. at 3. He has also previously testified as an expert on numerous ERISA cases involving 401(k) and other defined contribution plans. Id.

Whether the BlackRock TDFs were economically reasonable, from the perspective of an economist with Wermers' qualifications, is certainly relevant and helpful to determining whether the BlackRock TDFs were an imprudent investment for the Plan to retain. See Garthwait v. Eversource Energy Co., No. 3:20-cv-902, 2022 WL 3019633, at *14 (D. Conn. July 29, 2022)(finding that Wermers' economic reasonableness analysis regarding the performance of a challenged fund in a similar ERISA case would be relevant to determining losses and loss causation). Wermers' qualifications are also relevant to determining which fund(s) could serve as suitable replacements for the BlackRock TDFs. The record does not provide, and the Court does not see, any reason why an expert must be trained in fiduciary monitoring or ERISA, as opposed to general investment theory, to testify on the relative performance and comparability of various target date funds to aid the trier of

fact in the determination of whether the BlackRock TDFs violated the IPS's criteria. Nor is there any requirement for Wermers to address that issue directly for his testimony to be relevant in deciding that issue. To the contrary, generalized expert testimony on how to understand and evaluate target date funds is particularly helpful given their complex nature. The fact that Wermers' offers more generalized opinions on the BlackRock TDFs and their comparators rather than opinions directly tied to fiduciary monitoring goes to the weight rather than admissibility of his testimony.[3] See Iannone, 344 F.R.D. at 328-29, 340 (finding that Wermers' experience researching, writing, and teaching about a variety of investment products was sufficient to qualify him as an expert to testify on the economic reasonableness of the challenged investment and that his lack of specialization in stable value products went to the weight of his testimony).

## 2. Latham's Qualifications and Opinions

Plaintiffs also argue that Latham does not have specialized expertise or knowledge that will assist the trier of fact. ECF No. 211 at 19. Plaintiffs say that her experience comes from generalized personal observations and work experience while consulting with plan sponsors and discretionary fiduciaries. Id.

---

[3] Moreover, Plaintiffs do not explain how the opinions of an expert on general investment theory would diverge from an expert who focuses on investing as an ERISA fiduciary.

at 11. Plaintiffs also raise concerns that Latham was unwilling to identify the clients with whom she gained that experience during her deposition.[4] Id.

Latham is the founder and president of L. Latham Consulting, LLC, an independent consultancy where she provides financial and strategic advice to financial firms and retirement plan fiduciaries, boards, and committees. ECF No. 231 at 6. Before that, Latham served in senior executive and consulting roles advising on strategies and investment selection for defined contribution plans. Id. at 7. That work involved guiding plan fiduciaries in establishing reasonable and appropriate governance and monitoring practices for their defined contribution plans. Id. Latham has also co-authored numerous publications, including articles on defined-contribution plan governance decision making. Id. at 8.

The Court finds that, based on that experience, Latham has the requisite qualifications to assist the trier of fact regarding plan governance and fiduciary monitoring standards. The degree of connection between her experience and her opinions goes to the weight of her testimony. At trial, Plaintiffs will have the

---

[4] Latham states that she could not disclose the names of clients she worked for due to confidentiality agreements she had with those clients. ECF No. 211-6 ("Latham Tr.") 37:10-14. The identity of clients as to which experts contend provide all, or part of, their qualifications can, indeed, be a factor in assessing credibility, but the expert's refusal to supply that information is a matter to be addressed later at the final pretrial conference or at trial.

opportunity to cross-examine Latham on the relevancy of her experience and how that experience has informed her opinions. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). For purposes of Rule 702(a), the record shows that Latham has a wealth of relevant experience sufficient to qualify her as an expert and offer helpful and relevant testimony on the fiduciary monitoring topics she addresses.

### B. Whether Latham's and Wermers' Opinions Are Supported by Reliable Principles and Methods

Rule 702(c) requires that an expert's opinions be "the product of reliable principles and methods." Daubert articulates several factors that courts may consider in evaluating whether proffered expert testimony is based on reliable principles and methods, including "(1) whether the expert's methodology can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and, (4) whether the theory or technique has gained general acceptance within the relevant scientific community." Wood v. Credit One Bank, 277 F. Supp. 3d 821, 856 (E.D. Va. 2017)(citing Daubert, 509 U.S. at 593-94). However, the inquiry is a flexible one, and "Daubert's list of specific factors neither necessarily nor exclusively

13

Case 3:22-cv-00532-REP   Document 313   Filed 08/29/24   Page 14 of 27 PageID# 10129

applies to all experts or in every case." Kumho, 526 U.S. at 141. The "trial judge [has] broad latitude to determine" "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case." Id. at 153.

For "testimony that is primarily experiential in nature as opposed to scientific," there are "meaningful differences in how reliability must be examined." United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007). Inquiries into testability, peer review, and error rates may not necessarily apply. Id. Instead, a court may focus on whether the experiential expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" and whether the expert's reasoning or methodology has general acceptance in the relevant professional community. Kumho, 526 U.S. at 151-52. Additionally, Rule 702 requires a witness "relying solely or primarily on experience" to "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Committee Notes on Rules - 2000 Amendment; see also Wilson, 484 F.3d at 274 (stating the same); Reed v. MedStar Health, Inc., 2023 WL 5154507, at *12 (D. Md. Aug. 10, 2023)("[E]xperience is not a methodology. Methodology is the process by which the expert relates his experience to the facts at

14

hand in order to reach an expert opinion.")(quoting <u>Dean v.</u> <u>Thermwood Corp</u>., Civ. No. 10-0433-CVE-PJC, 2012 WL 90442, at *7 (N.D. Okla. Jan. 11, 2012)).

   1. <u>Whether Wermers' Economic Reasonableness Analysis is Based on Reliable Principles and Methods</u>

Plaintiffs argue that Wermers' assessment of "economic reasonableness" is not based on any method or discipline recognized within his industry, and instead, is based on his own subjective view of what represents an "attractive combination" between risk and return. ECF No. 211 at 21. Plaintiffs also claim that Wermers methodology lacks any objective standards. <u>Id.</u> at 21-22. Plaintiffs assert that Wermers could not articulate the difference between an investment that meets his standard and one that does not, and he could not specify what weight he gave to each factor underlying his opinion that the BlackRock TDFs are "economically reasonable" investments. <u>Id.</u> at 23. For those reasons, Plaintiffs argue that Wermers' opinions are merely *ipse dixit* rather than the result of any reliable, rules-based, or replicable methodology or framework. <u>Id.</u> at 22.

The Court disagrees. Plaintiffs' complaint is essentially that Wermers' concept of "economic reasonableness" is not reducible to a rigid, rules-based methodology. However, a formulaic methodology is not required for a witness to offer an expert opinion. <u>Wilson</u>, 484 F.3d at 274 ("Experiential expert

testimony, . . ., does not 'rely on anything like a scientific method.'"). As Plaintiffs acknowledge, an expert may be qualified based on experience or specialized knowledge. ECF No. 250 at 14; Wilson, 484 F.3d at 274. And, an "expert [may] draw a conclusion from a set of observations based on extensive and specialized experience." Kumho, 526 U.S. at 156. The important consideration is that such opinions are not based "on [mere] belief or speculation." Oglesby, 190 F.3d at 250. Thus, the experiential witness must "explain how [his] experience leads to the conclusion reached." Wilson, 484 F.3d at 274.

Here, Wermers relies on his specialized knowledge and experience to offer guiding principles on how to evaluate and compare the performance of target date funds, and he applies those principles to the BlackRock TDFs under a standard he calls "economic reasonableness." ECF No. 231 at 5. Wermers explains that an "economically reasonable" investment is one that "offers ex-ante an attractive combination of risk and return" based on its "qualitative and quantitative characteristics and its investment strategy." Wermers Tr. 64:22-65:13. Rather than a term of art, economic reasonableness is just another way of saying an investment is reasonable from an economic perspective. Wermers explains that he considers a variety of factors that experts in his field would consider about an investment to determine its "economic

16

reasonableness," but that it is not a "simple recipe-based system." Wermers Tr. 72:23-73:3, 73:13-74:7, 79:1-5.

Consistent with his definition, Wermers explains how a target date fund's strategy and risk profile must be taken into account when evaluating their returns, ECF No. 211-2 ("Wermers Rpt.") ¶¶ 26-41, and when considering those factors (among others), he concludes that the BlackRock TDFs are "economically reasonable." Wermers Rpt. ¶¶ 42-69. He then explains how Marin's analyses failed to take into account those considerations when comparing ex-post returns of fundamentally different types of target date funds, which Wermers says, makes Marin's conclusion that the BlackRock TDFs were "unreasonable" flawed. Wermers Rpt. ¶¶ 71-112.

Plaintiffs do not challenge the reliability of any of Wermer's specific analyses or conclusions, only that his overarching concept of "economic reasonableness" lacks clear guiding rules and principles. Such considerations may be important in evaluating the reliability of a scientific expert, for instance, but for a knowledge or experience-based expert like Wermers, the relevant inquiry is whether Wermers' opinions are sufficiently based on his specialized knowledge and experience rather than belief or speculation. Oglesby, 190 F.3d at 250.

The Court finds that Wermers' opinions are reliable because he thoroughly articulates his specialized knowledge on the

evaluation of target date funds with supporting citations to peer-reviewed articles and other industry sources, and then he applies that knowledge in evaluating the "economic reasonableness" of the BlackRock TDFs and in criticizing Marin's analyses. Therefore, Wermers does explain how his knowledge and experience leads to his conclusions reached. See Wilson, 484 F.3d at 274; see also Sardis, 10 F.4th at 296 (finding that the *lack* of "facts, test data, or peer-reviewed literature" creates a risk of *ipse dixit*)(emphasis added); Small v. WellDyne, Inc., 927 F.3d 169, 177 (4th Cir. 2019)(same). For that reason, Wermers' conclusions are not *ipse dixit* or mere subjective belief. That Wermers does not utilize a formulaic framework or employ a specific weighting of relevant factors goes to the weight, rather than the admissibility, of his testimony. See Fuller v. SunTrust Banks, Inc., No. 1:11-cv-784, 2019 WL 5448206, at *21 (N.D. Ga. Oct. 3, 2019)(rejecting a similar argument that an analysis of a fund for economic reasonableness was unreliable when it was conducted from the perspective of an economist).

## 2. Whether Latham's "Accepted Fiduciary Practices" Analysis is Based on Reliable Principles and Methods

First, Plaintiffs argue that Latham's testimony is unreliable because her opinions on "accepted fiduciary practices" are based on her work experience with unspecified clients rather than any specified method or discipline recognized within her industry. ECF

18

No. 211 at 21. Her failure to explain *how* her opinions derive from those client experiences, without other guiding industry standards, makes her testimony unreliable according to Plaintiffs. ECF No. 250 at 14.

Genworth raised similar concerns regarding Marin,[5] and the Court held that, in the context of a bench trial, Genworth could challenge the specifics of Marin's experience on cross-examination, and the Court could then determine how much weight to afford the evidence (if any). ECF No. 309 at 18-20; See In re Salem, 465 F.3d 767, 777 (7th Cir. 2006)("[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702."); Quality Plus Services, 2020 WL 239598, at *13. The same will be true for Latham. But at this stage, the Court is satisfied that Latham has the requisite experience to provide reliable experience-based opinions on the topics she addresses.

Second, Plaintiffs claim that Latham's opinions are unreliable and unhelpful *ipse dixit* because she does not rely on any objective, consistent, or rules-based analytical approaches

---

[5] Marin stated that he relies on "standards and criteria that are widely used in the retirement industry and which [he] used throughout [his] career," and he explains that his methods are so common and basic "that it's not something that one would bother writing a research paper about." ECF No. 309 at 14.

for what she calls "accepted fiduciary practices." ECF No. 211 at 21-22. Plaintiffs say that Latham could not articulate what makes a practice "accepted" or not or identify how such practices compared to others in the industry.[6] Id. at 23.

As discussed, formulaic, rules-based standards are not necessary for an expert's opinion to be the product of reliable principles and methods, particularly when the testimony is not scientific in nature. Wilson, 484 F.3d at 274. Latham explains that "there's not a written checklist" of accepted practices and "[p]lan governance structures vary, depending upon the size and culture of the plan sponsor, the type of plan, and other factors." ECF No. 211-6 ("Latham Tr.") 81:8-9; ECF No. 211-1 ("Latham Rpt.") ¶ 15. In other words, "[p]lan governance is not a one-size-fits-all endeavor". Latham Rpt. ¶ 15 "Accepted fiduciary standards" are therefore more akin to general customs rather than a set of specific rules in Latham's view.

Consequently, in her report, Latham reviews the specific practices of the Genworth Committee from the evidentiary record, and explains whether, in her professional experience, those

---

[6] Plaintiffs also say that Latham could not identify "even a single fiduciary action that would fail to satisfy her concept of accepted fiduciary practices." ECF No. 211 at 12. But this statement misconstrues Latham's deposition testimony. She states that she could not recall any unreasonable fiduciary practices with respect to her clients and did not want to speculate regarding practices of plan sponsors or fiduciaries that were not her clients. Latham Tr. 83:13-84:8.

individual practices comport with the typical industry practices she has observed over her decades-long career. Latham is permitted to rely on her experience to testify in that capacity. See, e.g., In re Zetia (Ezetimibe) Antitrust Litigation, No. 2:18-md-2836, 2021 WL 6690348, *7 (E.D Va. Aug. 16, 2021)("Molina applied his experience in the pharmaceutical industry to the facts of the case and reviewed and addressed the opinions of Defendants' experts . . . This is an appropriate methodology for an experiential expert to apply."); Clarendon Regency IV, LLC v. Equinox Clarendon, Inc., No. 1:20-cv-1433, 2022 WL 5101691, at *3 (E.D. Va. Oct. 4, 2022)("an expert *may* testify regarding custom and usage in an industry when pertinent to the factfinder's inquiry."). Plaintiffs' concerns over the objectivity of Latham's opinions and the specific experiences on which she relies can be addressed on cross-examination and with contrary evidence.

### C. Whether Latham and Wermers Reliably Applied Their Principles and Methods to the Facts of the Case

Rule 702(d) requires that "the expert's opinion reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). An expert may violate Rule 702(d) by "cherry-picking" certain data or facts to produce a misleadingly favorable result. See E.E.O.C. v. Freeman, 778 F.3d 463, 469 (4th Cir. 2015)(collecting cases).

21

## 1. Whether Wermers Reliably Applied His Principles and Methods to the Facts of the Case

Plaintiffs argue that Wermers failed to fully consider the IPS in his analysis and relied on other data that was cherry-picked and never relied on by the Plan's fiduciaries. ECF No. 211 at 24; ECF No. 250 at 17. According to Plaintiffs, that makes Wermers' analysis irrelevant to whether the Plan's fiduciaries acted prudently in retaining the BlackRock TDFs. ECF No. 250 at 16. Plaintiffs also claim that Wermers ignored discrepancies between his data and the data presented in materials provided to the Genworth Committee. ECF No. 211 at 24.

Plaintiffs' relevancy argument is addressed in the discussion of Rule 702(a). But even under Rule 702(d), Wermers reliably applies his methods to the facts of the case for the purpose of assessing "economic reasonableness." Had Wermers been retained to offer an opinion on whether the BlackRock TDFs violated the Plan's IPS criteria, a failure to consider all of those criteria would certainly impact the reliability of his analysis. But that is not what Wermers was retained to do. Wermers Tr. 97:16-98:4. Instead, Wermers was primarily retained to offer an opinion on whether the BlackRock TDFs were an "economically reasonable" investment and to rebut Marin's conclusions, particularly those based on his ex-post performance comparisons of the BlackRock TDFs to other funds and benchmarks. Wermers Rpt. ¶¶ 1, 4. Therefore, Plaintiffs'

22

criticisms about "the lack of references to the Plan's Investment Policy Statement does not undermine the reliability of [Wermers'] methodology" because that methodology was not predicated on evaluating the BlackRock TDFs' performance against the IPS's criteria. Garthwait, 2022 WL 3019633, at *13 (holding the same).

For the same reasons, it was not problematic for Wermers to have relied on external data which was not provided to the Genworth Committee. For instance, Wermers looked at third-party analyst ratings of the BlackRock TDFs as well as the BlackRock TDFs' prevalence in the broader retirement plan market to demonstrate that Marin's views on the BlackRock TDFs' performance were not widely held among the industry. Wermers Rpt. ¶ 59. For that purpose, using such data was not irrelevant or unreliable "cherry-picking." [7] And, Plaintiffs' own expert, Marin, also relied on data that was not provided to Genworth's Committee in his evaluation of the performance of the BlackRock TDFs, so Plaintiffs cannot hold Wermers to a double standard. See ECF No. 309 at 24 (describing Marin's Potential Alternative Funds analysis).

Finally, without context, Plaintiffs say that Wermers ignored discrepancies between his data and the data presented to Genworth's Committee. ECF No. 211 at 24. Based on their citations to Wermers'

---

[7] What other plans did may also bear on the question of whether "a hypothetical prudent fiduciary would have made the same decision anyway" for purposes of loss causation. See Tatum v. RJR Pension Inv. Committee, 761 F.3d 346, 357 (4th Cir. 2014).

deposition transcript, Plaintiffs appear to be referring to the data Wermers uses for Table 4 of his report. Wermers Rpt. ¶ 92. In that table, Wermers attempted to (but could not) replicate one of Marin's analyses (Marin's Table 5) using the same Morningstar data that Marin purported to rely on. Wermers Rpt. ¶ 92. So, it would seem appropriate for Wermers to use that data if Plaintiffs' own expert also used it.[8]

In sum, the Court finds that Wermers reliably applied his methodology to the facts of the case.

## 2. Whether Latham Reliably Applied Her Principles and Methods to the Facts of the Case

Plaintiffs argue that Latham failed to sufficiently consider the Plan's IPS in forming her opinions. ECF No. 211 at 25. According to Plaintiffs, Latham stated that the Plan's IPS is merely a non-binding, guiding document even though the Plan's fiduciary counsel provided advice to the Genworth Committee that the IPS was a binding, Plan document. Id.; ECF No. 250 at 17.

Plaintiffs do not dispute that Latham reviewed and relied on the IPS in forming her opinions. Instead, Plaintiffs disagreement

---

[8] Wermers also recreates Marin's peer percentile analysis using data exclusively from Morningstar, rather than a combination of Morningstar data and the data provided to Genworth's Committee, and reaches a different result than Marin applying the same objective frameworks test. Wermers Rpt. ¶ 92. Plaintiffs offer no explanation as to why it is unreliable for Wermers to tweak Marin's analysis, using the same source of data that Marin says he relies on, to point out a flaw. Plaintiffs can dispute the proper interpretation of that analysis and whether it was unreliable at trial if that is their concern.

is over Latham's understanding of the IPS's effect. ECF No. 211 at 25. At Latham's deposition, counsel for Plaintiffs asked Latham whether she disagreed with the general proposition that failure to follow an investment policy statement, as a plan document, would violate a fiduciary's duties. Latham Tr. 142:14-17, 151:14-17. Latham did not disagree, but rather, suggested, that in her experience, policy statements are not typically official plan documents and "plan document or not, . . . the policy statement offers guidelines, and in the case of Genworth, they did follow the objective in the policy statement and they did use it for guidelines." Latham Tr. 149:2-8, 151:19-152:4. But, Latham did acknowledge that a policy statement could be violated if the plan sponsors "disregard[] the objectives built into it." Latham Tr. 143:10-14.

So, from that exchange, the dispute appears to be over what constitutes a violation of the IPS, not whether the IPS is a legally binding plan document or not. That Plaintiffs disagree with Latham's understanding of the IPS's effect does not mean she failed to reliably apply her methods to the facts of the case. The interpretation of the IPS is a factual dispute for which expert testimony will be relevant and helpful. See Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999)("the court need not

determine that the expert testimony . . . is irrefutable or certainly correct.").

### D. Whether The Testimony Is Admissible Under Rule 403

Plaintiffs argue that Wermers' and Latham's testimony should also be excluded under Rule 403 because it threatens to mislead or confuse the issues for the same reasons already discussed. ECF No. 211 at 26.

Rule 403 provides that courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Having found Wermers' and Latham's testimony to be admissible under Rule 702, the Court also finds that their testimony is generally admissible under Rule 403 for the reasons discussed. Moreover, in a bench trial, the risk that an expert's testimony will be unduly confusing or misleading is much lower and excluding evidence under Rule 403 for such reasons is generally not appropriate. See Schultz v. Butcher, 24 F.3d 626, 632 (4th Cir. 1994)("[W]e hold that in the context of a bench trial, evidence should not be excluded under 403 on the ground that it is unfairly prejudicial.").

## CONCLUSION

For the foregoing reasons, the Court finds that both Wermers' and Latham's testimony satisfies the requirements of Rules 702 and 403. Plaintiffs' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF LORIE L. LATHAM AND RUSSELL R. WERMERS, PH.D. (ECF No. 207) will be denied.

It is so ORDERED.

/s/          REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 21, 2024